1

2                    IN THE UNITED STATES DISTRICT COURT

3                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

4                            SAN JOSE DIVISION

5

6

         THERANOS, INC., ET AL,            )   CV-11-5236-PSG
7                                          )
                          PLAINTIFF,       )   SAN JOSE, CALIFORNIA
8                                          )
                 VS.                       )   MARCH 13, 2014
9                                          )
         FUISZ PHARMA, LLC, ET AL,         )   VOLUME 2
10                                         )
                          DEFENDANT        )   PAGES 1-177
11                                         )

12

13                      TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE PAUL S. GREWAL
14                    UNITED STATES DISTRICT JUDGE

15     A P P E A R A N C E S:

16     FOR THE PLAINTIFF:      BOIES, SCHILLER & FLEXNER, LLP
                               BY:  MICHAEL UNDERHILL
17                             5301 WISCONSIN AVENUE, N.W.
                               WASHINGTON, D.C. 20015
18

19     FOR THE DEFENDANT:      PRO SE
                               BY:  JOSEPH MATUS FUISZ
20                             10350 W. BAY HARBOR DRIVE, 8C
                               BAY HARBOR ISLAND, FL 33154
21

22     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
       PRODUCED WITH COMPUTER.
23
                       APPEARANCES CONTINUED ON NEXT PAGE
24

25     OFFICIAL COURT REPORTER:      SUMMER FISHER, CSR, CRR
                                     CERTIFICATE NUMBER 13185

```
 1    FOR THE PLAINTIFF:        BOIES SCHILLER FLEXNER, LLP
                                BY:  DAVID BOIES
 2                                   WILLIAM MARSILLO
                                333 MAIN STREET
 3                              ARMONK, NY 10504

 4    FOR THE PLAINTIFF:        BOIES, SCHILLER & FLEXNER, LLP
                                BY:  MEREDITH DEARBORN
 5                              1999 HARRISON STREET, STE 900
                                OAKLAND, CA 94612
 6

 7    FOR THE DEFENDANT:        ATTORNEY AT LAW
                                BY:  RHONDA ANDERSON
 8                              2655 LEJUNE RD, STE 540
                                CORAL GABLES, FL 33134
 9

10    FOR THE DEFENDANT:        PRO SE
                                BY:  RICHARD CARL FUISZ
11                              1238 COLDWATER CANYON DRIVE
                                BEVERLY HILLS, CA 90210
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          INDEX OF WITNESSES

2        PLAINTIFF'S

3        **GEORGE SCHULTZ**
               DIRECT EXAM BY BY. BOIES              P. 88
4              CROSS-EXAM BY MS. ANDERSON            P. 96

5

6        **CHANNING ROBERTSON**
               DIRECT EXAM BY MR. BOIES             P. 100, 114
7              VOIR DIRE BY MS. ANDERSON            P. 109

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXHIBITS

| | MARKED | ADMITTED |
|---|---|---|

PLAINTIFF'S

| 2 | | P. 134 |
| 3 | | P. 134 |
| 4 | | P. 134 |
| 5 | | P. 135 |

```
 1    SAN JOSE, CALIFORNIA                    MARCH 13, 2014

 2                    P R O C E E D I N G S

 3       (WHEREUPON, COURT CONVENED AND THE FOLLOWING PROCEEDINGS

 4    WERE HELD:)

 5              (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD OUT

 6    OF THE PRESENCE OF THE JURY:)

 7              THE COURT:  MR. RIVERA WOULD YOU PLEASE CALL THE

 8    MATTER SET FOR TRIAL.

 9              THE CLERK:  YES, YOUR HONOR CALLING THERANOS, INC.,

10    ET AL VERSUS FUISZ PHARMA, LLC, ET AL.  CV-11-5236-PSG.

11         MATTER ON FOR TRIAL.  PLEASE STATE YOUR APPEARANCES.

12         MR. BOIES:  GOOD MORNING, YOUR HONOR.

13       DAVID BOIES FOR THE PLAINTIFFS TOGETHER WITH MR. UNDERHILL

14    AND MS. DEARBORN AND OUR CLIENT WHO IS ALSO PRESENT.

15              THE COURT:  GOOD MORNING.

16         MR. J. FUISZ:  GOOD MORNING, YOUR HONOR.

17       JOE FUISZ PRO SE.

18         MS. ANDERSON:  GOOD MORNING, YOUR HONOR.

19       RHONDA ANDERSON ON BEHALF OF FUISZ PHARMA.

20         MS. BALTA:  GOOD MORNING, YOUR HONOR.

21       ATHINA BALTA.

22         MR. R. FUISZ:  AND RICHARD FUISZ, PRO SE.

23         THE COURT:  GOOD MORNING TO EACH OF YOU AS WELL.

24       LET ME APOLOGIZE FOR OUR SLIGHT DELAY, SOMETIMES MY

25    CRIMINAL MATTERS DO TAKE UP SOME TIME SO ALL THAT I CAN SAY IS
```

1    BE PREPARED FOR THAT KIND OF DELAY IN THE DAYS TO COME.

2        I WANTED TO BEGIN BY FIRST OF ALL CONFIRMING THAT THERE

3    ARE NO DISPUTES REGARDING DOCUMENTS OR OPENING STATEMENTS

4    ANYTHING LIKE THAT.  IT APPEARS YOU ARE ALL READY TO GO

5            MR. BOIES:  I THINK WE ARE YOUR HONOR.

6            THE COURT:  OKAY.  I HAVE A COUPLE OF ISSUES I WANTED

7    TO RAISE BRIEFLY.

8        THE FIRST HAS TO DO WITH SOME PRELIMINARY JURY INSTRUCTIONS

9    I POSTED ON THE DOCKET LAST NIGHT.  ABSENT ANY OBJECTION, I

10   TAKE IT I MAY PROVIDE THESE INSTRUCTIONS?

11           MR. BOIES:  YES, YOUR HONOR.

12           MS. ANDERSON:  YES, YOUR HONOR.

13           THE COURT:  OKAY.  TERRIFIC.

14       ONE LAST ISSUE THAT I REGRET NOT RAISING WITH YOU ALL AT

15   THE FINAL PRETRIAL CONFERENCE, THIS HAS TO DO WITH QUESTIONS BY

16   JURORS.

17       IN THE PAST I HAVE PERMITTED AND INDEED ENCOURAGED JURORS

18   TO ASK QUESTIONS AT THE CONCLUSION OF THE WITNESS EXAMINATIONS.

19   THE WAY THIS WORKS PROCEDURALLY IS THAT THE JURORS HAVE PIECES

20   OF PAPER OR NOTE PAD AT THEIR SEATS.

21       ONCE THE FINAL CROSS-EXAMINATION OR FINAL REBUTTAL

22   DIRECT-EXAMINATION IS COMPLETED I WILL TURN TO THE JURY, ASK

23   THEM WHETHER THEY HAVE ANY QUESTIONS AND IF THEY HAVE ANY SUCH

24   QUESTIONS WE WILL PUT THEM ON THE PIECE OF PAPER, MR. RIVERA

25   WILL BRING THEM OVER TO ME.

```
1              BEFORE I ASK THE QUESTIONS OF THE WITNESS I WILL CALL
2    COUNSEL AND THE PARTIES TO SIDE BAR.  WE WILL REVIEW THEM, YOU
3    CAN RAISE ANY OBJECTIONS AND IN THAT FASHION THE PROCEDURE IS
4    PRESERVED.
5              I THINK IT'S A GOOD PRACTICE AND A HEALTHY PRACTICE TO
6    ENGAGE THE JURY BUT I ALWAYS GIVE COUNSEL AND THE PARTIES AN
7    OPPORTUNITY TO WEIGH IT, ANY OBJECTION TO THIS
8              MR. BOIES:  NO, YOUR HONOR.
9              MR. J. FUISZ:  NO, YOUR HONOR.
10             THE COURT:  OKAY.  I HAVE AN INSTRUCTION THAT WILL
11   EXPLAIN THIS TO THE JURY AS WELL.  THIS WAS NOT INCLUDED IN THE
12   PRELIMINARY JURY INSTRUCTIONS THIS WHICH FROM MODEL INSTRUCTION
13   1.15 FROM THE NINTH CIRCUIT.  THIS JUST EXPLAINS TO THE JURY
14   HOW WRITTEN QUESTIONS BY JURORS WORKS.
15             ANY OBJECTION TO MY INCLUDING THIS IN THE SET?
16             MR. BOIES:  NO, YOUR HONOR.
17             MR. J. FUISZ:  NO.
18             THE COURT:  OKAY.  TERRIFIC.  ALL RIGHT.  UNLESS
19   THERE'S ANYTHING FURTHER LET'S BRING THE JURY IN MR. RIVERA,
20   AND LET'S GET STARTED.
21             (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN THE
22   PRESENCE OF THE JURY:)
23             THE COURT:  GOOD MORNING LADIES AND GENTLEMAN, LET ME
24   EXPLAIN THE FIRST ITEM OF BUSINESS IS THAT WE STAND FOR YOU SO
25   UNTIL YOU SIT, WE CAN'T.  PLEASE BE SEATED.
```

1    GOOD MORNING AGAIN LADIES AND GENTLEMEN, I HOPE YOU HAD A

2    GOOD EVENING.  AS YOU WILL RECALL FROM THE FINAL MINUTES OF

3    YESTERDAY AFTERNOON WE ARE NOW READY TO PROCEED WITH THE TRIAL

4    IN THIS CASE.  BEFORE WE BEGIN WITH OPENING STATEMENTS FROM

5    EACH PARTY, I HAVE A NUMBER OF PRELIMINARY INSTRUCTIONS THAT

6    ARE GOING TO GUIDE AND ASSIST YOU THROUGHOUT THIS TRIAL.

7    AS I MENTIONED YESTERDAY AT THE CONCLUSION OF THE TRIAL I

8    WILL HAVE A MUCH RICHER SET OF FINAL INSTRUCTIONS THAT WILL

9    SPECIFICALLY GUIDE YOUR DELIBERATIONS BUT I PROVIDE YOU THESE

10   PRELIMINARY INSTRUCTIONS IN THE HOPE THAT THEY WILL BENEFIT YOU

11   AS THE CASE PROCEEDS.

12   LADIES AND GENTLEMEN, YOU ARE NOW THE JURY IN THIS CASE,

13   AND IT IS MY DUTY TOW INSTRUCT YOU ON THE LAW.  THESE

14   INSTRUCTIONS ARE PRELIMINARY INSTRUCTIONS TO HELP YOU

15   UNDERSTAND THE PRINCIPLE THAT IS APPLY TO CIVIL TRIALS AND TO

16   HELP YOU UNDERSTAND THE EVIDENCE AS YOU LYNCH TO IT.  YOU WILL

17   BE ALLOWED TO KEEP THIS SET THROUGHOUT THE TRIAL TO WHICH TO

18   REFER.  THIS SET OF INSTRUCTIONS IS NOT TO BE TAKEN HOME AND

19   MUST REMAIN IN THE JURY ROOM WHEN YOU LEAVE IN THE EVENINGS.

20   AT THE END OF THE TRIAL I WILL GIVE YOU A FINAL SET OF

21   INSTRUCTIONS.  IT IS THE FINAL SET OF INSTRUCTIONS WHICH WILL

22   GOVERN YOUR DELIBERATIONS.

23   YOU MUST NOT INFER FROM THESE INSTRUCTIONS OR FROM

24   ANYTHING I MAY SAY OR DO AS INDICATING THAT I HAVE AN OPINION

25   REGARDING THE EVIDENCE OR WHAT YOUR VERDICT SHOULD BE.

1        IT IS YOUR DUTY TOW FIND THE FACTS FROM ALL THE EVIDENCE

2    IN THIS CASE.  TO THOSE FACTS YOU WILL APPLY THE LAW AS I GIVE

3    IT TO YOU.  YOU MUST FOLLOW THE LAW AS I GIVE IT TO YOU WHETHER

4    YOU AGREE WITH IT OR NOT.

5        AND YOU MUST NOT BE INFLUENCED BY ANY PERSONAL LIKES OR

6    DISLIKES, OPINIONS, PREJUDICES OR SYMPATHY.

7        THAT MEANS YOU MUST DECIDE THE CASE SOLELY ON IT IS

8    EVIDENCE BEFORE YOU.  YOU WILL RECALL THAT YOU TOOK AN OATH TO

9    DO SO.  IN FOLLOWING MY INSTRUCTIONS YOU MUST FOLLOW ALL OF

10   THEM AND NOT SINGLE OUT SOME AND IGNORE OTHERS.  THEY ARE ALL

11   IMPORTANT.

12       THIS CASE INVOLVES THE DISPUTE RELATING TO A

13   UNITED STATES PATENT.  BEFORE SUMMARIZING THE POSITIONS OF THE

14   PARTIES AND THE LEGAL ISSUES INVOLVED IN THE DISPUTE LET ME

15   TAKE A MOMENT TO EXPLAIN WHAT A PATENT IS AND HOW ONE IS

16   OBTAINED.

17       PATENTS ARE GRANTED BY THE UNITED STATES PATENT AND

18   TRADEMARK OFFICE SOMETIMES CALLED THE PTO.  THE PROCESS OF

19   OBTAINING A PATENT IS CALLED PATENT PROSECUTION.  A VALID

20   UNITED STATES PATENT GIVES A PATENT HOLDER THE RIGHT FOR UP TO

21   20 YEARS FROM THE DATE OF THE PATENT APPLICATION WAS FILED TO

22   PREVENT OTHERS FROM MAKING, USING, OFFERING TO SELL OR SELLING

23   THE PATENTED INVENTION WITHIN THE UNITED STATES OR FROM

24   IMPORTING IT INTO THE UNITED STATES WITHOUT THE PATENT HOLDER'S

25   PERMISSION.

1       TO OBTAIN A PATENT ONE MUST FILE AN APPLICATION WITH THE

2   PTO.  THE PTO IS AN AGENCY OF THE FEDERAL GOVERNMENT AND

3   EMPLOYS TRAINED EMPLOYERS WHO REVIEW APPLICATIONS FOR PATENTS.

4   THE APPLICATION INCLUDES WHAT IS CALLED A SPECULATION WHICH

5   MUST CONTAIN A WRITTEN DESCRIPTION OF THE CLAIMED INVENTION

6   TELLING WHAT THE INVENTION IS HOW IT WORKS HOW TO MAKE IT AND

7   HOW TO USE IT SO OTHERS SKILLED IN THE FIELD WILL KNOW HOW TO

8   MAKE OUR USE IT PARAGRAPH THE SPECIFICATION INCLUDES ONE OR

9   MORE NUMBERED SENTENCES.  THESE ARE THE PATENT CLAIMS.  WHEN

10  THE PATENT IS EVENTUALLY GRANTED BY THE PTO, THE CLAIMS DEFINE

11  THE BOUNDARIES OF ITS PROTECTIONS AND GIVE NOTICE TO THE PUBLIC

12  OF THOSE BOUNDARIES.

13      AFTER THE APPLICANTS THE APPLICATION THE EXAMINER REVIEWS

14  THE APPLICATION TO DETERMINE WHETHER OR NOT THE CLAIMS ARE

15  PATENTABLE OR APPROPRIATE FOR PATENT PROTECTION AND WHETHER OR

16  NOT THE SPECIFICATION ADEQUATELY DESCRIBES THE INVENTION

17  CLAIMED.

18      IN EXAMPLING A PATENT APPLICATION THE EXAMINER REVIEWS

19  CERTAIN INFORMATION ABOUT THE STATE OF THE TECHNOLOGY AT R AT

20  THE TIME THE APPLICATION WAS FILED.  THE PTO SEARCHES FOR AND

21  REVIEWS INFORMATION THAT IS PUBLICLY AVAILABLE OR THAT IS

22  SUBMITTED BY THE APPLICANT.

23      THIS INFORMATION IS CALLED PRIOR ART.  THE EXAMINER

24  REVIEWS THIS PRIOR ART TO DETERMINE WHETHER OR NOT THE

25  INVENTION IS TRULY AN ADVANCE OR THE STATE OF THE ART AT THE

1    TIME.

2          PRIOR ART IS DEFINED BY LAW AND I WILL GIVE YOU AT A

3    LATER TIME DURING THESE INSTRUCTIONS SPECIFIC INSTRUCTIONS AS

4    TO WHAT CONSTITUTES PRIOR ART.  HOWEVER, IN GENERAL PRIOR ART

5    INCLUDES INFORMATION THAT DEMONSTRATES THE STATE OF TECHNOLOGY

6    THAT EXISTED BEFORE THE CLAIMED INVENTION WAS MADE OR BEFORE

7    THE APPLICATION WAS FILED.

8          A PATENT LISTS THE PRIOR ART THE EXAMINER CONSIDERED THIS

9    LIST IS CALLED THE CITED REFERENCES.

10          AFTER THE PRIOR ART SEARCH AN EXAMINATION OF THE

11    APPLICATION THE EXAMINER INFORMS THE APPLICANT IN WRITING OF

12    WHAT THE EXAMINER HAS FOUND AND WHETHER THE EXAMINER CONSIDERS

13    ANY CLAIM TO BE PATENTABLE AND THUS WOULD BE ALLOWED.

14          THIS WRITING FROM THE EXAMINER IS CALLED AN OFFICE

15    ACTION.  IF THE EXAMINER REJECTS THE CLAIMS, THE APPLICANT HAS

16    AN OPPORTUNITY TO RESPOND TO THE EXAMINER TO TRY TO PERSUADE

17    THE EXAMINER TO ALLOW THE CLAIMS AND TO CHANGE THE CLAIMS OR TO

18    SUBMIT NEW CLAIMS.

19          THIS PROCESS MAY GO BACK AND FORTH FOR SOME TIME UNTIL

20    THE EXAMINER IS SATISFIED THAT THE APPLICATION MEETS THE

21    REQUIREMENTS FOR A PATENT AND THE APPLICATION ISSUES AS A

22    PATENT.

23          OR THAT THE APPLICATION SHOULD BE REJECTED AND NO PATENT

24    SHOULD ISSUE.

25          SOMETIMES PATENTS ARE ISSUED AFTER APPEALS WITHIN THE PTO

1    OR TO A COURT.  THE PAPERS GENERATED DURING THESE

2    COMMUNICATIONS BETWEEN THE EXAMINER AND THE APPLICANT ARE

3    CALLED THE PROSECUTION HISTORY.  THE FACT THAT THE PTO GRANTS A

4    PATENT DOES NOT NECESSARILY MEAN THAT ANY INVENTION CLAIMED IN

5    THE PATENT IN FACT DESERVES THE PROTECTION OF A PATENT.

6         FOR EXAMPLE, THE PTO MAY NOT HAVE HAD AVAILABLE TO IT ALL

7    OTHER PRIOR ART THAT WILL BE PRESENTED TO YOU.  IT IS YOUR JOB

8    TO CONSIDER THE EVIDENCE PRESENTED BY THE PARTIES AND DETERMINE

9    INDEPENDENTLY WHETHER OR NOT THERANOS HAS PROVEN THAT IS PATENT

10   IN THIS CASE IS VALID.

11        TO HELP YOU FOLLOW THE EVIDENCE I WILL NOW SUMMARIZE THE

12   POSITIONS OF THE PARTIES.  THE PARTIES IN THIS CASE ARE

13   ELIZABETH HOLMES AND THERANOS INC. AS PLAINTIFFS.  AND RICHARD

14   FUISZ AND JOSEPH FUISZ AND FUISZ PHARMA LLC, AS DEFENDANTS.

15        FOR SIMPLICITY I WILL REFER TO THE PLAINTIFFS

16   COLLECTIVELY AS THERANOS AND THE DEFENDANTS COLLECTIVELY AS THE

17   FUISZ PARTIES.

18        THE CASE INVOLVES UNITED STATES PATENT OBTAINED BY JOHN

19   FUISZ AND JOSEPH FUISZ AND TRANSFERRED BY RICHARD FUISZ AND

20   JOSEPH FUISZ TO FUISZ PHARMA LLC.  THE PATENT IS UNITED STATES

21   PATENT NUMBER 7824, 612 WHICH LISTS RICHARD AND JOSEPH FUISZ AS

22   INVENTORS.

23        FOR CONVENIENCE THE PARTIES AND I WILL OFTEN REFER TO

24   THIS PATENT AS THE 612 OR '612 PATENT.  612 OR 612 BEING THE

25   LAST THREE DIGITS OF ITS PATENT NUMBER.

1        THERANOS FILED SUIT IN THIS COURT SEEKING TO CORRECT THE

2    IDENTIFICATION OF INVENTORS ON THE '612 PATENT.  THERANOS

3    CONTENDS THAT ELIZABETH HOLMES AND TIMOTHY KEMP ARE THE TRUE

4    INVENTORS OF THE SUBJECT MATTER CLAIMED IN THE '612 PATENT AND

5    THAT RICHARD FUISZ AND JOSEPH FUISZ USED THERANOS'S SECRET

6    INFORMATION TO PREPARE AND PROSECUTE THE APPLICATION FOR THE

7    '612 PATENT.

8        ACCORDINGLY THERANOS SEEKS TO CORRECT THE '612 PATENT TO

9    ADD ELIZABETH HOLMES AND TIMOTHY KEMP AS INVENTORS AND TO

10   REMOVE RICHARD FUISZ AND JOSEPH FUISZ AS NAMED INVENTORS.

11       THERANOS ALSO CONTENDS THE '612 PATENT IS INVALID BECAUSE

12   IT IS OBVIOUS OVER THE PRIOR ART.  INCLUDING THERANOS'S OWN

13   PATENTS, PATENT APPLICATIONS AND OTHER MATERIALS THAT QUALIFY

14   AS PRIOR ART UNDER THE LAW.

15       SPECIFICALLY, THERANOS ARGUES THAT THE PTO DID NOT

16   EVALUATE WHETHER THE '612 PATENT SHOULD ISSUE IN LIGHT OF THE

17   THERANOS PROVISIONALS AND OTHER PRIOR ART TO THE '612 PATENT,

18   AND THAT THE '612 PATENT SHOULD BE FOUND INVALID IN LIGHT OF

19   THIS PRIOR ART.

20       ADDITIONALLY THERANOS CONTENDS THAT THE '612 PATENT IS

21   UNENFORCEABLE DUE TO INEQUITABLE CONDUCT COMMITTED BY RICHARD

22   FUISZ AND JOSEPH FUISZ, DURING THE PROSECUTION OF THE '612

23   PATENT BEFORE THE PTO.

24       SPECIFICALLY, THERANOS ARGUES THAT THE FUISZ'S

25   DELIBERATELY WITHHELD INFORMATION FROM THE PTO AND PROVIDED

1    INCORRECT INFORMATION TO THE PTO.

2         FINALLY, THERANOS CONTENDS THAT THE FUISZ PARTIES WERE

3    UNJUSTLY ENRICHED AT THERANOS'S EXPENSE BY WRONGFULLY OBTAINING

4    THE '612 PATENT ONLY IN THE NAMES OF RICHARD AND JOSEPH FUISZ.

5         THE FUISZES DENY THESE CLAIMS.  YOUR JOB WILL BE TO

6    DECIDE WHETHER ELIZABETH HOLMES AND TIMOTHY KEMP ARE THE

7    INVENTORS OF THE SUBJECT MATTER CLAIMED IN THE '612 PATENT,

8    WHETHER RICHARD AND JOSEPH FUISZ SHOULD BE REMOVED AS

9    INVENTORS, WHETHER ANY AND ALL CLAIMS OF THE '612 PATENT ARE

10   INVALID IN LIGHT OF THE PRIOR ART OR ENFORCEABLE UNDER THE

11   INEQUITABLE PARTY OR WHETHER THE PARTIES HAVE BEEN UNJUSTLY

12   ENRICHED.

13        BEFORE YOU DECIDE THE QUESTION OF INVENTORS SHIP AND THE

14   INVALIDITY YOU EIGHT NEED TO UNDERSTAND THE PATENT CLAIMS.  AS

15   I MENTION PATENT CLAIMED ARE NUMBERED SENTENCES AT THE END OF

16   THE PATENT THAT DESCRIBE THE BOUNDARIES OF THE PATENT'S

17   PROTECTIONS.

18        IT IS MY JOB AS JUDGE TO EXPLAIN TO YOU THE MEANING OF

19   ANY LANGUAGE IN THE CLAIMS THAT NEEDS INTERPRETATION.  I HAVE

20   ALREADY DETERMINED THE MEANING OF CERTAIN TERMS OF THE CLAIMS

21   OF THE '612 PATENT.  YOU HAVE BEEN GIVEN A DOCUMENT REFLECTING

22   THOSE MEANINGS.

23        YOU ARE TO APPLY MY DEFINITIONS OF THESE TERMS THROUGHOUT

24   THIS CASE.  HOWEVER, MY INTERPRETATION OF THE LANGUAGE OF THE

25   CLAIMS SHOULD NOT BE TAKEN AS AN INDICATION THAT I HAVE A VIEW

1    REGARDING ISSUES SUCH AS INVENTORSHIP AND INVALIDITY.  THOSE

2    ISSUES ARE YOURS TO DECIDE.  I WILL PROVIDE YOU WITH MORE

3    DETAILED INSTRUCTIONS ON THE MEANING OF THE CLAIMS BEFORE YOU

4    RETIRE TO DELIBERATE YOUR VERDICT.

5        THE EVIDENCE YOU ARE TO CONSIDER IN DECIDING WHAT THE

6    FACTS ARE CONSISTS OF ONE, THE SWORN TESTIMONY OF ANY WITNESS.

7        TWO, THE EXHIBITS WHICH ARE RECEIVED INTO EVIDENCE.

8        AND THREE, ANY FACTS TO WHICH THE LAWYERS HAVE AGREED.

9        IN REACHING YOUR VERDICT, YOU MAY CONSIDER ONLY THE SWORN

10   TESTIMONY OF WITNESSES AND EXHIBITS RECEIVED INTO EVIDENCE OR

11   FACTS TO WHICH THE LAWYERS HAVE AGREED.  CERTAIN THINGS ARE NOT

12   EVIDENCE AND YOU MAY NOT CONSIDER THEM IN DECIDING WHAT THE

13   FACTS ARE.

14       ONE, ARGUMENTS AND STATEMENTS BY LAWYERS OR BY DOCTOR AND

15   MR. FUISZ ACTING AS THEIR OWN LEGAL REPRESENTATIVES ARE NOT

16   EVIDENCE.  BECAUSE THE FUISZES REPRESENT THEMSELVES IN THIS

17   PROCEEDING, ONLY CERTAIN STATEMENTS MADE BY THEM CONSTITUTE

18   EVIDENCE.  WHEN THE FUISZES ARE WITNESSES AT THIS TRIAL AND

19   OFFER SWORN TESTIMONY, THAT TESTIMONY CONSTITUTES EVIDENCE.

20       THE FUISZ'S QUESTIONS ARGUMENTS OR OBJECTIONS WHEN NOT ON

21   THE WITNESS STAND ARE NOT EVIDENCE.  THE LAWYERS ARE ALSO NOT

22   WITNESSES.  WHAT THE PARTIES HAVE SAID IN THEIR OPENING

23   STATEMENTS, WILL SAY IN THEIR CLOSING ARGUMENTS AND AT OTHER

24   TIMES IS INTENDED TO HELP YOU INTERPRET THE EVIDENCE BUT IT IS

25   NOT EVIDENCE.

```
 1            IF THE FACTS AS YOU REMEMBER THEM DIFFER FROM THE WAY THE

 2     LAWYERS OR LEGAL REPRESENTATIVES HAVE STATED THEM, YOUR MEMORY

 3     OF THEM CONTROLS.

 4            TWO, QUESTIONS AND OBJECTIONS BY LEGAL REPRESENTATIVES

 5     ARE NOT EVIDENCE.  ATTORNEYS AND LEGAL REPRESENTATIVES HAVE A

 6     DUTY TO THEIR CLIENTS TO OBJECT WHEN THEY BELIEVE A QUESTION IS

 7     IMPROPER UNDER THE RULES OF EVIDENCE.

 8            YOU SHOULDN'T BE INFLUENCED BY THE OBJECTION OR BY THE

 9     COURT'S RULING ON IT.

10            THREE, TESTIMONY THAT HAS BEEN EXCLUDED OR STRICKEN OR

11     THAT YOU HAVE BEEN INSTRUCTED TO DISREGARD IS NOT EVIDENCE AND

12     MUST NOT BE CONSIDERED.

13            FOUR, ANYTHING YOU MAY HAVE SEEN OR HEARD WHEN THE COURT

14     WAS NOT IN SESSION IS NOT EVIDENCE.  YOU ARE TO DECIDE THE CASE

15     SOLELY ON IT IS EVIDENCE RECEIVED AT TRIAL.

16            SOME EVIDENCE MAY BE ADMITTED FOR A LIMITED PURPOSE ONLY.

17     IF I INSTRUCT YOU THAT AN ITEM OF EVIDENCE HAS BEEN ADMITTED

18     FOR A LIMITED PURPOSE, YOU MUST CONSIDER IT ONLY FOR THAT

19     LIMITED PURPOSE AND FOR NO OTHER.

20            EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL.  DIRECT

21     EVIDENCE IS DIRECT PROOF OF A FACT SUCH AS TESTIMONY BY A

22     WITNESS ABOUT WHAT THE WITNESS PERSONALLY SAW OR HEARD OR DID.

23            CIRCUMSTANTIAL EVIDENCE IS THE PROOF OF ONE OR MORE FACTS

24     FROM WHICH YOU COULD FIND ANOTHER FACT.  YOU SHOULD CONSIDER

25     BOTH KINDS OF EVIDENCE, THE LAW MAKES NO DISTINCTION BETWEEN
```

1    THE WEIGHT TO BE GIVEN TO EITHER DIRECT OR CIRCUMSTANTIAL

2    EVIDENCE.  IT IS FOR YOU TO DECIDE HOW MUCH WEIGHT TO GIVE TO

3    ANY EVIDENCE.

4         BY WAY OF AN EXAMPLE, IF YOU WAKE UP IN THE MORNING AND

5    YOU SEE THAT THE SIDEWALK IS WET, YOU MAY FIND FROM THAT FACT

6    THAT IT RAINED DURING THE NIGHT.

7         HOWEVER, OTHER EVIDENCE SUCH AS A TURNED ON GARDEN HOSE

8    MAY PROVIDE A DIFFERENT EXPLANATION FOR THE PRESENCE OF WATER

9    ON THE SIDEWALK.

10        THEREFORE, BEFORE YOU DECIDE THAT A FACT HAS BEEN PROVED

11   BY CIRCUMSTANTIAL EVIDENCE, YOU MUST CONSIDER ALL THE EVIDENCE

12   IN THE LIGHT OF REASON, EXPERIENCE AND COMMON SENSE.

13        THE TRIAL WILL NOW BEGIN.  FIRST EACH SIDE MAY MAKE AN

14   OPENING STATEMENT.  AN OPENING STATEMENT IS NOT EVIDENCE.  IT

15   IS SIMPLY AN OUTLINE TO HELP YOU UNDERSTAND WHAT THAT PARTY

16   EXPECTS THE EVIDENCE WILL SHOW.  PRESENTATION OF EVIDENCE WILL

17   THEN BEGIN.  WITNESSES WILL TAKE THIS WITNESS STAND AND THE

18   DOCUMENTS WILL BE OFFERED AND ADMITTED INTO EVIDENCE.

19        THERANOS WILL PRESENT ITS EVIDENCE ON ITS CONTENTION THAT

20   MS. HOLMES AND MR. KEMP ARE THE TRUE INVENTORS OF THE SUBJECT

21   MATTER OF THE CLAIMS OF THE '612 PATENT, THAT THE FUISZES ARE

22   NOT PROPERLY NAMED AS INVENTORS, THAT THE CLAIMS OF THE '612

23   PATENT ARE INVALID AND UN ENFORCEABLE AND THE FUISZ PARTIES

24   HAVE BEEN UNJUSTLY ENRICHED BY SECURING THE '612 PATENT.

25        AFTER THERANOS PRESENTS ITS WITNESSES THE FUISZ PARTIES

1    WILL CALL THEIR WITNESSES WHO WILL ALSO BE EXAMINED AND

2    CROSS-EXAMINED.  THE FUISZ PARTIES WILL PUT ON EVIDENCE

3    RESPONDING TO THERANOS'S CONTENTIONS.  THERANOS WILL THEN

4    RETURN AND HAVE THE OPTION TO PUT ON WHAT IS REFERRED TO AS

5    REBUTTAL EVIDENCE TO ANY EVIDENCE OFFERED BY THE FUISZ PARTIES.

6         BECAUSE THE EVIDENCE IS INTRODUCED PIECEMEAL, IT IS

7    IMPORTANT TO KEEP AN OPEN MIND AS THE EVIDENCE COMES IN AND

8    WAIT FOR ALL THE EVIDENCE BEFORE YOU MAKE ANY DECISIONS.  IN

9    OTHER WORDS, YOU SHOULD KEEP AN OPEN MIND THROUGHOUT THE ENTIRE

10   TRIAL.

11        THE PARTIES MAY PRESENT THE TESTIMONY OF A WITNESS BY

12   READING FROM HIS OR HER DEPOSITION TRANSCRIPT OR PLAYING A

13   VIDEO TAPE OF THE WITNESS'S DEPOSITION TESTIMONY.  A DEPOSITION

14   IS THE SWORN TESTIMONY OF A WITNESS TAKEN BEFORE TRIAL AND IS

15   ENTITLED TO THE SAME CONSIDERATION AS IF THE WITNESS HAD

16   TESTIFIED AT TRIAL.

17        THERE ARE RULES OF EVIDENCE THAT CONTROL WHAT CAN BE

18   RECEIVED INTO EVIDENCE.  WHEN A LAWYER ASKS A QUESTION OR

19   OFFERS AN EXHIBIT INTO EVIDENCE, AND THE LAWYER ON THE OTHER

20   SIDE THINKS IT IS NOT PERMITTED BY THE RULES OF EVIDENCE, THAT

21   LAWYER MAY OBJECT.

22        IF I OVERRULE THE OBJECTION, THE QUESTION MAY BE ANSWERED

23   OR THE EXHIBIT RECEIVED.  IF I SUSTAIN THE OBJECTION, THE

24   QUESTION CANNOT BE ANSWERED AND THE EXHIBIT CANNOT BE RECEIVED.

25        WHENEVER I SUSTAIN AN OBJECTION TO A QUESTION, YOU MUST

1    IGNORE THE QUESTION AND MUST NOT GUESS WHAT THE ANSWER MIGHT

2    HAVE BEEN.

3          SOMETIMES I MAY ORDER THAT EVIDENCE BE STRICKEN FROM THE

4    RECORD AND THAT YOU DISREGARD OR IGNORE THE EVIDENCE.  THAT

5    MEANS THAT WHEN YOU ARE DECIDING THE CASE, YOU MUST NOT

6    CONSIDER THE EVIDENCE THAT I TOLD YOU TO DISREGARD.

7          IN DECIDING THE FACTS IN THIS CASE, YOU MAY HAVE TO

8    DECIDE WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO

9    BELIEVE.  YOU MAY BELIEVE EVERYTHING A WITNESS SAYS OR PART OF

10   IT OR NONE OF IT.  PROOF OF A FACT DOESN'T NECESSARILY DEPEND

11   ON THE NUMBER OF WITNESSES WHO TESTIFY ABOUT IT.

12         IN CONSIDERING THE TESTIMONY OF ANY WITNESS, YOU MUST

13   TAKE INTO ACCOUNT ONE, THE OPPORTUNITY AND ABILITY OF A WITNESS

14   TO SEE OR HEAR OR KNOW THE THINGS TESTIFIED TO.

15         TWO, THE WITNESS'S MEMORY.

16         THREE, THE WITNESS'S MANNER WHILE TESTIFYING.

17         FOUR, THE WITNESS'S INTEREST IN THE OUTCOME OF THE CASE

18   AND ANY BIAS AND PREJUDICE.

19         FIVE, WHETHER OTHER EVIDENCE CONTRADICTED THE WITNESS'S

20   TESTIMONY.

21         SIX, THE REASONABLENESS OF THE WITNESS'S TESTIMONY IN

22   LIGHT OF ALL THE EVIDENCE.

23         AND SEVEN, ANY OTHER FACTORS THAT BEAR ON BELIEVABILITY.

24         THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES NOT

25   NECESSARILY DEPEND ON THE NUMBER OF WITNESSES WHO TESTIFY ABOUT

1    IT.

2         I WILL NOW SAY A FEW WORDS ABOUT YOUR CONDUCT AS JURORS.

3    FIRST, KEEP AN OPEN MIND THROUGHOUT THE TRIAL AND DO NOT DECIDE

4    WHAT THE VERDICT SHOULD BE UNTIL YOU AND YOUR FELLOW JURORS

5    HAVE COMPLETED YOUR DELIBERATIONS AT THE END OF THE CASE.

6         SECOND, BECAUSE YOU MUST DECIDE THIS CASE BASED ONLY ON

7    THE EVIDENCE RECEIVED IN THE CASE AND ON MY INSTRUCTIONS AS TO

8    THE LAW THAT APPLIES, YOU MUST NOT BE EXPOSED TO ANY OTHER

9    INFORMATION ABOUT THE CASE OR TO THE ISSUES IT INVOLVES DURING

10   THE COURSE OF YOUR JURY DUTY.  THUS UNTIL THE END OF THE CASE

11   OR UNLESS I TELL YOU OTHERWISE, DO NOT COMMUNICATE WITH ANYONE

12   IN ANY WAY AND DO NOT LET ANYONE ELSE COMMUNICATE WITH YOU IN

13   ANY WAY ABOUT THE MERITS OF THE CASE, OR ANYTHING TO DO WITH

14   IT.

15        THIS INCLUDES DISCUSSING THE CASE IN PERSON, IN WRITING

16   BY PHONE OR ELECTRONIC MEANS BY E-MAIL, TEXT MESSAGING OR

17   INTERNET CHAT ROOM, BLOG, WEBSITE OR ANY FEATURE AND LET ME

18   ALSO THROUGH SOCIAL NETWORKS.

19        THIS APPLIES TO COMMUNICATING WITH YOUR FELLOW JURORS

20   ABOUT THE CASE UNTIL I GIVE YOU THE CASE FOR DELIBERATION AND

21   IT APPLIES TO COMMUNICATING WITH EVERYBODY ELSE INCLUDING YOUR

22   FAMILY MEMBERS YOUR EMPLOYER THE MEDIA OR PRESS AND THE PEOPLE

23   INVOLVED IN THE TRIAL.  ALTHOUGH YOU MAY NOTIFY YOUR FAMILY AND

24   YOUR EMPLOYER THAT YOU HAVE BEEN SEATED AS A JUROR IN THIS

25   CASE.

```
 1              BUT, AND THIS IS VERY IMPORTANT, IF YOU ARE ASKED OR

 2      APPROACHED IN ANY WAY ABOUT YOUR JURY SERVICE OR ANYTHING ABOUT

 3      THIS CASE, YOU MUST RESPOND THAT YOU HAVE BEEN ORDERED NOT TO

 4      DISCUSS THE MATTER AND TO REPORT THE CONDUCT TO THE COURT.

 5              BECAUSE YOU WILL RECEIVE ALL THE EVIDENCE AND LEGAL

 6      INSTRUCTION YOU PROPERLY MAY CONSIDER TO RETURN A VERDICT, DO

 7      NOT READ, WATCH, OR LISTEN TO ANY NEWS OR MEDIA ACCOUNTS OR

 8      COMMENTARY ABOUT THE CASE OR ANYTHING TO DO WITH IT.  DO NOT DO

 9      ANY RESEARCH SUCH AS CONSULTING DICTIONARIES, SEARCHING THE

10      INTERNET OR USING OTHER REFERENCE MATERIALS, AND DO NOT MAKE

11      ANY INVESTIGATION OR IN ANY OTHER WAY TRY TO LEARN ABOUT THE

12      CASE ON YOUR OWN.

13              YOU MAY NOT HAVE ANY CONTACT OR ENGAGE IN ANY

14      COMMUNICATIONS WITH THE LAWYERS OR WITNESSES IN THIS CASE.  IF

15      THEY AVOID YOU IN THE COURT HOUSE OR DO NOT MAKE EYE CONTACT,

16      DO NOT THINK THAT THEY ARE BEING RUDE OR UNFRIENDLY.  RATHER

17      THEY ARE SIMPLY ADHERING TO THE RULE THAT THERE SHALL BE NO

18      CONTACT WITH THE JURORS.

19              THE LAW REQUIRES THESE RESTRICTIONS TO ENSURE THE PARTIES

20      HAVE A FAIR TRIAL BASED ON THE SAME EVIDENCE THAT EACH PARTY

21      HAS HAD AN OPPORTUNITY TO ADDRESS.  A JUROR WHO VIOLATES THESE

22      RESTRICTIONS JEOPARDIZES THE FAIRNESS OF THESE PROCEEDINGS.  IF

23      ANY JUROR IS EXPOSED TO ANY OUTSIDE INFORMATION, PLEASE NOTIFY

24      THE COURT IMMEDIATELY.

25              A FINAL POINT, YOU WILL BE ALLOWED TO PROPOSE WRITTEN
```

1    QUESTIONS TO WITNESSES AFTER THE LAWYERS AND PARTIES HAVE

2    COMPLETED THEIR QUESTIONING OF EACH WITNESS.

3         YOU MAY PROPOSE QUESTIONS IN ORDER TO CLARIFY THE

4    TESTIMONY BUT YOU ARE NOT TO EXPRESS ANY OPINION ABOUT THE

5    TESTIMONY OR ARGUE WITH A WITNESS.

6         IF YOU PROPOSE ANY QUESTIONS REMEMBER THAT YOUR ROLE IS

7    THAT OF A NEUTRAL FACT FINDER NOT AN ADVOCATE.  BEFORE I EXCUSE

8    EACH WITNESS I WILL OFFER YOU THE OPPORTUNITY TO WRITE OUT A

9    QUESTION ON A FORM PROVIDED BY THE COURT.  DO NOT SIGN THE

10   QUESTION.  I WILL REVIEW THE QUESTION WITH THE ATTORNEYS AND

11   PARTIES TO DETERMINE IF IT IS LEGALLY PROPER.  THERE ARE SOME

12   PROPOSED QUESTIONS THAT I WILL NOT PERMIT OR WILL NOT ASK IN

13   THE PARTICULAR WORDING SUBMITTED BY THE JUROR.  THIS MIGHT

14   HAPPEN EITHER DUE TO THE RULES OF EVIDENCE OR OTHER LEGAL

15   REASONS OR BECAUSE THE QUESTION IS EXPECTED TO BE ANSWERED

16   LATER IN THE CASE.

17        IF I DO NOT ASK A PROPOSED QUESTION OR IF I REPHRASE IT,

18   DO NOT SPECULATE AS TO THE REASONS.  DO NOT GIVE UNDUE WEIGHT

19   TO THE QUESTIONS YOU OR OTHER JURORS PROPOSE.  YOU SHOULD

20   EVALUATE THE ANSWERS TO THESE QUESTIONS IN THE SAME MANNER YOU

21   EVALUATE ALL OF THE OTHER EVIDENCE.

22        BY GIVING YOU THE OPPORTUNITY TO PROPOSE QUESTIONS I AM

23   NOT REQUESTING OR SUGGESTING YOU DO SO.  IT WILL OFTEN BE THE

24   CASE THAT A LAWYER HAS NOT ASKED A QUESTION BECAUSE IT IS

25   LEGALLY OBJECTIONABLE OR BECAUSE A LATER WITNESS MAY BE

```
1      ADDRESSING THAT SUBJECT.

2           WITH THAT LADIES AND GENTLEMEN, IT'S TIME FOR US TO TURN

3      TO THE OPENING STATEMENTS.  IT IS CUSTOM AS I'VE EXPLAINED FOR

4      THE PLAINTIFF TO GO FIRST.  THEN WE WILL HEAR FROM THE

5      DEFENDANTS.

6           MR. BOIES?

7                MR. BOIES:  THANK YOU, YOUR HONOR.

8                MS. ANDERSON:  I REQUEST THE RULE BE INVOKED.

9                THE COURT:  THE RULE IS INVOKED I TAKE IT THE PARTIES

10     WILL BE RESPONSIBLE FOR PROPERLY POLICING ANY WITNESSES WHO ARE

11     TO APPEAR LATER IN THE TRIAL WITH THE EXCEPTION OF COURSE OF

12     THE PARTIES TO THE CASE.  AND INCLUDING MS. HOLMES AS

13     THERANOS'S REPRESENTATIVE.

14                MR. BOIES:  LET ME HAVE JUST A MOMENT YOUR HONOR.

15                THE COURT:  YOU MAY.

16                MR. BOIES:  IS THERE A HAND HELD MICROPHONE.  I KNOW

17     I HAD ONE YESTERDAY.

18                THE COURT:  I WILL CONFIRM THAT WITH MR. RIVERA.

19                MR. UNDERHILL:  AND YOUR HONOR I BELIEVE THE RULE

20     DOES NOT APPLY TO EXPERTS AS WELL, CORRECT.

21                THE COURT:  THAT IS CORRECT.  THANK YOU FOR THAT

22     CLARIFICATION MR. UNDERHILL.

23          YOU MAY PROCEED.

24                MR. BOIES:  THANK YOU, YOUR HONOR.

25
```

1             **OPENING STATEMENT BY MR. BOIES**

2

3         MR. BOIES:  GOOD MORNING LADIES AND GENTLEMEN.

4      I WANT TO BEGIN BY THANKING YOU AGAIN FOR YOUR SERVICE.

5  IN THIS COUNTRY WE GO TO COURTS FOR JUSTICE AND THE COURTS

6  DEPEND COMPLETELY ON JURORS TO HELP DO JUSTICE.  SO YOUR

7  SERVICE HELPS ALL OF US BOTH THE PLAINTIFFS AND THE DEFENDANTS

8  AND WE ARE ALL GRATEFUL FOR IT.

9      I WANT TO BEGIN AND DURING MY OPENING STATEMENT I'M GOING

10  TO USE SOME CHARTS TO HELP ORGANIZE MY THOUGHTS AND I WILL

11  PRESENT TO YOU THE POINTS THAT I'M TRYING TO MAKE.

12      AS THE COURT SAID, NOTHING THAT I'M GOING TO BE SHOWING

13  YOU TODAY IS YET IN EVIDENCE.  EVEN WHEN I SHOW YOU DOCUMENTS,

14  THOSE DOCUMENTS ARE NOT YET IN EVIDENCE.  WE BELIEVE THEY WILL

15  COME INTO EVIDENCE AND WHEN THEY COME INTO EVIDENCE THEY WILL

16  BE EVIDENCE.  BUT UNTIL YOU ACTUALLY SEE THE EVIDENCE, NOTHING

17  THAT YOU ARE GOING TO HEAR THIS MORNING IS ACTUALLY SOMETHING

18  THAT YOU CAN DECIDE THE CASE ON.  WHAT WE ARE TRYING TO DO IS

19  WE ARE TRYING TO GIVE YOU A CONTEXT TO UNDERSTAND WHAT COMES

20  IN.  BECAUSE WHAT COMES IN IS GOING TO COME IN PIECEMEAL.  WHAT

21  WE ARE TRYING TO DO IS GIVE YOU AT THE BEGINNING AN OVER ALL

22  PICTURE OF WHAT WE ARE GOING TO PROVE SO THAT WHEN YOU SEE

23  INDIVIDUAL PIECES OF EVIDENCE COME IN YOU KNOW HOW THEY FIT OR

24  AT LEAST HOW WE THINK THEY FIT.

25      I WANT TO BEGIN WITH A CHART THAT SHOWS YOU ABOUT THE

1       '612 PATENT THE COURT MENTIONED.  AND I WANT TO EMPHASIZE A

2       COUPLE OF THINGS ABOUT THAT PATENT.

3              AND WHAT I WANT TO DO IS I WANT TO EMPHASIZE A COUPLE OF

4       POINTS.  FIRST, I WANT TO EMPHASIZE THAT THIS PATENT RELATES TO

5       SOMETHING CALLED BODILY FLUID ANALYSIS TECHNOLOGY.  YOU ARE

6       GOING TO HEAR THAT TERM A LOT AND THAT IS A TERM THAT IS

7       APPLICABLE TO A LOT OF THE PATENTS AND PATENT APPLICATIONS, BUT

8       I WANT YOU TO KEEP IN MIND THE GENERAL SUBJECT MATTER THAT WE

9       ARE DEALING WITH IN TERMS OF THIS TECHNOLOGY.

10             I NEXT WANT YOU TO JUST HAVE IN MIND SOME DATES.

11      SEPTEMBER 23, 2005, IS THE DATE RICHARD FUISZ FIRST DECIDED TO

12      APPLY FOR A BODILY FLUID ANALYSIS PATENT.  AND THAT DATE IS

13      GOING TO BE SIGNIFICANT.  AND I WILL SHOW YOU THE SIGNIFICANCE

14      OF THAT AS I GO THROUGH MY OPENING STATEMENT.  BUT WHAT WE SAY

15      IS THAT THIS DATE DEMONSTRATES THAT WHEN HE APPLIED AND DECIDED

16      TO APPLY FOR THIS PATENT, HE WAS DOING IT NOT BASED ON ANYTHING

17      THAT HE OR HIS SON HAD DONE BUT BASED ON WHAT HE HAD

18      INAPPROPRIATELY ACCESSED IN TERMS OF THERANOS'S CONFIDENTIAL

19      AND SECRET INFORMATION.

20             I ALSO WANT YOU TO LOOK AT THREE OTHER DATES.  APRIL 24,

21      2006, WHEN MR. FUISZ SUBMITTED WHAT IS CALLED A PROVISIONAL

22      APPLICATION.

23             APRIL 24TH, A YEAR LATER 2007, WHEN MR. FUISZ SUBMITTED

24      HIS FEW TILT APPLICATION.  AND THEN NOVEMBER 2, 2010, WHEN THE

25      PATENT ACTUALLY ISSUED.

1        AND THAT PERIOD IS IMPORTANT BECAUSE IT IS DURING THIS

2    PERIOD UNTIL THE PATENT ISSUED THAT THERE IS THE OBLIGATION

3    THAT THE COURT TALKED TO YOU ABOUT TO COME FORWARD WITH PRIOR

4    ART, TO TELL THE PATENT EXAMINER ABOUT PRIOR ART THAT YOU ARE

5    AWARE OF.

6        SO I WANT YOU TO AS YOU LOOK AT THE PRIOR ART, THAT YOU

7    ARE GOING TO SEE COME INTO EVIDENCE, I WANT YOU TO KEEP IN MIND

8    WHAT THE DATE OF THAT IS.  I WANT YOU TO KEEP IN MIND THAT THE

9    FUISZES KNEW ABOUT IT, AND THEN I WANT YOU TO KEEP IN MIND THIS

10   NOVEMBER 2, 2010, DATE, BECAUSE THE EVIDENCE WILL SHOW THAT

11   THEY WERE AWARE OF PRIOR ART, THERANOS PRIOR ART IN PARTICULAR,

12   BUT OTHER PRIOR ART AS WELL, AND THEY DID NOT TELL THE PATENT

13   EXAMINER ABOUT IT.

14       NOW LET ME GO TO THE NEXT CHART.  I ALSO WANT TO TALK A

15   LITTLE BIT ABOUT WHAT THE THERANOS.  THERANOS IS A COMPANY.  IT

16   WAS INCORPORATED TEN YEARS AGO IN 2004.  ITS BUSINESS ACTUALLY

17   STARTED THE PRIOR YEAR 2003, BUT IT GOT INCORPORATED IN 2004.

18       TODAY IT EMPLOYS HUNDREDS OF PEOPLE, PRIMARILY IN THIS

19   BAY AREA.  SINCE ITS FOUNDING, THERANOS'S CHIEF EXECUTIVE

20   OFFICER HAS BEEN ELIZABETH HOLMES, THE INDIVIDUAL WHO YOU MET

21   YESTERDAY WHO YOU WILL HEAR FROM AT THIS TRIAL.

22       THERANOS'S BOARD OF DIRECTORS INCLUDES A NUMBER OF VERY

23   EMINENT PEOPLE.  IT INCLUDES FORMER SECRETARY OF STATE HENRY

24   KISSINGER, FORMER SECRETARY OF STATE AND FORMER SECRETARY OF

25   THE TREASURY GEORGE SCHULTZ, FORMER SENATOR SAM NUNN, FORMER

1    SECRETARY OF DEFENSE WILLIAM PERRY, RETIRED NAVY ADMIRAL,

2    RETIRED MARINE GORE GENERAL, FORMER CEO OF WELLS FARGO.

3         THIS IS A COMPANY THAT HAS A TOP MANAGEMENT SYSTEM, IT

4    HAS TOP MANAGEMENT EXECUTIVES, IT IS A COMPANIES THAT VERY WELL

5    ORGANIZED.  YOU HEARD A LITTLE BIT IN THE JURY SELECTION SOME

6    STATEMENTS BY THE DEFENDANTS DISPARAGING THE COMPANY,

7    DISPARAGING ITS CHIEF EXECUTIVE OFFICER, WHAT WE WANT TO DO

8         MS. ANDERSON:  OBJECTION YOUR HONOR.  THERE HAVE BEEN

9    NO STATEMENTS DISPARAGING.

10        THE COURT:  OVERRULED.  LET CONTINUE.

11        MR. BOIES:  AND IT IS A COMPANY THAT DEVOTES

12   SIGNIFICANT FINANCIAL ENGINEERING AND SCIENTIFIC RESOURCES AND

13   PERSONNEL TO RESEARCHING, DEVELOPING PATENT TECHNOLOGY.  AND

14   THEN IT USES ITS TECHNOLOGY TO DESIGN AND BUILD INNOVATIVE

15   PRODUCTS THAT IMPROVE HEALTH CARE AND REDUCE HEALTH CARE COSTS.

16        THAT IN A NUT SHELL IS THE THERANOS COMPANY THAT'S ONE OF

17   THE PLAINTIFFS.

18        THE OTHER PLAINTIFF IS ELIZABETH HOLMES.  AND LET ME GO

19   TO A CHART ON THAT.  BEFORE I DO THAT, LET ME -- LET ME JUST

20   SAY ONE THING ABOUT THERANOS.  THE PARTICULAR PERIOD OF TIME

21   THAT WE ARE GOING TO BE FOCUSSING ON IS THE PERIOD OF TIME

22   BETWEEN 2003 WHEN ELIZABETH HOLMES FILED HER FIRST PATENT IN

23   BODILY FLUID TECHNOLOGY AREA, AND 2010 WHEN THE PATENT ISSUED.

24   THAT'S GOING TO BE PRIMARILY THE TIME WE ARE GOING TO BE

25   FOCUSSING ON.

1      IN ADDITION TO THAT, I WANT YOU TO UNDERSTAND WHO THE

2  COMPANY IS AND WHO THE CHIEF EXECUTIVE OFFICER IS.  AND FIRST

3  OF ALL ELIZABETH HOLMES IS A BRILLIANT SCIENTIST WHO HAS BEEN

4  WORKING ON BODILY FLUID ANALYSIS FOR 12 YEARS.  NOW YOU LOOK AT

5  HER AND YOU THINK SHE MAY NOT BE WORKING ON IT THAT YOUNG BUT

6  SHE STARTED VERY YOUNG.  SHE FOUNDED THERANOS IN 2004.  FILED

7  HER FIRST PATENT APPLICATION CONCERNING BODILY FLUID ANALYSIS

8  TECHNOLOGY IN 2003.  SHE WAS A PRESIDENTIAL SCHOLAR AT STANFORD

9  UNIVERSITY.  AND PRESIDENTIAL SCHOLARS AT STANFORD UNIVERSITY

10 GET SOME GRANTS.  SHE USED THAT GRANT TO START RESEARCH.

11      AFTER HER FRESHMAN YEAR SHE SPENT THE SUMMER IN SINGAPORE

12 DOING RESEARCH AT THE GENOME INSTITUTE.  SHE WAS ABLE TO DO

13 THAT BECAUSE WHEN SHE WAS IN HIGH SCHOOL SHE CAME TO STANFORD

14 EVERY SUMMER AND LEARNED MANDARIN.  BY THE TIME SHE WAS A

15 FRESHMAN IN COLLEGE SHE WAS FLUENT IN MANDARIN SO SHE COULD GO

16 TO SINGAPORE AND DO THIS RESEARCH.  DURING THE FIRST HALF OF

17 HER SOPHOMORE YEAR HER RESEARCH HAD PROGRESSED TO THE POINT

18 WHERE HER PROFESSOR.  AND YOU WILL HEAR FROM HER PROFESSOR,

19 HE'S GOING TO COME IN AND TESTIFY.  AND YOU WILL HEAR HE WAS SO

20 IMPRESSED WITH HER TECHNOLOGY SO IMPRESSED WITH HER RESEARCH

21 AND WHAT SHE WAS GOING TO DO THAT SHE TOOK THE VERY UNUSUAL

22 STEP OF ACTUALLY SUPPORTING HER DECISION TO DROP OUT OF SCHOOL

23 AND FORM A COMPANY TO CONTINUE HER WORK.  THAT COMPANY IS WHAT

24 IS NOW NAMED THERANOS, IT HAD A DIFFERENT NAME WHEN IT STARTED,

25 REAL TIME CURES, BUT IT'S THE SAME COMPANY.

1       THE INVENTIONS SHE HAS MADE THE EVIDENCE WILL SHOW, ARE

2    GOING TO REVOLUTIONIZE HEALTH CARE MAKING DIAGNOSTICS FASTER

3    MORE RELIABLE LESS COSTLY AND LESS PAIN EMPLOY.  THEY PERMIT

4    BREAKTHROUGHS IN PREVENTATIVE MEDICINE AND THE EARLY DETECTION

5    OF DISEASE AT A TIME WHEN IT CAN BE READILY CURED.

6       THIS IS WHAT BODILY FLUID TECHNOLOGY OFFERS.  THIS IS WHY

7    THIS CASE AND THESE PATENTS ARE SO IMPORTANT LET ME GO JUST A

8    MINUTE TO TALK A LITTLE BIT MORE ABOUT THAT TECHNOLOGY, BECAUSE

9    IT'S IN SOME SENSE IT'S SIMPLE BUT IN SOME SENSES IT'S

10   COMPLICATED.

11      CHART NUMBER THREE.  THE TECHNOLOGY BODILY FLUID ANALYSIS

12   TECHNOLOGY HAS A NUMBER OF PURPOSES.  ONE OF THOSE IS THAT YOU

13   CAN RUN A FULL BATTERY OF BLOOD TESTS ON JUST A FEW DROPS OF

14   BLOOD AND PROVIDE ACCURATE RESULTS IN HOURS, NOT DAYS OR WEEKS.

15      YOU CAN DO THAT BY JUST TAKING SMALL DROPS, A FEW DROPS

16   OF BLOOD.  YOU DON'T HAVE TO GO TO DOCTOR AND HAVE THEM TAKE IT

17   OUT OF YOUR ARM THE WAY THEY DO TRADITIONALLY.  BY MAKING BLOOD

18   TESTS LESS PAINFUL MORE ACCURATE AND AFFORDABLE, FAST AND

19   CONVENIENT.  THIS BODILY FLUID ANALYSIS TECHNOLOGY THAT

20   THERANOS HAS DEVELOPED, NOT ONLY IMPROVES THE QUALITY OF LIFE

21   OF THE INDIVIDUAL PLAINTIFFS, BUT IT MAKES IT POSSIBLE TO MAKE

22   ADVANCES IN PREVENTATIVE MEDICINE AND THE EARLY CURE OF

23   DISEASES THAT COULD NOT OTHERWISE BE DONE.

24      AND YOU ARE GOING TO HEAR FROM DOCTOR CHANNING ROBERTSON

25   WHO IS THE FORMER DEPARTMENT HEAD AT STANFORD UNIVERSITY WHO

1    WAS ELIZABETH HOLMES'S PROFESSOR.  WHO IS GOING TO COME IN AND

2    TALK ABOUT HOW IMPORTANT THIS TECHNOLOGY IS AND WHAT IT DOES.

3         NOW TO GET THAT TECHNOLOGY, THERANOS SPENDS LARGE SUMS ON

4    RESEARCH AND DEVELOPMENT TO CREATE THOSE BREAKTHROUGHS.

5    NEITHER THERANOS NOR ANY INNOVATIVE COMPANY COULD AFFORD TO

6    MAKE THESE INVESTMENTS IF IT COULD NOT PROTECT THE DISCOVERIES

7    THAT IT MAKES.

8         I WOULD ALSO LIKE TO TALK TO YOU ABOUT WHO ARE THE

9    DEFENDANTS HERE.  AND ONE OF THE THINGS IS THAT WE WANT TO BE

10   RESPECTFUL OF EACH OTHER IN THIS COURTROOM BUT THERE ARE SOME

11   HARSH THINGS THAT YOU ARE GOING TO HEAR.  AND THE REASON YOU

12   ARE GOING TO HEAR THOSE HARSH THINGS IN THE EVIDENCE IS BECAUSE

13   THERE WERE SOME HARSH THINGS THAT WERE DONE.  AND IT'S

14   IMPORTANT WE BE ABLE TO SPEAK CANDIDLY ABOUT SOME OF THE THESE

15   THINGS EVEN WHEN THEY ARE CRITICAL.

16        IF WE GO TO NUMBER FIVE, WHO IS RICHARD FUISZ.  YOU KNOW

17   RICHARD FUISZ OR DR. FUISZ IS A MEDICAL DOCTOR.  BUT THAT'S NOT

18   WHAT THIS CASE IS ABOUT.  WHAT THIS CASE IS ABOUT IS THAT FOR

19   MANY YEARS HE SOUGHT OUT AREAS WHERE OTHER COMPANIES LIKE

20   THERANOS ARE INVESTING IN RESEARCH AND DEVELOPMENT.  AND THEN

21   WOULD SEEK TO DRAFT PATENT THAT IS SIT ON TOP OF SUCH COMPANY'S

22   TECHNOLOGY.  AND THOSE ARE NOT MY WORDS, THOSE ARE HIS WORDS

23   FROM ONE OF HIS DOCUMENTS THAT WE ARE GOING TO SHOW YOU.

24        AND MAKE IT DIFFICULT BY THE PRESENCE OF THE FUISZ PATENT

25   FOR THE COMPANY THAT IS INNOVATED ACTUALLY USE THEIR

1    TECHNOLOGY.  THEN DEMAND MONEY OR SUE THE COMPANIES FOR PATENT

2    INFRINGEMENT.  THAT IS THE ACCIDENT MOTTO THAT WAS EMPLOYED

3    WITH RESPECT TO THE '612 PATENT.

4        ANOTHER DEFENDANT IS JOSEPH FUISZ.  JOSEPH FUISZ IS A

5    LAWYER, WORKS WITH HIS FATHER, RICHARD FUISZ.  HE'S ONE OF THE

6    TWO OWNERS OF FUISZ PHARMA.  HE'S THE BROTHER OF PATENT

7    ATTORNEY JOHN FUISZ, AND THAT'S GOING TO BE IMPORTANT BECAUSE

8    LATER YOU ARE GOING TO HEAR ABOUT SOME OF THE THING THAT IS

9    JOHN FUISZ DID.

10       JOSEPH FUISZ HAS MOW MEDICAL OR SCIENTIFIC TRAINING.  NO

11   EXPERIENCE WITH BODILY FLUID ANALYSIS TECHNOLOGY PRIOR TO

12   SEPTEMBER 2005, NEVER DID ANY LAB WORK CONCERNING BODILY FLUID

13   ANALYSIS TECHNOLOGY.  NEVER DID ANY RESEARCH CONCERNING BODILY

14   FLUID ANALYSIS TECHNOLOGY.  NEVER DESIGNED OR BUILT A

15   PROTOTYPE.  BUT HE'S ONE OF THE TWO LISTED "INVENTORS" OF THE

16   '612 PATENT.

17       ONE OF THE THINGS WE ARE GOING TO ASK YOU TO DO IS USE

18   YOUR COMMON SENSE AS TO WHETHER SOMEBODY WHO DIDN'T DO ANY OF

19   THESE THINGS DOESN'T HAVE THE BACKGROUND OR THE PREPARATION,

20   AND INCIDENTALLY WE WILL COME TO LATER, DOESN'T HAVE ANY RECORD

21   OF HAVING DONE ANY INVENTIVE ACTIVITY WITH RESPECT TO THE '612

22   PATENT COULD REALLY HAVE BEEN THE INVENTOR OF THAT PATENT.

23       NEXT, WHAT IS FUISZ PHARMA.  FUISZ PHARMA IS THE THIRD

24   DEFENDANT.  IT WAS FORMED IN 2010.  IT IS WHOLLY OWNED BY

25   RICHARD FUISZ AND JOSEPH FUISZ.  IT'S NEVER HAD ANY EMPLOYEES

1    OTHER THAN ITS OWNERS.  IT DOES NOT HAVE ANY LABORATORIES OR

2    RESEARCH OR DEVELOPMENT FACILITIES THAT WERE USED FOR BODILY

3    FLUID TECHNOLOGY ANALYSIS.  IT DID NOT CONDUCT OR CONTRACT FOR

4    ANY RESEARCH OR DEVELOPMENT CONCERNING BODILY FLUID TECHNOLOGY.

5    DID NOT DESIGN OR SELL ANY PRODUCT.

6         WHAT YOU WILL HEAR IS THAT THIS SHELL COMPANY, THE

7    EVIDENCE WILL SHOW, GOT ASSIGNED THE PATENT IN 2010 THE VERY

8    DAY DR. FUISZ AND JOSEPH FUISZ WERE SERVED WITH THIS LAWSUIT.

9    UNTIL THAT DAY, THEY HELD THE PATENT.  WHEN WE SUED THEM THEY

10   TRANSFERRED THE PATENT TO THE SHELL COMPANY.

11        NOW LET ME TALK JUST A MOMENT ABOUT THE REQUIREMENTS FOR

12   A PATENT THAT THE JUDGE TALKED TO YOU ABOUT.  NUMBER 11.

13        AS YOU HEARD IN ORDER FOR A "INVENTION "TO BE PATENTED,

14   IT'S GOT TO BE ORIGINAL, IT MUST BE YOUR IDEA, WANT SOMEONE

15   ELSE'S.  IT MUST BE NOVEL, NEW, NO ONE ELSE COULD HAVE DONE IT

16   BEFORE.

17        AND, AND THIS IS VERY IMPORTANT, IT MUST NOT BE OBVIOUS.

18   IT MUST BE SOMETHING THAT WOULD NOT BE APPARENT TO SOMEBODY

19   THAT IS "SKILLED IN THE ART." YOU ARE GOING TO HEAR THAT WORD

20   A NUMBER OF TIMES, THE JUDGE WILL GIVE YOU SOME INSTRUCTIONS AS

21   TO WHAT IT MEANS.

22        BUT IF SOMEBODY WHO IS SKILLED IN THE ART WOULD BE ABLE

23   TO UNDERSTAND WHAT FROM EXISTS THAT THIS COULD BE DONE, YOU

24   DON'T GET A PATENT FOR IT.  AND THE REASON IS THAT PATENTS ARE

25   ONLY DESIGNED TO ENCOURAGE PEOPLE TO INVENT THINGS.  AND CREATE

1    THINGS.

2         AND IT'S VERY POWERFUL BECAUSE ONCE YOU GET A PATENT YOU

3    CAN KEEP EVERYBODY ELSE FROM DOING IT.  EVEN IF THEY DESIGN IT

4    THEMSELVES, EVEN IF SOMEBODY COMES UP WITHOUT EVER USING

5    ANYTHING THAT YOU HAVE PUBLISHED, YOU STILL KEEP THEM FROM

6    DOING T. THAT'S HOW POWERFUL A PATENT IS.

7         SO A PATENT PREVENTS PEOPLE FROM PRACTICING THEIR OWN

8    INVENTIONS.  SO WE WANT TO BE CAREFUL THAT ONLY PEOPLE WHO

9    DESERVE IT GET PATENTS.  BUT WE WANT TO BE SURE THAT IF YOU DO

10   DESERVE A PATENT, YOU GET IT.  BECAUSE THE PATENT IS THE REWARD

11   FOR THIS CREATIVE ACTIVITY.

12        NOW LET ME GO TO NUMBER 13.

13        WE BELIEVE THE EVIDENCE WILL SHOW THAT THE FUISZ'S CANNOT

14   MEET ANY OF THE THREE ESSENTIAL REQUIREMENTS FOR A PATENT.

15        FIRST, THE ELEMENTS AND THE COMBINATION OF ELEMENTS OF

16   THE '612 PATENT WERE NOT ORIGINAL.  THEY WERE BASED ON THE WORK

17   OF ELIZABETH HOLMES AND THERANOS.

18        SECOND, THE ELEMENTS AND THE COMBINATION OF ELEMENTS OF

19   THE '612 PATENT WERE NOT NOVEL, THEY HAD BEEN DONE BEFORE,

20   INCLUDING BY THERANOS.

21        THIRD, EVEN IF ONE OR MORE OF THE ELEMENTS OF THE '612

22   PATENT HAD BEEN NEW, AND WE BELIEVE THE EVIDENCE WILL SHOW THAT

23   WOULD NOT BE THE CASE, BUT EVEN IF THAT HAD BEEN TRUE, THE

24   ELEMENTS AND THE COMBINATION OF ELEMENTS OF THE '612 PATENT

25   WERE CERTAINLY OBVIOUS TO SOMEONE WORKING IN THE FIELD.

1       EACH OF THESE THREE FAILURES IS AN INDEPENDENT GROUND FOR

2    INVALIDATING THE '612 PATENT.  THAT MEANS IF WE ESTABLISH ANY

3    ONE OF THOSE THREE POINTS, THE PATENT IS INVALID.

4       NOW LET ME ADDRESS ONE THING THAT YOU MAY HEAR AND GO TO

5    THE NEXT CHART TO DO THAT.

6       YOU MAY HEAR BECAUSE THEY'VE SAID IT BEFORE, THAT THERE'S

7    A DIFFERENCE BETWEEN THE THERANOS TECHNOLOGY AND THE '612

8    PATENT, IN THAT THEY CLAIM THAT THE THERANOS TECHNOLOGY WAS

9    ONLY DESIGNED FOR USE IN CLINICAL TRIALS.

10       THERE IS NO SUPPORT FOR THAT WHATSOEVER.  IT IS TRUE THAT

11   THE THERANOS TECHNOLOGY IS USED IN CLINICAL TRIALS, BUT IT'S

12   USED FOR A LOT OF OTHER PURPOSES AS WELL.  IT IS USED AND

13   PRIMARILY WAS DESIGNED, YOU WILL HEAR, TO HELP PATIENTS,

14   INDIVIDUAL PATIENTS.  AND THE THERANOS PROVISIONAL APPLICATION

15   EXPRESSLY REFERS TO ENABLING HEALTH CARE PROVIDERS, DOCTORS

16   NURSES, WHOEVER, TO IMPROVE CARE FOR PATIENTS.

17       AND OF COURSE THE '612 PATENT ITSELF TALKS ABOUT BEING

18   USED IN CLINICAL PROGRAMS.  THEY ARE BOTH DIRECTED TO CLINICAL

19   CARE PROGRAMS AND HEALTH CARE PROVIDERS.  THERE'S SIMPLY NO

20   BASIS IN THE RECORD TO MAKE THAT DISTINCTION.  WE MAY COVER

21   THAT POINT TO THE POINT WHERE IT MAY BECOME A LITTLE BIT

22   TEDIOUS.  BUT IT'S VERY IMPORTANT WE DEMONSTRATE TO YOU THAT

23   THE ELEMENTS OF THE '612 PATENT ARE THE THERANOS ELEMENTS

24       WE ALSO BELIEVE THE EVIDENCE WILL SHOW, IF YOU GO TO THE

25   NEXT CHART, THAT EVERY ELEMENT OF THE FUISZ'S '612 PATENT IS

1    OBVIOUS FROM THE PRIOR ART.  AND REMEMBER IF IT'S OBVIOUS, THE

2    PATENT IS INVALID.

3          THE FUISZ'S OWN EXPERT WITNESS, EACH SIDE HAS RETAINED

4    EXPERT WITNESSES TO COME IN AND TESTIFY ABOUT THIS.  THEIR OWN

5    RETAINED EXPERT SAYS THAT THE ONLY ELEMENT OF THE '612 PATENT

6    THAT MIGHT POSSIBLY BE NEW, NOVEL, WAS THE SELECTING ELEMENT.

7    REMEMBER, SELECTING ELEMENT.

8          BUT THE SELECTING ELEMENT IS EXPLICITLY DISCLOSED IN

9    THERANOS'S '192 PROVISIONAL APPLICATION, AN APPLICATION THAT

10   HAS PRIORITY OVER THE '612 PATENT.  IN FACT, ONE OF THE THINGS

11   THAT WE ARE GOING TO SHOW YOU AS EVIDENCE THAT ONE WEEK AFTER

12   THE '192 PROVISIONAL APPLICATION, WHICH WAS AT THE TIME SECRET,

13   WAS SENT TO THERANOS'S LAWYERS, A LAW FIRM WHERE JOHN FUISZ WAS

14   A PARTNER AND WHERE JOHN FUISZ HAD ACCESS TO ALL OF THE

15   CONFIDENTIAL INFORMATION THAT THERANOS SENT THERE.  ONE WEEK

16   AFTER THAT WAS WHEN DR. FUISZ WROTE HIS PATENT LAWYER SAYING, I

17   WANT TO FILE A BODILY FLUID ANALYSIS PATENT TOO.

18         SINCE I'VE MENTIONED THE LAW FIRM -- LET ME GO TO CHART

19   EIGHT.  AND JUST TALK A MOMENT ABOUT WHAT A PROVISIONAL

20   APPLICATION IS.

21         WHEN A PATENT APPLICATION IS FILED, IT'S ASSIGNED TO THE

22   PATENT EXAMINER LIKE THE COURT TOLD YOU, IT TAKES SEVERAL

23   MONTHS SOMETIMES LONGER, AFTER AN APPLICATION IS FILED, FOR IT

24   TO BECOME PUBLIC.

25         BEFORE FILING A PATENT APPLICATION, APPLICANTS HAVE A

1    RIGHT TO FILE WHAT IS CALLED A PROVISIONAL APPLICATION.  THAT'S

2    TO ESTABLISH THE PRIORITY OF YOUR INVENTION SO THAT EVERYBODY

3    KNOWS YOU DID IT FIRST.

4         NOW THAT PROVISIONAL APPLICATION IS NOT PUBLIC.  AND IT

5    DOESN'T BECOME PUBLIC UNTIL THE ACTUAL PATENT APPLICATION IS

6    PUBLISHED.

7         YOU HAVE UP TO A YEAR AFTER FILING A PROVISIONAL

8    APPLICATION TO FILE YOUR ACTUAL PUBLISH APPLICATION.  SO ABOUT

9    18 MONTHS OR LONGER BEFORE YOU FILE A PROVISIONAL APPLICATION,

10   THAT'S STILL CONFIDENTIAL.  PEOPLE CAN'T SEE IT.  IT'S STILL

11   TRADE SECRET.

12        NOW I MENTIONED JOHN FUISZ.  JOHN FUISZ WAS A PATENT

13   ATTORNEY WHO WORKED AT MCDERMOTT WILL EMERY, WE ABBREVIATE THAT

14   MWE, FROM 1999 TO 2009.  HE'S THE SON OF DOCTOR RICHARD FUISZ

15   AND THE BROTHER OF JOSEPH FUISZ.  WHILE AT MCDERMOTT, JOHN

16   FUISZ WAS THE PARTNER IN CHARGE OF PATENT MATTERS FOR HIS

17   FATHER, DR. FUISZ, WHO WAS ALSO A CLIENT OF MWE, WHILE AT MWE

18   JOHN FUISZ WAS ALSO LISTED AS REPRESENTING ELIZABETH HOLMES AND

19   THERANOS.

20        AND JOHN FUISZ HAD ACCESS TO THERANOS'S CONFIDENTIAL

21   PROVISIONAL APPLICATIONS.

22        HE CLAIMS HE NEVER USED THAT ACCESS.  THAT IS ONE OF THE

23   ISSUES THAT YOU ARE GOING TO HAVE TO DECIDE.

24        NEXT.

25        JUST A MOMENT ON WHAT MWE IS.  IT'S A LAW FIRM, IT HAS

1    OFFICES IN WASHINGTON, D.C., THAT'S WHERE JOHN FUISZ WAS A

2    PARTNER.  THAT'S WHERE HIS FATHER HAD HIS REPRESENTATION,

3    THAT'S WHERE THERANOS AND ELIZABETH HOLMES HAD THEIR

4    REPRESENTATION.

5         FROM 2003 TO 2006, MWE REPRESENTED HOMES AND THERANOS.

6    THEY HAD SUBSTANTIAL INVOLVEMENT IN DRAFTING ELIZABETH HOLMES

7    FIRST PATENT APPLICATION, ASSISTED HER WITH DRAFTING AND

8    STRATEGIZING ABOUT HER INTELLECTUAL PROPERTY.  AFTER THAT IN

9    GENERAL MOST OF THE DRAFTING OF THERANOS'S SUBSEQUENT PATENT

10    APPLICATIONS WAS DONE IN CALIFORNIA.  BUT, AND THIS IS WHAT'S

11    IMPORTANT, THE DRAFTS WERE STILL SENT TO MWE TO FILE.  THEY

12    WERE STILL CENT TO MWE TO FINALIZE AND FILE.  SO EVEN WHEN THE

13    PATENTS WERE DRAFTED IN CALIFORNIA, THEY STILL WENT MWE'S

14    WASHINGTON OFFICE WHERE THEY WERE FILED.  AND AFTER FILING, MWE

15    KEPT COPIES IN ITS CENTRAL FILE ROOM TO WHEN JOHN FUISZ HAD

16    UNLIMITED AND UN SUPERVISED ACCESS.  WE COULD GO IN WHENEVER HE

17    WANTED TO.  THAT'S WHAT THE EVIDENCE IS GOING TO SHOW

18    NOW LET ME GO BACK TO CHART 11 JUST A MOMENT.

19         IN ORDER TO GET A PATENT YOUR INVENTIONS MUST BE

20    ORIGINAL.  IT MUST BE YOUR IDEA AND NOT SOMEONE ELSE'S.  THAT'S

21    WHAT WE ARE TALKING ABOUT RIGHT NOW.  WE ARE TALKING ABOUT

22    WHETHER THIS IS THEIR IDEA OR WHETHER THEY GOT IT FROM

23    THERANOS.

24         LET ME GO TO CHART 16.  WE BELIEVE THE EVIDENCE WILL SHOW

25    THAT THE FUISZ'S USED THERANOS'S CONFIDENTIAL TRADE SECRET

1    PROVISIONALS TO PREPARE THEIR '612 PATENT APPLICATION.  NOW,

2    HOW ARE WE GOING TO DO THAT?  WELL, FIRST, THE '612 PATENT

3    APPLICATION INCLUDES MATERIAL THAT WAS SET FORTH IN THE TRADE

4    SECRET PROVISIONAL APPLICATIONS ON FILE AT JOHN FUISZ'S LAW

5    FIRM.

6         THAT IS WE WILL SHOW YOU MATERIAL THAT IS IN THEIR

7    APPLICATION AND CAME FROM THOSE PROVISIONALS THOSE SECRET

8    PROVISIONALS, THOSE PROVISIONALS THAT JOHN FUISZ DID NOT HAVE

9    ANY RIGHT TO ACCESS FOR PURPOSES OF HELPING HIS FATHER AND

10   BROTHER PREPARE A PATENT APPLICATION.

11        IN ADDITION, PRIOR TO APRIL 2006 WHEN THE FUISZ'S

12   PROVISIONAL APPLICATION WAS FILED, NONE OF THE PUBLICLY

13   AVAILABLE INFORMATION ABOUT THERANOS'S BODILY FLUID ANALYSIS

14   TECHNOLOGY COULD HAVE BEEN USED TO PREPARE THE FUISZ'S

15   APPLICATION.  THAT IS, YOU CAN'T, AND YOU ARE GOING TO HEAR

16   EXPERT TESTIMONY ON THIS, YOU CAN'T LOOK AT WHAT WAS PUBLICLY

17   AVAILABLE AND SAY, WELL, THEY MIGHT HAVE BEEN ABLE TO PREPARE

18   THEIR APPLICATION FROM THAT.  THEY HAD TO USE THE CONFIDENTIAL

19   TECHNOLOGY.

20        NOW THE FUISZ'S TRIED BUT FAILED TO OBTAIN INFORMATION

21   ABOUT WHAT ELIZABETH HOLMES WAS DOING FROM HER FAMILY.  ONE OF

22   THE THINGS YOU ARE GOING TO HEAR IS THAT WHEN ELIZABETH HOLMES

23   WAS VERY YOUNG HER PARENTS LIVED NEXT TO DR. FUISZ AND HIS

24   WIFE.  AND YOU ARE GOING TO HEAR THAT IN 2005 AND 2006 AND

25   THERE AFTER, DR. FUISZ WENT TO ELIZABETH HOLMES'S PARENTS AND

1   TRIED TO ENGAGE THEM IN CONVERSATION ABOUT WHAT ELIZABETH

2   HOLMES WAS DOING.

3        YOU ARE DOING TO HEAR THAT HE DIDN'T TELL HER PARENTS

4   THAT HE WAS TRYING TO FILE A PATENT APPLICATION OF HIS OWN.

5   WHAT HE TOLD HIS PARENTS IS HE WANTED TO HELP ELIZABETH.  AND

6   YOU ARE GOING TO HEAR THAT FROM I BELIEVE DR. FUISZ IS GOING TO

7   HAVE TO ADMIT THAT.  YOU ARE GOING TO HEAR THAT FROM ELIZABETH

8   HOLMES'S MOTHER, AND IF WE CAN GET HER TO COME TO COURT YOU ARE

9   GOING TO HEAR FROM DR. FUISZ'S WIFE AS WELL.

10        LET ME GO TO THE NEXT CHART.

11        WE'VE TALKED ABOUT EXPERTS.  EXPERTS HAVE ANALYZED THE

12   '612 PATENT APPLICATION AND THE THERANOS TRADE SECRET

13   PROVISIONALS AND OTHER MATERIALS THAT ARE AVAILABLE AND HAVE

14   CONCLUDED, AND YOU ARE GOING TO HEAR THESE CONCLUSIONS FROM THE

15   WITNESS STAND, THAT THE '612 PATENT APPLICATION WAS PREPARED

16   USING THE THERANOS TRADE SECRET PROVISIONALS.

17        NOW WHO ARE THESE EXPERTS?  WELL ONE OF THEM IS DOCTOR

18   CHANNING ROBERTSON, THE FORMER CHAIR OF STANFORD UNIVERSITY'S

19   DEPARTMENT OF CHEMICAL ENGINEERING.

20        ANOTHER IS DOCTOR WILLIAM CLARKE, THE ASSOCIATE PROFESSOR

21   OF THE DEPARTMENT OF PATHOLOGY AT THE JOHN HOPKINS MEDICAL

22   SCHOOL.

23        ANOTHER IS DR. ROBERT LEONARD A NATIONALLY RECOGNIZED

24   EXPERT IN LINGUISTICS.  AND ONE OF THE THINGS YOU ARE GOING TO

25   HEAR IS THAT THE CONCEPTS AND EVEN IN SOME CASES THE LANGUAGE

1   IS TAKEN FROM THE THERANOS PROVISIONALS.

2          LET ME GO TO THE NEXT CHART.

3          REMEMBER I SAID I WANTED YOU TO REMEMBER THE DATE

4   SEPTEMBER 16, 2005.  THIS IS WHY I WANTED YOU TO REMEMBER.

5          ON SEPTEMBER 162005, 1 WEEK EARLIER, ELIZABETH HOLMES AND

6   THERANOS SENT A CONFIDENTIAL PROVISIONAL PATENT APPLICATION

7   CONCERNING BODILY FLUID ANALYSIS TECHNOLOGY TO MWE.  THAT IS

8   WHAT IS CALLED THE '192 PROVISIONAL PATENT APPLICATION.

9          AT THAT TIME ELIZABETH HOLMES HAD BEEN WORKING ON BODILY

10  FLUID ANALYSIS TECHNOLOGY FOR MORE THAN 30 MONTHS.  SHE HAD AT

11  LEAST THREE PENDING PRIOR APPLICATIONS CONCERNING BODILY FLUID

12  ANALYSIS TECHNOLOGY.  SHE INVESTIGATED AND ANALYZED THE PRIOR

13  ART.  SHE INVESTED TIME MONEY AND RESEARCH CONCERNING

14  DEVELOPMENT IN BODILY FLUID ANALYSIS TECHNOLOGY.

15         LET'S GO TO THE NEXT CHART.  SHE HAD PERSONALLY SPENT

16  THOUSANDS OF HOURS IN LABORATORIES WORKING ON BODILY FLUID

17  ANALYSIS TECHNOLOGY.  PERSONALLY HAD SPENT THOUSANDS OF HOURS

18  DOING THIS RESEARCH.

19         SHE HAD ALSO RETAINED EXPERTS TO ASSIST IN RESEARCH

20  DEVELOPMENT CONCERNING BODILY FLUID ANALYSIS TECHNOLOGY.  THAT

21  IS SHE JUST DIDN'T DO IT ALL BY HERSELF, SHE HAD A LOT OF OTHER

22  PEOPLE HELPING HER.

23         SHE AND THE EXPERTS WORKING WITH HER HAD CONDUCTED

24  NUMEROUS EXPERIMENTS CONCERNING BODILY FLUID ANALYSIS

25  TECHNOLOGY.

```
1            ALL OF THIS BEFORE SHE FILED THE '192 PROVISIONAL

2     APPLICATION.  AND SHE AND EXPERTS WORKING WITH HER HAD DESIGNED

3     AND BUILT A PROTOTYPE OF HER BODILY FLUID ANALYSIS TECHNOLOGY

4     INVENTION.

5            IN ORDER TO GET WHERE SHE GOT FOR THAT '192 PROVISIONAL

6     APPLICATION, SHE HAD DONE ALL THAT.  LET'S COMPARE THAT TO WHAT

7     HAPPENED NEXT.

8            ONE WEEK LATER, ON SEPTEMBER 23RD, 2005, RICHARD FUISZ

9     SENT AN E-MAIL TO HIS PATENT ATTORNEY ABOUT FILING HIS OWN

10    BODILY FLUID ANALYSIS PATENT APPLICATION.  AND THIS IS

11    IMPORTANT, AT NO TIME IN THE PRIOR THREE YEARS, THE TIME DURING

12    WHICH ELIZABETH HOLMES WAS DOING HER WORK, AT NO TIME DURING

13    THOSE PRIOR THREE YEARS DID RICHARD FUISZ DO ANY WORK ON BODILY

14    FLUID ANALYSIS TECHNOLOGY, HAVE ANY PENDING PRIOR APPLICATIONS

15    CONCERNING THAT TECHNOLOGY, DO ANY INVESTIGATION OR ANALYSIS OF

16    THE PRIOR ART CONCERNING BODILY FLUID ANALYSIS TECHNOLOGY,

17    INVEST ANY TIME OR MONEY IN RESEARCH AND DEVELOPMENT, SPEND ANY

18    HOURS IN THE LABORATORY WORKING ON THAT TECHNOLOGY, RETAIN ANY

19    EXPERTS TO ASSIST HIM, CONDUCT ANY EXPERIMENTS CONCERNING ANY

20    RELEVANT AND RELATED BODILY FLUID ANALYSIS TECHNOLOGY, OR

21    DESIGN OR BUILD ANY BODILY FLUID ANALYSIS TECHNOLOGY PROTOTYPE.

22           HE HADN'T DONE ANY OF THAT.  NONE OF IT WHEN HE CALLS UP

23    HIS PATENT ATTORNEY AND WRITES HIS PATENT ATTORNEY AN E-MAIL

24    AND SAYS, LET'S FILE A PATENT.

25           IN ADDITION, YOU WILL HEAR THE EVIDENCE THAT HE DID NOT
```

1    PREPARE ANY NOTES, ANY LAB RECORDS, ANY DATA OR ANY DOCUMENTS

2    WHATSOEVER ABOUT HIS PURPORTED INVENTION OR HOW HE ACHIEVED IT.

3    IT JUST EITHER APPEARED OUT OF THIN AIR OR, WE THINK THE

4    EVIDENCE WILL SHOW, WAS BASED NOT ON ANYTHING HE DID, BUT ON

5    WHAT THERANOS HAD DONE.

6         LET ME GO TO CHART 22 BECAUSE I THINK THIS SORT OF

7    SUMMARIZES WHAT WE BELIEVE THE EVIDENCE IS GOING TO SHOW.

8         WE BELIEVE THE EVIDENCE THAT THE FUISZ'S ACTUALLY

9    ACCESSED THERANOS'S SECRET PROVISIONALS IS OVERWHELMING.  WE

10   DON'T HAVE A VIDEO TAPE OF IT, SO WE ARE GOING TO BE TALKING

11   ABOUT TO SOME EXTENT WHAT THE COURT REFERRED TO AS

12   CIRCUMSTANTIAL EVIDENCE, ALTHOUGH WE DO HAVE THE PATENT

13   APPLICATION ITSELF WHICH WE THINK IS DIRECT EVIDENCE OF THE

14   COPYING BECAUSE YOU WILL LOOK AT THE TERMS AND YOU WILL SEE THE

15   SAME ELEMENTS AND YOU WILL SEE IN SOME CASES THE SAME

16   LINGUISTIC FORMULATIONS.

17        THE EVIDENCE THAT THE FUISZ'S ACTUALLY ACCESSED THE

18   SECRET PROVISIONALS INCLUDES A STRIKING SIMILARITY BETWEEN THE

19   THERANOS PROVISIONALS IN THE 612.  THE FACT THE ONE ELEMENT

20   DEFENDANTS SAY IS NOVEL IN THE 612 IS FOUND ONLY IN THE SECRET

21   THERANOS PROVISIONALS, NOT IN THEIR PUBLIC MATERIALS.

22        THE FACT THAT ONLY THE FUISZ AND THERANOS USED THE

23   CERTAIN OF THE SAME WORDS AND PHRASES AND LINGUISTIC CONCEPTS

24   TO COMMUNICATE.

25        THE FACT THE FUISZ'S HAD NO RELEVANT EXPERIENCE, RESEARCH

```
 1    LAB WORK AND NO DOCUMENTS.  THE FACT THAT THE FIRST FUISZ

 2    E-MAIL THAT LEAD TO THE '612 PATENT CAME ONE WEEK AFTER THEIR

 3    LAW FIRM RECEIVED THE '192 PROVISIONAL.

 4         THE FACT THAT RICHARD FUISZ NEVER MENTIONED HIS PATENT

 5    EFFORTS TO THE HOLMES'.  THE FACT THEY ADMITTEDLY AIMED THAT

 6    TECHNOLOGY AT THERANOS'S TECHNOLOGY.

 7         WE THINK THE EVIDENCE WHEN YOU HEAR IT, WILL BE AS

 8    OVERWHELMING AS IT IS TO US.

 9         NOW WE ALSO THINK, THAT THE FUISZ'S CONDUCT IS EVIDENCE

10    THAT THEY KNEW WHAT THEY WERE DOING WAS WRONG.

11         FIRST, IN THIS LITIGATION, THE DEFENDANTS TRIED TO COVER

12    UP THEIR ACCESS TO THERANOS'S CONFIDENTIAL INFORMATION AT MWE

13    BY FALSELY CLAIMING THAT THEY DIDN'T EVEN KNOW THAT THERANOS

14    AND HOLMES WERE MWE CLIENTS.

15         THE EVIDENCE WILL SHOW YOU THAT THEY KNEW, THE EVIDENCE

16    WILL SHOW YOU THAT THEY CLAIMED NOT TO HAVE KNOWN THAT, BECAUSE

17    THEY KNEW THAT THAT WAS A STEP IN UNDERSTANDING WHAT THEY HAD

18    DONE.

19         WE HAVE ALSO MENTIONED THAT THEY DIDN'T TELL MS. HOLMES'S

20    PARENTS THAT THEY WERE PROSECUTING THEIR OWN PATENT APPLICATION

21    EVEN THOUGH THEY TRIED TO CONVINCE HER PARENTS TO LET THEM HELP

22    MS. HOLMES.

23         IN ADDITION, THE DAY THE FUISZ'S WERE SERVED WITH THIS

24    CASE WHICH WE BROUGHT HERE IN THE STATE OF CALIFORNIA, THE

25    FUISZ'S TRANSFERRED THE '612 PATENT FROM THEMSELVES TO THEIR
```

1    SHELL COMPANY FUISZ PHARMA.  AND THEN HAD FUISZ PHARMA SUE

2    THERANOS FOR PATENT INFRINGEMENT IN DELAWARE.

3         NOW IF YOU ARE INNOCENT, IF YOU HAVEN'T DONE ANYTHING

4    WRONG, WHAT'S THE EXPLANATION FOR THAT?

5         IN ADDITION, AND I'M GOING TO APOLOGIZE TO SOME OF YOU

6    FOR SOME OF THE LANGUAGE HERE, BUT IN ADDITION, JOHN FUISZ,

7    FORMER PATENT ATTORNEY FOR HIS FATHER, HAS TRIED TO INTIMIDATE

8    MS. HOLMES BY THREATENING TO "FILE PATENTS AND FUCK WITH HER

9    UNTIL SHE DIES".

10        THAT WAS IN THIS LITIGATION, THAT'S WHAT HE SAID IN THIS

11   LITIGATION AND WE'VE CAPTURED IT ON VIDEO, AND YOU WILL HEAR

12   THAT, YOU WILL SEE THAT.  AND WHEN YOU HEAR THAT AND SEE THAT,

13   ASK YOURSELF, IS THIS THE STATEMENT OF AN INNOCENT PERSON?

14        NOW, WHAT WAS THE MOTIVE FOR ALL THIS?  WELL, WE THINK

15   THE MOTIVE IS PRETTY CLEAR.  THE MOTIVE WAS TO FIND A WAY TO

16   BENEFIT FROM THE WORK AND INVESTMENT OF THERANOS AND ELIZABETH

17   HOLMES.

18        YOU WILL SEE BOTH FROM THEIR OWN TESTIMONY AND FROM THEIR

19   OWN INTERNAL DOCUMENTS THAT THE FUISZES WERE VERY INTERESTED IN

20   THE FACT THAT THERANOS HAD WHAT THE FUISZES CALL HIGH LEVEL

21   INVENTORS.  THAT ELIZABETH HOLMES WAS WELL FINANCED AND THAT

22   SHE WAS SUPPORTED BY THE "HUGE VC'S" REFERRING TO VENTURE

23   CAPITAL PEOPLE.  THE FUISZ'S WANTED TO BENEFIT FROM THE RULES

24   OF THERANOS'S LARGE INVESTMENTS BY GETTING A PATENT THAT WOULD

25   INTERFERE WITH THERANOS'S BUSINESS AND REQUIRE THERANOS TO BUY

1    THE FUISZES OFF.

2         NOW IT'S THE CLAIM HAS SINCE BEEN WITHDRAWN, THE FUISZ'S

3    DID IN FACT AS I MENTIONED EARLIER SUE THERANOS FOR ALLEGEDLY

4    INFRINGING THE '612 PATENT.  THAT'S WHAT THEY DID AFTER WE SUED

5    THEM HERE IN CALIFORNIA, SUED THEM AT A TIME WHEN THEY HAD THE

6    PATENT THEMSELVES.  AS SOON AS WE SUED THEM THEY TRANSFERRED

7    THE PATENT TO THIS SHELL COMPANY AND SAID, WE DON'T HAVE A

8    PATENT ANYMORE AND YOU CAN'T SUE FUISZ PHARMA BECAUSE THEY ARE

9    ALREADY SUING YOU IN DELAWARE.

10        NOW, WE GOT THE CASE TRANSFERRED HERE, BUT AGAIN, I'M

11   ASKING YOU TO USE YOUR COMMON SENSE.  IS THAT SOMETHING THAT

12   INNOCENT PEOPLE DO.

13        NOW, WHY DID THE FUISZ'S THINK THEY COULD SUCCEED?  YOU

14   WILL SEE FROM THEIR INTERNAL DOCUMENTS THAT BECAUSE OF

15   ELIZABETH HOLMES'S GENDER AND HER AGE, THEY THOUGHT THAT THEY

16   COULD TAKE ADVANTAGE OF HER.

17        YOU WILL SEE, THIS COMES FROM THEIR OWN INTERNAL

18   DOCUMENTS, YOU SEE THEM REFERRING TO HER AS A "DUMB ASS KID."

19        WELL, THIS WAS THE DUMB ASS KID WHO TAUGHT HERSELF

20   MANDARIN IN HIGH SCHOOL, WHO WAS A SCHOLAR WHO MADE SOME OF THE

21   BREAKTHROUGH MEDICAL INVENTIONS OF THIS, OR PERHAPS ANY

22   GENERATION.  NOT ONLY IS SHE A DUMB ASS KID BUT SHE IS "NAIVE

23   AND DUMB."

24        IN HIS DEPOSITION RICHARD FUISZ REFERRED TO MS. HOLMES AS

25   A "GIRL WITH A LOOSE TONG."

1    BECAUSE THEY THOUGHT THAT THEY COULD TAKE ADVANTAGE OF

2    HER BECAUSE OF HER AGE AND GENDER, THEY HAD A PLAN.  AND WHAT

3    WAS THAT PLAN?  WELL, THE PLAN IS DESIGNED TO DESIGN A PATENT

4    THAT WAS "AIMED AT THERANOS" BY BEING DESIGNED TO "SIT ON TOP

5    "OF THERANOS'S TECHNOLOGY."

6    TO BE "IN THE WAY" OF THERANOS'S BUSINESS.

7    IN FACT, IN HIS DEPOSITION, AND THOSE QUOTES ALL COME

8    FROM THE INTERNAL DOCUMENTS THAT YOU ARE GOING TO SEE IN

9    EVIDENCE.  THERANOS'S EXHIBITS 104, 138, 228.  YOU ARE GOING TO

10   SEE THOSE DOCUMENTS COME INTO EVIDENCE.

11   IN HIS DEPOSITION IN THIS CASE DR. FUISZ ADMITTED THE

12   PURPOSE OF THE '612 PATENT WAS TO PATENT THE FRONT END OF

13   THERANOS'S TECHNOLOGY.  AND THE FUISZES HAVE CONTINUED TO FILE

14   PATENT APPLICATIONS CONCERNING BODILY FLUID ANALYSIS.  AND THIS

15   IS THE LARGER QUOTE THAT I REFERRED TO FROM JOHN FUISZ BEFORE,

16   JOHN FUISZ, AND AGAIN THIS IS CAPTURED ON VIDEO TAPE, I'M NOT

17   MAKING THIS UP, LADIES AND GENTLEMEN.

18   JOHN FUISZ SAYS "GOING TO MAKE SURE THAT ELIZABETH HOLMES

19   NEVER HAS ANOTHER FUCKING COMPANY AS LONG AS SHE LIVES.  I WILL

20   USE MY ABILITY TO FILE PATENTS AND FUCK WITH HER TILL SHE DIES,

21   ABSOLUTELY."

22   AND AGAIN, LADIES AND GENTLEMEN, I ASK YOU TO THINK

23   WHETHER THIS IS THE KIND OF WAY THAT INNOCENT PEOPLE, WHO HAVE

24   NOTHING TO HIDE, ACT AND TALK.

25   NOW, WE ARE ALSO GOING TO ARGUE AS THE COURT INDICATED,

1    THAT THEY FAILED TO TELL THE PATENT OFFICE ABOUT OUR PRIOR ART

2    AND BECAUSE THEY DID THAT, THEY ENGAGED IN WHAT WAS CALLED

3    INEQUITABLE CONDUCT.  SO THE PATENT IS INVALID FOR THAT REASON

4    ALONE.

5         NOW I'VE SPENT A LOT OF TIME TALKING ABOUT THE EVIDENCE

6    THAT THEY ACCESS OUR SECRET INFORMATION AND USE THAT SECRET

7    INFORMATION TO PREPARE THEIR PATENT.  AND IF THEY DID, IF WE

8    PROVE THAT, AND I BELIEVE WE WILL PROVE THAT BY REALLY CLEAR

9    AND CONVINCING EVIDENCE TO YOU.  IF WE PROVE THAT, THAT

10   INVALIDATES THEIR PATENT.  BUT I ALSO WANT TO EMPHASIZE, THAT

11   OTHER ARGUMENTS THAT WE HAVE FOR INVALIDATING THE PATENT, DO

12   NOT DEPEND ON WHETHER OR NOT THEY SNUCK IN AND GOT OUR

13   CONFIDENTIAL INFORMATION.

14        OUR ARGUMENT FOR NOT DISCLOSING THE PRIOR ART TO THE

15   PATENT OFFICE, THAT WE ARGUE WOULD INVALIDATE THE PATENT, EVEN

16   IF THEY HAD DONE IT ALL BY THEMSELVES.  EVEN IF THEY NEVER

17   ACCESSED ANY OF OUR CONFIDENTIAL INFORMATION, IF THEY DID NOT

18   DISCLOSE THE PRIOR ART TO THE PATENT OFFICE, THAT WE ARGUE

19   SHOULD INVALIDATE THE PATENT.

20        SECOND, IF WE DEMONSTRATE AS I THINK THE EVIDENCE WILL,

21   THAT THIS WAS OBVIOUS TO ANYBODY SKILLED IN THE ART FROM WHAT

22   THERANOS AND OTHER PEOPLE HAD ALREADY DONE, THEN THAT

23   INVALIDATES THE PATENT EVEN IF THEY NEVER ACCESSED OUR

24   MATERIALS.

25        SO WHILE WE ARE GOING TO CONCENTRATE A LOT OF TIME AND

1    ATTENTION ON THE ACCESS POINT BECAUSE IT'S OBVIOUSLY CRITICAL

2    AND THAT'S IMPORTANT TO OUR CLAIM THAT ELIZABETH HOLMES AND

3    PERHAPS MR. KEMP SHOULD BE THE NAMED INVENTORS, IN TERMS OF THE

4    INVALIDITY OF THE PATENT, THAT THE PATENT IS INVALID WHETHER OR

5    NOT THEY ACCESS OUR CONFIDENTIAL INFORMATION.

6         I APPRECIATE YOUR ATTENTION TO ME TODAY.  I APPRECIATE

7    THE ATTENTION THAT I KNOW THAT YOU WILL GIVE AS THE DAYS GO ON.

8    THANK YOU AGAIN FOR YOUR SERVICE.

9         THE COURT:  THANK YOU, MR. BOIES.

10        LADIES AND GENTLEMEN, BEFORE WE HEAR FROM THE DEFENDANTS

11   I WOULD LIKE TO TAKE OUR MORNING RECESS.  WE ARE GOING TO TAKE

12   JUST FIVE OR SEVEN MINUTES TO GIVE YOU A CHANCE TO STRETCH AND

13   PERHAPS GIVE YOU THE RESTROOM IF YOU NEED IT.  WE WILL SEE YOU

14   BACK HERE IN FIVE MINUTES.  I WILL INSTRUCT YOU ONCE AGAIN DO

15   NOT DISCUSS THE CASE WHILE WE ARE OUT ON BREAK.  YOU WILL HEAR

16   A LOT FROM PEOPLE ON THAT SUBJECT.  BUT PLEASE DO NOT DISCUSS

17   THE CASE.  WE WILL SEE YOU BACK HERE IN A FEW MINUTES.

18        (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD OUT OF

19   THE PRESENCE OF THE JURY:)

20        THE COURT:  WE WILL STAND IN RECESS.

21        MR. BOIES:  THANK YOU.

22        (WHEREUPON A RECESS WAS TAKEN.)

23        (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD OUT OF

24   THE PRESENCE OF THE JURY:)

25        THE COURT:  PLEASE REMAIN STANDING.  MR. RIVERA WOULD

1       YOU RETRIEVE THE JURY.

2               (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN THE

3       PRESENCE OF THE JURY:)

4               THE COURT:  PLEASE BE SEATED.  WELL, THERE YOU GO,

5       LADIES AND GENTLEMEN, I FIGURED IT OUT.  I APPRECIATE YOUR

6       DOING THAT.

7               IT'S NOW TIME FOR THE OPENING STATEMENT FROM DEFENDANTS.

8       DR. FUISZ, YOU MAY PROCEED.

9

10              **OPENING STATEMENT BY MR. RICHARD FUISZ**

11

12              MR. R. FUISZ:  HELLO TO ALL OF YOU.

13      I'M GOING TO DO THE SAME THING YOU'VE HAD TO DO

14      YESTERDAY.  MY NAME IS RICHARD FUISZ.  I'M 74 YEARS OLD.  I

15      LIVE IN LOS ANGELES.  I HAVE 115 PATENTS, MORE THAN 200

16      WORLDWIDE.  I HAVE FIVE CHILDREN.  TWO ARE LAWYERS, ONE IS A

17      PHYSICIAN, ONE IS A SCREEN WRITER, AND ONE RUNS FUISZ MEDIA

18      WHICH IS BASED ON OUR PATENT.

19              THE SAD PART ABOUT TODAY AND I'M NOT GOING TO DWELL ON

20      IT, IS I ONCE HAD A HIGH OPINION ABOUT A CERTAIN LAWYER.

21              WHAT I HEARD TODAY AND KNOWING HE RECEIVED THE AMERICAN

22      BAR ASSOCIATION AWARD FOR ETHICS MAKES ME VERY SAD.  WHAT YOU

23      WERE TOLD WERE UNTRUTHS.  TO BE TOLD THAT BY A LAWYER OF HIS

24      VANE IS VERY, VERY DISCOURAGING.

25              FIRST OF ALL, THE FIRST BODILY FLUID ANALYZER, I INVENTED

1    THE FIRST ONE BEFORE ELIZABETH HOLMES WAS BORN.  I INVENTED THE

2    SURE CATCH URINE BODILY FLUID ANALYZER FOR CR BAIRD.  WHAT IT

3    DID WAS USE A PLASTIC MULTI ARRAY TO GO INTO A DIAPER FOR A NEW

4    MOTHER TO COLLECT THE URINE, GUIDE THE URINE THROUGH THE MICRO

5    CHANNELS DOWN TO A SPECIAL VALVE AND THEN MOVE IT FORWARD INTO

6    A SEGMENTED COLORIMETRIC REACTION, SO THAT A MOTHER COULD TELL

7    VERY EASILY IF HER CHILD WAS ILL.

8        NOW, SHE WASN'T BORN YET.  HE PUT A STATEMENT UP THERE

9    THAT I HAD NEVER INVENTED ANYTHING IN THAT FIELD.  AND I'M NOT

10   DWELLING ON THIS, BUT THERE SEEMS TO BE SOME FEELING OF BLOOD

11   ANALYSIS WAS INVENTED BY THERANOS.  BLOOD ANALYSIS HAS BEEN

12   AROUND FOR YEARS.

13       I HATE TO DISAPPOINT PEOPLE ABOUT THAT, BUT THAT'S TRUE.

14       A LABORATORY, WE HAVE A LABORATORY, WE HAD A LABORATORY.

15   I DON'T KNOW WHERE MR. BOIES COMES ALONG WITH THIS KNOWLEDGE.

16   OUR LABORATORY BEFORE IT WAS INVENTED WAS AN OLD TILE SHOP THAT

17   WE USED ON THE EAST COAST, WHERE THIS PARTICULAR INVENTION WAS

18   DONE.

19       I'VE CREATED MORE JOBS FOR THERANOS.  WE CREATED JOBS FOR

20   A THOUSAND INDIVIDUALS.  THOUSANDS OF INDIVIDUALS, FAR MORE

21   THAN THERANOS.

22       WE ARE GOING TO GET INTO SOMETHING HERE BUT I JUST WANTED

23   IT SAY IT NOW, WE ARE GOING TO DISCUSS THERAPEUTIC INDEX.  HE

24   TRIED TO SAY TO YOU UP ON THAT BOARD THAT, OF COURSE, THERANOS

25   WAS NOT JUST INTERESTED IN CLINICAL TRIALS, THEY WERE

1    INTERESTED IN ALL TYPES OF TESTING.

2         WELL, I'M SORRY, BUT THERAPEUTIC INDEX IS ONLY DONE IN

3    CLINICAL TRIALS.  AND I WILL GET INTO THAT.  BUT IF ONE OF YOU

4    CAME TO ME, AND I'LL GO INTO IT IN DETAIL, BUT IF YOU WANTED A

5    TEST FOR EXAMPLE, IF I COLLECT YOUR KIDNEY FUNCTION, IT WAS

6    MARGINAL, AND I DID A CREATINE ON YOU, WHICH I GET THE RESULTS

7    BACK IN SIX HOURS, I DON'T NEED THERANOS.

8         THERE'S NO THERAPEUTIC INDEX FOR CREATINE.  IT'S NOT A

9    DRUG.  SO THERE IS NO SUCH THING.

10        IF I DID A BILIRUBIN ON YOU, THERE'S NO THERAPEUTIC INDEX

11   BECAUSE IT'S NOT A DRUG.  SO THE VERY USE OF THE TERM

12   THERAPEUTIC INDEX IN THEIR PROVISIONAL SHOWS THEY WERE MEANT

13   FOR CLINICAL DRUG TRIALS FOR PHARMACEUTICAL COMPANIES.

14        I WILL GET BACK TO THAT.

15        IN TERMS OF THE -- AND I DON'T KNOW, I'M NOT A LAWYER BUT

16   I'M GOING TO TELL YOU NOW, I WOULD URGE YOU ALL TO READ THE

17   ORIGINAL COMPLAINTS BECAUSE HE, AGAIN, MY FORMER -- NEVER WAS A

18   HERO, SOMEBODY I FELT MORE HIGHLY OF, HE TRIED TO TELL YOU THAT

19   MCDERMOTT, WILL & EMERY DID THE PATENTS.  IT'S IN THE

20   COMPLAINTS.  IT'S ON THE AMENDED COMPLAINT.

21        IT'S A LIE.  THEY WERE DONE BY BOMMANNAN, A PATENT

22   WRITER.  WHY DO PEOPLE GO TO PATENT WRITERS?  THEY GO TO PATENT

23   WRITERS BECAUSE PATENT WRITERS DON'T LOOK INTO PRIOR ART.  YOU

24   ARE GOING TO HEAR THAT IN HIS DEPOSITION, THEY DON'T CARE ABOUT

25   PRIOR ARTS AND THAT'S WHY PEOPLE GO TO THEM, BECAUSE THEY DON'T

1    WANT SOMEBODY TO LOOK AT PRIOR ART.

2         AND I WOULD POINT THE FACT THAT THERANOS HAS SERIOUS

3    PRIOR ART PROBLEMS ON THEIR OWN.

4         LAST ONE, AND I'M GOING TO SPEAK TO WHY I ORIGINALLY WAS

5    HERE.  THEY ARE TRYING TO INFER THAT IF YOU TAKE KNOWN THINGS

6    AND PUT THEM TOGETHER IN A NEW WAY, THAT SOMEHOW THAT'S NOT A

7    PATENT.

8         WELL, YOU KNOW, SOMEBODY OUGHT TO TALK TO THE AMERICAN

9    DRUG COMPANIES, BECAUSE HALF OF THE DRUGS YOU ARE TAKING IN THE

10   PHARMACY THAT ARE OVER THE COUNTER, ARE THE RESULT OF THE

11   DOCTOR MY AGE WHO WAS CALLED DR. SUNSHINE.  AND WHAT

12   DR. SUNSHINE DISCOVERED IS THAT IF YOU TAKE CERTAIN DRUGS THAT

13   ARE PATENTED BY SOMEBODY ELSE, AND YOU COMBINE THEM, YOU

14   COMBINE AN ANTIHISTAMINE WITH TYLENOL, THAT MAKES A NEW DRUG,

15   YET BOTH DRUGS HAD OWNERSHIP OF THEIR ORIGINAL PATENTS BY OTHER

16   COMPANIES.

17        DR. SUNSHINE EASILY OBTAINED THE PATENT ON THE

18   COMBINATION.  SO ALMOST EVERY PATENT IN OUR LIVES ARE BUILT ON

19   THE OTHER PATENTS.  AND DISPARAGE OUR PATENTS AS BEING NOT

20   VALID BECAUSE CERTAIN COMPONENTS WERE KNOWN IS JUST UNTRUE.

21        OKAY.  OTHERS WILL COVER THE REST OF THIS.  I'M SHOCKED

22   BY IT.  MYSELF, I'M A PHYSICIAN.  I'M 74 YEARS OLD.  I'VE

23   DELIVERED PROBABLY A THOUSAND BABIES.  I'VE DONE A LOT OF

24   SURGERY.  I'M TRAINED IN FAMILY PRACTICE AND I'M ALSO TRAINED

25   IN PSYCHIATRY.

```
1          I'M OLD ENOUGH -- WE WERE TRAINED IN A DIFFERENT WAY AT

2     THAT TIME.  YOU CHOSE HOW YOU WERE TRAINED IN TERMS OF WHAT YOU

3     WANTED TO STUDY.  SO I WENT TO GEORGETOWN COLLEGE IN WASHINGTON

4     THEN I WENT TO GEORGETOWN MEDICAL SCHOOL.  I WAS RAISED ON A

5     FARM IN PENNSYLVANIA.  AND I WENT ON TO THE HARVARD CAMPUS OF

6     CAMBRIDGE CITY HOSPITAL WHEREIN I TRAINED IN, AS I SAID, FAMILY

7     MEDICINE WHICH WAS CHIEFLY OBSTETRICS AND GYNECOLOGICAL

8     PROCEDURES AND PSYCHIATRY.

9          I'VE SERVED MY COUNTRY TWICE.  I CAN TELL YOU ABOUT ONE

10    PART OF IT, THE OTHER I CAN'T.

11         THE VERY NEXT THING I WOULD LIKE TO GO TO IS THE PATENT

12    ITSELF, AND THEN I'M GOING TO COME BACK TO WHY WE ARE HERE,

13    BECAUSE WE ARE HERE FOR A VERY INTERESTING REASON WHY I DON'T

14    THINK THEY LIKE TO BRING UP.

15         LET'S JUST, IF YOU WILL, JUST THE WAY MY MIND WORKS, JUST

16    GO ON THIS THE IMAGINATION TOUR WITH ME.  AS A HOBBY I ENJOY

17    PAINTING.  IMAGINE THERE'S A LINE HERE, RIGHT HERE.  ON THIS

18    SIDE IS -- HOW DO YOU -- HOW DO YOU ANALYZE SOMETHING?  THAT'S

19    A DEVICE.  THAT'S A DEVICE.  THIS IS WHAT THERANOS DOES, THEY

20    DEVELOP THE DEVICE TO ANALYZE BLOOD.

21         I HAVE NEVER BEEN INTERESTED IN DEVICE IN THIS PORTION,

22    DEVELOPING A DEVICE.  AND THE REASON IS BECAUSE HISTORICALLY

23    THEY ALWAYS COST TOO MUCH, THEY TAKE TOO LONG TO FINISH, THEY

24    TAKE LONG FDA APPROVAL, AND IN TERMS OF THE INVESTMENT

25    COMMUNITY, THEY ARE NOT PARTICULARLY THOUGHT OF VERY HIGHLY
```

1    BECAUSE THIS IS SO DIFFICULT, THIS PART, AND THEN THE ULTIMATE

2    PROBLEM IS EVEN IF YOU GET A PATENT ON IT, BAXTER OR BAYER OR

3    SOMEBODY ELSE COMES IN AND SAYS, WE HAVE A DIFFERENT WAY OF

4    DOING IT.  AND I'VE NEVER INVESTED ON THAT.

5         WHAT OUR PATENT IS ABOUT, OUR '612 HAS NOTHING TO DO WITH

6    THE THERANOS PATENTS.  WHEN HE PUTS UP ON THE BOARD HOW THESE

7    ARE SIMILAR TO THE PROVISIONALS, THEY CAN'T BE SIMILAR BECAUSE

8    ONE IS A BANANA AND ONE IS AN APPLE.

9         WHAT I SAID IS AS FOLLOWS, I'M OPERATING UP HERE.  THIS

10   IS MY PRESCRIPTION PAD, OKAY, IT GIVES MY NAME AT THE TOP, IT

11   GIVES MY DEA, NUMBER IT GIVES MY ADDRESS IN LOS ANGELES AND IT

12   GIVES MY LICENSES.

13        I'M LICENSED IN CALIFORNIA, PENNSYLVANIA, VIRGINIA, NEW

14   YORK, AND WASHINGTON, D.C.  TO MAINTAIN FIVE MEDICAL LICENSES

15   IN TODAY'S CLIMATE, I'VE DONE IT FOR A NUMBER OF YEARS MEANS

16   THE NUMBER OF CME COURSES I HAVE TO TAKE IS ALMOST UNBEARABLE,

17   BECAUSE THEY REQUIRE IT NOWADAYS.

18        NOW, THIS IS INTERESTING TO ME AND THIS IS TRULY HOW THIS

19   PATENT STARTED, IT HAD NOTHING TO DO WITH THERANOS, WASN'T EVEN

20   AWARE OF THERANOS AT THE TIME.  DIDN'T KNOW THEY HAD A PATENT.

21   HER PARENTS ARE SECRETIVE, THEY DON'T LIKE TO TALK.  AND A

22   DIFFERENT ISSUE WE NEEDN'T GO INTO IT.

23        WHAT I WAS INTERESTED IN WAS SOMETHING ELSE.  AS I SAY,

24   PASS THE NUMBER I HAD NO INTEREST IN THAT.  YOU FILL IN THE

25   NAME HERE, WHEN YOU COME TO ME AND I WRITE IN THE PRESCRIPTION

1    I FILL IN THE NAME, THE ADDRESS THE DATE OF BIRTH, THE DATE,

2    YOUR SEX THEN I HAVE TO WRITE THE DRUG.  AND I HAVE TO WRITE

3    WHAT DOSE, AND HOW MANY TIMES A DAY YOU TAKE IT AND THEN OTHER

4    DETAILS ABOUT REFILLS AT THE BOTTOM.

5         NOW, KEEP IN MIND THAT WHEN YOU GO TO A DOCTOR, AND AS

6    FAR AS I KNOW I'M THE ONLY PHYSICIAN IN THE ROOM, BUT WHEN YOU

7    GO TO A GOOD DOCTOR, THE GOOD DOCTOR KNOWS THE MOST IMPORTANT

8    THING HE CAN DO, IT'S IMPORTANT THAN ANY OF THIS IT'S MORE

9    IMPORTANT THAN DRUGS, IT'S MORE IMPORTANT THAN ANYTHING, IS

10   THAT HE TALK TO YOU.

11        80 PERCENT OF DIAGNOSIS CAN BE HAD BY SITTING IN A ROOM

12   AND TALKING TO A PATIENT.

13        WHEN IT WAS MENTIONED YESTERDAY ABOUT OBAMA CARE, I HAVE

14   NOTHING AGAINST OBAMA CARE.  AS LONG AS IT ALLOWS A DOCTOR TO

15   SIT ONE-ON-ONE WITH A PATIENT AND FIND OUT WHAT IS BOTHERING

16   THAT PATIENT, DO THEY HAVE PAIN?  DO THEY HAVE SORROW, WHAT DO

17   THEY HAVE, THEY ARE HUMAN BEINGS.

18        AND IF YOU TAKE A GOOD HISTORY, IF YOU TALK, YOU ALREADY

19   HAVE AN IDEA WHAT'S WRONG WITH THE PATIENT.  AND THEN COMES

20   STEP NUMBER TWO IN WHICH YOU EXAMINE THE PATIENT BASED ON WHAT

21   YOU KNOW FROM THE HISTORY.

22        SO YOU HAVE THE HISTORY AND THE PHYSICAL EXAM.  NOW IF

23   THE PHYSICAL EXAM BEARS OUT WHAT YOU THINK IS WRONG, THEN YOU

24   WRITE A PRESCRIPTION FOR A DRUG.  THAT DRUG IS APPROVED

25   ALREADY.  I'M A PRACTICING PHYSICIAN.  I DON'T KNOW THE

```
 1      THERAPEUTIC INDEX NOR DO I CARE, BECAUSE WHAT IS THERAPEUTIC?
 2      NOW LET'S GO INTO IT.
 3           THERAPEUTIC INDEX IS WHEN A DRUG COMPANY KNOWS A NEW
 4      DRUG, THEY CALL IT IN THE INDUSTRY AN NCE, A NEW CHEMICAL
 5      ENTITY.
 6           AND WHAT THAT NEW DRUG AMOUNTS TO IS IN THE CLINICAL
 7      TRIAL AMOUNTS TO IS IF I HAVE A DRUG AND I KNOW THAT THIS DRUG
 8      IS ACTIVE AGAINST A CERTAIN DISEASE, NOW I HAVE TO SAY AND
 9      PROVE TO THE FDA, WHAT DOSE DO I GIVE?  AND THAT'S THE
10      THERAPEUTIC INDEX, BECAUSE EVERY DRUG HAS AN AMOUNT THAT
11      DOESN'T HELP YOU, IT'S TOO LITTLE, IT HAS AN AMOUNT THAT HELPS
12      YOU, AND IT HAS AN AMOUNT THAT HURTS YOU.
13           THERAPEUTIC INDEX IS SIMPLY TRYING TO FIND THAT OUT.  AND
14      HOW DO THEY FIND THAT OUT?  THEY DO THAT WITH WHAT THERANOS IS
15      TRYING TO MAKE MONEY OFF OF.  THEY DO THAT BY DOING CLINICAL
16      TRIALS AND FEEDING ALL THIS DATA INTO COMPUTERS THEN TRYING TO
17      FIGURE OUT WHAT IS THE RANGE THAT WE GO TO FDA TO GET CLEARANCE
18      FOR.  AND THIS IS WHY YOUR TABLETS COME IN VARIOUS SIZES.
19           THAT'S A THERAPEUTIC INDEX.  IT HAS NOTHING TO DO WITH
20      THE PRACTICE OF THE MEDICINE WHICH IS WHAT OUR PATENT IS ABOUT.
21           NOW WHAT OUR PATENT IS ABOUT IS SIMPLY THIS, CAN YOU HEAR
22      ME?  DO WE REALLY NEED THIS?  I THINK YOU ARE THE ONE -- CAN
23      YOU HEAR ME?  THANK YOU.
24           I WAS FRUSTRATED BY THIS, OKAY, BECAUSE IF YOU COME IN TO
25      ME, LET'S JUST TAKE THIS, WHEN YOU COME INTO ME AND YOU HAVE
```

1    HYPERTENSION, AND LET'S SAY I SUSPECT THAT YOUR HYPERTENSION IS

2    ON THE BASIS OF SODIUM RETENTION, SODIUM RETENTION GIVES YOU

3    TOO MUCH BLOOD VOLUME YOUR BLOOD PRESSURE GOES UP TO HIGH.  IF

4    YOU FOLLOW THE LITERATURE LATELY, YOU ARE FINDING MORE AND MORE

5    HYPERTENSION IS CAUSED BY TOO MUCH ALDOSTERONE.  YOUR ADRENALS

6    SECRETE IT, IT'S A HORMONE WE ALL HAVE IT.  WHAT IT DOES

7    BASICALLY IS THE ALDOSTERONE SAYS, HEY GIVE ME THE SALT, GIVE

8    ME THE SALT, KEEP THE SALT.  SO IF YOU EAT A PRETZEL THAT HAS

9    SALT ON IT, ALDOSTERONE IS SAYING HEY, I WANT TO SALT.  DON'T

10   PEE OUT THAT SALT, KEEP IT.

11        NOW GRADUALLY THAT RAISES THE BLOOD VOLUME.  AS IN ANY

12   CLOSED SYSTEM WHICH OUR BODY IS, IT'S GOING TO RAISE THE BLOOD

13   PRESSURE.

14        NOW, IF I FEEL THAT'S WHAT YOU HAVE, AND THIS IS WHAT

15   LEAD TO THE '612, NONE OF THE NONSENSE YOU SAW ON THE BOARD, IF

16   I GIVE YOU A CLEAR DON'T, I HAVE TO LOOK AT YOU FIRST AND

17   EVALUATE YOU.  YOU LOOK LIKE YOU ARE PRETTY YOUNG AND HEALTHY.

18   I'M NOT WORRIED ABOUT YOUR KIDNEYS UNLESS I HAVE EXAMINED YOU

19   AND YOU HAVE A HISTORY OF KIDNEY DISEASE.  SO I KNOW YOUR

20   KIDNEY IS CLEAR OR WELL.

21        SO IF I GIVE YOU 75 MILLIGRAMS OF EPLERENONE, I'M NOT

22   PARTICULARLY WORRIED ABOUT A NASTY LITTLE HABIT, IT'S AN OLD

23   SAYING AMONG OLD DOCTORS THAT ARE OLDER, AND THAT IS THAT THE

24   MULE CAN KICK YOU.

25        AND I KNOW IT FROM THE FARM WHEN I WAS BEING RAISED,

1    YOU'VE GOT TO BE CAREFUL AROUND A MULE BECAUSE YOU COULD GO TO

2    A MULE AND BE NICE TO THE MULE, BE NICE TO THE MULE, ONE DAY

3    THE MULE IS GOING TO KICK YOU IF YOU ARE NOT CAREFUL WALKING IN

4    BACK OF IT.

5         DRUGS ARE LIKE MULES.  SO LET'S TAKE OUR EPLERENONE, ALSO

6    KNOWN ASPERA.  WHAT DOES IT DO?  IT BLOCKS SODIUM INTAKE.  SO

7    WHEN YOU EAT THAT PRETZEL, THAT SALT IS, YOU ARE GOING TO PEE

8    IT OUT.  IT'S GONE.  AND YOUR PRESSURE IS GOING TO DROP.

9         NOW, EVERYONE HERE IS YOUNG, I'M DIPLOMATIC, EVERYBODY

10   HERE IS YOUNG, I MEAN, THERE'S NO OLD PEOPLE, RATHER, NONE OF

11   YOU ARE OLD.  BUT LET'S SAY WE HAD AN OLD WOMAN SITTING BACK

12   THERE AND LET'S SAY SHE'S MY AGE AND SHE'S KIND OF FRAGILE.

13        WELL, WHEN I LOOK AT HER, I KNOW IMMEDIATELY JUST LOOKING

14   AT HER JUST BY HINT OF AGE, SHE'S LOST PROBABLY 25, 30 PERCENT

15   OF HER KIDNEY FUNCTION.  THAT'S JUST AGE.

16        WELL THEN IF SHE HAS HYPERTENSION, LET'S SAY SHE'S HAD IT

17   FOR 34 YEARS, HYPERTENSION POUNDING AWAY AT THE KIDNEY THROUGH

18   THE RENAL ARTERY, IT'S GOING TO DO SOME DAMAGE.

19        SO NOW I SAY TO MYSELF, YOU KNOW, AND ANY GOOD PHYSICIAN

20   WOULD DO THIS, WOULD SAY SHE'S GOT 25 PERCENT LOSS BY AGE, SHE

21   COULD HAVE 10, 15 PERCENT LOSS JUST BY HER DISEASE.

22        THEREFORE, WHEN I GIVE HER THE EPLERENONE, NOW I'M GOING

23   TO GIVE HER 50 MILLIGRAMS, I GAVE YOU 75, I'M GOING TO GIVE HER

24   50 TO START OR EVEN 25.  BUT NOW I'M GOING TO SAY TO MYSELF,

25   YOU KNOW, I'M A LITTLE CONCERNED ABOUT SOMETHING BECAUSE WHAT

1     IF SHE IN FACT HAS, THE MULE KICKS HER, BECAUSE WHAT EPLERENONE

2     DOES, IS YES IT GETS RID OF SODIUM, BUT IT KEEPS POTASSIUM.  SO

3     THE RESULT IS THAT IF YOU ARE ON EPLERENONE, YOUR SODIUM GOES

4     DOWN, YOUR POTASSIUM GOES UP.

5         YOU COULD SAY TO ME, SO WHAT.  THE SO WHAT IS THAT'S AN

6     ELECTRICAL DEATH.  THAT'S HOW PEOPLE DIE.  POTASSIUM IF IT GOES

7     TO MY YOU GET A VERY IRREGULAR HEARTBEAT AND YOU CAN DIE FROM

8     IT.  SO IT'S SOMETHING TO WORRY ABOUT.

9         NOW THE WAY THE '612 ORIGINATED WAS, AND WE HAVE BEEN IN

10    DIAGNOSTICS OUR WHOLE LIFE, NOT THIS FABLE YOU HAVE TALKED

11    ABOUT.  AND I WILL TELL YOU MANY MORE DIAGNOSTICS WE WERE IN.

12    AND YOU SAY TO YOURSELF, WOULDN'T IT BE GREAT IF -- AND HERE'S

13    THE CONNECTION WITH THERANOS COMES IN, AND IF I DID CALL HER A

14    DUMB ASS KID, I WILL ADMIT TO IT, BUT I CALLED IT BECAUSE IT

15    WAS IGNORANT WAY A CERTAIN THING WAS DONE.

16        SHE WENT ALL OVER YOU TUBE, ALL OVER THE PUBLIC, TALKING

17    ABOUT THERANOS IS GOING TO PUT AN ANALYZER IN EVERYBODY'S

18    HOUSE.

19        AND KEEP IN MIND, WHICH I WAS GOING TO SAVE UNTIL THE

20    END, WHAT THIS CASE IS ABOUT.  THIS CASE IS NOT ABOUT ANYBODY

21    WHO IS IN THE ROOM RIGHT NOW, THE CASE IS ABOUT WHO IS IN THIS

22    CHAIR.  THERE'S SOMEBODY SITTING IN THIS CHAIR WHO I WILL

23    IDENTIFY FOR YOU.  THAT'S WHO CAUSED THIS LAWSUIT, BECAUSE THEY

24    THOUGHT BIG MONEY WAS GOING TO BE MADE FROM THIS.

25        BUT WHEN YOU PUT ALL OF THIS TOGETHER, IT WAS THERANOS

1    AND THIS PARTY THAT FUNDED HER AND SAID, OH, THEY ARE GOING TO

2    BE ANALYZERS IN EVERY HOME.

3         SO NOW IF YOU ARE AN INVENTOR AND YOU HAVE AS MANY

4    INVENTIONS AS WE HAVE.  AND MY SON JOE IS A GENIUS, BY THE WAY,

5    AT INVENTIONS.  IF YOU SAY TO YOURSELF IF THAT'S TRUE, WOULDN'T

6    IT BE GREAT THEN FOR THAT LITTLE OLD WOMAN THAT I DON'T HAVE TO

7    WORRY THAT HER POTASSIUM IS GOING TO GO TOO HIGH AND SHE'S

8    GOING TO HAVE HEART TROUBLES.

9         IF, AND ALL THE INVENTION IS IF, GOD BLESS YOU, YOU COULD

10   ALL BE INVENTORS, AND I WISH YOU WOULD, BUT WHEN YOU THINK OF

11   INVENTING YOU HAVE TO THINK OF THE FUTURE.  THE SECRET TO

12   INVENTING IS YOU HAVE TO THINK OF NOT WHAT'S NOW BUT WHAT COULD

13   BE.

14        SO THE ONLY CONNECTION TO THERANOS IS THEY ARE RUNNING

15   AROUND ALL OVER THE MEDIA AS I SAID, SAYING EVERYBODY IS GOING

16   TO HAVE AN ANALYZER.

17        SO THEN JOE AND I WERE TALKING MONTHS BEFORE THIS E-MAIL,

18   MONTHS BEFORE, AND WHAT WE SAID WAS, YOU KNOW, HOW ARE THE

19   ANALYZERS GOING TO BE SET IN PEOPLE'S HOUSES?  NO MATTER WHO

20   MAKES THEM, IF BAXTER MAKES THEM, IF THERANOS MAKES THEM, ARE

21   THEY GOING TO LITERALLY HAVE THOUSANDS OF TECHNICIANS THAT ARE

22   GOING TO GO TO PEOPLE'S HOMES TO SET THE ANALYZER LEVEL, OR THE

23   POTASSIUM OR WHATEVER DRUG YOU ARE GIVING?  IT DIDN'T MAKE ANY

24   SENSE.

25        SO IT'S HOW AN INVENTOR THINKS.  AND WE SAY WOULDN'T IT

 1    BE IDEAL IF YOU TOOK THIS AND YOU SAID OKAY, MOST OF YOU I

 2    THINK KNOW WHAT A PHYSICIAN DESK REFERENCE IS.  YOU KNOW IT'S

 3    THAT RED BOOK, DOCTORS USUALLY READ IT WHEN THE PATIENT DOESN'T

 4    SEE AND THEY GO IN THE BACK SO THE PATIENT THINKS THEY KNEW.

 5    BUT THAT GIVES YOU EVERY DRUG, THE SIDE EFFECTS OF THE DRUG,

 6    THE DOSE OF THE DRUG, EVERYTHING ABOUT IT.

 7         SO WE SAID THAT THE LOGICAL WAY TO DO THIS IS THAT THE

 8    PHYSICIAN DESK REFERENCE HAVE AN APPENDIX TO IT AND THAT

 9    APPENDIX BASICALLY HAVE DIFFERENT STOMA FOR SETTING THE

10    ANALYZER.

11         SO YOU, I'M NOT WORRIED ABOUT YOU, I SET YOU AS 3 TO 5,

12    SOMEBODY AS HEALTHY AS YOU.  THAT LITTLE OLD LADY BACK THERE I

13    WOULD NOT DO THAT.  I WOULD WANT TO SET HER FOR SAFETY AT LET'S

14    SAY, 2 TO 3.8 OR 4.

15         HOW AM I GOING TO SET THAT?  WELL, THAT WAS OUR

16    INVENTION.  OUR INVENTION WAS SIMPLY TO PUT, IN THIS EXAMPLE,

17    AND WE COVERED SEVERAL DIFFERENT WAYS OF DOING IT, BUT THIS WAS

18    ONE WAY, TO HAVE A BAR CODE HERE SO THAT WHEN THE PHARMACIST

19    FILLED THIS, WE HAD A REFERENCE TO WHAT BAR CODE WE WANTED IT

20    AFFIXED TO YOUR BOTTLE OF MEDICATION.

21         SO EVERYTHING WOULD BE THE SAME.  HE FILLS YOUR

22    EPLERENONE.  THE ONLY THING YOU NOTICE IS THAT THERE'S A BAR

23    CODE ON THE SIDE OF YOUR EPLERENONE.

24         YOU WOULD TAKE THAT HOME AND YOU WOULD PLACE THAT IN

25    FRONT OF A READER ON YOUR ANALYZER AND IT WOULD SET THE LIMITS

1    ON THE ANALYZER.  AND IT WOULD ALERT YOU IF YOU ARE OUTSIDE

2    YOUR PROPER LIMIT.  AND YOU COULD NOTIFY YOUR PHYSICIAN AND

3    SAY, MY ALERT WENT OFF.

4         NOW DOES THAT MAKE SENSE?  I MEAN, DOESN'T THAT JUST MAKE

5    COMMON SENSE THAT THAT'S AN INTERESTING WAY OF DOING IT?  WELL,

6    WHEN WE LOOKED INTO IT, THERE'S NO PRIOR ART.  NOBODY EVER

7    THOUGHT OF THAT.  WHAT THEY CALL PRIOR ART, AND WE WILL SEE IT

8    THROUGHOUT THIS TRIAL, THEY WILL SAY THAT IF THEY WROTE IN THE

9    PATENT THAT THEIR ANALYZER COULD COMMUNICATE WITH OUTSIDE

10   PEOPLE LIKE PHYSICIANS, COULD, AND OF COURSE MY ANSWER TO THAT

11   IS, I COULD CLIMB MOUNT EVEREST TOO.  I COULD AT THIS AGE I

12   DON'T KNOW IF I WOULD MAKE IT BUT THEORETICALLY I COULD.

13        SO COULD, CAN, MAYBE.  THAT'S NOT THE SAME AS DOING IT.

14   AND THAT'S WHAT THEY ARE GOING TO BE POINTING TO TIME AFTER

15   TIME AFTER TIME IN THEIR PATENTS IS COULD BE.

16        WELL, I'M NOT GOING TO SAY THE WORD, BUT THE FACT OF THE

17   MATTER IS, COULD ISN'T ENOUGH.  YOU HAVE TO SHOW, THE WAY THE

18   PATENT LAW IS WRITTEN IT SAYS YOU HAVE IT TEACH.  YOU HAVE TO

19   SHOW HOW IT'S DONE.  AND THAT'S WHAT WE DID AND THAT'S WHAT THE

20   '612 WAS ABOUT.

21        IT WAS NO THREAT TO THEM.  I SENT HER BECAUSE WE WERE

22   FRIENDS YEARS AGO, UNTIL HER FAMILY FOR WHATEVER REASON BECAME

23   JEALOUS OF US AND DIDN'T WANT ANYTHING TO DO WITH OUR FAMILY.

24   WE WERE FRIENDS.  I THOUGHT I WAS HELPING HER.  THIS SEEMED TO

25   MATCH.  ALL I DID WAS SEND HER A COPY OF THE PATENT.

1          NOW, WHY ARE WE HERE?  THAT'S A BETTER STORY.  WE ARE

2     HERE BECAUSE THE PATENT PUBLISHED.  THEY WEREN'T PAYING

3     ATTENTION.  SO THE WAY THE PATENT LAW IS WRITTEN, WHEN YOU'RE

4     IN A GIVE FIELD, AS JOE AND I ARE, INTERNET HAS TICKLERS.  WE

5     ALWAYS HAVE TICKLERS OUT FOR FIELDS WE ARE INTERESTED IN.

6          AND BY THE WAY, AS WE SAT HERE YESTERDAY, IF YOU NOTICED

7     ANY FUSS OVER AT OUR TABLE, IT WAS BECAUSE ANOTHER ONE OF OUR

8     PATENTS ISSUED, AND AN E-MAIL CAME IN FROM THE LAWYER THAT WE

9     HAVE ANOTHER ISSUANCE.  WHAT AREA IS IT IN?  ANALYZERS.  SO IT

10    ISSUED RIGHT IN FRONT OF YOU.

11         WHAT I'M GETTING AT IS WHY ARE WE HERE TODAY?  WELL, WE

12    ARE HERE BECAUSE THE PATENT LAW SAYS THAT WHEN A PATENT

13    PUBLISHES, THAT IF YOU'RE AN INTERESTED PARTY YOU HAVE ONE YEAR

14    TO REGISTER WITH THE PATENT OFFICE, VERY SIMPLE PROCEDURE,

15    SOMETHING CALLED AN INTERFERENCE.  AND WHAT AN INTERFERENCE IS,

16    IS IF YOU INVENTED SOMETHING AND YOU THINK THAT YOU EITHER

17    INVENTED IT TOO OR YOU HELPED HIM, WITHIN ONE YEAR AFTER ITS

18    PUBLISHED YOU CAN DECLARE AN INTERFERENCE AND THE PATENT OFFICE

19    WILL THEN INVESTIGATE WHETHER IN FACT YOU SHOULD BE A

20    COINVENTOR OR WHETHER IT BELONGS TO YOU, IT'S CALLED AN

21    INTERFERENCE.

22         THEY MISSED IT.  THEY DIDN'T DO THEIR HOME WORK, THEY

23    MISSED IT.  AGAIN, DUMB ASS KID.  I SHOULDN'T PROBABLY HAVE

24    SAID THOSE WORDS, BUT A GOOD CEO KNOWS THAT.  THAT'S WHY YOU

25    GET PAID A LOT OF MONEY AS A CEO.

1         NOW WHAT ARE YOU GOING TO DO IF SOMEBODY HAS A PATENT

2    THAT THIS MAN IN THE CHAIR THINKS IS BLOCKING HIM?  AND THAT

3    MAN IN THE CHAIR IS LARRY ELLISON BY THE WAY WHO OWNS ORACLE

4    AND OWNS THEM.

5         IF YOU ARE THE THIRD RICHEST GUY IN THE WORLD, WHAT ARE

6    YOU GOING TO DO?  WELL, ONE THING YOU CAN DO IS GO TO ONE OF

7    THE RICHEST LAWYERS IN THE COUNTRY SITTING OVER HERE AND YOU

8    SAY, I'VE GOT TO DO SOMETHING.  THIS PATENT IS IN THE WAY, I'VE

9    GOT TO GET INTO A FEDERAL COURT HOW DO I GET INTO A FEDERAL

10   COURT?

11        I DON'T WANT TO GO INTO CRIMINAL COURT, SO I'VE GOT TO

12   DECLARE SOMETHING TO GET ME IN FEDERAL COURT.  SO THE FIRST

13   THING THAT WOULD COME TO MIND WOULD BE OH, AND BY THE WAY, THE

14   HOLMES'S GOT MY SON INTO LAW SCHOOL.  THE HOLMES'S VACATIONED

15   AT LEAST 60 TIMES WITH MY FAMILY.

16        AND YET YOU ARE GOING TO SEE IN THIS CASE THAT THEY

17   CLAIM, ELIZABETH HOLMES CLAIMS IN 2008, SHE DISCOVERED THAT

18   JOHN FUISZ WORKED AT MCDERMOTT.

19        IT'S STRANGE CREDIBILITY, THE AMOUNT OF TIME OUR FAMILIES

20   SPENT TOGETHER.  AND THEY KNEW DAM WELL WHERE HE WORKED.

21   ELIZABETH HOLMES ALSO TESTIFIED ON THE DOCKET, I WROTE AT LEAST

22   FIVE PRESCRIPTIONS FOR HER FAMILY.  SHE ASKED FOR A TOUR OF

23   GEORGETOWN MEDICAL SCHOOL WHERE I WENT.  MY WIFE TOOK HER.  BUT

24   SHE DIDN'T KNOW I'M A DOCTOR ANYMORE.

25        I MEAN, IT JUST DOESN'T RING TRUE.  SO WHAT DID THEY DO

1    THEN, THEY HAD TO GET INTO A FEDERAL COURT, SO SOMEBODY SAYS I

2    GUESS LAWYERS DO AND SAID, OH, DOESN'T JOHN WORK AT MCDERMOTT?

3            WELL, LET'S SAY, LET'S SAY THAT HE STOLE IT.  BUT LET'S

4    NOT DO IT IN A CRIMINAL COURT, WE CAN'T DO THAT IN A CRIMINAL

5    COURT BECAUSE IN CRIMINAL COURT THEY ARE GOING TO WANT PROOF.

6            A PROSECUTOR IS GOING TO SAY, WHAT'S YOUR PROOF THAT JOHN

7    FUISZ STOLE THE PATENT?  WELL, I DON'T KNOW.  SO THEY SAID

8    LET'S DO IT IN A CIVIL COURT.  BECAUSE THERE WE CAN USE

9    CIRCUMSTANTIAL EVIDENCE AND THAT'S WHY WE ARE HERE TODAY.  WE

10   ARE HERE BECAUSE THIS WAS A CLEVER WAY THE LAWYERS HAD TRYING

11   TO SAVE MR. ELLISON'S VESTMENT IN THE COMPANY BECAUSE OF OUR

12   PATENT.

13           AND THE FACT OF THE MATTER IS, AND WE WILL SHOW YOU THIS

14   BEFORE THIS TRIAL IS OVER, ONE OF THE BILLS FROM MCDERMOTT,

15   WILL & EMERY, AND GOD LOVE YOU IF YOU PAID BILLS LATELY TO

16   LAWYERS, TO FILE THEIR PATENTS WAS $516.

17           AND WHY WAS THAT?  BECAUSE THEY DIDN'T WRITE THE PATENTS.

18   IT WAS A LIE.  THE COMPLAINT IS A LIE.  THE AMENDED COMPLAINT

19   IS A LIE.  BOMMI BOMMANNAN WROTE THE PATENTS.

20           THEY SENT THEM TO A FRIEND AT MCDERMOTT, THEN MCDERMOTT

21   FILED THEM.  YOU REALIZE HOW LONG FILING TAKES ELECTRONICALLY?

22   IT LITERALLY TAKES YOU FIVE MINUTES.

23           SO MCDERMOTT PLAYED NO ROLE IN THIS EXCEPT THEY HAD A

24   FRIEND THERE, A FAMILY FRIEND WHO GAVE THEM A GOOD BREAK ON

25   CHEAP WAYS OF FILING PATENTS.

1          IN SUMMARY I DON'T KNOW WHAT ELSE TO TELL YOU ABOUT THIS,

2     THIS IS A SAD THING IN TERMS OF JOHN, HE HAD A SICK CHILD AND A

3     SICK BABY, THEY CALLED US THIEVES.  IN ORDER TO SAVE -- OF

4     COURSE HE WAS ANGRY, IT RUINED HIS PRACTICE WHEN YOU ARE CALLED

5     A THIEF.  MY SON'S LAW LICENSE IS GOING TO BE CANCELLED WHEN

6     THIS CASE GOES THROUGH.

7          CALL SOMEBODY A THIEF.  THEY DIDN'T HAVE TO CALL US A

8     THIEF.  IT'S A MEAN, VINDICTIVE THING THAT WE ARE IN THIS

9     COURTROOM IN THE FIRST PLACE.

10          GOD BLESS YOU.  I LOVE YOU.

11          THE COURT:  THANK YOU, DR. FUISZ.

12     MS. ANDERSON?  MR. FUISZ?

13          MR. BOIES:  MAY WE APPROACH, YOUR HONOR.

14          THE COURT:  YOU MAY.  LET'S APPROACH AT SIDEBAR.

15     (SIDE-BAR DISCUSSION OFF THE RECORD.)

16          THE COURT:  GO AHEAD.

17          MR. BOIES:  I THINK YOU NEED TO TELL THE JURY, AND I

18     THINK YOU NEED TO TELL THE JURY NOW, THAT THAT WAS IMPROPER.

19          HE DID EVERYTHING THAT HE COULD TO INFLAME THE JURY.  HE

20     VIOLATED YOUR COURT'S ORDER.  HE ATTACKED THE LAWYERS WHICH

21     YOUR HONOR SAID HE COULD NOT DO.  HE TALKED ABOUT THE EFFECT ON

22     HIS FAMILY OF THIS LAWSUIT WHICH YOUR HONOR SAID HE COULD NOT

23     DO.

24          MR. R. FUISZ:  THAT'S NOT TRUE.  THERE'S NO ATTACK ON

25     ANYONE.

1           THE COURT:  ONE AT A TIME.

2           MR. BOIES:  WAIT A MINUTE.

3       HE WAS TALKING ABOUT HOW HIS -- THE EFFECT ON HIS SON,

4   HOW HIS SON'S LAW PRACTICE WAS RUINED, HOW HE'S GOING TO GET

5   DISBARRED IF THIS CASE GOES FORWARD, TALKING ABOUT ONE OF THE

6   MOST EGREGIOUS LAWYERS IN THE COUNTRY.  HE'S TALKING ABOUT

7   LARRY ELLISON GOING OUT AND BRINGING THIS LAWSUIT.

8       VIRTUALLY NONE OF WHAT HE HAS TALKED ABOUT TO THE JURY IS

9   SOMETHING THAT WAS GOING TO BE THE SUBJECT OF PERMISSIBLE

10  EVIDENCE IN THIS CASE.  AND I THINK THE JURY HAS GOT TO BE TOLD

11  THAT AND TOLD THAT NOW.

12          THE COURT:  ALL RIGHT.

13      BRIEF RESPONSE?

14          MR. J. FUISZ:  I'M SORRY.  YOU DID, IN FAIRNESS, I

15  BELIEVE THE COURT DID SAY WE COULD OFFER TESTIMONY ABOUT OUR

16  FAMILY.  MY FATHER IS 74 YEARS OLD, I MEAN -- GO AHEAD --

17          THE COURT:  ONE AT A TIME, AND VERY BRIEFLY.

18      GO AHEAD.

19          MS. ANDERSON:  YOUR HONOR, AFTER THE POWERPOINT

20  DISPLAY WAS PUT UP THAT THE ALLEGATIONS ARE AGAINST, THE TYPE

21  OF LANGUAGE THAT THE PLAINTIFFS CHOSE TO PUT UP, TO RESPOND TO

22  IN ORDER TO SHOW THE EFFECT UPON THE FAMILY AND WHY THERE'S A

23  BASIS, THE REASON FOR THOSE STATEMENTS THAT WERE MADE, THAT'S

24  FAIR GAME TO BE ABLE TO SHOW WHAT THE EVIDENCE DOESN'T SHOW IN

25  THIS CASE.

```
1              THE COURT:  ALL RIGHT.

2         I THINK I'VE HEARD WHAT I NEED TO HEAR.

3         AT LEAST AS TO THE FACT THAT THERE WAS AN ATTACK ON THE

4    LAW FIRMS, THAT WAS THE SUBJECT OF MY ORDER ON THE MOTION IN

5    LIMINE.  THAT WAS IMPROPER.

6         RATHER THAN SIMPLY CRAFT A LIMITING INSTRUCTION HERE ON

7    THE FLY, WE WILL CONTINUE WITH THE OPENING STATEMENTS FROM THE

8    DEFENDANTS.

9         OVER THE LUNCH HOUR, MR. BOIES, IF YOU OR YOUR COLLEAGUES

10   WOULD LIKE TO POSE A VERY NARROW CORRECTING INSTRUCTION I WILL

11   CONSIDER IT.  IF I AGREE WITH IT, I WILL DELIVER IT AFTER WE

12   RETURN FROM LUNCH.

13              MR. R. FUISZ:  EXCUSE ME.  ON WHAT?

14              THE COURT:  I WILL LET YOU PROPOSE WHATEVER YOU WOULD

15   LIKE.

16              MR. R. FUISZ:  IS IT UNTRUE --

17              THE COURT:  WE NEED TO PROCEED WITH OPENING

18   STATEMENTS.

19         MR. FUISZ, YOU MAY PROCEED.

20              MR. J. FUISZ:  THANK YOU, YOUR HONOR.

21         LADIES AND GENTLEMEN, MY NAME IS JOE FUISZ.  I LIVE IN

22   MIAMI FLORIDA.  I'VE GOT TWO KIDS, SIX-YEAR OLD AND FOUR-YEAR

23   OLD.

24         I HAVE BEEN WORKING WITH MY DAD FOR THE LAST 15 YEARS.  WE

25   WORK PRINCIPALLY WITH TECHNOLOGY, ALSO SORTS OF DIFFERENT
```

1    TECHNOLOGIES.  AND WE ARE VERY GOOD AT PATENTING.

2         NOW LET ME TALK, AND UNFORTUNATELY I DON'T HAVE A LOT OF

3    TIME.  BUT I WANT TO TALK A LITTLE BIT ABOUT THE POWER POINT

4    THAT YOU SAW.  AND I WANT TO TALK ALSO ABOUT WHAT YOUR HONOR

5    SAID EARLIER ABOUT THE TYPES OF EVIDENCE IN THIS CASE.

6         HE GAVE YOU TWO TYPES OF EVIDENCE DIRECT EVIDENCE AND

7    THEN A SECOND CLASS, CIRCUMSTANTIAL EVIDENCE FROM WHICH THERE'S

8    NO DIRECT EVIDENCE OF A THEFT IN THIS CASE.  THERE'S NOT AN

9    E-MAIL, THERE'S NO RECORD OF -- EXCUSE ME, I'M A LITTLE

10   EMOTIONAL MYSELF SO I WILL BE REAL QUICK.

11        THERE'S NO RECORD OF JOHN FUISZ EVER ACCESSING OVER THE

12   MCDERMOTT, WILL & EMERY -- FROM THE MCDERMOTT FILE SYSTEMS THE

13   THERANOS DOCUMENTS.  HE WAS NEVER A LAWYER OF THERANOS, NEVER

14   BILLED ANY TIME FOR THERANOS, PLAINTIFF'S LAWYER DOESN'T

15   ALLEGE, BUT THIS IS SORT OF IMPLIED.

16        WE CITED THE THERANOS PATENTS THAT WERE PUBLIC IN OUR

17   PATENT APPLICATION.  THEY WERE CONSIDERED BY THE EXAMINER.  AND

18   AT LEAST WITH RESPECT TO THOSE THAT WERE PUBLIC AT THE TIME WE

19   SHOWED THEM.

20        SO JOHN'S -- JOHN'S FORMER LAW FIRM WILL TESTIFY THERE'S

21   NO KNOWLEDGE OF HIM DOING ANYTHING WRONG.  THERE'S SIMPLY NO

22   EVIDENCE WHATSOEVER TO SUGGEST THAT JOHN FUISZ TOOK THEIR

23   PROVISIONALS AND SENT THEM TO US, OKAY.

24        THAT'S DIRECT EVIDENCE.  I'M SORRY I'M EMOTIONAL, I'M NOT

25   SPEAKING WITH YOU RIGHT NOW.  BUT I'M REPRESENTING MYSELF, AND

1    I'M NOT ASKING FOR SYMPATHY TELLING YOU THIS BECAUSE I'M A VERY

2    LUCKY MAN IN A LOT OF WAYS, BUT THE FACT OF THE MATTER IS I'M

3    SPEAKING IN THIS CASE FOR MYSELF, PRO SE, AND SO I DON'T HAVE A

4    FANCY POWER POINT, SO I NEED YOU TO WORK IN THIS CASE WITH THE

5    EVIDENCE THAT'S THERE AND REALLY PAY ATTENTION, OKAY, AND NOT

6    JUST BE LULLED BY POWERPOINT.  YOU'VE GOT TO LOOK WHAT'S THERE.

7         AND I SUBMIT TO YOU WHEN YOU LOOK WHAT'S THERE, YOU WILL

8    FIND THERE'S NO DIRECT EVIDENCE OF ANY KIND OF ACCESS.

9         NUMBER TWO, CIRCUMSTANTIAL EVIDENCE.  YOUR HONOR GAVE A

10   WONDERFUL METAPHOR, THE EXAMPLE OF A GARDEN HOSE AND WHEN IT'S

11   WET ON THE SIDEWALK.

12        I WOULD SUBMIT TO YOU THAT MY FATHER'S RECORD OF 114

13   ISSUED PATENTS AND I GUESS ONE OF THEM IS THE '612 SO WE WILL

14   SUBTRACT IT, I WOULD SUBMIT TO YOU THOSE ARE 113 GARDEN HOSE'S,

15   AS IT WERE.

16        WE ARE VERY GOOD AT FILING PATENTS, WE ARE VERY GOOD AT

17   GETTING PATENTS.

18        SINCE THIS LAWSUIT WAS INSTITUTED IN OCTOBER, I THINK 26

19   OF 2011, I CAN'T EVEN GIVE YOU THE NUMBER, BUT I THINK IT'S

20   LIKE BETWEEN 14 AND 16 NEW PATENTS WE'VE HAD ISSUED BY THE

21   PATENT OFFICE.

22        AS MY DAD SAID, THE PATENT EXAMINERS WORKING ON ANOTHER

23   CASE FOR US.  IT'S A SKILL.  AND IT'S PARTLY, A LOT OF IT, AND

24   I WILL TELL YOU SOMETHING ABOUT MY DAD, I'M SO PROUD OF HIM.

25   MY DAD IS ONE OF THESE GUYS WHO FORGETS MORE, AND I'M A PRETTY

1    SMART GUY MYSELF, I WENT TO YALE I WENT TO COLUMBIA LAW SCHOOL

2    I'M NO DUMMY BUT MY DAD IS ONE WHO FORGETS WORSE THAN ANYONE OF

3    US LEARN IN OUR LIVES.

4         LET ME GIVE YOU AN EXAMPLE -- A COUPLE STORIES I WILL

5    TELL YOU I WILL TRY TO BE QUICK BECAUSE OF THE TIME LIMITS.

6         ABOUT A YEAR AND A HALF AGO, APPROXIMATELY, I'M SITTING

7    AT HOME ON A SATURDAY, I GOT TWO YOUNG KIDS, MY KIDS WERE

8    YOUNGER AT THAT TIME.  IF YOU HAVE KIDS, YOU KNOW WHAT THAT'S

9    LIKE ON SATURDAY.

10        AND MY PHONE, BING, BING, BING, IT'S GOING OFF.  AND IT'S

11   GETTING MESSAGES.  I'M NOT LOOKING AT IT.  FINALLY THE PHONE

12   RINGS AND MY FATHER IS ANNOYED WITH ME.  JOE, WHY AREN'T YOU

13   RESPONDING TO THESE PICTURES, DON'T YOU SEE THE SIGNIFICANCE OF

14   THIS?  WELL, WHAT IS HE DOING, HE'S TAKING A GEL CAP, DO YOU

15   REMEMBER WHAT THE LIQUID GEL IS, IT'S LIKE A SOFT GELATIN

16   TABLET.

17        HE'S TAKING THEM WITH APPLIERS AND HE'S RESHAPING THEM.

18   OKAY.  SO HE'S RESHAPING THEM TO CHANGE THE SHAPE FROM THE WAY

19   THEY WERE BEFORE, THEN HE'S GOT ADHESIVE TAPE ON AN INCLINE.

20   HE TAKES A GLASS OF WATER AND HE'S TRYING TO SEE HOW THEY

21   RELEASE OFF THE TAPE.  OKAY.

22        THAT SOUNDS KIND OF GOOFY RIGHT.  YOU MIGHT THAT THAT

23   SOUNDS ALMOST LIKE HE'S CRAZY, WHAT IS HE TRYING TO DO, WHAT

24   THAT MATURED HIM TO WAS SUBSEQUENTLY A LOT OF WORK AND WAS

25   ACTUALLY FUN FOR ME BECAUSE I HAD TO LEARN A LITTLE BIT ABOUT

1    GEOMETRY TO HELP FIGURE OUT THE CASE.  IT MATURED INTO NEW

2    TABLET SHAPES THAT WE HAVE PROVEN THROUGH CLINICAL STUDY ARE

3    BETTER AT TRANSMITTING THE ESOPHAGUS, BETTER AT GETTING IN YOUR

4    STOMACH THAN CONVENTIONAL SHAPES.

5         IT'S FASCINATING, NOT SOMETHING MOST PEOPLE WOULD THINK

6    OF, ALL RIGHT.

7         WHAT'S ANOTHER EXAMPLE OF YOUR CRAZY INVENTIONS POP,

8    COTTON CANDY SPINNER.  LET ME TELL YOU SOMETHING ELSE ABOUT

9    THAT TILE SHOP WHEN I FELT WE WERE DEGRADED A LITTLE BIT THAT

10   WE DON'T HAVE R&D FACILITIES THAT ARE SUFFICIENT FOR PLAINTIFFS

11   THERE.

12        AT THE TIME PERIOD, ACTUALLY WHEN THE '612 WAS FILED, MY

13   DAD AND I HAD AN OFFICE IN GREAT FALLS, VIRGINIA.  AND IT WAS A

14   FORMER TILE SHOP, SO THEY HAD THESE DIFFERENT TILE PATTERNS ON

15   THE FLOOR SO IT WAS KIND OF GOOFY BUT WE LIKE IT AND DIDN'T

16   WANT TO SPEND THE MONEY TO CHANGE IT.

17        WE STARTED WORKING ON THIN FILM DRUG DELIVERY SYSTEMS

18   THERE.  I DON'T KNOW IF YOU HAVE SEEN THE THIN FILM DRUG

19   PRODUCT BUT I BET SOME OF YOU HAVE SEEN THE POCKET PACK THE

20   BREATH FRESHENERS THAT YOU PUT ON YOUR TONG AND IT DISSOLVES

21   RIGHT AWAY.  WELL, WANTED TO WORK ON PUTTING DRUGS IN FILMS

22   LIKE THAT.  AND THERE WERE A LOT OF COMPLICATED ISSUES AROUND

23   DOING THAT.  DRUG UNIFORMITY, TASTE MASKING, HOW TO PACKAGE IT,

24   ET CETERA.

25        THE PATENTS THAT WE, THE PATENTS THAT WE FILED IN THAT

1    SAME TILE SHOP, YOU WILL NOW FIND ONE OF THOSE PATENTS LISTED

2    IN THE ORIGINAL BOOK, SUBOXONE.  YOU MIGHT NOT KNOW WHAT

3    SUBOXONE IS.  IT'S A BILLION DOLLAR DRUG SOLD IN FILM FORMAT

4    AND IT'S A PRODUCT THAT'S USED TO HELP FOLKS FIGHT HEROIN

5    ADDICTION.  AND THE REASON IS IT'S SAFER THAN METHADONE.  AND

6    THE REASON IT'S A POPULAR DRUG BECAUSE PRIMARY CARE DOCTORS CAN

7    BRIBE IT.

8         SO A LOT OF FOLKS THAT HAVE DRUG ISSUES DON'T WANT TO GO

9    TO METHADONE CLINICS BECAUSE IT'S EMBARRASSING.  SO SUBOXONE

10   CAME OUT OF THAT SAME TILE SHOP.

11        WE DO -- VISUAL IMAGE MARKET, LET ME TELL YOU ABOUT

12   ANOTHER -- THIS TIME I DIDN'T PARTICIPATE.  I WAS NOT A NAMED

13   INVENTOR IN THIS CASE.  MY DAD, THIS IS THE SAME GUY WHO WILL

14   HAVE TROUBLE OPERATING E-MAILS SOMETIMES, HE WILL CALL ME ON

15   SUNDAY TO TRY TO FIX HIS SYTEM.

16        AND I DON'T WANT TO GIVE YOU THE PRECISE DATE BECAUSE I

17   MAY MESS IT UP, BUT BACK IN EARLY 2000'S.  HE CONCEIVES OF THIS

18   NOTION THAT WOULDN'T IT BE -- YOU COULD CREATE -- IT'S

19   BASICALLY SORT OF SEEING THE FUTURE OF WHAT THE INTERNET AND

20   VIDEO SEQUENCES, WATCHING MOVIES AND TV ON THE INTERNET WOULD

21   BE LIKE, ALL RIGHT.

22        SO HE HAS THIS IDEA THAT HE'S GOING, THAT HE'S GOING TO

23   FILE A PATENT THAT YOU COULD ACTUALLY CLICK ON AN OBJECT IN A

24   VIDEO SEQUENCE AND YOU CAN BUY IT.

25        SO IF YOU SEE A SWEATER YOU LIKE ON A TV SHOW THAT YOU

1    LIKE, THAT YOU WOULDN'T HAVE AN ADD-ON THE SCREEN, THAT YOU

2    COULD ACTUALLY CLICK ON IT AND GET AN OPPORTUNITY TO BUY IT.

3         YOU KNOW, THAT'S -- IT'S, YOU KNOW, IT'S -- YOU COULD SAY

4    OH, HE'S A MEDICAL DOCTOR, HE DIDN'T HAVE AN R&D FACILITY.  HE

5    COULDN'T HAVE PROGRAMMED THAT SYSTEM TO SAVE HIS LIFE.  HE

6    INVENTED IT.  IT'S NOW THE BACK COMPANY THAT MY LITTLE BROTHER

7    RETURNS, AROUND THAT SYSTEM.

8         WHILE WORKING IN E-COMMERCE, ELECTRONIC MAIL.  SEE, BEING

9    AN INVENTOR, IT'S ABOUT SEEING THE FUTURE -- MAY DAD HAS BEEN

10   AN AMAZING VISIONARY HIS WHOLE LIFE, YOU'VE GOT TO SEE THE

11   FUTURE, YOU'VE GOT TO CALL YOUR SHOTS, YOU OFTEN GET IT WRONG,

12   SOMETIMES YOUR PATENTS DON'T ISSUE, SOMETIMES WE PATENT THINGS

13   NOBODY WANTS, WE ARE FAR FROM PERFECT AT PATENTING.

14        BUT IT'S A SKILL.  AND IT'S A SKILL YOU NEED TO -- AND A

15   LOT OF TIMES YOU JUST NEED TO UNDERSTAND WHAT IT IS THAT'S NEW

16   AND WHAT'S DIFFERENT AND WHAT HASN'T BEEN DONE.

17        I WILL GIVE YOU ANOTHER EXAMPLE, THIS IS NOT A FUISZ

18   PATENT.  A FRIEND OF MINE IN SOUTH FLORIDA.  DOES ANYONE KNOW

19   WHAT AN E-CIGARETTE, ELECTRONIC CIGARETTE.  OKAY.  ELECTRONIC

20   CIGARETTE IS BASICALLY A NICOTINE VAPORIZER, LOOKS LIKE A

21   CIGARETTE AND SOME MIGHT THINK THEY ARE A LOT SAFER THAN

22   CONVENTIONAL CIGARETTES, IT'S A GROWING MARKET IN THE US, OKAY.

23        AND ONE OF THE PROBLEMS WITH THESE CIGARETTES IS THEY

24   DON'T TEND TO TASTE VERY GOOD, IF YOU EXTRACT STRAIGHT

25   NICOTINE, IT TASTES TERRIBLY.  THE FORMULATOR'S BIGGEST

1  NIGHTMARE.  NATURE TASTE MASKS NICOTINE WITH TOBACCO BETTER

2  THAN ANY LABORATORY CAN.

3  ANOTHER EXAMPLE LIKE THAT IS CAFFEINE.  CAFFEINE IS A

4  DISASTER TO WORK WITH, BUT COFFEE WE LOVE EVERY MORNING, IT

5  MASKS THE FLAVOR VERY WELL.  WHY AM I MENTIONING COFFEE BECAUSE

6  IT RELATES TO THE CIGARETTES.

7  SO MY FRIEND CALLS ME ONE DAY AND HE SAYS JOE -- I'M

8  SORRY.  I DON'T HAVE A LOT OF TIME.  I APOLOGIZE.  PARDON ME IF

9  I'M SPEAKING TOO -- PARDON ME, I WILL TRY TO SLOW DOWN.

10  SO MY FRIEND CALLS ME AND HE SAYS I WANT TO SHOW YOU THIS

11  PRODUCT TO USE IN ANY CIGARETTE, I THINK I SOLVED THE FLAVOR

12  ISSUE, OKAY.

13  AND HE SHOWS ME, HE'S GOT THIS HYDROLYZED TOBACCO, IT'S

14  JUST A TOBACCO EXTRACT, IT'S BASICALLY WATER TOBACCO.  HE SAYS

15  I WANT TO PATENT IT, YOU KNOW, PATENT LAWYERS, CAN YOU SEND ME

16  TO A PATENT FIRM.

17  SO I'M LOOKING AT IT, AND THIS IS NOW AN ISSUE OF

18  PATENTS, I'M NOT TELLING YOU ANY SECRETS.  AND I SAY TOM, SHOW

19  ME HOW YOU MAKE IT AND I CAN GIVE YOU AN IDEA IF I THINK YOU

20  CAN GET A PANT ON IT.  HE SAYS OH, IT'S REALLY EASY, I'VE GOT

21  AN ESPRESSO MAKER.  HE'S TAKING TOBACCO, HE PUTS IT IN THE

22  ESPRESSO MAKER, HE RUNS IT THROUGH, IT'S BASICALLY LIKE A

23  TOBACCO COFFEE.

24  BUT THE ONE HE MAKES, THE BREW HE MAKES IS NOT STRONG

25  ENOUGH SO HE RUNS IT BACK THROUGH THE MACHINE AGAIN AND HE RUNS

1    IT AGAIN AND HE RUNS IT AGAIN.  HE REPEATS OR ITERATES.

2         AND HE GETS A MAGNIFICENT PRODUCT OUT OF IT.  IT'S THE

3    BEST TASTING CIGARETTE YOU COULD IMAGINE.  SO HE SAYS, JOE, CAN

4    I PATENT THIS?  AND I LOOK AT IT AND I'M THINKING TO MYSELF,

5    COUNSEL MENTIONED TRADE SECRET, I'M THINKING TO MYSELF TRADE

6    SECRET, TOM, DON'T TELL ANYONE HOW YOU ARE MAKING THIS IT'S TOO

7    SIMPLE.

8         AND WITHOUT BENEFIT OF RESEARCH BECAUSE I DIDN'T BOTHER

9    TO RESEARCH IT BUT I'M THINKING TO MYSELF, THE PARAMETERS OF

10   THIS ESPRESSO MACHINE ARE SO SIMPLE YOU'VE GOT LIKE 8 OR 9 BARS

11   OF PRESSURE, OKAY.  SO THE PRESSURE IS I'M SURE IT'S GOING TO

12   BE WITHIN THE REALM OF WHAT'S NORMALLY DONE.

13        YOU'VE GOT WATER.  I COULD CALL IT AN EXTRACTION SOLVENT

14   TO MAKE IT FANCY, BUT IT'S REALLY JUST WATER, IS YOUR SOLVENT,

15   YOU ARE MAKING COFFEE, YOU ADD WATER TO IT, AND THAT'S REALLY

16   IT.  AND IT HEATS IT, RIGHT.  I MEAN, YOU MAKE ESPRESSO HOT.

17   YOU TAKE HOT WATER, YOU PRESSURIZE IT, IT COMES OUT.

18        I SAY TOM, KEEP THE TRADE SECRET, I DON'T THINK YOU CAN

19   PATENT IT.  THE PARAMETERS ARE TOO SIMPLE.  HE BUGS ME FIVE

20   TIMES.  HE SAYS, I WANT A PATENT, I WANT A PATENT, I WANT A

21   PATENT, AND IT DAWNS ON ME THE FIFTH TIME, AS MUCH AS I THINK

22   I'M GOOD AT IDENTIFYING NOVEL THINGS, BECAUSE I HAD DONE A LOT

23   OF WORK FOR MY DAD ON ANOTHER TOBACCO PRODUCT WHICH

24   INCIDENTALLY IT'S ANOTHER STORY.  BUT I KNEW SOMETHING ABOUT

25   THE PRIOR ART IN TOBACCO AND WHAT THE EMPHASIS WAS.  AND THE

1    EMPHASIS FOR TOBACCO IN THE LAST HUNDRED YEARS IS ABOUT MAKING

2    CIGARETTES MORE CHEAPLY AND EFFICIENTLY, FOR BETTER OR WORSE.

3         SO IT FINALLY DAWNS ON ME TOM, YOU ARE THROWING OUT ALL

4    THIS TOBACCO, RIGHT, BECAUSE HE'S MAKING THE COFFEE FIVE TIMES

5    AND THROWING OUT THE GROUNDS.  SO I SAY TOM, THAT'S YOUR STEP,

6    THAT'S GOING TO HELP YOU GET THIS TO THAT PATENT.

7         SO I WILL SET YOU UP WITH SOMEBODY, GO TO THEM, GOT TO

8    FOCUS, YOU GOT TO FOCUS YOUR LAWYER ON THE NOTION OF THIS

9    ITERATION, THE STEPS OF REPETITION, AND BECAUSE THE INDUSTRY

10   HAS BEEN FOCUSED FOR A HUNDRED YEARS ON EFFICIENCY AND NOT

11   FLOWING ANYTHING OUT, THE FACT THAT YOU ARE WASTING ON PURPOSE,

12   IS GOING TO BE -- IS INVENTIVE.  BECAUSE NO ONE HAS TAUGHT IT

13   OR SUGGESTED IT.

14        HE -- HIS PATENT ISSUED, AND PROPERLY SO.

15        SEE, A PATENT IS -- A PATENT IS SOMETIMES IT'S VERY

16   COMPLEX, SOMETIMES IT'S NOT AS COMPLEX.  IT JUST, IT HAS TO BE

17   NEW AND DIFFERENT FROM WHAT'S BEEN DONE BEFORE.  AND THAT'S,

18   YOU KNOW THE '612, IT'S NOT A PARTICULARLY COMPLEX PATENT, IT'S

19   NOT A PARTICULARLY SIMPLE PATENT, IT'S A WAY OF PROGRAMMING AND

20   ANALYZING.

21        MY DAD EXPLAINED TO YOU BEFORE WITH THE DOCTOR SETS A

22   THRESHOLD FOR AN ANALYTE.  SO FOR A PARTICULAR PATIENT IT'S

23   PROGRAMMED SLIGHTLY THROUGH THE DATA STORAGE UNIT, THE

24   EMBODIMENTS WE GIVE THE BAR CODE, THE RFID TAG, AND THEN THE

25   ANALYZER HAS A READER ON IT THAT READS IT.  THEN THAT DEVICE

1    ITSELF, IF IT GENERATES AN ALARM.  AND THAT'S WHAT THE '612

2    PATENT IS.

3         NOW, I DON'T HAVE ANY PROBLEM WITH THERANOS'S WORK.  IT

4    IS WHAT IT IS.  IN A LOT OF WAYS A LOT OF THINGS THAT ARE DONE

5    ARE FRANKLY MORE COSTLY AND COMPLEX THAN WHAT WE DID.

6         WE NEVER HAD TO MAKE IT ANALYZE TO DO WHAT WE DID, IN THE

7    SAME WAY THAT WE FILE A LOT OF OUR DATABASE STUFF OUR

8    E-COMMERCE STUFF, WE DON'T NECESSARILY CODE IT OR CREATE IT.

9    YOU JUST HAVE TO TEACH NEW STEPS AND NEW SYSTEM.

10        AND I WILL PROBABLY SHOW YOU MORE PATENTS OF MY DADS AND

11   MYSELF TO SOME EXTENT, I'M NOT NEARLY -- I DON'T HAVE AS MANY

12   PATENTS AS HE HAS, DURING THE COURSE OF THE TRIAL.

13        BUT I THINK, YOU KNOW, WHAT I'M GOING TO WANT TO SHOW YOU

14   IN THIS TRIAL IS, YOU KNOW, IN ADDITION TO THE ABSENCE OF ANY

15   DIRECT EVIDENCE, AND BY THE WAY, WHEN YOU FIND OUT OF THIS

16   POWER OF ATTORNEY THE PLAINTIFFS ARE MENTIONING YOU ARE GOING

17   TO BE VERY UPSET WITH THEM BECAUSE IT'S PROBATIVE OF ABSOLUTELY

18   NOTHING, BUT I WILL EXPLAIN THAT LATER.

19        BUT I'M GOING TO SHOW YOU THERE'S NO DIRECT EVIDENCE, I'M

20   GOING TO SHOW YOU THROUGH THE CIRCUMSTANTIAL EVIDENCE OF ALL

21   THE WORK IN ALL THESE DIFFERENT FIELDS, THAT WE WERE ENTIRELY

22   CAPABLE OF GENERATING THE '612 PATENT.

23        I'M GOING TO TELL YOU WHICH I BELIEVE IT'S QUITE

24   DIFFERENT FROM THE THERANOS ART.  ALTHOUGH TO BE PERFECTLY

25   HONEST WITH YOU, THE REASON I'M HERE REPRESENTING MYSELF TODAY,

1    WHAT I'M MOST CONCERNED ABOUT IS MY REPUTATION, BECAUSE THAT,

2    IF I TALK ABOUT IT TOO MUCH I'M GOING TO BREAK DOWN WHICH I

3    DON'T WANT TO DO.

4         BUT THE IDEA OF BEING, AND I WILL TELL YOU SOMETHING --

5    YOU KNOW, WHAT WAS DONE, THE ACCUSATION THAT WAS LEVELLED

6    AGAINST MY BROTHER FOR ESSENTIALLY BEING A THIEF WITH NO

7    EVIDENCE AND ACTUALLY WORSE THAN THAT, BECAUSE I'M GOING TO

8    SHOW YOU THE COMPLAINT, ESSENTIALLY CONTAINED

9    MISREPRESENTATIONS THAT WERE DESIGNED TO MAKE MY BROTHER LOOK

10   GUILTY THAT WEREN'T TRUE.

11        AND HE HAS EVERY RIGHT -- HE'S GOT TWO KIDS.  HE'S GOT

12   EVERY RIGHT TO BE UPSET ABOUT WHAT WAS DONE TO HIM, OKAY,

13   BECAUSE HE WAS A FATHER, TO JUST BE DESTROYED OF THIS PROCESS

14   THAT IS NONSENSICAL, THIS CRAZINESS.

15        I SAID A LOT.  I TALKED REALLY FAST BECAUSE I DIDN'T HAVE

16   A LOT OF TIME.  I WILL TRY TO TALK TO YOU MORE SLOWLY DURING

17   THE TRIAL, OKAY.  BUT LISTEN, I'M GOING TO ASK YOU THIS, FOR

18   MYSELF AND MY DAD AND MY BROTHER, I NEED YOU TO WORK WITH ME IN

19   THE CASE.  I WANT A SPECIAL FAVOR BUT I NEED YOU TO LOOK AT

20   WHAT THE ACTUAL EVIDENCE IS.  AND THE EVIDENCE IS NOT A

21   POWERPOINT, IT'S NOT INNUENDO, I MEAN REAL EVIDENCE, ALL RIGHT.

22        THANK YOU VERY MUCH, LADIES AND GENTLEMEN.

23          THE COURT:  THANK YOU, MR. FUISZ.  MS. ANDERSON?

24          MS. ANDERSON:  YES, YOUR HONOR.

25

1                **OPENING STATEMENT BY MS. ANDERSON**

2

3          I UNDERSTAND YOU ALL HAVE BEEN SITTING THERE FOR A WHILE.

4     AND I DON'T INTEND TO KEEP YOU SITTING MUCH LONGER BECAUSE

5     HAVING THREE PEOPLE SPEAK ON BEHALF OF AN ISSUE WOULD NOT BE

6     FAIR TO YOU, NOR DO I NECESSARILY WANT TO REPEAT THINGS THAT

7     HAVE BEEN SAID.

8          I REPRESENT THE COMPANY, FUISZ PHARMA.  AND JUST GIVE ME

9     A MOMENT TO BRING THIS UP ON THE SCREEN.  SHOW YOU THE REASON

10    WHY YOU HAD SOME OF THE REACTIONS THAT YOU DID PROSECUTE

11    INDIVIDUALS -- IF I TURN I CAN SHAPE THIS A LITTLE BIT BETTER.

12         IN THE DEPOSITIONS, HIS TIMING IS CRITICAL IN THIS CASE.

13    MR. BOIES WAS CORRECT IN THAT STATEMENT.

14         WE HAVE AN ALLEGATION HERE IN A PUBLIC DOCUMENT THAT WAS

15    FILED IN A COURT WITH YOUR NAME IN IT, JOHN FUISZ PROVIDED HIS

16    FATHER AND BROTHER WITH THERANOS CONFIDENTIAL INFORMATION.

17         THIS IS A LAWYER THAT WORKS IN A PATENT FIRM AND SERVES A

18    NUMBER OF OTHER CUSTOMERS THAT ALSO CREATE INVENTIONS.

19         THAT STATEMENT ITSELF WAS MADE IN THIS DOCUMENT IN 2,011

20    BUT THE CASE WAS FILED -- THIS WAS 2012 AND 2011.  AND YOU HAVE

21    TO USE YOUR COMMON SENSE AND EXPERIENCE ABOUT WHEN SOMEONE

22    MAKES A FALSE ALLEGATION AGAINST A PERSON, WHAT IS THE NATURAL

23    REACTION THAT WOULD OCCUR.

24         WHAT MR. BOIES PUT UP ON THE SCREEN IN FRONT OF YOU WERE

25    STATEMENTS THAT WERE TAKEN AFTER THAT STATEMENT WAS PLACED IN A

1    PUBLIC FILING IN THIS COURT.

2        THAT STATEMENT HAD A TREMENDOUS EFFECT UPON JOHN FUISZ IN

3    HIS PRACTICE EVERY SINGLE TIME AN OPPONENT WANTS TO CHALLENGE A

4    PATENT BECAUSE THEY WANT TO SAY THAT SOME PRIOR ART WAS STOLEN

5    OR SOME SECRET CONFIDENTIAL FILES WERE STOLEN.  THEY LOOK TO

6    THIS DOCUMENT AS EVIDENCE THAT HE'S A THIEF.

7        THAT'S A HEAVY ALLEGATION TO BRING AGAINST AN INDIVIDUAL.

8    AND NATURALLY, AN INNOCENT PERSON GETS EXTREMELY UPSET.  IS IT

9    NATURAL TO BE ANGRY AFTER A STATEMENT LIKE THAT IS MADE AGAINST

10   A PERSON?  I SUBMIT TO YOU, YES IT IS.

11       AND THE EVIDENCE WILL BEAR THAT OUT.  IS IT NATURAL TO BE

12   EMOTIONAL ABOUT IT, UPSET ABOUT IT, AND MAKE STATEMENTS LIKE, I

13   WANT A PATENT AGAINST YOU AND FILE PATENTS AGAINST YOU IN THE

14   FUTURE, I SUBMIT IT WOULD BE.

15       BUT IF THE STANDARD THAT THE PLAINTIFFS SUGGEST IS

16   ACCEPTED HERE TODAY AND IN THIS CASE THEN THERANOS AND

17   MS. HOLMES CAN NECESSARILY SAY THAT IF THEY GO TO A LAW FIRM

18   AND THEY USE SIMILAR LANGUAGE, THAT THAT INFORMATION MUST HAVE

19   BEEN STOLEN TOO.

20       AND YOU CAN THINK OF THOUSANDS OF PRACTICAL EXAMPLES OF

21   HOW SIMILAR LANGUAGE MUST BE USED TO CREATE INVENTIONS.  WE ARE

22   TALKING ABOUT BLOOD, WE ARE TALKING ABOUT TESTING BLOOD AND

23   ANALYTES BECAUSE THOSE ARE ALL THINGS THAT THEY TEST FOR.  THE

24   ORIGINAL INVENTOR OF THE WINDSHIELD WIPER COULD PREVENT FROM

25   SOMEBODY ELSE FROM IMPROVING UPON IT IN THE FUTURE, WE WOULDN'T

1       HAVE TIMED WINDSHIELD WIPERS NOW THAT MOVE MORE SLOWLY.

2       BECAUSE THE WINDSHIELD WIPER WAS ALREADY INVENTED.

3            THE TIMING IS GOING TO BE BROUGHT OUT MORE IN THE TRIAL

4       AND I WANT YOU TO FOCUS CLOSELY ON IT.  IS HOW WOULD A THIEF IF

5       HE WANTED TO DO THE JOB WELL, DO IT.

6            WOULD HE AT THE TIME HE TOOK THE FILE AND SUPPOSEDLY

7       STOLE IT FROM THE LAW FIRM AND TOOK IT INTO HIS POSSESSION,

8       ONLY PUT IN A LITTLE SIMPLE E-MAIL, OR WOULD HE PUT IN A MORE

9       DESCRIPTIVE DIAGRAM THAT MORE CLOSELY MATCHED WHAT THERANOS WAS

10      DOING?

11           WOULD HE NOT FOLLOW THROUGH ON CREATING NOTEBOOKS TO BACK

12      UP THIS DEVELOPMENT OF THIS INVENTION THAT HE DID, BECAUSE

13      THAT'S SOMETHING A THIEF WOULD DO.  A THIEF WOULD CREATE THE

14      NOTEBOOKS, A THIEF WOULD MOCK IT UP.  A THIEF WOULD MAKE A

15      FALSE SENSE.

16           YOU ARE NOT GOING TO SEE THAT IN THIS CASE.  YOU ARE NOT

17      GOING TO SEE ANY EVIDENCE THAT JOHN FUISZ WENT INSIDE THE FILE

18      ROOM.  YOU ARE GOING TO SEE SMOKE AND MIRRORS THAT HE

19      SUPPOSEDLY HAD ACCESS TO THE FILE ROOM.  BUT NEVER WENT IN

20      THERE, NO ONE SAW HIM, NO ONE HEARD HIM, THERE'S NO METADATA ON

21      ANY FILES THAT SHOWS THAT HE DOWNLOADED IT.  NOBODY E-MAILED

22      HIM ANY OF THESE FILES THAT THEY SAY HE STOLE.

23           THERE'S SIMPLY NOTHING OTHER THAN THE SMOKE AND MIRRORS

24      THAT HAVE BEEN PRESENTED TO YOU TODAY, THAT THEY ARE GOING TO

25      SAY, THAT THEY ARE GOING TO PROVE TO YOU THAT HE ACTUALLY TOOK

1    THE FILES.

2         YOU HAVE A COINCIDENCE HERE.  HAVE YOU PEOPLE INVENTING

3    IN THE SAME AREA.  AND YOU ARE GOING TO HEAR FROM SOME EXPERT

4    WITNESSES.

5         AND WHAT IS AN EXPERT WITNESS?  AN EXPERT WITNESS IS

6    SOMEBODY THAT CAN EXPLAIN SOMETHING TO YOU IN AN AREA THAT YOU

7    DON'T PRACTICE IN OR YOU ARE NOT FAMILIAR WITH, TO ASSIST YOU,

8    YOU, IN MAKING THE CONCLUSION.

9         IF THE EXPERT REACHES ANOTHER CONCLUSION, YOU HAVE TO

10   ANALYZE WHY THAT CONCLUSION WAS REACHED, WHAT INFORMATION WAS

11   THAT EXPERT RELYING UPON, WAS IT COMPLETE, WAS IT ACCURATE, DID

12   IT ASSUME THAT JOHN FUISZ STOLE THE FILES.

13        DID THEY HAVE A FINANCIAL INTEREST IN THE OUTCOME OF THIS

14   CASE AND WHAT IS IT?

15        YOU'RE THE TRIER OF FACT, NOT THE EXPERT WITNESS.  SO

16   LOOK BEHIND IT AND ANALYZE IT YOURSELF.

17        NOW, WE HAD AN AGREEMENT THAT WE WOULD KEEP THE OPENINGS

18   AN HOUR A SIDE.  AND I APPRECIATE YOUR PATIENCE BECAUSE I KNOW

19   THAT WE WENT A LITTLE OVER AND I WANT TO THANK YOU AT THIS TIME

20   AND ASK YOU TO LOOK CLOSELY AT THE EVIDENCE AS ITS COMING IN,

21   AND YOU ARE NOT GOING TO SEE A SMOKING GUN.

22        AND I'M CONFIDENT YOU WILL RETURN A VERDICT IN FAVOR OF

23   THE DEFENDANTS.

24        THANK YOU.

25             THE COURT:  THANK YOU, MS. ANDERSON.

1          LADIES AND GENTLEMEN OF THE JURY, WE ARE GOING TO TAKE

2     OUR LUNCH BREAK AT THIS TIME.

3          I WILL REMIND YOU YET AGAIN, DO NOT DISCUSS IT IS CASE

4     WHILE WE ARE OUT ON BREAK.  WHEN WE RETURN IN ONE HOUR'S TIME

5     WE WILL BEGIN WITH THE PRESENTATION OF EVIDENCE BEGINNING WITH

6     THE PLAINTIFFS.

7          (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD OUT OF

8     THE PRESENCE OF THE JURY:)

9          THE COURT:  PLEASE BE SEATED.

10          COUNSEL, AS WE DISCUSSED AT SIDE BAR I WILL ENTERTAIN A

11     REQUEST FOR AN INSTRUCTION TO THE JURY BEFORE WE BEGIN WITH THE

12     PRESENTATION OF EVIDENCE.

13          I WANT TO FOCUS EVERYONE'S ATTENTION ON PAGE 12 OF MY

14     ORDER ON THE MOTIONS IN LIMINE WHERE I MADE IT EXPLICIT THAT

15     THERE WERE NOT TO BE ANY REFERENCES OR ATTACKS TO COUNSELS OR

16     MOTIVES OF COUNSEL OR ANY FIRM.

17          I, AT THE SAME TIME, PERMITTED REFERENCE TO THE CASE WHAT

18     WAS MEANT TO THE PARTIES AND THE EFFECTS OF THE LITIGATION.

19          SO WITH THOSE ADMONITIONS AND RULINGS IN MIND, DO YOU

20     WISH TO PROPOSE AN INSTRUCTION, I WILL ENTERTAIN IT?

21          MR. BOIES:  I WILL, YOUR HONOR.

22          I ALSO THINK THAT WHILE IT'S POSSIBLE TO TALK ABOUT WHAT

23     THE EVIDENCE WILL SHOW IN TERMS OF THE EFFECT, IT IS NOT

24     APPROPRIATE TO GET UP AND CRY IN FRONT OF THE JURY.

25     I THINK THAT THIS IS --

```
1              THE COURT:  I WILL ENTERTAIN A REQUEST ALONG THOSE

2     LINES, MR. BOIES.

3              WE WILL SEE YOU BACK HERE IN ONE HOUR'S TIME.

4              THANK YOU.

5              (WHEREUPON A RECESS WAS TAKEN.)

6              (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD OUT OF

7     THE PRESENCE OF THE JURY:)

8              THE COURT:  PLEASE BE SEATED.

9         I HAVE RECEIVED A REQUEST FOR A CURATIVE INSTRUCTION FROM

10    THE PLAINTIFFS.  I WILL CUT TO THE CHASE, DO YOU WANT TO BE

11    HEARD ON THIS?  I WILL GIVE YOU THE OPPORTUNITY.

12         GO AHEAD.

13             MS. ANDERSON:  JUST BRIEFLY, YOUR HONOR.  UNLESS YOU

14    HAD SOME DISAGREEMENT WITH IT.

15             THE COURT:  YOU ARE ENTITLED TO BE HEARD.  I WANT TO

16    GIVE YOU THAT OPPORTUNITY.

17             MS. ANDERSON:  I DON'T FRANKLY HAVE A COPY OF YOUR

18    ORDER UP IN FRONT OF ME AT THE MOMENT TO REPLY UPON.  BUT I'M

19    LOOKING AT PAGE 1, STARTING ON LINE 4, THERE'S NO CONNECTION IN

20    THIS CASE ABOUT LARRY ELLISON.

21         I DON'T RECALL THAT BEING ADDRESSED IN THE MOTIONS IN

22    LIMINE, AND I THINK THE COURT, WILL CONTINUE TO INSTRUCT THE

23    JURY THAT THEY HAVE TO RELY UPON THE EVIDENCE.

24             AND AT THIS TIME TO MENTION THAT WOULD BE IMPROPER.  BUT

25    CLEARLY IF THE COURT GAVE AN INSTRUCTION ABOUT TAKING A SHOT AT
```

1      COUNSEL ACROSS THE TABLE HERE, SO I'M NOT GOING TO QUARREL WITH

2      THAT.

3              THE COURT:  ALL RIGHT.

4          LET ME JUST OFFER MY THOUGHTS.  I APPRECIATE THOSE

5      COMMENTS.

6              WITH RESPECT TO THE LANGUAGE OF THE FIRST PARAGRAPH, I DO

7      HAVE SOME MODIFICATIONS.  IN LINE 2 I'M GOING TO STRIKE THE

8      LANGUAGE THAT FOLLOWS IRRELEVANT AND CONTINUES THROUGH

9      TESTIMONY.  SO THAT SENTENCE WILL READ:

10             ASSERTIONS ABOUT PLAINTIFF'S LAWYERS ARE IRRELEVANT,

11     PERIOD.  END TOP.

12             AND LINE 3, I'M GOING TO DELETE THE "WERE IMPROPER" AND

13     SIMPLY HAVE THE SENTENCE READ:  ALL REFERENCES TO THE

14     PLAINTIFFS LAWYERS SHOULD BE DISREGARDED.

15             I'M GOING TO KEEP THE REFERENCE TO MR. ELLISON IN LINES 4

16     AND 5 AND I'M GOING TO KEEP THE REST OF THE LANGUAGE AS WELL.

17             MY REASON FOR THIS IS AS FOLLOWS:  IN MY ORDER ON THE

18     MOTIONS IN LIMINE, I ACTUALLY GRANTED A MOTION BY THE

19     DEFENDANTS TO PRECLUDE ANY REFERENCES TO INVESTORS.

20             MR. ELLISON IS CLEARLY AN INVESTOR.  THAT DOOR HAS NOW

21     BEEN OPENED, I THINK IT'S APPROPRIATE TO TELL THE JURY TO

22     DISREGARD THAT CONTENTION.

23             LET'S FOCUS ON WHAT WE HAVE TO DO THIS AFTERNOON.

24             SO WITH THAT, UNLESS THERE'S ANY OTHER ISSUES TO RAISE, I

25     WOULD LIKE TO BRING THE JURY BACK IN AND GET STARTED.

1          (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN THE

2     PRESENCE OF THE JURY:)

3          THE COURT:  LADIES AND GENTLEMEN, WELCOME BACK.  I

4     HOPE YOU HAD A GOOD LUNCH.

5          BEFORE WE TURN TO THE EVIDENCE IN THIS CASE, I DO NEED TO

6     PROVIDE YOU WITH ONE FURTHER INSTRUCTION.

7          AND THAT IS INSTRUCTION IS AS FOLLOWS:  AN OPENING

8     STATEMENT IS SUPPOSED TO BE LIMITED TO A DISCUSSION OF WHAT THE

9     EVIDENCE WILL SHOW.  ASSERTIONS ABOUT PLAINTIFF'S LAWYERS ARE

10    IRRELEVANT.  ALL REFERENCES TO PLAINTIFF'S LAWYERS SHOULD BE

11    DISREGARDED.  THERE IS ALSO NO CONTENTION IN THIS CASE ABOUT

12    LARRY ELLISON.  ALL REFERENCES TO HIM SHOULD ALSO BE

13    DISREGARDED.

14         I ALSO CAUTION YOU THAT THE CASE MUST BE DECIDED ON THE

15    EVIDENCE.  ATTEMPTS TO ELICIT SYMPATHY SHOULD BE DISREGARDED.

16         WITH THAT, MR. BOIES WOULD YOU LIKE TO CALL YOUR FIRST

17    WITNESS

18         MR. BOIES:  THANK YOU, YOUR HONOR.  WE CALL DOCTOR

19    GEORGE SCHULTZ.

20         THE COURT:  DR. SCHULTZ, GOOD AFTERNOON, SIR.

21         IF YOU WOULD APPROACH THE WITNESS STAND I DO NEED TO HAVE

22    YOU SWORN BEFORE YOU TAKE THE WITNESS STAND.

23

24                    **GEORGE SCHULTZ,**

25    BEING CALLED AS A WITNESS ON BEHALF OF THE

DIRECT EXAM BY MR. BOIES

1    PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND

2    TESTIFIED AS FOLLOWS:

3          THE WITNESS:  I DO.

4          THE CLERK:  PLEASE STATE YOUR FULL NAME AND SPELL

5    YOUR LAST NAME FOR THE RECORD.

6          THE WITNESS:  S-C-H-U-L-T-Z.

7          MR. BOIES:  DR. SCHULTZ, THERE'S A MICROPHONE THERE,

8    AND IF YOU WOULD MOVE UP AND USE THE MICROPHONE, IT WILL HELP

9    EVERYBODY HERE.

10

11                **DIRECT-EXAMINATION BY MR. BOIES**

12

13   BY MR. BOIES:

14   Q.  LET ME BEGIN WITH A LITTLE BACKGROUND.  HOW OLD ARE YOU?

15   A.  93.

16   Q.  ARE YOU THE OLDEST MEMBER OF THE THERANOS BOARD?

17   A.  WELL, WE HAVEN'T GONE AROUND BUT I SUPPOSE SO.

18   Q.  ARE YOU MARRIED?

19   A.  YES.

20   Q.  HOW LONG?

21   A.  I HAD A WONDERFUL WIFE OF ALMOST 50 YEARS WHO DIED OF

22   CANCER AND AFTER SOME YEARS I MARRIED AGAIN AND I HAVE BEEN

23   LUCKY TWICE.  WE HAVE BEEN MARRIED FOR 16 YEARS.

24   Q.  CONGRATULATIONS.

25   A.  BUT MOST OF MY ADULT LIFE HAS BEEN MARRIED LIFE AND I LIKE

DIRECT EXAM BY MR. BOIES

1    TO.

2    Q.  CONGRATULATIONS.  ANY CHILDREN?

3    A.  I HAVE FIVE CHILDREN.  I HAVE 11 GRANDCHILDREN AND I HAVE

4    FOUR GREAT GRANDCHILDREN.  AND IT'S SO MUCH FUN TO HAVE BABIES

5    AROUND THE HOUSE.

6        THE YOUNGEST IS ABOUT A LITTLE OVER ONE AND THE OLDEST A

7    LITTLE OVER THREE.  WHEN YOU WATCH THESE KIDS AND THEY ARE SO

8    ENERGETIC.  LIFE IS SO EXCITING.  THEY ARE CURIOUS ABOUT

9    EVERYTHING.  YOU CAN'T HAVE ANY KNICKKNACKS ON THE TABLES

10   BECAUSE THEY WILL GRAB THEM.

11       SO I LOOK AT THESE KIDS AND I SAY, WHAT KIND OF A WORLD

12   ARE THEY GOING TO LIVE IN AND WHAT CAN I DO TO TRY TO MAKE IT

13   BETTER?  SO THAT'S MY MOTIVATING REASON FOR BEING RIGHT NOW.

14   Q.  LET ME GO OVER SOME OF YOUR WORK IN THE PAST.  YOU ARE A

15   PHD, CORRECT?

16   A.  ECONOMICS FROM MIT.

17   Q.  WHERE HAVE YOU TAUGHT?

18   A.  I'VE TAUGHT AT MIT FOR ALMOST TEN YEARS AT THE UNIVERSITY

19   OF CHICAGO FOR ABOUT THE SAME AMOUNT OF TIME.  AND I HAVE NOW

20   HAD A HOUSE ON THE STANFORD CAMPUS FOR 40 YEARS, EXCEPT WHEN I

21   WAS ON LEAVE TO BE SECRETARY OF STATE, I HAVE BEEN AROUND

22   STANFORD.

23   Q.  NOW, HAVE YOU SERVED IN ANY ADMINISTRATIVE CAPACITIES IN

24   ACADEMIC LIFE?

25   A.  WHEN I WAS AT THE UNIVERSITY OF CHICAGO I WAS DEAN OF THE

DIRECT EXAM BY MR. BOIES

1    GRADUATE SCHOOL OF BUSINESS.

2    Q.   DID YOU EVER SERVE IN THE MILITARY?

3    A.   I AM A UNITED STATES MARINE.  I HAVEN'T BEEN ON ACTIVE DUTY

4    SINCE 1945 WHEN I CAME BACK FROM TWO AND A HALF YEARS IN THE

5    PACIFIC FIGHTING WORLD WAR II, BUT I'M VERY PROUD TO BE A

6    MARINE.

7    Q.   NOW YOU MENTIONED THAT YOU HAD SERVED AS SECRETARY OF

8    STATE; IS THAT CORRECT?

9    A.   THAT'S CORRECT.

10   Q.   HAVE YOU SERVED IN ANY OTHER CABINET POSITIONS IN THE

11   UNITED STATES GOVERNMENT?

12   A.   I WAS SECRETARY OF LABOR.  THEN I WAS THE FIRST DIRECTOR OF

13   THE OFFICE OF MANAGEMENT AND BUDGET, AND THEN SECRETARY OF THE

14   TREASURY.  SO I'VE HELD FOUR CABINET POSTS.

15       AND ONE OTHER PERSON HAS DONE THE SAME, ELLIOTT RICHARDSON

16   AND THAT'S ALL.

17   Q.   AND DID YOU PLAY ANY ROLE OR HAVE ANY POSITION IN THE

18   PRESIDENT'S ECONOMIC ROLE ADVISORY BOARD?

19   A.   WELL, I WAS PRESIDENT EISENHOWER'S COUNSEL OF ECONOMIC

20   ADVISORS, HE WAS A WONDERFUL PRESIDENT.  AND FOR QUITE A LONG

21   TIME FOR PRESIDENT REAGAN DURING THE PRIMARIES AND DURING THE

22   ELECTION CAMPAIGN AND THE FIRST YEAR AND A HALF OF HIS

23   PRESIDENT, I WAS CHAIRMAN OF HIS ECONOMIC POLICY ADVISORY

24   BOARD.

25   Q.   HAVE YOU SERVED IN AN EXECUTIVE CAPACITY IN ANY BUSINESS?

DIRECT EXAM BY MR. BOIES

1    A.   WELL, I SPENT EIGHT YEARS TIME AT THE BECHTEL CORPORATION.

2    THAT'S AN ENGINEERING CONSTRUCTION COMPANY WITH HEADQUARTERS IN

3    SAN FRANCISCO, AND FOR QUITE A WHILE I WAS PRESIDENT, I WAS NOT

4    CEO.

5    Q.   HOW LARGE AN ORGANIZATION IS THE BECHTEL GROUP?

6    A.   WELL, WHEN I WAS THERE, WE HAD, I DON'T KNOW, AROUND 20,000

7    PEOPLE IF YOU COUNT THE PEOPLE WORKING OUT ON JOBS; IF YOU

8    COUNT WHAT PEOPLE REFER TO AS NONMANUAL, THAT IS THE ENGINEERS

9    AND SO FORTH THAT WERE PERMANENT, WHEREAS PEOPLE ON JOBS WOULD

10   COME UP TO THE JOB AND I GUESS IT WAS AROUND 8,000.  IT'S A

11   VERY SUBSTANTIAL COMPANY.

12   Q.   NOW, IN VARIOUS JOBS THAT YOU'VE HAD, HAVE YOU HAD OCCASION

13   TO DEAL WITH PHYSICAL SCIENTISTS, AND I'M TALKING ABOUT YOUR

14   JOBS PRIOR TO BECOMING A BOARD MEMBER AT THERANOS?

15   A.   WELL, OF COURSE AT THE MIT, I'M ASSOCIATING WITH PEOPLE IN

16   THE VARIOUS SCIENCES ALL THE TIME, ENGINEERS, AND YOU SEE

17   THINGS DEVELOP FROM SOME SCIENTIST IDEA, AND YOU INTERACT WITH

18   ENGINEERS AND IT GRADUALLY DEVELOPS INTO SOMETHING AND YOU SEE

19   THAT PROCESS TAKE PLACE.

20        AND THE SAME, NOT QUITE AS EXPLICIT BUT AT THE UNIVERSITY

21   OF CHICAGO.  OF COURSE AT BECHTEL WE HAD ALL KINDS OF

22   INNOVATIONS THAT YOU ARE WORKING WITH.

23        AND THEN I WAS ON THE BOARD OF A COMPANY CALLED GILEAD

24   SCIENCES, I WAS ON THE BOARD WHEN WE WORRIED ABOUT OUR BURN

25   RATE, WE WERE GOING TO RUN OUT OF MONEY AND WE HAD A VERY GOOD

DIRECT EXAM BY MR. BOIES

1    SCIENCE GROUP AND WE HAD A STRONG PIPELINE.

2         SO I WATCHED GILEAD GRADUATE, TURN ITS PRODUCTS INTO

3    PHARMACEUTICAL PRODUCTS.  AND AT THIS TIME WE HAD PRODUCTS THAT

4    DEALT WITH THE AIDS PROBLEM AND WE HAVE JUST NOW HAD A PRODUCT

5    THAT WILL CURE HEPATITIS C.  SO WE HAVE SEEN OUR SCIENCE TURN

6    INTO PRODUCTS IN A VERY, GOOD WAY.

7         I THINK IT'S TRUE AT GILEAD, ONE REASON WHY IT'S SUCH A

8    WONDERFUL COMPANY IS THAT EVERYBODY FEELS THAT WE ARE HERE

9    BECAUSE WE ARE ACHIEVING SOMETHING WORTHWHILE.  YES WE ARE

10   GETTING PAID AND ALL THAT, BUT WHAT WE ARE DOING IS TURNING OUT

11   TO BE GOOD.

12   Q.   I WOULD LIKE TO ASK YOU A LITTLE BIT ABOUT THERANOS AND

13   HAVE YOU INTRODUCE THE COMPANY TO THE JURY.  WHEN DID YOU JOIN

14   THE THERANOS BOARD OF DIRECTORS?

15   A.   IN JULY OF 2011.

16   Q.   WHAT LEAD YOU TO BE WILLING TO JOIN THE BOARD OF THAT

17   COMPANY?

18   A.   ELIZABETH HOLMES CAME TO SEE ME.  SHE WAS INTRODUCED BY A

19   COLLEAGUE OF MINE, JOHN SHOGUN.  JOHN AND I HAD WRITTEN A BOOK

20   TOGETHER CALLED *PUTTING OUR HOUSE IN ORDER: A GUIDE TO SOCIAL*

21   *SECURITY AND HEALTH CARE REFORM*.

22        AND FOR VARIOUS REASONS HE KNEW ELIZABETH HOLMES AND HAD

23   STAYED FOR A WHILE AND THEN WE TALKED FOR QUITE A LONG WHILE,

24   AN HOUR, HOUR AND A HALF.

25   Q.   AND WHAT LEAD YOU IN THAT CONVERSATION OR THERE AFTER TO

DIRECT EXAM BY MR. BOIES

1    DECIDE THAT THERANOS WAS A COMPANY THAT YOU WANTED TO BE

2    ASSOCIATED WITH?

3    A.   WELL, SHE DESCRIBED WHAT THEY HAD INVENTED AND THE PROCESS.

4    AND I COULD SEE IT WAS REALLY UNIQUE.  AND EVEN AT THE

5    BEGINNING YOU COULD SEE THE POSSIBLE IMPLICATIONS.  AND OF

6    COURSE AS I'VE GONE ON AND LEARNED MORE ABOUT IT AND PUT IT

7    INTO THE CONTEXT OF HEALTH CARE, I COULD SEE THE HUGE POTENTIAL

8    IMPLICATIONS OF WHAT HAS BEEN INVENTED THERE.

9    Q.   DOES THERANOS ENGAGE IN RESEARCH AND DEVELOPMENT?

10   A.   THAT'S WHAT IT'S BEEN MAINLY ALL ABOUT.  YOU CAN'T JUST

11   TAKE AN IDEA AND THERE'S SOMETHING, YOU HAVE TO START WITH AN

12   IDEA AND YOU HAVE TO EXPERIMENT AND TEST IT AND CHANGE IT AND

13   DEVELOP IT.  IT TAKES A LONG TIME.

14        AND ONE OF THE THINGS I NOTICED WHEN I VISITED THERANOS

15   IS THERE ARE A LOT OF REALLY TERRIFIC YOUNG PEOPLE AROUND, AND

16   YOU ASK THEM WELL, WHERE ARE YOU FROM?  WELL I HAVE A PHD, FROM

17   MIT, WHERE ARE YOU FROM, I GOT STANFORD AND SO ON.  AND THEY

18   ARE MOSTLY YOUNG.  OF COURSE YOUNG FOR ME, BUT THEY ARE BRIGHT

19   AND THEY ARE INTERESTING AND ALL GOOD AND WORKING HARD.  AND

20   INVOLVED IN WHAT THEY ARE DOING.  SO THERE'S AN ORGANIZATION

21   THERE.

22        SO ELIZABETH HOLMES GIVES GREAT LEADERSHIP PERSONALLY AS

23   AN EXECUTIVE BUT SHE IS PRESIDING OVER A LARGE COMPANY NOW.

24   Q.   I WOULD LIKE TO ASK YOU SOME QUESTIONS ABOUT ELIZABETH

25   HOLMES.  IN THE COURSE OF YOUR WORK AT THERANOS, DO YOU MEET

DIRECT EXAM BY MR. BOIES

1  WITH HER ON A REGULAR BASIS?

2  A.  YES.  I CHECK BACK ON THE RECORDS TO PREPARE MYSELF FOR

3  COMING HERE BECAUSE I KNEW I MET A LOT WITH ELIZABETH.  AND THE

4  FIRST YEAR SINCE I MET HER, WE MET 30 TIMES FOR LUNCH OR SHE

5  HAD COME TO MY OFFICE OR I WOULD GO OVER TO THERANOS OR

6  WHATEVER.  AND SORT OF STRATEGIZE GUISE AND TALK ABOUT WHAT'S

7  GOING ON AND EDUCATE ME.

8      BUT I WOULD SPEND -- I REALLY APPRECIATED IT.  AND I FEEL

9  AS THOUGH I'M PART OF SOMETHING THAT'S REALLY WORTHWHILE,

10  THAT'S WHAT IT'S ABOUT.

11  Q.  NOW AS A MEMBER OF THE BOARD, DID YOU EVER RECEIVE ANY

12  DOCUMENTS OR MATERIALS FROM ANY OF THE DEFENDANTS HERE?

13  A.  ANY OF WHO?

14  Q.  THE DEFENDANTS.  DOCTOR RICHARD FUISZ, JOSEPH FUISZ, FUISZ

15  PHARMA.  DO YOU KNOW IF THEY EVER SENT THE BOARD ANY DOCUMENTS?

16  A.  WELL, I'M AWARE OF, THE SUBPOENA I GOT, IT WAS ACCOMPANIED

17  BY AN ODD CHECK FOR $42 THAT I COULDN'T UNDERSTAND WHAT THAT

18  WAS ABOUT SO I DIDN'T CASH IT.

19  Q.  I THINK THAT'S A LEGAL REQUIREMENT FROM WHEN SUBPOENAED ARE

20  SEARCHED?

21  A.  WELL YOU ARE LAWYERS, I DO NOT KNOW.  THAT'S PRETTY CHEAP,

22  $42.

23  Q.  IN CONNECTION WITH YOUR WORK AT THERANOS, ARE YOU AWARE OF

24  THERANOS'S EFFORTS TO KEEP THEIR TRADE SECRET AND CONFIDENTIAL

25  INFORMATION NONPUBLIC, SO IT COULD BE PROTECTED?

DIRECT EXAM BY MR. BOIES

```
1    A.   YES, OF COURSE.  YOU HAVE TO DO THAT IN THAT KIND OF A

2    COMPANY, ANY KIND OF A COMPANY.  CERTAIN THINGS WILL REMAIN

3    PUBLIC.

4         THERE WAS A "WALL STREET JOURNAL" ABOUT US THAT THIS

5    REPORTER HAD ASKED ALL THESE QUESTIONS AND WROTE THIS ARTICLE.

6    ON THE OTHER HAND, CERTAIN THINGS ABOUT OUR PROCEDURES THAT ARE

7    KEPT SECRET.

8         I HAVE -- ONE OF MY GRANDSONS JUST GRADUATED FROM

9    STANFORD AND HE WORKED AT THERANOS IN THE SUMMER, AND HIS

10   MOTHER WOULD ASK HIM WHAT HE WAS WORKING ON AND HE WOULDN'T

11   TELL HER.

12        I SAID TO MYSELF, BOY, THAT'S PRETTY STRONG IF YOU WON'T

13   EVEN TELL YOUR MOTHER.

14   Q.   IN CONNECTION WITH YOUR WORK AS A MEMBER OF THE BOARD OF

15   THERANOS, YOU HAD OCCASION TO EVALUATE ELIZABETH HOLMES AS A

16   SCIENTIST AND RESEARCHER?

17   A.   OF COURSE.  YOU'RE INTERACTING WITH HER AND YOU ARE SEEING

18   HER IN THE SETTING OF THERANOS.  AND IT'S OBVIOUS THAT SHE IS A

19   STRONG LEADER, THEY LOOK TO HER.  HER OFFICE IS GLASS,

20   EVERYBODY CAN SEE THAT SHE'S THERE AND WORKING.  AND SHE'S A

21   REALLY CREATIVE PERSON.

22        BUT AS I LOOK AROUND, THERE ARE AROUND 500 EMPLOYEES I

23   THINK, AND YOU LOOK AROUND ALL THESE PEOPLE ARE WORKING AWAY.

24   IT'S A TEAM.  AND SO YOU CAN'T DO THESE THINGS JUST SOMEBODY

25   WITH A BRIGHT IDEA, YOU'VE GOT TO HAVE A TEAM THAT WORKS
```

CROSS-EXAM BY MS. ANDERSON

1   TOGETHER AND INTERACTS AND TRIES THINGS OUT AND EXPERIMENTS AND

2   REJECTS THIS AND ACCEPTS THAT AND SO ON.  AND IT FLOWS INTO

3   HER.

4       BUT SHE'S NOT ALONE BY ANY STRETCH OF THE IMAGINATION,

5   SHE HAS A LOT OF PEOPLE WORKING AWAY VERY HARD, TALENTED

6   PEOPLE.  AND YOU HAVE TO DO THAT IF YOU ARE GOING TO GET

7   ANYWHERE.

8   Q.   THANK YOU, DR. SCHULTZ FOR YOUR TESTIMONY.  WE HAVE NO MORE

9   QUESTIONS AT THIS TIME?

10       THE COURT:  THANK YOU, MR. BOIES.  ANY

11  CROSS-EXAMINATION FROM DEFENDANTS?

12       MS. ANDERSON:  BRIEFLY, YOUR HONOR.

13       THE COURT:  MS. ANDERSON, YOU MAY PROCEED.

14

15                      **CROSS-EXAMINATION**

16

17       MS. ANDERSON:

18  Q.   GOOD AFTERNOON, DR. SCHULTZ.  PLEASURE TO MEET YOU.  MY

19  NAME IS RHONDA ANDERSON AND I REPRESENT FUISZ PHARMA.

20       I JUST HAVE A FEW QUESTIONS FOR YOU.

21       YOU INDICATED THAT YOU HAD JOINED THE COMPANY ON ITS

22  BOARD IN JULY OF 2011 -- EXCUSE ME.  MAYBE I WILL GET SOME

23  WATER.

24       YOU SAID YOU HAD JOINED IN JULY OF 2011.  PRIOR TO JULY

25  OF 2011, HAD YOU BEEN AT THERANOS?

CROSS-EXAM BY MS. ANDERSON

1    A.   NO.

2    Q.   SO IN 2004 AND 2005, YOU DIDN'T HAVE AN IDEA OF HOW LARGE

3    OR SMALL THE COMPANY WAS?

4    A.   NO.

5    Q.   DID YOU EVER HAVE AN OPPORTUNITY TO SPEAK TO TIMOTHY KEMP?

6    A.   I COULDN'T HEAR YOU.

7    Q.   DID YOU HAVE AN OPPORTUNITY TO SPEAK TO TIMOTHY KEMP?

8    A.   NO.

9    Q.   OKAY.  DO YOU KNOW WHO TIMOTHY KEMP IS?

10   A.   NO.

11   Q.   WHEN YOU JOINED THE BOARD, YOU WENT TO MEETINGS?

12   A.   OF COURSE.

13   Q.   OKAY.  AND WHEN YOU WENT TO THOSE MEETINGS, DID YOU DISCUSS

14   THE FILING OF THE LAWSUIT IN THIS CASE?

15   A.   THE CASE HAS BEEN CALLED TO THE ATTENTION OF THE BOARD, AND

16   I THINK IT'S FAIR TO SAY WE ALL FEEL THAT THE COMPANY IS

17   HANDLING IT WELL AND THEY ARE WELL REPRESENTED, AND THAT'S THE

18   BOARD'S JOB TO SEE THAT THAT'S HAPPENING.  THAT'S THE EXTENT TO

19   WHICH WE, AT LEAST I HAVEN'T GOTTEN INTO IT.

20   Q.   WAS IT SOMETHING THE BOARD DECIDED TO DO OR WAS JUST, AS

21   YOU ARE INDICATING NOW THAT YOU'RE SEEING THAT THE JOB IS BEING

22   WELL DONE?

23   A.   WELL, OF COURSE THERE HAD TO BE A DECISION TO GO FORWARD

24   WITH THE CASE.

25   Q.   AT THE TIME IT WAS INITIALLY FILED?

CROSS-EXAM BY MS. ANDERSON

1    A.   PRESUMABLY, I THINK THAT WAS BEFORE I WAS ON THE BOARD, BUT

2    I'M NOT SURE ABOUT THAT.

3    Q.   WHEN YOU WERE ON THE BOARD, WAS THERE ANY EVIDENCE SHOWING

4    THAT DOCUMENTS WERE TAKEN BY JOHN FUISZ, OTHER THAN JUST SAYING

5    IT BECAUSE JOHN FUISZ WORKED AT MCDERMOTT, THE PATENT LAW FIRM

6    THAT WAS BEING USED, OTHER THAN JUST SPECULATING THAT

7    DOCUMENTING WERE TAKEN, WAS THERE ANY PHYSICAL EVIDENCE THAT

8    WAS PRESENTED THAT HE SIGNED OUT A FILE, THAT SOMEONE SAW HIM

9    TAKE A FILE.  WAS THERE ANYTHING LIKE THAT?

10   A.   I THINK THE IN'S AND OUT'S AND THE CONDUCT OF THE CASE WE

11   FELT WERE PROPERLY IN THE HANDS OF MANAGEMENT AND OUR ATTORNEY.

12        I THINK IT'S IMPORTANT FOR A BOARD NOT TO TRY TO MANAGE A

13   COMPANY.  A BOARD HIS CERTAIN TASKS AND THE MANAGEMENT HAS

14   CERTAIN TASKS.  AND IF THE BOARD TRIES TO GET INTO THE

15   MANAGEMENT IT'S A MISTAKE.

16   Q.   OKAY.  SO CORRECT ME IF I'M WRONG, THAT WASN'T SOMETHING

17   THAT YOU MADE A DECISION ON, YOU DIDN'T LOOK AT EVIDENCE, YOU

18   DIDN'T LOOK AT DOCUMENTS, YOU DIDN'T -- THAT WASN'T YOUR JOB?

19   A.   AS I SAID, OUR JOB WAS TO ASSURE OURSELVES THAT THE COMPANY

20   WAS PROCEEDING PROPERLY AND WAS WELL REPRESENTED.

21   Q.   YOU MADE A COMMENT EARLIER IN YOUR TESTIMONY THAT

22   INVENTIONS HELP MAKE THE WORLD BETTER, CORRECT?

23   A.   MOST OF THEM DO, NOT ALL OF THEM.

24   Q.   NOT ALL.  OKAY.  AND THINGS THAT WOULD HELP PATIENTS DEAL

25   WITH THEIR HEALTH BETTER WOULD MAKE THE WORLD BETTER TOO, WOULD

1  YOU AGREE WITH THAT STATEMENT?

2  A.   ABSOLUTELY.

3          MS. ANDERSON:  MAY I CONFER WITH THEM FOR A MOMENT?

4          THE COURT:  YOU MAY, MS. ANDERSON.

5          MS. ANDERSON:  NOTHING FURTHER, YOUR HONOR.

6          THE COURT:  THANK YOU, MS. ANDERSON.

7      ANY FURTHER QUESTIONS FROM THE DEFENDANTS?  MR. BOIES ANY

8  FURTHER EXAMINATION?

9          MR. BOIES:  NO, YOUR HONOR.

10         THE COURT:  DR. SCHULTZ YOU MAY STEP DOWN.  THANK

11 YOU, SIR.

12     DR. SCHULTZ BEFORE I LET YOU GO SIR I APOLOGIZE.  MEMBERS

13 OF THE JURORS DO YOU HAVE ANY QUESTIONS FOR DR. SCHULTZ?  YOU

14 MAY STEP DOWN, SIR.  THANK YOU.

15         THE WITNESS:  I'M USED TO CLASSROOMS.

16         THE COURT:  MR. BOIES, WHENEVER YOU ARE READY YOU MAY

17 CALL YOUR NEXT WITNESS.

18         MR. BOIES:  WE CALL AS OUR NEXT WITNESS DOCTOR

19 CHANNING ROBERTSON.

20         THE COURT:  DR. ROBERTSON, GOOD AFTERNOON, SIR.

21     PLEASE STEP FORWARD.

22

23                      **CHANNING ROBERTSON,**

24 BEING CALLED AS A WITNESS ON BEHALF OF THE

25 PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND

DIRECT EXAM BY MR. BOIES

1    TESTIFIED AS FOLLOWS:

2            THE WITNESS:  I DO.

3            THE CLERK:  THANK YOU.  PLEASE BE SEATED.  PLEASE

4    STATE YOUR FULL NAME AND SPELL YOUR LAST NAME FOR THE RECORD.

5            THE WITNESS:  MAY NAME IS CHANNING ROBERTSON.

6    SPELLED R-O-B-E-R-T-S-O-N.

7

8            **DIRECT-EXAMINATION BY MR. BOIES**

9

10   BY MR. BOIES:

11   Q.   DR. ROBERTSON, I WOULD LIKE TO HAVE YOU TELL THE JURY A

12   LITTLE BIT ABOUT YOURSELF.  YOU LIVE IN STANFORD, CALIFORNIA;

13   IS THAT RIGHT?

14   A.   I DO, I LIVE ON THE STANFORD UNIVERSITY CAMPUS.

15   Q.   ARE YOU MARRIED?

16   A.   YES.

17   Q.   HOW LONG?

18   A.   WE ARE ABOUT READY TO CELEBRATE OUR FIFTH WEDDING

19   ANNIVERSARY.

20   Q.   DO YOU HAVE ANY CHILDREN?

21   A.   I HAVE TWO CHILDREN.  A SON AND A DAUGHTER.  OUR DAUGHTER

22   LIVES IN PALO ALTO, SHE'S AN EMERGENCY ROOM PHYSICIAN AT KAISER

23   SANTA CLARA NOT FAR FROM HERE AND OUR SON LIVES IN SAINT PAUL

24   MINNESOTA.

25   Q.   WHAT IS YOUR EDUCATIONAL DEGREES?

DIRECT EXAM BY MR. BOIES

1    A.   I RECEIVED A BACHELOR'S OF SCIENCE DEGREE IN CHEMICAL

2    ENGINEERING FROM THE UNIVERSITY OF CALIFORNIA BERKELEY.  AND

3    MASTER'S AND PHD DEGREES FROM STANFORD UNIVERSITY IN CHEMICAL

4    ENGINEERING.

5    Q.   YOU WERE A PROFESSOR AT STANFORD, CORRECT?

6    A.   WELL, I'M AN EMERITUS PROFESSOR BUT I STILL TEACH.  SO I

7    CONSIDER MYSELF STILL AT LEAST IN PART A PROFESSOR.

8    Q.   WHAT IS AN EMERITUS PROFESSOR?

9    A.   IT'S, AN EMERITUS PROFESSOR IS ONE WHO NO LONGER HAS TENURE

10   AND IS NO LONGER A MEMBER OF THE COUNSEL, EFFECTIVELY RETIRED,

11   BUT NOT NECESSARILY INACTIVE.

12   Q.   HOW LONG HAVE YOU BEEN AN EMERITUS PROFESSOR AT STANFORD

13   UNIVERSITY?

14   A.   I BECAME EMERITUS IN JUNE OF 2011.

15   Q.   AND PRIOR TO JUNE 2011 HAD YOU BEEN ON THE FACULTY OF

16   STANFORD?

17   A.   YES.

18   Q.   HOW LONG WERE YOU ON THE FACTUALLY OF STANFORD BEFORE YOU

19   BECAME AN EMERITUS PROFESSOR?

20   A.   I JOINED THE FACULTY IN 1970.

21   Q.   FROM 1970 TO 2011?

22   A.   RIGHT.  ABOUT 42 YEARS.

23   Q.   AND WHAT DEPARTMENT WERE YOU IN?

24   A.   I WAS IN THE CHEMICAL ENGINEERING DEPARTMENT.

25   Q.   DID YOU EVER HOLD POSITIONS IN ADMINISTRATION AND

DIRECT EXAM BY MR. BOIES

1    MANAGEMENT AT STANFORD?

2    A.   I DID.

3    Q.   CAN YOU GIVE US SOME EXAMPLES?

4    A.   I WAS SHARE MAN OF THE CHEMICAL ENGINEERING DEPARTMENT ON

5    TWO SEPARATE OCCASIONS FOR A TOTAL PERIOD OF EIGHT YEARS.  AND

6    I WAS SENIOR ASSOCIATE DEAN OF THE SCHOOL OF ENGINEERING FOR

7    APPROXIMATELY SEVEN YEARS, AND I SERVED ON THE UNIVERSITY OF

8    PROVOS SPECIAL COMMITTEE FOR APPROXIMATELY SEVEN YEARS.

9    Q.   WHAT COURSES DID YOU TEACH AT STANFORD OR CAN YOU GIVE ME

10   EXAMPLES OF THE COURSES YOU TAUGHT AT STANFORD?

11   A.   I TAUGHT COURSES IN FUNDAMENTALS OF CHEMICAL ENGINEERING.

12   FLUID MECHANICS, HEAT TRANSFER, MASS TRANSFER, CHEMICAL

13   KINETICS, SEPARATIONS.

14        I TAUGHT COURSES IN DIRECT DELIVERY, ENERGY, ENGINEERING

15   DESIGN, THE TRANSPORT AND FATE OF CONTAMINANTS IN THE

16   ENVIRONMENT.  AND I CURRENTLY AM TEACHING A THREE QUARTER

17   SEMINAR SERIES IN GRADUATE BIOTECHNOLOGY.  AND I ALSO TEACH TWO

18   COURSES ON CRITICAL ANALYTICAL THINKING IN GRADUATE SCHOOL OF

19   BUSINESS.

20   Q.   COULD YOU EXPLAIN WHAT BIO TECHNOLOGY IS IN THE SENSE THAT

21   YOU USE IT BIO TECHNOLOGY?

22   A.   THE WAY I USE IT IS THE APPLICATION OF ENGINEERING

23   PRINCIPALS TO PROBLEMS IN THE LIFE SCIENCES AND MEDICINE.

24   Q.   WHAT ARE BIO MEDICAL DEVICES?

25   A.   BIO MEDICAL DEVICES THAT COVERS A BROAD SPECTRUM OF

DIRECT EXAM BY MR. BOIES

1    POSSIBILITIES.  AN EXAMPLE WOULD BE AN ARTIFICIAL KIDNEY,

2    ARTIFICIAL LUNG.  A PLASMAPHERESIS MACHINE THAT SEPARATES

3    PLATELETS FROM BLOOD.

4        IT CAN BE DIAGNOSTIC DEVICES THAT MEASURE CHEMICAL

5    COMPONENTS AND BODILY FLUIDS.  IT COVERS A WIDE BREADTH OF

6    POINTS.

7    Q.   DO YOU DEAL WITH BIO MEDICAL DEVICES IN THE COURSES THAT

8    YOU TEACH?

9    A.   YES.  I HAVE PRETTY MUCH MY ENTIRE TEACHING CAREER HAVE

10   TAUGHT COURSES THAT INCLUDE THE DESIGN OF VARIETY OF BIO

11   MEDICAL DEVICES, INCLUDING ARTIFICIAL KIDNEYS AND LUNGS AS WELL

12   AS DIAGNOSTIC DEVICES, THE TERM BEING USED, BLOOD ANALYZERS.

13       I TEACH THE STUDENTS THE FUNDAMENTAL PRINCIPALS OF HOW YOU

14   MOVE THE FLUIDS AROUND, HOW YOU ANALYZE THEM, HOW YOU DETECT

15   COMPONENTS IN THE BLOOD, HOW YOU DO THAT WITH THE APPROPRIATE

16   AMOUNT OF PRECISION AND ROBUSTNESS AND ACCURACY.

17       PRETTY MUCH COVER THE WHOLE GAMBIT FROM CONCEPT OF THE

18   DEVICE TO HOW IT'S DESIGNED AND EVEN WHAT THE MANUFACTURING AND

19   PACKAGING OPTIONS ARE.

20   Q.   DURING YOUR TIME AT STANFORD, WERE YOU A MEMBER OF ANY

21   PROFESSIONAL ENGINEERING SOCIETIES?

22   A.   YES, I WAS.

23   Q.   COULD YOU GIVE ME SOME EXAMPLES?

24   A.   I'M A SENIOR MEMBER OF THE BIO MEDICAL ENGINEERING SOCIETY.

25   I WAS A FOUNDING FELLOW OF THE AMERICAN INSTITUTE OF AMERICAN

DIRECT EXAM BY MR. BOIES

1    MEDICAL BIO ENGINEERING.

2         AND I'M A MEMBER OF THE AMERICAN INSTITUTE OF CHEMICAL

3    ENGINEERS.

4    Q.   HAVE YOU PUBLISHED ARTICLES IN PEER REVIEWED SCIENTIFIC

5    JOURNALS RELATING TO YOUR RESEARCH?

6    A.   I HAVE.

7    Q.   APPROXIMATELY HOW MANY ARTICLES?

8    A.   APPROXIMATELY 160.

9    Q.   HAVE YOU SERVED AS CONSULTANT OR AS A CONSULTANT TO ANY

10   COMPANIES?

11   A.   YES, I HAVE.

12   Q.   COULD YOU GIVE US SOME EXAMPLES OR DESCRIBE BRIEFLY AND

13   GENERALLY WHAT YOUR CONSULTING EXPERIENCE HAS BEEN?

14   A.   I THINK OVER THE LAST 45 YEARS I'VE CONSULTED FOR WELL OVER

15   40 DIFFERENT COMPANIES.

16        I WOULD SAY ROUGHLY HALF OR IN WHAT ONE MIGHT CALL THE

17   CHEMICAL PROCESS INDUSTRY, THE OTHER HALF ARE IN THE BIO

18   TECHNOLOGY SIDE OF THINGS WITH ESSENTIALLY ALL OF THEM BEING IN

19   THE AREA OF BLOOD ANALYZERS.

20   Q.   AND HAVE YOUR WORK OR HAS YOUR WORK AS A CONSULTANT DEALT

21   WITH DIAGNOSTIC DEVICES, WHICH WE MENTIONED EARLIER?

22   A.   YES, ACTUALLY THE BULK OF THE CONSULTING AND THE BIO

23   TECHNOLOGY SIDE HAS BEEN INVOLVED WITH BLOOD ANALYZERS IN ONE

24   WAY OR ANOTHER.

25   Q.   ARE YOU THE INVENTOR OF ANY PATENTS?

DIRECT EXAM BY MR. BOIES

1    A.   I'M THE COINVENTOR ON SIX PATENTS.

2    Q.   OTHER THAN THE PATENTS THAT YOU YOURSELF HAVE BEEN THE

3    COINVENTOR ON, HAVE YOU HAD ANY OTHER INVOLVEMENT WITH PATENTS?

4    A.   YES, I HAVE.  I CERTAINLY WAS INVOLVED WITH THE DEVELOPMENT

5    OF PATENTS IN, WITH THE COMPANY THAT I WAS CONSULTING WITH.

6    AND MORE RECENTLY, JOHN HENNESSY WHO IS THE PRESIDENT OF

7    STANFORD UNIVERSITY AND ANN ARVIN WHO IS THE DEAN OF RESEARCH

8    AND KATHLEEN KU, WHO RUNS OUR OFFICE OF TECHNOLOGY AND

9    LICENSING AT STANFORD, ASKED ME TO LEAD A PROJECT TO REVIEW THE

10   ENTIRE PENDING STANFORD PATENT PORTFOLIO TO ASCERTAIN IF THERE

11   ARE INVENTIONS, PATENTS THAT HAVE BEEN ASSIGNED TO STANFORD,

12   THAT WITH SOME MORE RESOURCES AND ASSISTANCE COULD BE TAKEN TO

13   A POINT WHERE THEY COULD BE COMMERCIALIZED AND MARKETED.

14        THE BUDGET I'M WORKING WITH IS APPROXIMATELY ABOUT

15   $5 MILLION A YEAR IN THAT ENDEAVOR.

16   Q.   YOU MENTION THE STANFORD UNIVERSITY OFFICE OF TECHNOLOGY

17   LICENSING.  CAN YOU EXPLAIN WHAT THAT OFFICE IS?

18   A.   THE OFFICE OF TECHNOLOGY AND LICENSING WHICH REALLY WAS ON

19   THE UNIVERSITY CAMPUS, WAS REALLY ONE OF THE VERY FIRST ONE

20   STARTED ABOUT 30 YEARS AGO, PRETTY MUCH BECAUSE WE ARE IN

21   SILICON VALLEY, AND WE HAVE PEOPLE IN THE ACADEMIC COMMUNITY ON

22   THE FACULTY AT STANFORD WHO INVENT AND WHO ARE INTERESTED IN

23   TRANSLATING THE RESULTS OF THE RESEARCH AND ENTER IT INTO THE

24   PUBLIC DOMAIN.

25        SO THAT OFFICE WAS CREATED TO PROVIDE A MEANS WHEREBY

DIRECT EXAM BY MR. BOIES

1    WHEN RESEARCH IN OUR LABORATORIES REACH THE POINT WHERE AN

2    INVENTION COULD BE IDENTIFIED AND ARTICULATED, YOU COULD GO TO

3    THIS OFFICE AND THEY WOULD HAVE THE RESOURCES TO ASSIST YOU IN

4    WRITING A PROVISIONAL OR PREPARING A PATENT APPLICATION.  THEY

5    HAD THE ABILITY TO HIRE ATTORNEYS, TO MAKE THAT HAPPEN AND MAKE

6    IT POSSIBLE AND PROSECUTE THE PATENTS.

7         AND IF PATENTS ARE LICENSED, THERE'S GENERALLY ROYALTY

8    INCOME.  AND SINCE THE INCEPTION OF THAT OFFICE, WE'VE RECEIVED

9    WELL OVER A BILLION DOLLARS OF INCOME TO THE UNIVERSITY AS A

10   RESULT OF THESE ACTIVITIES.

11        AN EXAMPLE THAT YOU PROBABLY WOULD ALL KNOW IS THE

12   PAGERING SYSTEM WHICH WAS INVENTED BY TWO STUDENTS AT STANFORD.

13   THAT'S BECOME KNOWN AS GOOGLE.

14   Q.  IN CONNECTION WITH YOUR WORK AT THE OFFICE OF TECHNOLOGY

15   LICENSING, APPROXIMATELY HOW MANY PATENTS DID YOU AND YOUR TEAM

16   EVALUATE?

17   A.  WE'VE EVALUATED AND EXAMINED WELL OVER A THOUSAND PATENTS

18   AND WE WORK HARD TO KEEP UP WITH THE FLOW.

19        AT STANFORD WE GENERALLY GET ABOUT ONE PATENT DISCLOSURE

20   EVERY DAY, 365 DAYS A YEAR, AND OF THOSE THOUSAND PLUS PATENTS,

21   WE HAVE FOUND PERHAPS ON THE ORDER OF SOMEWHERE BETWEEN 30 AND

22   40 THAT WE BELIEVE WITH FURTHER EXAMINATION WE MIGHT BE ABLE TO

23   MAKE A DETERMINATION AS TO WHETHER OR NOT WE SHOULD PUT

24   INSTITUTIONAL RESOURCES INTO THOSE IN ORDER TO TAKE THEM THE

25   NEXT STEP TOWARD COMMERCIALIZATION, WHERE WE CAN ACTUALLY

DIRECT EXAM BY MR. BOIES

1    LICENSE THEM OUT EITHER TO A COMPANY OR TO A START UP.

2    Q.   I TAKE IT FROM WHAT YOU JUST SAID THAT THE VALUE OF PATENTS

3    WILL VARY GREATLY.  SOME WILL BE VERY VALUABLE, SOME NOT?

4    A.   YOU HAVE THE FULL SPECTRUM OF SOME PATENTS WHICH SIMPLY

5    NEVER GET LICENSED AND SOME WHICH SHOULD BUT NEED TO BE TAKEN A

6    FEW MORE STEPS WHICH ARE THE ONES WE NEED TO TRY IT FIND.  AND

7    THERE ARE OTHERS WHICH JUST BY VIRTUE OF GETTING THE PATENT TO

8    ATTRACT A LOT OF INTEREST, AN EXAMPLE IS WHAT WE CALL THE

9    YAMAHA PATENT, THAT WAS THE SYNTHESIZER CHIP THAT WENT INTO THE

10   YAMAHA DEVICE THAT FIRST PRODUCED DIGITAL MUSIC.  AND IT'S

11   CALLED THE YAMAHA BECAUSE THEY ARE THE ONES WHO LICENSED IT.

12        ANOTHER IS STANFORD AND THE UNIVERSITY OF CALIFORNIA

13   SAN FRANCISCO CO-PATENT OR REPRESENTED BY ACADEMIC FACULTY FROM

14   BOTH SCHOOLS ON THE RECUMBENT DNA PATENT, WHICH WAS A VERY

15   IMPORTANT PATENT THAT EFFECTIVELY STARTED THE BIO TECHNOLOGY

16   INDUSTRY IN 1973.

17   Q.   A MOMENT AGO I THINK YOU SAID YOU WERE THE CO-INVENTOR ON

18   SIX PATENTS.  IN CONNECTION WITH THOSE PATENTS, WHAT WAS YOUR

19   PATENT ROLE IN THE PATENT PROCESS?

20   A.   WELL, IT BEGAN WITH, I GUESS YOU CAN CALL THE IDEA AND

21   CONCEPT AND WORKING THAT THROUGH TO VALIDATE IT TO THE POINT

22   WHERE WE COULD ARTICULATE WHAT IT IS WE THOUGHT WE HAD

23   INVENTED.  THEN WORKING WITH PATENT ATTORNEYS TO DEVELOP THE

24   PATENT TO THE POINT THAT IT WOULD BE SUBMITTED TO THE PATENT

25   OFFICE, PATENT AND TRADEMARK OFFICE.

DIRECT EXAM BY MR. BOIES

1    AND THEN THAT WAS FOLLOWED BY SOMEWHAT LENGTHY PROCESS OF

2    CONVERSATION THAT INVENTORS AND PATENT ATTORNEYS HAVE WITH THE

3    PATENT OFFICE TO ANSWER QUESTIONS THAT ARE RAISED TO BE SURE

4    THAT ALL OF THE PRIOR ART HAD BEEN UN COVERED AS BEST AS

5    EVERYONE COULD TELL, THROUGH THE EFFORTS OF THE INVENTORS AND

6    THROUGH THE EFFORTS OF THE PATENT EXAMINER WHO WOULD ALSO

7    SEARCH THE RELEVANT MATERIALS IN THE FIELD OF INVENTION.

8    Q.   DID YOU HAVE AN UNDERSTANDING THAT YOU HAD AN OBLIGATION TO

9    TURN OVER TO THE PATENT OFFICE, MATERIAL, PRIOR ART THAT YOU

10   WERE AWARE OF?

11   A.   YES.  IT'S PART OF THE DUTY OF AN INVENTOR WHEN YOU GO TO

12   THE U.S. PATENT OFFICE IS TO PROVIDE THEM WITH ALL THE

13   INFORMATION YOU KNOW OF THIS MATERIAL TO THE INVENTION THAT YOU

14   HAVE MADE, SO THAT THE PATENT EXAMINER HAS THE OPPORTUNITY TO

15   EVALUATE AND ENSURE THAT THERE'S A CLEAR DISTINCTION BETWEEN

16   THE EXISTING PRIOR ART AND THE INVENTION TO COME TO THE

17   CONCLUSION THAT YES, THIS IS SOMETHING NEW AND NOVEL AND

18   NONOBVIOUS.

19   Q.   NOW, YOU'VE IDENTIFIED A NUMBER OF ASPECTS OF YOUR WORK IN

20   WHICH YOU'VE COME INTO CONTACT WITH PATENTS, BOTH YOUR OWN AND

21   REVIEWING PATENTS AT THE OFFICE OF TECHNOLOGY AND LICENSING AND

22   ELSEWHERE.

23       HAVE YOU EVER BEEN AWARE OF PATENTS WHERE THE INVENTOR

24   HAD NO DOCUMENTATION SUPPORTING THE INVENTION, NO LAB WORK, NO

25   NOTES, NOTHING THAT SHOWED HOW THE INVENTION HAD BEEN CREATED

VOIR DIRE BY MS. ANDERSON

1    OR WHAT THE INVENTION WAS?

2    A.   WELL, IN MY EXPERIENCE WITH MY OWN PATENTS, THE ONES THAT I

3    HAVE ENCOUNTERED IN 40 PLUS YEARS OF CONSULTING, AND THE

4    PATENTS THAT I REVIEWED IN THE CONTEXT OF THE, WHAT'S CALLED

5    THE STANFORD INNOVATION PROJECT, IT'S NEW ACTIVITY THAT I HAVE

6    BEEN INVOLVED WITH, I HAVE YET TO ENCOUNTER A SITUATION WHERE

7    THERE IS AN ABSENCE OF INFORMATION REGARDING THE PATH TAKEN

8    FROM THE MENTAL CONCEPT OF AN INVENTION TO THE POINT WHERE IT

9    CAN BE ARTICULATED DURING THE FORM OF A PROVISIONAL APPLICATION

10   OR PATENT APPLICATION.

11        IN MY EXPERIENCE, AT LEAST, THERE'S ALWAYS A TRAIL THAT

12   ONE CAN FOLLOW AND UNDERSTAND AND EXAMINE.  WE CALL THAT THE

13   INVENTIVE PROCESS.

14        MR. BOIES:  YOUR HONOR, WE WOULD OFFER DR. ROBERTSON

15   AS AN EXPERT IN THE FIELD.

16        THE COURT:  ANY OBJECTION.

17        MS. ANDERSON:  I WOULD LIKE TO VOIR DIRE FOR A

18   MOMENT.

19        THE COURT:  YOU MAY.  YOU MAY PROCEED.

20

21                    **VOIR DIRE BY MS. ANDERSON**

22

23   BY MS. ANDERSON:

24   Q.   GOOD AFTERNOON, HOW ARE YOU DOING TODAY; DOCTOR.

25   A.   DO YOU WANT TO KNOW THE TRUTH.

VOIR DIRE BY MS. ANDERSON

1    Q.   OF COURSE.  YOU ARE ON THE WITNESS STAND.

2    A.   I DIDN'T MEAN IT IN THAT SENSE.  I'M DOING AS WELL AS I

3    GUESS COULD BE EXPECTED.

4    Q.   TO BE IN THE WITNESS STAND, CORRECT?

5    A.   RIGHT.

6    Q.   OKAY.  JUST WANTED TO UNDERSTAND YOUR BACKGROUND A LITTLE

7    BIT MORE.  YOU TAUGHT CLASSES IN CHEMICAL ENGINEERING BUT I

8    WANT TO KNOW IF YOU HAD EVER TAUGHT CLASSES IN PATENT

9    EXAMINATION?

10   A.   NO.

11   Q.   AND PATENT PROSECUTION, HAVE YOU TAUGHT ANY CLASSES IN THAT

12   AREA?

13   A.   NO.

14   Q.   DO YOU HAVE A BACKGROUND AT ALL IN BEING A PATENT EXAMINER?

15   A.   NO.

16   Q.   AND DO YOU HAVE ANY BACKGROUND IN LAW?

17   A.   WELL, I SUPPOSE EVERYBODY HAS SOME KIND OF BACKGROUND BUT

18   NOT AN ACADEMIC BACKGROUND IN LAW.  I DIDN'T GO TO LAW SCHOOL.

19   Q.   DIDN'T GO TO LAW SCHOOL.  OKAY.

20        AND YOU'RE A CHEMICAL ENGINEER BUT YOU'RE NOT A MEDICAL

21   DOCTOR, THOUGH, ARE YOU?  WE CALL YOU DOCTOR BUT ARE YOU A

22   MEDICAL DOCTOR?

23   A.   NO, I'M NOT.

24   Q.   DO YOU YOURSELF TREAT INDIVIDUALS FOR ILLNESSES AT ALL?

25   A.   MY KIDS.

VOIR DIRE BY MS. ANDERSON

1   Q.   YOUR KIDS.  BEYOND YOUR KIDS?

2   A.   NO.

3   Q.   BEYOND THE NORMAL STUFF THAT PARENTS DO WITH CHILDREN?

4   A.   NOT AS A MEDICAL DOCTOR, NO, BECAUSE I'M NOT A MEDICAL

5   DOCTOR.

6   Q.   A MOMENT AGO YOU SAID, WE TALKED ABOUT LAB BOOKS.  WOULD

7   YOU AGREE THAT LAB BOOBS OR THE EXTENT OF LAB BOOKS WOULD

8   DEPEND ON WHAT INVENTION WE ARE TALKING ABOUT?

9   A.   I THINK THAT LAB, LAB NOTEBOOKS IN GENERAL, THAT LEAD UP TO

10  AN INVENTION, THEY ARE WHAT THEY ARE.  HOW EXTENSIVE THEY MAY

11  OR MAY NOT BE DEPENDS ON THE AMOUNT OF WORK THAT WAS REQUIRED.

12  Q.   OKAY.  AND THERE ARE DIFFERENCES IN THE WAY THAT

13  INDIVIDUALS DO INVENT, SOMEBODY MIGHT TAKE METICULOUS NOTES AND

14  SOME MAY HAVE THE CONCEPT IN THEIR HEAD, ALONE?

15  A.   WELL, AS I SAID, MY EXPERIENCE HAS BEEN THUS FAR, AND IT'S

16  ONLY BEEN MERELY A HALF CENTURY, BUT I HAVEN'T SEEN A SITUATION

17  WHERE AN INVENTION HAS, THAT I'M AWARE OF, THAT HAS BEEN

18  BROUGHT TO THE POINT OF ARTICULATION THAT HASN'T HAD SOME

19  DESCRIPTIVE MATERIAL OF SOME SORT, WHETHER IT'S JOURNAL

20  ENTRIES, SKETCHES, LABORATORY NOTEBOOKS, RESEARCH, THAT HAS

21  PRECEDED THAT.  I JUST HAVEN'T SEEN IT.

22  Q.   BUT YOUR FIELD IS CONCENTRATED IN THE CHEMICAL ENGINEERING

23  AND THAT'S A PRETTY COMPLEX FIELD THAT YOU ARE IN, CORRECT?

24  A.   ACTUALLY, MY FIELD, WHILE I AM A CHEMICAL ENGINEER, IT'S

25  ALL BEEN APPLIED TO THE BIOLOGICAL SCIENCES.  BIOLOGY IS JUST

VOIR DIRE BY MS. ANDERSON

1    CHEMISTRY WITH ANOTHER NAME.

2    Q.   AND CHEMISTRY ITSELF CAN BE MORE COMPLEX WHEN YOU ARE DOING

3    TESTING, CORRECT?

4         MR. BOIES:  OBJECTION.  I'M GOING TO OBJECT.  THIS IS

5    WAY BEYOND ANY VOIR DIRE.

6         THE COURT:  I WILL SUSTAIN THE OBJECTION.

7       YOU MAY ASK ANOTHER QUESTION, MS. ANDERSON.

8         MS. ANDERSON:

9    Q.   SIMPLY STATED, WOULD YOU AGREE THAT NOT ALL LAB BOOKS ARE

10   ALIKE?  WOULD YOU AGREE?

11   A.   I WOULD SAY NOT ALL LAB BOOKS ARE ALIKE BECAUSE THE COUNTER

12   TO THAT LOGIC WOULD BE ALL LAB BOOKS ARE THE SAME WHICH THEY

13   ARE NOT.

14   Q.   AND NOT ALL INVENTORS INVENT THE SAME?

15   A.   I DON'T KNOW HOW TO ANSWER THAT QUESTION.  THERE'S A

16   PROCESS THAT'S FOLLOWED AT LEAST THE PROCESS I'VE SEEN AND

17   ENCOUNTERED OVER THE MANY YEARS THAT I'VE BEEN INVOLVED WITH

18   PATENTS IN BOTH NOT ONLY MY OWN BUT STANFORD AND THEN MY

19   CONSULTING.

20       THERE IS A CONSISTENCY TO WHAT I SEE IN TERMS OF THE PATH

21   THAT IS FOLLOWED FROM THE MENTAL CONCEPT TO THE POINT OF

22   ARTICULATION.

23       I SEE NOTHING DIFFERENT THAN THAT.  SO HOW YOU DESCRIBE

24   THAT IN TERMS OF WHAT'S IN A LAB NOTEBOOK OR WHAT'S NOT OR HOW

25   MANY LAB NOTEBOOKS ARE THERE, THERE'S SOMETHING, IT'S ALWAYS

VOIR DIRE BY MS. ANDERSON

1    BEEN SOMETHING.

2    Q.   AND THAT'S -- STANFORD UNIVERSITY, THAT'S WHAT YOU HAVE

3    BEEN EXPERIENCING, CORRECT?

4    A.   NO.

5    Q.   YOU JUST MENTIONED THAT YOU WERE TALKING ABOUT STANFORD

6    UNIVERSITY, THAT'S BEEN YOUR EXPERIENCE, CORRECT?

7    A.   WHAT I HAVE SEEN IN PART HAS BEEN DEVELOPMENTS THAT EMERGE

8    FROM THE VARIOUS CORNERS OF THE UNIVERSITY.  BUT THE OTHER PART

9    IS WHAT I'VE SEEN OUTSIDE OF THE UNIVERSITY AND MANY COMPANIES

10   I'VE CONSULTED WITH AREN'T NECESSARILY ASSOCIATED WITH THE

11   UNIVERSITY AT ALL.

12   Q.   OKAY.  AND IT WILL VARY BASED ON THE INSTITUTION AS TO HOW

13   THEY KEEP NOTEBOOKS OR HOW THEY INVENT?

14        MR. BOIES:  AGAIN YOUR HONOR.  I DON'T THINK THIS HAS

15   ANYTHING TO DO WITH VOIR DIRE, SHE MAY WANT TO ASK THESE

16   QUESTIONS ON CROSS-EXAMINATION BUT I DON'T THINK THIS GOES TO

17   WHETHER HE'S AN EXPERT.

18        MS. ANDERSON:  I WILL AGREE.  I'M JUST GOING TO ASK

19   THE COURT TO LIMIT THE EXPERTISE TO THE FIELD THAT HE IS IN.

20   AND NOTHING FURTHER.

21        THE COURT:  ALL RIGHT.  MR. BOIES, DO YOU WANT TO

22   RESPOND TO THAT REQUEST?

23        MR. BOIES:  WE'VE OFFERED HIM AN EXPERT IN DIAGNOSTIC

24   DEVICES, YOUR HONOR.  WE DIDN'T OFFER HIM AS AN EXPERT IN LAW.

25        THE COURT:  I WILL PERMIT THIS WITNESS TO TESTIFY,

1    DR. ROBERTSON CAN TESTIFY TO THE FIELD OF DIAGNOSTICS.  WITH

2    THAT INSTRUCTION, WHY DON'T YOU PROCEED.

3         THANK YOU, MS. ANDERSON.  YOU WILL HAVE AN OPPORTUNITY

4    FOR FURTHER CROSS-EXAMINATION.

5         GO AHEAD.

6         MR. BOIES:  THANK YOU, YOUR HONOR.

7         OKAY.

8

9                **DIRECT-EXAMINATION BY MR. BOIES**

10

11   BY MR. BOIES:

12   Q.   NOW, BEFORE PROCEEDING TO THE REST OF YOUR EXAMINATION,

13   DR. ROBERTSON, I WANT TO GO THROUGH WITH YOU SORT OF WHAT YOUR

14   INTEREST IS, IF ANY, IN THIS LITIGATION ITSELF, THAT IS FOR

15   EXAMPLE YOU ARE AN INVENTOR IN THERANOS, CORRECT?

16   A.   TO THE EXTENT I HAVE EXERCISED SOME OPTIONS I HAVE, IF YOU

17   CALL THAT INVESTING, YES, THAT'S THE EXTENT OF IT.

18   Q.   AND YOU HAVE CONSULTED FOR THERANOS, CORRECT?

19   A.   I HAVE BEEN CONSULTING WITH THERANOS ESSENTIALLY SINCE

20   ELIZABETH STARTED THE COMPANY GOING BACK TO 2003.

21   Q.   AND DID THERE COME A TIME WHEN SHE HAD ENOUGH MONEY TO PAY

22   YOU FOR THAT CONSULTING?

23   A.   IT TOOK A WHILE, BUT YES, SHE DID.

24   Q.   NOW, DO YOU BELIEVE THAT YOU CAN GIVE COMPLETE AND CANDID

25   TESTIMONY DESPITE THE FACT THAT YOU'RE AN INVESTOR AND

DIRECT EXAM BY MR. BOIES (CONT.)

1    CONSULTANT IN AND TO THERANOS?

2    A.   OF COURSE.  ABSOLUTELY.

3    Q.   BY THE WAY, DO YOU HOLD A POSITION AT THERANOS NOW?

4    A.   I DO.

5    Q.   WHAT IS THAT POSITION?

6    A.   MY TITLE IS DISTINGUISHED THERANOS TECHNOLOGIST.

7    Q.   AND WHEN DID YOU ASSUME THAT POSITION?

8    A.   WHEN I FULLY RETIRED, WHICH WAS IN END OF JUNE IN 2013.

9         SO IT'S I BECAME EMERITUS IN 2011, IN CASE YOU ARE

10   CONFUSED, I HAD A HALF-TIME APPOINTMENT FOR AN ADDITIONAL TWO

11   YEARS AS I WOUND DOWN MY LABORATORY AND WOUND DOWN PART BUT NOT

12   ALL OF MY TEACHING.  WHEN YOU HOLD AN APPOINTMENT AT STANFORD,

13   YOU'RE LIMITED IN THE AMOUNT OF TIME THAT YOU CAN COMMIT TO

14   OUTSIDE ACTIVITIES.

15        SO I WASN'T ABLE TO BE A FULL TIME CONSULTANT AT THERANOS

16   UNTIL I WAS FULLY RETIRED, AND THAT WAS LAST JULY AND THAT WAS

17   THE TIME THAT I ASSUMED THIS TITLE.

18   Q.   WHAT IS A DISTINGUISHED THERANOS TECHNOLOGIST?

19   A.   WELL, YOU ARE LOOKING AT THE ONLY ONE.  I'M HOPING, I'M

20   HOPING IT'S THE BEGINNING OF MANY DISTINGUISHED THERANOS

21   TECHNOLOGISTS.

22        I HAVE TO DO TWO THINGS PRIMARILY.  I WORK WITH THE

23   TECHNICAL TEAMS AT THE COMPANY.  I ENGAGE WITH THESE SCIENTISTS

24   AND ENGINEERS IN EVERYTHING FROM SOPHISTICATED ANALYTICAL

25   CHEMISTRY THAT GOES TO THE BODILY FLUID ANALYZERS TO PRODUCTION

DIRECT EXAM BY MR. BOIES (CONT.)

1   AND MANUFACTURING, WORKING ON CONCEPTS WITH THE DEVICE DESIGNS

2   THEMSELVES.

3   AND I ALSO SPEND, TRY TO SPEND AT LEAST ABOUT HALF OF MY

4   TIME THINKING ABOUT, THINKING ABOUT THE FUTURE, WHERE THIS

5   COMPANY CAN EVOLVE IN THE FUTURE TO REALLY MEET OUR COLLECTIVE

6   DREAM OF PROVIDING THE BEST HEALTH CARE POSSIBLE TO THE PUBLIC.

7   AND WHAT THIS MEANS IS LOOKING INTO THE FUTURE AND

8   ATTEMPTING TO IDENTIFY EITHER BRAND-NEW TECHNOLOGIES, EXISTING

9   TECHNOLOGIES THAT ARE OUT THERE BUT HAVEN'T BEEN USED IN THIS

10  CONTEXT, BUT YOU MAY HAVE HEARD OF THE SKUNK WORKS OF LOCK

11  HEED.  THIS WAS A GROUP OF PEOPLE THAT LOCK HEED REALLY LOOKED

12  TO THE FUTURE.  THAT'S THE GROUP THAT BUILT THE U2 AND THE R71

13  BLACKBIRD.  THESE WERE PHENOMENAL DEVELOPMENTS THAT CAME FROM

14  WITHIN THAT COMPANY.

15  ANOTHER EXAMPLE IS BARNEY OLIVER.  BARNEY OLIVER WAS

16  ESSENTIALLY IN SOME SENSE MY EQUIVALENT AT HEWLETT-PACKARD.

17  WHEN YOU THINK OF BILL HEWLETT AND DAVID PACKARD, BARNEY OLIVER

18  WHO WAS REALLY PUSHING THE NEW DISRUPTIVE TECHNOLOGIES, I HOPE

19  THAT I WON'T DO THAT ALONE, I HOPE THERE WILL BE OTHERS LIKE

20  THIS.

21  AND ELIZABETH AND I HAVE TALKED ABOUT THAT, I THINK SHE'S

22  FAVORABLY INCLINED TO DO THAT SO THAT THE COMPANY IS PREPARED

23  TO MEET THE CHALLENGES OF THE FUTURE AND TO, IN A SENSE,

24  CONTINUE TO OBSOLETE YOURSELF AS YOU UNRAVEL AND THE SCIENCE

25  AND TECHNOLOGY THAT'S REQUIRED TO BRING FORTH DEVELOPMENTS THAT

DIRECT EXAM BY MR. BOIES (CONT.)

1    IN SOME SENSE YOU CAN'T EVEN IMAGINE TODAY.

2         JUST LIKE DESKTOP COMPUTERS.  WHEN I STARTED TEACHING AT

3    STANFORD, I TELL MY STUDENTS, I HAVE A ROTARY DIAL TELEPHONE,

4    BUT I WANTED TO MAKE A CALL TO WASHINGTON, D.C. SO I WOULD DIAL

5    0, GET AN OPERATOR, AND GIVE THE OPERATOR THE NUMBER, I WOULD

6    HANG THE PHONE UP.  IN AN HOUR OR TWO LATER IT WOULD RING, THAT

7    WAS MY CONNECTION.  XEROX MACHINES WEREN'T THERE.

8         AND I WAS TEACHING STUDENTS TO SOLVE PROBLEMS USING SLIDE

9    ROLLS.  YOU CAN IMAGINE IF I DIDN'T MOVE ON FROM THAT, THESE

10   SORT OF FOSSILIZED.

11        SO EVEN THEN, I COULDN'T IMAGINE THE INTERNET.  I WISH I

12   HAD.  I COULDN'T IMAGINE YAHOO, AND I HAD JERRY YANG AND DAVID

13   FILO IN CLASS, AND THEY WENT OFF AND DID YAHOO.

14        I HAD A PHYSICS FROM ARTHUR SHALLOW WHO INVENTED THE

15   LASER.  AND I ASKED HIM, HOW DID YOU DO THAT?  AND HE SAID

16   WELL, I WORKED A LONG TIME IN THE ACOUSTIC AREA AND DECIDED

17   MAYBE IF WE USE SHORTER WAVELENGTHS WE WOULD BE ABLE TO DO THAT

18   WITH LIGHT.

19        SO I'M HOPING TO BRING SOME OF THAT INNOVATION AND

20   INVIGORATION TO THE COMPANY AS TIME GOES ON.

21        YOU MENTIONED ELIZABETH HOLMES.  WHEN DID YOU FIRST MEET

22   MS. HOLMES?

23   A.  I MET ELIZABETH IN THE FALL OF 2002 WHEN SHE CAME TO

24   STANFORD AS A FRESHMAN AND SHE ENROLLED IN A CLASS I WAS

25   TEACHING CONTROLLED DRUG DELIVERY.

DIRECT EXAM BY MR. BOIES (CONT.)

1      AND I TOLD HER SHE COULDN'T ENROLL IN THE CLASS BECAUSE SHE

2   WAS A FRESHMAN AND THIS WAS THE SOPHOMORE SEMINAR.  SO SHE

3   SAID, COULD I SIT IN ON THE CLASS, AND I JUST WON'T REGISTER

4   FOR IT.

5      I SAID WELL, IF YOU WANT TO DO THAT, THAT'S FINE.  AND 12

6   STUDENTS MAXIMUM IN THE CLASS.  A STUDENT DROPPED OUT THE FIRST

7   WEEK, ELIZABETH SLOTTED IN, AND THAT WAS MY FIRST ENCOUNTER

8   WITH HER.  AND IN THE SOPHOMORE CLASS, SHE WAS A FRESHMAN.

9   Q.   DID SHE WORK WITH YOU IN ANY LABORATORY OR LABORATORY WORK

10   WHILE SHE WAS AT STANFORD?

11   A.   SHE DID, YES.

12   Q.   WHEN DID THAT START?

13   A.   WELL, SOON AFTER I MET HER AND HAD HER IN CLASS, IT'S A

14   SMALL CLASS, 12 PEOPLE SO I GET TO KNOW THE STUDENTS FAIRLY

15   WELL.  SHE BEGAN ASKING ME IF SHE COULD COME TO WORK IN MY

16   LABORATORY.

17      AND YOU COULD IMAGINE WHAT MY LABORATORY WAS LIKE, IT WAS

18   ABOUT A ROOM THIS SIZE, LAB BENCHES AND EQUIPMENT AND SO FORTH,

19   AND GENERALLY I WOULD HAVE MAYBE A VISITING FACULTY MEMBER FROM

20   ANOTHER INSTITUTION, MAYBE 1 OR 2 POST DOCTORAL FELLOWS AND

21   GENERALLY HALF A DOZEN PHD STUDENTS WORKING THROUGH STANFORD TO

22   GET THEIR PHD, PERHAPS A MASTER STUDENT AND GENERALLY A COUPLE

23   OF UNDER GRADUATES.

24      SO SHE MADE THE INQUIRY AND I SAID I DON'T NORMALLY TAKE

25   FRESHMAN INTO THE LAB AND SHE REMINDED ME THAT SHE WAS A

DIRECT EXAM BY MR. BOIES (CONT.)

1   PRESIDENT'S SCHOLAR.  AND, YOU KNOW, STANFORD'S COMPETITIVE TO

2   GET IN AS A STUDENT.  AND IN ANY SENSE OF THE WORD.

3        AND IN THAT TIME FRAME, THE UNIVERSITY HAD CREATED A

4   PRESIDENT'S SCHOLARS PROGRAM WHERE THEY TOOK THE TOP 5 TO

5   10 PERCENT OF THE STUDENTS THAT WERE ADMITTED.  WE GET 15 OR

6   1600 STUDENTS ADMITTED, SO WE ARE TALKING ABOUT A SMALL

7   FRACTION OF THEM WHO WERE DOING GRANTS, MONETARY GRANTS THAT

8   THEY COULD USE TO GO FIND A LABORATORY TO WORK IN TO DO

9   RESEARCH.

10       AND IT WAS APPARENT TO ME SHE WAS HIGHLY MOTIVATED,

11  INCREDIBLY CURIOUS AND QUITE PERSISTENT IN WANTING TO COME AND

12  WORK IN THE LAB.

13       I ASKED HER HOW MANY UNITS SHE WAS TAKING, BECAUSE

14  TYPICALLY WHEN STUDENTS WORK IN MY LAB I LIKE TO HAVE THEM WORK

15  AT LEAST 15 HOURS A WEEK OR SOMETHING OF THAT NATURE.  AND SHE

16  SAID, WELL, I HAVE TIME.  AND I SAID HOW MANY UNITS ARE YOU

17  TAKING.

18       SHE WAS TAKING THE MAXIMUM NUMBER OF UNITS THE UNIVERSITY

19  WOULD ALLOW AND STILL HAD THE CAPACITY TO COME INTO THE LAB AND

20  ENGAGE WITH MY STUDENTS AND SHE STARTED OUT IN THE LATE FALL I

21  BELIEVE OF 2002 AND THEN CONTINUED ON AND ACTUALLY TOOK AN

22  INTRODUCTION TO CHEMICAL ENGINEERING COURSE WHICH I TAUGHT.

23       I HAD HER IN CLASS AGAIN, AND SHE CONTINUED TO WORK IN

24  THE LAB FOR THE REMAINDER OF HER FRESHMAN YEAR.

25  Q.  DO YOU RECALL ANY OF THE WORK THAT SHE WAS DOING IN YOUR

DIRECT EXAM BY MR. BOIES (CONT.)

1   LAB WHEN SHE WAS A FRESHMAN AT STANFORD?

2   A.   YES.   ONE OF THE PROJECTS THAT WE WERE WORKING ON WAS

3   TRYING TO UNDERSTAND AND DESCRIBE HOW ENZYMES, ENZYMES ARE

4   NATURE'S CATALYST, THEY ACCELERATE CHEMICAL REACTIONS.  HOW

5   ENZYMES REACT WITH SOLID SURFACES LIKE THIS TABLE OR MATERIAL.

6       IN ORDER TO DO THEIR CHEMICAL WORK OF CATALYSIS.  THIS

7   WAS DRIVEN BY A COLLABORATIVE RESEARCH PROGRAM I HAD WITH A

8   COMPANY CALLED GENENCOR.  AND GENENCOR WAS A COMBINATION OF

9   GENENTECH -- A SOUTH BAY BIOTECHNOLOGY COMPANY.

10      AND ONE OF THEIR PRODUCTS WAS LAUNDRY DETERGENTS.  AND THEY

11  WANTED TO PUT ENZYMES IN LAUNDRY DETERGENTS.  THESE ARE

12  BIOLOGICAL MOLECULES, AND OF COURSE THE DIRT IS ON CLOTHING

13  SURFACES AND THERE WAS ESSENTIALLY NO UNDERSTANDING OF HOW

14  ENZYMES WOULD WORK AT SURFACES, MUCH LESS AT THE TEMPERATURE OF

15  A WASHING MACHINE, FOR EXAMPLE.

16      BUT WE SOLVED THAT PROBLEM BY GETTING ENZYMES OUT OF

17  BUBBLING POTS IN GALVESTON BECAUSE WE KNEW THEY EVOLVE TO LIVE

18  IN HIGH TEMPERATURES AND WE COULD TRANSLATE THAT INTO THE

19  LABORATORY.

20      SO SHE WORKED ON THE EXPERIMENTS WE WERE DOING, VERY

21  SOPHISTICATED EXPERIMENTS.  WE HAD TO GIVE REPORTS TO GENENCOR

22  TO THEIR SCIENTISTS AND THEIR ENGINEERS, AND ELIZABETH WOULD

23  COME OVER AND TALK ABOUT THE WORK AND PRESENTATIONS BUT IT WAS

24  REALLY HARD TO TELL HER FROM ANY SENIOR STUDENTS IN THE LAB.

25      SHE WAS SUCH A TERRIFIC CONTRIBUTOR, A REAL PART OF THE

DIRECT EXAM BY MR. BOIES (CONT.)

1    INTELLECTUAL ENGINE THAT DROVE MY LABORATORY AT THAT TIME.

2         SHE ALSO THEN RECEIVED EMERITUS SCHOLAR AWARD WHICH SHE

3    HAD BEEN DONE, THEN SHE USED THAT IN THAT CAPACITY TO

4    INVESTIGATE SOME ISSUES WITH WIRELESS COMMUNICATIONS.  AND THEN

5    THE END OF HER FRESHMAN YEAR CAME AND SHE LEFT AND WENT TO

6    SINGAPORE TO WORK IN GENOME INSTITUTE.  AND PROTEIN ARRAYS

7    WHICH I THINK YOU HEARD EARLIER.

8         I THINK MY RECOLLECTION WAS IF I KNEW PEOPLE IN

9    SINGAPORE.  SHE KNEW SOME OF MY STUDENTS HAD GONE OVER THERE,

10   BUT I SAID THE ONES I KNOW ALL SPEAK CHINESE AND THAT'S WHEN I

11   LEARNED, SHE SAYS, WELL, I'M FLUENT IN CHINESE.  I SAID WHAT

12   ELSE DO YOU DO, JUST INCREDIBLE.

13        SO SHE WENT AND SPENT THE SUMMER THERE AND CAME BACK HER

14   SOPHOMORE YEAR AND PICKED UP WHERE SHE LEFT WORKING IN MY LAB.

15   Q.  AND THE WORK SHE WAS DOING IN YOUR LAB FRESHMAN YEAR, DID

16   ANY OF THAT WORK RELATE TO BODILY FLUID ANALYSIS TECHNOLOGY?

17   A.  YES, IN THE FOLLOWING WAY.

18        WE WERE DEVELOPING VERY SOPHISTICATED DETECTION

19   TECHNOLOGIES.  IT'S SIMPLE TO SAY, I WANT TO KNOW WHAT AN

20   ENZYME IS DOING ON THE SURFACE, BUT YOU CAN'T SEE THEM.  THEY

21   ARE MOLECULAR IN SIZE, VERY SMALL.

22        SO YOU HAVE TO DETECT THEIR PRESENCE AND YOU HAVE TO DETECT

23   WHAT IT IS THEY ARE DOING INDIRECTLY.  AND ONE WAY TO DO THAT

24   IS TO ESSENTIALLY PUT A LITTLE BEACON ON THEM.

25        I MEAN I WALK MY BLACK LAB AT NIGHT.  I PUT A LITTLE LIGHT

DIRECT EXAM BY MR. BOIES (CONT.)

1    AROUND HER COLLAR SO I CAN SEE HER.  IT'S VERY MUCH THE SAME

2    THING EXCEPT THAT THE MOLECULAR LEVEL, AND THAT OPTICAL

3    DETECTION SYSTEM SHE HELPED DEVELOP AND WORK WITH ACTUALLY IS,

4    ITS UTILITY IS DESCRIBED IN, WELL, ONE OF THE VERY FIRST

5    PATENTS THAT SHE HAD.

6        SO THE ANSWER IS YES.

7    Q.   HOW LONG DID MS. HOLMES WORK IN YOUR LAB?

8    A.   SHE WORKED IN THE LAB THROUGH THE BEGINNING OF HER

9    SOPHOMORE YEAR, THE SECOND YEAR SHE WAS AT STANFORD.

10   Q.   WHAT HAPPENED THEN?

11   A.   WELL, I WOULD MEET WITH HER AND THE STUDENTS ON A REGULAR

12   BASIS AND SHE SAID, I HAVE SOME IDEAS HAVING TO DO WITH

13   IMPROVEMENTS IN HEALTH CARE AND LET'S START A COMPANY.  AND I

14   SAID, WELL, THAT'S A BIG FEAT.

15       WHY DON'T YOU FINISH YOUR DEGREE AND COME BACK AND WE

16   WILL TALK ABOUT THIS, AND I REMEMBER HER SAYING, WHY, AND I

17   DIDN'T GET A REAL GOOD ANSWER FOR THAT BECAUSE SHE BEGAN

18   REVEALING TO ME WHAT SHE WAS THINKING ABOUT.

19       AND AS I LISTENED TO HER, SHE HAD SOMEHOW BEEN ABLE TO

20   TAKE AND SYNTHESIZE THESE PIECES OF SCIENCE AND ENGINEERING AND

21   TECHNOLOGY IN WAYS THAT I HAD NEVER THOUGHT OF, ALTHOUGH I HAD

22   WORKED IN THE AREA OF DRUG DELIVERY FOR 40 YEARS, I HAD WORKED

23   IN THE AREA OF BODILY FLUID ANALYSIS.

24       I WAS FAMILIAR WITH, OF COURSE, WIRELESS COMMUNICATIONS.

25   BUT SHE STARTED PAINTING A PICTURE OF HOW ONE MIGHT PUT THIS

DIRECT EXAM BY MR. BOIES (CONT.)

1  TOGETHER TO EFFECT A VERY SOPHISTICATED DRUG DELIVERY BLOOD

2  MONITORING SYSTEM THAT WOULD BE ULTIMATELY RAPID, EASY TO

3  DEPLOY, ROBUST, HOPEFULLY INEXPENSIVE, AND SOMETHING THAT COULD

4  BE USED IN HOMES AND IN CLINICS.

5      AND AS SHE TALKED TO, IT WENT ON FOR A NUMBER OF WEEKS,

6  IF NOT MONTHS, SHE THEN WENT AND RECRUITED THESE GRAPHICS SHE

7  WAS WORKING WITH AND HE WOULD COME IN AND SAY LET'S ALL OF US

8  START A COMPANY AND SHE WOULD AFFECT THE OTHER STUDENTS IN THE

9  LAB AND I DECIDED THAT -- I REMEMBER A DAY WHEN I THOUGHT I

10  MUST BE LOOKING INTO THE EYES OF THE NEXT BILL GATES OR STEVE

11  JOBS.  I MEAN, I NEVER ENCOUNTERED A STUDENT LIKE THIS BEFORE

12  OF THE THEN THOUSANDS OF STUDENTS THAT I HAD TALKED OVER THE

13  LAST 45 YEARS.

14      SHE JUST STOOD OUT IN WAYS THAT ARE REALLY VERY HARD TO

15  DESCRIBE.  BUT I KNEW SHE WAS DIFFERENT AND DETERMINED AND

16  MOTIVATED AND IN THE END I ENCOURAGED HER TO GO OUT AND PURSUE

17  HER DREAM.  AND SHE DID.

18  Q.  AFTER SHE LEFT, DID YOU CONTINUE TO HAVE SOME INVOLVEMENT

19  WITH HER WORK?

20  A.  YES.  SO SHE LEFT STANFORD.  SHE WAS JOINED WITH ONE OF MY

21  PHD STUDENTS WHO HAD JUST FINISHED UP AND ONE OF THE UNDER

22  GRADUATES WHO WAS WORKING IN THE LAB, THE THREE OF THEM.  AND

23  IT'S TYPICAL SILICON VALLEY STORY.  STARTED IN A SMALL OFFICE

24  BUILDING OR GARAGE, AND YOU START TAKING THESE IDEAS AND

25  VALIDATING THEM AND BUILDING PROTOTYPES, DOING EXPERIMENTATION,

DIRECT EXAM BY MR. BOIES (CONT.)

1    DOING RESEARCH AND DEVELOPMENT.

2         AND THIS IS NOT CHEAP BECAUSE, FIRST OF ALL, THESE PEOPLE

3    HAVE TO FEED THEMSELVES AND THEY NEEDED TO HAVE THE EQUIPMENT

4    AND RENT SPACE.

5         SO I INTRODUCED HER TO SOME VENTURE CAPITALISTS THAT I

6    KNEW AND SHE LITERALLY TOOK IT FROM THERE, SHE RAISED A

7    SUBSTANTIAL SUM OF MONEY AND THAT WAS EXTRAORDINARY IN ITSELF.

8    A 19-YEAR OLD WHO HAS LEFT THE UNIVERSITY GOING OUT TO THESE

9    VERY SEASONED VENTURE CAPITALISTS UP ON SANDHILL ROAD, AND

10   TELLING THEM SUCH A COMPELLING TALE THAT THEY WOULD BACK HER

11   AND INVEST IN HER, WHICH THEY DID.

12        THAT ALLOWED US TO MOVE INTO A LARGER FACILITY AND THAT

13   WAS THE BEGINNING OF THERANOS.  AND YOU HEARD, WE WERE UPWARDS

14   OF 400 EMPLOYEES CONSTRUCTING A NEW FACILITY, THIS HAS BEEN

15   JUST AN INCREDIBLE SILICON VALLEY SUCCESS STORY.

16        AND I THINK IF I HAVE TO MAKE A PREDICTION, THERANOS WILL

17   BECOME THE APPLE OR THE GOOGLE OF HEALTH CARE IN THE FUTURE.

18   Q.  AS A CONSULTANT TO THERANOS BACK IN 2003, WERE YOU INVOLVED

19   IN ITS RESEARCH AND DEVELOPMENT EFFORTS AND AWARE OF THOSE

20   EFFORTS?

21   A.  YES, I WAS, OF COURSE I STILL HAD MY FULL TIME APPOINTMENT

22   AT STANFORD.  TYPICALLY THEY WOULD COME DOWN WHEN THEY WERE IN

23   THE FIRST FACILITY, THERE WERE ONLY THREE OF THEM, AND WE WOULD

24   CHAT IN MY OFFICE ABOUT WHAT THEY WERE DOING AND THE WORK THEY

25   WERE DOING.

DIRECT EXAM BY MR. BOIES (CONT.)

1    WHEN WE MOVED INTO THE MENLO PARK FACILITY I WOULD GO

2    OVER THERE, BEEN THE BOUNDS OF MY BEING ABLE TO COMMIT TIME,

3    STILL HAVING MY LAB AND TEACHING DUTIES AND ADMINISTRATIVE

4    DUTIES, AT THAT TIME I WAS ALSO IN WHAT YOU CALL SECOND IN

5    COMMAND OF THE SCHOOL OF ENGINEERING SO I WAS IN CHARGE OF 250

6    FACULTY, SETTING ALL THEIR SALARIES, DOING THE TENURE

7    APPOINTMENTS IN THE SCHOOL OF ENGINEERING WHICH TOOK SOME TIME.

8    BUT I HAD PUT AS MUCH OF MY WORK AS I COULD IN THE WATER

9    AS I COULD TO HELP OUT ON AN ADVISORY, CONSULTING BASIS WHICH

10   THEN SHIFTED OVER VERY MUCH ON TO THE TECHNOLOGY SIDE.

11   Q.   AND DID YOU KNOW WHAT SHE WAS WORKING ON AT THAT TIME?

12   A.   I WAS THERE WORKING WITH HER.

13   Q.   WHAT WAS SHE WORKING ON?

14   A.   BASICALLY WE WERE WORKING ON BLOOD ANALYZER PROTOTYPES FOR

15   A VARIETY OF ANALYTES AND WITH A FOCUS ON VERY SMALL VOLUMES OF

16   BLOOD.

17   ONE OF THE IDEAS IS THAT SHE COULD GO INTO A CLINICAL LAB

18   AND YOU HAVE YOUR BLOOD TAKEN.  AND YOU USUALLY GET A NEEDLE

19   STUCK IN YOUR ARM AND THEY USUALLY TAKE OUT 2 OR 3 VIALS.

20   RECOGNIZING THAT THAT'S PAINFUL, RECOGNIZING THAT'S DIFFICULT

21   TO DO IN THE ELDERLY AND NEONATES AND BABIES, AND KIDS AND

22   PROBABLY ALL OF US.  IT'S NOT A FUN PROCESS.

23   SO THE NOTION THAT YOU COULD JUST PERHAPS PRICK YOUR

24   FINGER AND GET A DROP OF BLOOD AND DO ALL THESE TESTS ON THESE

25   ANALYTES WHICH ARE A THOUSAND TIMES LESS THAN NORMALLY IS DONE,

DIRECT EXAM BY MR. BOIES (CONT.)

1    WAS A HUGE CHALLENGE AND ELIZABETH SAW THIS AS ONE OF THE REAL

2    WHOLLY GRAILS, SOMETHING THAT WE SHOULD AS A COMPANY

3    ACCOMPLISH.

4         AND I CAN TELL YOU WHEN WE GOT STARTED I WOULD CALL MY

5    FRIENDS WITH WHOM I WORKED IN THE BLOOD ANALYZER SPACE OVER THE

6    PAST 30 YEARS, I WOULD PHONE THEM UP AND I WOULD SAY, DO YOU

7    WANT TO GO BACK TO WORK?  DO YOU WANT TO COME DOWN AND SORT OF

8    LIKE OCEANS 11, DO YOU WANT TO TRY THIS ONE MORE TIME?

9         AND I HAVE TO TELL YOU, THESE ARE VERY, VERY WISE, BRIGHT

10   EXPERIENCED PEOPLE, AND I HAD TO DO SOME CONVINCING TO SAY

11   THAT, YEAH, I BELIEVE EVERYTHING IS GOING TO BE POSSIBLE TO DO

12   THIS, TO COMPLETELY REVOLUTIONIZE THE WAY IN WHICH BODILY

13   FLUIDS ARE ANALYZED CHEAPER, FASTER, MORE ROBUST, MORE

14   ACCURATE, MORE PRECISE, AND WITHOUT HAVING TO USE A BIG NEEDLE.

15        AND WE ARE WELL ON THE ROAD.

16        THE COURT:  MR. BOIES, I APOLOGIZE, I DO NEED TO

17   INTERRUPT YOU AND TAKE OUR AFTERNOON BREAK.

18        LADIES AND GENTLEMEN OF THE JURY, IT IS TIME FOR OUR

19   AFTERNOON BREAK SO WE ARE GOING TO TAKE ABOUT TEN MINUTES.

20        AGAIN, DO NOT DISCUSS THE CASE WHILE WE ARE OUT ON BREAK.

21   WE WILL SEE YOU SHORTLY.

22        (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD OUT OF

23   THE PRESENCE OF THE JURY:)

24        THE COURT:  LET'S TAKE TEN MINUTES.

25        DR. ROBERTSON, WHILE YOU ARE OUT ON BREAK I WANT YOU TO

DIRECT EXAM BY MR. BOIES (CONT.)

1     UNDERSTAND YOU REMAIN UNDER OATH, SO YOU SHOULD NOT DISCUSS

2     YOUR TESTIMONY WITH ANY LAWYER OR ANYONE ELSE.

3          WE WILL SEE YOU ALL BACK HERE IN ABOUT 15 MINUTES

4          (WHEREUPON A RECESS WAS TAKEN.)

5          (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN THE

6     PRESENCE OF THE JURY:)

7               THE COURT:  PLEASE BE SEATED.  WELCOME BACK, LADIES

8     AND GENTLEMEN.

9          MR. BOIES, YOU MAY RESUME YOUR EXAMINATION.

10              MR. BOIES:  THANK YOU, YOUR HONOR.

11    Q.  DR. ROBERTSON, JUST BEFORE THE BREAK YOU SAID THAT YOU

12    BELIEVE THERANOS WAS WELL ON THE ROAD TO REPLACING THE BIG

13    NEEDLE, DO YOU RECALL THAT?

14    A.  YES.

15    Q.  AND CAN YOU EXPLAIN WHAT YOU MEAN BY THAT?

16    A.  REPLACING --

17    Q.  YES.

18    A.  I DIDN'T HEAR IT --

19    Q.  I THOUGHT YOU SAID RIGHT AT THE VERY END OF YOUR ANSWER

20    JUST BEFORE WE BROKE, THAT THERANOS WAS, I THINK YOU SAID, WELL

21    ON ITS WAY TO REPLACING THE USE OF THE BIG NEEDLE TO DRAW

22    BLOOD?

23    A.  RIGHT.  WE ARE.

24    Q.  AND CAN YOU EXPLAIN WHAT THAT MEANS, HOW THAT'S BEING

25    ACCOMPLISHED?

DIRECT EXAM BY MR. BOIES (CONT.)

1    A.   SO TO DO A VEINOUS BLOOD DRAW FROM A VAIN IN YOUR ARM,

2    YOU'VE PROBABLY ALL DONE THAT.  IF YOU CAN IMAGINE NOT EVER

3    HAVING TO DO THAT AGAIN AND JUST SIMPLY GO INTO WALGREENS

4    PHARMACY IN PALO ALTO, YOU CAN HAVE YOUR FINGER PRICKED AND A

5    LITTLE DROP OF BLOOD WILL FORM AND IN A DEVICE WE'VE DESIGNED

6    AND MANUFACTURED, THAT LITTLE DROP OF BLOOD WILL BE COLLECTED

7    AND IT WILL BE ANALYZED.

8        AND IN A FEW HOURS YOU OR YOUR HEALTH CARE PROVIDER WILL

9    HAVE THE RESULTS AND YOU CAN CONTINUE SHOPPING AT WALGREENS AND

10   YOU DON'T HAVE TO GO TO A CLINIC.  SO THIS IS VERY REAL.

11   Q.   WHAT DOES IT MEAN -- OBVIOUSLY THE PROCESS BY WHICH IT

12   HAPPENS IS LESS PAINFUL.  BUT WHAT DOES IT MEAN NOT TO THE

13   PATIENT BUT TO MEDICAL CARE, HOW DOES THIS PROCESS HELP, AS YOU

14   PUT IT EARLIER, REVOLUTIONIZE MEDICAL CARE?

15   A.   SO YOU CAN IMAGINE OTHER THAN IT BEING MUCH LESS

16   INCONVENIENT AND MUCH LESS PAINFUL, YOU CAN CLEARLY DO IT MORE

17   FREQUENTLY.  AND YOU CAN DO IT IN A SETTING THAT IS MUCH MORE

18   PLEASANT, IF YOU WILL.

19       AND AS A RESULT OF THAT, YOUR HEALTH CARE PROVIDER CAN

20   TRACK CHANGES IN CONCENTRATIONS OF VARIOUS, WE CALL THEM

21   ANALYTES OR SUBSTANCES IN YOUR BLOOD THAT ARE IMPORTANT TO

22   TRACK TO ASSESS WHETHER OR NOT YOU ARE WITHIN THE NORMAL RANGE

23   OR BOUNDS OR IF YOU MIGHT BE ACTUALLY HEADED TOWARDS AN ADVERSE

24   CONDITION, SAY AN ADVERSE DRUG REACTION OR MAYBE THE ON SET OF

25   DISEASE PROGRESSION.

DIRECT EXAM BY MR. BOIES (CONT.)

1    SO THIS CAN BE DETECTED MUCH SOONER THAN YOU CAN WITH

2   TODAY'S TECHNOLOGY WHERE MAYBE YOU ONLY GET A BLOOD TEST ONCE A

3   YEAR.  AND THAT'S ONE DATA POINT A YEAR.

4    BUT IF YOU HAVE A DATA POINT EVERY FEW WEEKS, YOU CAN BE

5   ABLE TO WATCH YOUR BODY CHANGING OR SOMEONE CAN WATCH YOUR BODY

6   CHANGING IN SUCH A WAY AS TO BE ABLE TO HEAD OFF THE AD VERSE

7   CONSEQUENCES OF DRUG REACTIONS THAT YOU DON'T WANT OR

8   MEDICATION THAT YOU'RE TAKING IS MAINTAINED WITHIN THE

9   APPLICATIONS BOUNDS THAT IT OUGHT TO BE.

10    AND SO THE WHOLE NOTION OF UNDERSTANDING THAT WHEN YOU

11   TREAT THE BODY WITH A DRUG, THE DRUG RESPONDS AND YOU LIKE TO

12   BE ABLE TO ASSESS THAT RESPONSE QUICKLY AND OVER THE COURSE OF

13   TIME THAT YOU ARE TAKING THE DRUG.  YOU DON'T WANT TO WAIT

14   UNTIL YOU BECOME SYMPTOMATIC.

15    AND BY THAT I MEAN, THAT'S WHEN YOU GET UP AND YOU SAY,

16   I'VE GOT A FEVER, I'VE GOT A COUGH OR I'VE GOT A RASH AND I'VE

17   GOT TO GO SEE THE DOCTOR.

18    SO WE BELIEVE THAT THIS TECHNOLOGY WILL BE VERY IMPORTANT

19   IN ASSESSING THE EFFICACY OF DRUGS YOU ARE TAKING AND TO AVOID

20   AND HEAD OFF ADVERSE DRUG REACTIONS THAT MIGHT HAPPEN.

21    AS YOU MAY KNOW, ADVERSE DRUG REACTIONS ACCOUNT FOR MANY

22   DEATHS AROUND THE WORLD BECAUSE OF UN EXPECTED INTERACTIONS

23   BETWEEN ONE DRUG WITH ANOTHER OR JUST SIMPLY THE DRUG YOU ARE

24   TAKING WITH YOUR BODY'S OWN REACTION TO IT.

25    SO THE WHOLE NOTION OF SMALL VOLUMES, RAPID FREQUENT

DIRECT EXAM BY MR. BOIES (CONT.)

1    TESTING AND DEPLOYING INSTRUMENTS LIKE OURS, THROUGHOUT THE

2    WORLD, INSTEAD OF HAVING YOUR BLOOD TESTED IN A CLINICAL LAB IN

3    MODESTO, RENO AND NEW YORK, ALL OF WHICH WILL USE DIFFERENT

4    EQUIPMENT, ALL OF WHICH WILL USE DIFFERENT TECHNICIANS, GIVES

5    RISE TO VERY LARGE ERROR RATES.

6         BUT IF YOU CAN IMAGINE HAVING THE SAME MACHINE IN RENO,

7    THE SAME MACHINE IN NEW YORK, IT DOESN'T MATTER WHERE YOU ARE.

8    AND THAT REDUCES THE ERROR RATE SUBSTANTIALLY AND MAKES IT MUCH

9    MORE ROBUST.

10   Q.   YOU'VE USED THE TERM ANALYTES A COUPLE OF TIMES.  CAN YOU

11   EXPLAIN WHAT ANALYTE IS?

12   A.   ANALYTE IS A SUBSTANCE TO BE ANALYZED.  SO IT COULD BE THE

13   DRUG THAT YOU'VE TAKEN, IT COULD BE A METABOLITES OF THE DRUG

14   YOU HAVE TAKEN, MEANING A PARTIAL DECOMPOSITION PRODUCT THAT

15   HAS A LONG ENOUGH LIFETIME SO THAT IT CAN BE MEASURED THAT IS

16   RELATED TO THE DRUG YOU TOOK, OR IT CAN BE A BIOMARKER.

17        A BIOMARKER IS SOMETHING THAT YOUR BODY PRODUCES.  SO AN

18   EXAMPLE MIGHT BE IF YOU HAVE HIGH CHOLESTEROL YOU MIGHT BE

19   TAKING A STATIN WHICH INHIBITS THE LIVER ENZYME THAT MAKES

20   CHOLESTEROL.

21        BUT WHEN YOU MEASURE, IT'S NOT THE STATIN NOT THE DRUG

22   YOU TAKE, BUT YOU ARE INTERESTED IN THE OUTCOME, THE

23   CHOLESTEROL LEVEL, SO YOU MEASURE THAT.  AND THAT'S CALLED A

24   BIOMARKER.

25        SO AN ANALYTE, CAN EITHER BE A DRUG, A METABOLITE OF THE

DIRECT EXAM BY MR. BOIES (CONT.)

1    DRUG, OR ONE OF THESE BIOMARKERS.

2    Q.   DID THE WORK THAT ELIZABETH HOLMES AND THERANOS WAS DOING

3    ON THE BODILY FLUID ANALYSIS TECHNOLOGY IN 2002, 2003, 2004,

4    2005, RESULT IN ANY PATENT APPLICATIONS?

5    A.   YES, IT DID.

6    Q.   NOW ALTHOUGH I THINK WE REFERRED TO THEM IN OPENING

7    STATEMENTS, I DON'T THINK THERE'S BEEN ANY TESTIMONY ABOUT WHAT

8    PROVISIONAL PATENT APPLICATIONS ARE.

9       ARE YOU FAMILIAR WITH THE TERM PROVISIONALS AS APPLIED TO

10   PATENT APPLICATIONS?

11   A.   I AM.

12   Q.   AND WHAT DOES THAT REFER TO?

13   A.   IT IS -- IT IS SOMETHING LESS THAN A FULL PATENT

14   APPLICATION.  BUT VERY DESCRIPTIVE OF THE INVENTION.  AND IT IS

15   A DOCUMENT THAT CAN BE FILED WITH THE PATENT OFFICE THAT IT

16   ESSENTIALLY ASSIGNS YOU A DATE OF, CHRONOLOGICAL DATE OF WHEN

17   THE INVENTION WAS APPOINTED, WHEN THE PATENT OFFICE WOULD

18   RECOGNIZE ITS EXISTENCE.

19      THEN YOU HAVE A YEAR TO TURN THAT INTO A FULL FLEDGED

20   PATENT APPLICATION WHICH IS THE DOCUMENT THAT ACTUALLY GETS

21   EXAMINED BY THE PATENT EXAMINER.  SOMETIMES PEOPLE SAY IT

22   PROVIDES YOU WITH AN EARLIER FILING DATE, AND YOU HAVE THIS

23   YEAR TO CONVERT THAT INTO A FULL PATENT APPLICATION IF YOU SO

24   DESIRE.

25   Q.   WHEN A COMPANY FILES A PROVISIONAL PATENT APPLICATION, IS

DIRECT EXAM BY MR. BOIES (CONT.)

1    THAT PROVISIONAL APPLICATION PUBLIC?

2    A.   NO.  MY UNDERSTANDING IS THAT THEY ARE AND THEY REMAIN

3    CONFIDENTIAL.

4    Q.   NOW, I WANT TO SHOW YOU FOUR DOCUMENTS AND ASK YOU TO

5    IDENTIFY THEM.  AND AM I CORRECT THAT THERE WERE FOUR

6    PROVISIONAL PATENT APPLICATIONS FILED BY THERANOS IN 2005?

7    A.   THAT'S CORRECT.

8    Q.   YOU'VE GOT A BOOK IN FRONT OF YOU WITH SOME TABS IN IT.

9    THIS WILL ALLOW IT TO GO, I THINK, A LITTLE FASTER.

10       IF YOU LOOK AT TAB TWO, THIS IS A DOCUMENT THAT HAS BEEN

11   PREVIOUSLY MARKED AS THERANOS TRIAL EXHIBIT 2.

12       DO YOU RECOGNIZE THIS DOCUMENT?

13   A.   YES, I DO.

14   Q.   AND WHAT IS IT?

15   A.   THIS IS A PROVISIONAL PATENT APPLICATION.  IT'S NUMBER IS

16   60,678,801.  IT WAS FILED ON MAY 9TH, 2005, IT'S ENTITLED

17   SYSTEM FOR REAL TIME THERAPEUTIC MONITORING.

18       AND THE INVENTORS THAT ARE NAMED ARE ELIZABETH HOLMES,

19   SHAUNAK ROY, JOHN HOWARD, CHENGWANG WANG, IAN GIBBONS AND TIM

20   KEMP.

21   Q.   ARE ALL THE NAMED INVENTORS OTHER THAN ELIZABETH HOLMES,

22   ALSO PEOPLE WHO WERE WORKING AT THERANOS?

23   A.   THEY ARE PEOPLE THAT WERE WORKING AT THERANOS AT THE TIME

24   AND/OR STILL CONTINUE TO WORK THERE, YES.

25   Q.   AND THIS IS A DOCUMENT THAT WE SOMETIMES REFER TO WITH THE

DIRECT EXAM BY MR. BOIES (CONT.)

1   CONVENTION OF THE LAST THREE NUMBERS AS THE '801 PROVISIONAL

2   PATENT, CORRECT, SIR?

3   A.   THAT'S TRUE.

4           MR. BOIES:  YOUR HONOR, I WOULD OFFER THERANOS TRIAL

5   EXHIBIT 2.

6           THE COURT:  TRIAL EXHIBIT 2 IS ADMITTED.

7       ANY OBJECTION?

8           MS. ANDERSON:  NO.

9           THE COURT:  OKAY.  GO AHEAD MR. BOIES.

10     (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER 2 HAVING BEEN

11   PREVIOUSLY MARKED FOR IDENTIFICATION, WAS ADMITTED INTO

12   EVIDENCE.)

13   BY MR. BOIES:

14   Q.   LET ME ASK YOU TO TURN TO TAB 3 WHICH IS THERANOS TRIAL

15   EXHIBIT 3.  CAN YOU IDENTIFY THIS DOCUMENT?

16   A.   THIS IS ANOTHER PROVISIONAL APPLICATION 60,705,489.  IT WAS

17   FILED AUGUST 5TH, 2005.  IT'S ENTITLED METHODS FOR MINIMIZING

18   CALIBRATION ERRORS FOR ASSAYS PERFORMED IN DISPOSABLE

19   ANALYTICAL SYSTEMS.

20       THE NAMED INVENTORS ARE IAN GIBBONS, CHENGWANG WANG,

21   SHAUNAK ROY AND ELIZABETH HOLMES

22   Q.   AND THIS IS THE SO CALLED '489 PROVISIONAL.

23       AND I WOULD OFFER THERANOS TRIAL EXHIBIT 3.

24           THE COURT:  ANY OBJECTION?

25           MS. ANDERSON:  NO.

DIRECT EXAM BY MR. BOIES (CONT.)

1          THE COURT:  TRIAL EXHIBIT NUMBER 3 IS ADMITTED.

2      (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER 3 HAVING BEEN

3    PREVIOUSLY MARKED FOR IDENTIFICATION, WAS ADMITTED INTO

4    EVIDENCE.)

5    BY MR. BOIES:

6    Q.  WOULD YOU TURN TO TAB 4, THIS IS THERANOS TRIAL EXHIBIT 4.

7          AND THIS IS THE SO CALLED '192 PROVISIONAL; IS THAT

8    CORRECT?

9    A.  THAT'S RIGHT.

10    Q.  AND IT IS DATED SEPTEMBER 16TH, 2005; IS THAT CORRECT?

11    A.  THAT'S CORRECT.

12    Q.  AND WHO ARE THE NAMED INVENTORS OF THIS?

13    A.  THE NAMED INVENTORS ARE ELIZABETH HOLMES, SHAUNAK ROY, JOHN

14    HOWARD, CHENGWANG WANG, IAN GIBBONS AND TIM KEMP.

15    Q.  I WOULD OFFER THERANOS TRIAL EXHIBIT 4.

16          THE COURT:  ANY OBJECTION?

17          MS. ANDERSON:  NO.

18          THE COURT:  TRIAL EXHIBIT 4 IS ADMITTED.

19      (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER 4 HAVING BEEN

20    PREVIOUSLY MARKED FOR IDENTIFICATION, WAS ADMITTED INTO

21    EVIDENCE.)

22    BY MR. BOIES:

23    Q.  THEN LAST WOULD YOU LOOK AT TAB FIVE THERANOS TRIAL

24    EXHIBIT 5.  AND IS THIS AN ADDITIONAL PROVISIONAL PATENT

25    APPLICATION?

DIRECT EXAM BY MR. BOIES (CONT.)

1    A.   YES, THIS WOULD BE THE FOURTH ONE THAT WAS TALKED ABOUT.

2    Q.   AND THIS IS THE 097 PROVISIONAL DATED SEPTEMBER 28TH, 2005;

3    IS THAT CORRECT?

4    A.   THAT'S RIGHT.

5         MR. BOIES:  YOUR HONOR, I WOULD OFFER -- LET ME ASK

6    YOU FIRST --

7    Q.   WHO ARE THE NAMED INVENTORS OF THIS?

8    A.   THE NAMED INVENTORS ARE TIM KEMP, CHRIS TODD, RON ORAL,

9    SHULING ZING, JOHN HOWARD AND JEFF FENTON.

10        MR. BOIES:  YOUR HONOR, I WOULD OFFER THERANOS TRIAL

11   EXHIBIT 5.

12        MS. ANDERSON:  NO OBJECTION.

13        THE COURT:  TRIAL EXHIBIT NUMBER 5 IS ADMITTED.

14    (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER 5 HAVING BEEN

15   PREVIOUSLY MARKED FOR IDENTIFICATION, WAS ADMITTED INTO

16   EVIDENCE.)

17   BY MR. BOIES:

18   Q.   NOW, DO THESE FOUR PROVISIONALS REPRESENT PRIOR ART TO THE

19   '612 PATENT?

20   A.   MY UNDERSTANDING IS YES, THEY DO.

21   Q.   AND WHAT DOES THAT MEAN?

22   A.   IT MEANS THAT THESE PROVISIONALS -- COULD YOU SAY THE

23   QUESTION AGAIN, LET ME MAKE SURE I HAVE YOU CORRECT.

24   Q.   YES.  WHAT DOES IT MEAN TO SAY THAT THESE PROVISIONALS ARE

25   PRIOR ART TO THE '612 PATENT?

DIRECT EXAM BY MR. BOIES (CONT.)

1    A.   TO THE '612 PATENT.  YEAH.  SO THESE FOUR PROVISIONALS ALL

2    HAVE FILING DATES THAT PRECEDE THE FILING DATE OF THE '612

3    PATENT.

4    Q.   WHEN DID THE FUISZ'S FILE THEIR PROVISIONAL APPLICATION FOR

5    WHAT EVENTUALLY RESULTED IN THE '612 PATENT, IF YOU KNOW?

6    A.   IT WAS I BELIEVE IT WAS APRIL 24TH, 2006, SO THAT WOULD

7    HAVE BEEN 4 OR 5 MONTHS AFTER THE LAST PROVISIONAL FROM

8    THERANOS.

9    Q.   LET ME SHOW YOU A TIMELINE JUST FOR DEMONSTRATIVE PURPOSES.

10   I THINK YOU'VE SEEN THIS BEFORE.  AND THIS SHOWS THE DATES OF

11   THE FOUR PROVISIONALS THAT YOU JUST IDENTIFIED, CORRECT,

12   STARTING MAY 9TH AND THEN AUGUST 5TH, THEN SEPTEMBER 16TH, THEN

13   SEPTEMBER 28TH, ALL OF 2005, CORRECT?

14   A.   THAT'S RIGHT.

15   Q.   AND THEN THE APRIL 24TH, 2006, IS THE DATE THAT YOU

16   IDENTIFIED WHEN THE FUISZ'S FILED THEIR PROVISIONAL

17   APPLICATION, CORRECT?

18   A.   YES.  THIS IS THE PROVISIONAL APPLICATION THAT ULTIMATELY

19   BECAME THE '612 PATENT.

20   Q.   AND BOTH THE SEPTEMBER 23, 2005, E-MAIL FROM RICHARD FUISZ

21   TO HIS ATTORNEY ABOUT MAKING A PATENT APPLICATION, AND THE

22   PROVISIONAL PATENT APPLICATION ITSELF, BOTH TAKE PLACE BEFORE

23   NOVEMBER 23, 2006; IS THAT CORRECT?

24   A.   YES, THAT'S CORRECT.

25   Q.   AND WHAT IS THE SIGNIFICANCE OF NOVEMBER 23, 2006?  DO YOU

DIRECT EXAM BY MR. BOIES (CONT.)

1    SEE THAT?

2    A.   YES, I CAN NOW.  THANKS.

3        THAT'S WHEN THE THERANOS PROVISIONALS, THE FOUR THERANOS

4    PROVISIONALS WERE FIRST PUBLISHED.  AND THEREBY MADE AVAILABLE

5    PUBLICLY.

6    Q.   SO THAT ON SEPTEMBER 23, 2005, AND ON APRIL 24, 2006, THE

7    FOUR THERANOS PROVISIONALS WOULD NOT HAVE BEEN PUBLICLY

8    AVAILABLE; IS THAT CORRECT?

9    A.   THEY WERE NOT.

10   Q.   WERE YOU ASKED TO CONSIDER ANY ISSUES IN THIS CASE

11   REGARDING OR RELATED TO THE TEACHINGS OF THE THERANOS

12   PROVISIONAL, THE FOUR PROVISIONAL PATENT APPLICATIONS WE JUST

13   IDENTIFIED?

14   A.   YES.

15   Q.   AND DID YOU FORM A CONCLUSION OR OPINION AS TO WHETHER THE

16   THERANOS PROVISIONALS EVIDENCE THAT THERANOS INVENTED THE IDEAS

17   THAT ARE CLAIMED IN THE FUISZ '612 PATENT?

18   A.   I DO.

19   Q.   WHAT IS YOUR CONCLUSION?

20   A.   MY CONCLUSION IS THAT THE THERANOS PROVISIONALS DEMONSTRATE

21   THAT THERANOS HAD INVENTED THE CLAIMS THAT ARE PRESENT IN THE

22   '612 PATENT.

23   Q.   WERE YOU ALSO ASKED TO CONSIDER WHETHER RICHARD AND JOSEPH

24   FUISZ SHOULD HAVE BEEN NAMED AS INVENTORS ON THE '612 PATENT

25   WHICH THEY WERE WHEN THE PATENT WAS FILED?

DIRECT EXAM BY MR. BOIES (CONT.)

1    A.  I DID CONSIDER THAT, YES.

2    Q.  AND DID YOU FORM AN OPINION AND CONCLUSION ON THAT?

3    A.  I DID.

4    Q.  AND WHAT IS THAT CONCLUSION?

5    A.  AFTER DOING MY ANALYSIS, I CONCLUDED THAT IT'S UNLIKELY

6    THAT RICHARD AND JOSEPH FUISZ COULD HAVE INVENTED THE IDEAS

7    THAT ARE EXPRESSED IN THE '612 PATENT WITHOUT HAVING HAD ACCESS

8    TO THE FOUR THERANOS PROVISIONALS.

9    Q.  WHAT IS THE EARLIEST EVIDENCE THAT YOU HAVE SEEN THAT

10   RICHARD OR JOSEPH FUISZ WERE THINKING ABOUT ANY OF THE IDEAS IN

11   THE '612 PATENT?

12   A.  THE FIRST DOCUMENTARY EVIDENCE THAT I'M AWARE OF IS SHOWN

13   THERE ON THE POSTER ON SEPTEMBER, I BELIEVE IT'S 23RD 2005 IN

14   AN E-MAIL FROM RICHARD FUISZ TO HIS PATENT ATTORNEY ALLEN

15   SCHIAVELLI.

16   Q.  IS THE DATE OF THAT E-MAIL BEFORE OR AFTER THERANOS FILED

17   ITS PROVISIONAL APPLICATIONS?

18   A.  THE DATE OF THAT E-MAIL IS AFTER MCDERMOTT, WILL & EMERY

19   HAD FILED THREE OF THE FOUR PROVISIONALS.  THE FOURTH

20   PROVISIONAL, THE '097 WAS FILED FIVE DAYS AFTER THAT E-MAIL.

21   Q.  IS THE DATE OF THAT E-MAIL BEFORE OR AFTER THE PROVISIONALS

22   BECAME PUBLICLY AVAILABLE TO THE FUISZES AND TO THE REST OF THE

23   PUBLIC?

24   A.  IT OCCURRED WELL BEFORE THAT HAPPENED WHICH WAS NEARLY A

25   YEAR LATER.

DIRECT EXAM BY MR. BOIES (CONT.)

1    Q.   AND THAT YEAR LATER WAS NOVEMBER 23, 2006?

2    A.   THAT'S CORRECT.

3    Q.   LET ME NOW ASK YOU TO LOOK AT TAB ONE IN YOUR BINDER.  DO

4    YOU RECOGNIZE THIS?

5    A.   YES, I DO.

6    Q.   AND WHAT IS THIS?

7    A.   THIS IS THE '612 PATENT THAT WE HAVE BEEN DISCUSSING TODAY.

8    Q.   OKAY.  AND AT THE TIME THAT THE FUISZ'S FILED THE

9    PROVISIONAL APPLICATION FOR THIS PATENT, AND THAT WAS

10   APRIL 24TH, 2006, CORRECT?

11   A.   THAT'S RIGHT.

12   Q.   AT THAT TIME WERE ANY OF THE THERANOS PROVISIONALS PUBLICLY

13   AVAILABLE?

14   A.   THEY WERE NOT.

15   Q.   HAD ALL OF THOSE THERANOS PROVISIONALS NEVER THE LESS BEEN

16   FILED WITH THE PATENT OFFICE?

17   A.   THEY HAVE BEEN, YES.

18   Q.   ARE YOU AWARE OF ANY LEGITIMATE WAY THE FUISZES COULD HAVE

19   HAD ACCESS TO THE THERANOS PROVISIONALS AT THE TIME THEY FILED

20   THEIR PROVISIONAL APPLICATION?

21   A.   NO.

22   Q.   NOW EARLIER YOU SAID THAT YOU HAD REACHED THE CONCLUSION

23   THAT THERANOS HAD INVENTED THE INVENTION CLAIMED IN THE FUISZ'S

24   '612 PATENT.  WHAT WAS THE PROCESS THAT LEAD YOU TO THAT

25   CONCLUSION?

DIRECT EXAM BY MR. BOIES (CONT.)

1    A.   I MADE AN ANALYSIS WHICH COMPARED THE DISCLOSURES IN THE

2    FOUR PROVISIONALS AND COMPARED THOSE DISCLOSURES WITH THE

3    CLAIMS IN THE '612 PATENT.

4    Q.   AND WHAT DID YOU CONCLUDE?

5    A.   I CONCLUDED THAT WHAT IS DISCLOSED IN THE THERANOS, THE

6    FOUR THERANOS PROVISIONALS, IS DISCLOSED IN ITS ENTIRETY IN THE

7    '612 PATENT IN CLAIMS 1 AND 9 WHICH ARE THE TWO INDEPENDENT

8    CLAIMS IN THE '612 PATENT.

9    Q.   YOU MENTION THE TERM INDEPENDENT CLAIM.  COULD YOU EXPLAIN

10   WHAT THE TERM INDEPENDENT CLAIM MEANS?

11   A.   A PATENT MAKES CLAIMS ABOUT THE INVENTION.  IT'S MUCH LIKE

12   A PROPERTY DEED TELLS YOU ABOUT THE BOUNDARIES OF THE PROPERTY,

13   WHERE THEY ARE, WHAT'S INSIDE AND WHAT'S OUTSIDE, WHAT YOU MAY

14   OWN AND WHAT YOU DON'T OWN.

15        A PATENT IS MUCH LIKE THAT.  THE CLAIMS STAKE OUT, IF YOU

16   WILL, THE BOUNDARY IN WHICH THE INVENTION IS CONTAINED.  AND IT

17   IDENTIFIES THE SCOPE OF THE INVENTION.

18        THERE ARE TWO KINDS OF CLAIMS.  THERE ARE THE ONES I

19   REFERRED TO WHICH ARE INDEPENDENT CLAIMS, THEY STAND ON THEIR

20   OWN.

21        THERE ARE THE DEPENDENT CLAIMS, AND THE DEPENDENT CLAIMS

22   REFERENCE BACK TO AN INDEPENDENT CLAIM AND ADD A NEW FEATURE OR

23   ELEMENT TO THAT INDEPENDENT CLAIM.  SO THE CLAIMS WOULD, YOU

24   KNOW, A PATENT COULD BE A COLLECTION OF INDEPENDENT CLAIMS AND

25   THEN DEPENDENT CLAIMS THAT REFER BACK TO AND DEPEND ON THOSE

DIRECT EXAM BY MR. BOIES (CONT.)

1    INDEPENDENT CLAIMS.

2    Q.   OKAY.  LET ME GO BACK NOW.  YOU MENTIONED CLAIM ONE WHICH

3    IS ONE OF THE TWO INDEPENDENT CLAIMS IN THE '612 PATENT.  WOULD

4    YOU PLEASE EXPLAIN THE BASIS FOR YOUR OPINION, THAT THE

5    CONFIDENTIAL THERANOS PROVISIONALS DISCLOSE ALL THE ELEMENTS OF

6    CLAIM ONE OF THE '612 PATENT?

7    A.   SO I TOOK THE CLAIM IN CLAIM ONE IN THE '612 PATENT AND IT

8    HAS A NUMBER OF PARTS TO IT.  THESE PARTS ARE CALLED ELEMENTS.

9    IN FACT IT HAS SIX.  AND I EXAMINED EACH OF THOSE SIX ELEMENTS

10   TO SEE WHETHER WHAT WAS DISCLOSED IN THAT ELEMENT IN THE '612

11   PATENT WAS ALSO DISCLOSED IN ONE OR MORE OF THE FOUR THERANOS

12   PROVISIONALS.

13        SO IT WAS A COMPARISON.  COMPARING WHAT WAS SAID IN THE

14   '612 TO WHAT I COULD ASCERTAIN HAD BEEN SAID AND WAS SAID IN

15   THE FOUR THERANOS PROVISIONALS WHICH PRECEDED IT.

16   Q.   I THINK I HAVE A DEMONSTRATIVE OF THE FIRST ELEMENT, CLAIM

17   ONE.

18        IS THIS THE DEMONSTRATIVE THAT TALKS ABOUT THE FIRST

19   ELEMENT OF CLAIM ONE?

20   A.   YES.

21   Q.   NOW, CAN YOU TELL THE JURY WHAT YOU'VE DONE HERE, AND I

22   DON'T KNOW WHETHER IT'S POSSIBLE OR NOT TO GET THIS UP ON THE

23   SCREEN.  CAN YOU PUT THAT UP ON THE SCREEN, ON THE BIG SCREEN

24   OR NOT?

25        IN ANY EVENT, WE CAN USE THIS BOARD.  CAN YOU EXPLAIN

DIRECT EXAM BY MR. BOIES (CONT.)

1    WHAT THIS BOARD DOES, WHAT THIS DESCRIPTION OF THE FIRST

2    ELEMENT OF THE FIRST CLAIM DOES.

3    A.   SO THESE REPRESENT THREE OF THE, I THINK IT'S THREE OF THE

4    ELEMENTS THAT ARE IN --

5    Q.   CAN YOU READ THIS FROM THERE?  I APOLOGIZE.

6    A.   THAT'S BETTER.  SO YES, THESE ARE ALL QUOTES TAKEN FROM THE

7    ELEMENTS IN CLAIM ONE.

8    Q.   UH-HUH.  OKAY.  WE'VE GOT A SLIDE UP THERE.  NOW THAT MIGHT

9    BE EASIER.  CAN YOU SEE FROM AROUND THIS --

10            JUROR:  I CAN SEE THAT.

11            MR. BOIES:  LET ME TAKE THIS DOWN AND MAYBE WE CAN DO

12   IT OFF OF THE BOARD.

13   Q.   DR. ROBERTSON, CAN YOU SEE THIS BOARD ON THE SCREEN?

14   A.   YES.

15   Q.   OKAY.  AND THE FIRST BEGINS, A METHOD FOR PROGRAMMING

16   BODILY FLUID ANALYZER COMPRISING.  AND THIS IS A QUOTE FROM THE

17   '612 PATENT; IS THAT CORRECT?

18   A.   YES.

19   Q.   IT SAYS, AT LEAST ONE THRESHOLD VALUE OF AT LEAST ONE

20   ANALYTE.  DO YOU SEE THAT?

21   A.   YES, I DO.

22   Q.   NOW, IS THAT ASPECT OF THIS ELEMENT OF CLAIM ONE OF THE

23   '612 PATENT DISCLOSED IN THE THERANOS PROVISIONALS?

24   A.   YES, IT IS.

25   Q.   THE '612 PATENT THEN GOES ON TO SAY, SELECTING BY A

DIRECT EXAM BY MR. BOIES (CONT.)

1    PRESCRIBING PHYSICIAN OR DRUG COMPANY AT LEAST ONE THRESHOLD

2    VALUE OF AT LEAST ONE ANALYTE TO BE SENSED BY THE BODILY FLUID

3    ANALYZER, DO YOU SEE THAT?

4    A.  I DO.

5    Q.  AND IS THAT ASPECT ELEMENT ONE OF CLAIM ONE OF THE '612

6    PATENT DISCLOSED IN THE THERANOS PROVISIONALS?

7    A.  IT IS.

8    Q.  IT THEN GOES ON TO SAY, THE AT LEAST ONE THRESHOLD VALUE OF

9    THE AT LEAST ONE ANALYTE BEING ASSOCIATED WITH A PARTICULAR

10   DRUG BEING OR TO BE TAKEN BY THE PATIENT OR COURSE OF TREATMENT

11   FOR THE PATIENT.

12       DO YOU SEE THAT?

13   A.  I DO.

14   Q.  AND IS THAT ASPECT DISCLOSED IN THE THERANOS PROVISIONALS?

15   A.  IT IS.

16   Q.  NOW I DON'T KNOW WHETHER OR NOT YOU WERE HERE FOR THE

17   ENTIRE OPENING STATEMENTS THIS MORNING, BUT DID YOU HEAR ONE OF

18   THE DEFENDANTS SAY THAT THE THERANOS PROVISIONALS WERE JUST

19   FOCUSED ON CLINICAL DRUG TRIALS AND NOT ON PATIENTS?

20   A.  I DO.

21   Q.  IS THAT ACCURATE, SIR?

22   A.  NO.

23   Q.  CAN YOU EXPLAIN WHY NOT?

24   A.  THE FOUR PROVISIONALS ARE VERY CLEAR IN THAT THEY REFER TO

25   BODILY ANALYZERS THAT CAN BE IMPLEMENTED FOR AND USED BY

DIRECT EXAM BY MR. BOIES (CONT.)

1    PATIENTS BY INDIVIDUALS, AND THEY MAKE IT VERY CLEAR THAT THEY,

2    BODILY FLUID ANALYZERS THAT ARE DISCUSSED IN THESE PROVISIONALS

3    CAN BE USED IN CLINICAL TRIALS.

4        THEY DON'T SPEAK TO ONE OVER THE OTHER, IN FACT THEY CAN

5    BE USED IN BOTH SETTINGS.

6    Q.   LET ME ASK YOU TO LOOK AT A PORTION OF THE '192 THERANOS

7    PROVISIONAL.  I'M SWITCHING FROM THE '612 PATENT NOW TO THE

8    '192 THERANOS PROVISIONAL.  AND I PARTICULARLY WANT YOU TO LOOK

9    AT PARAGRAPH 37 WHICH I THINK I CAN PUT UP ON THE SCREEN, BUT

10   IF NOT WE CAN LOOK THAT UP IN YOUR BOOK.

11       IT'S ON THE SCREEN.  I DON'T KNOW IF YOU CAN READ THIS

12   FROM THE SCREEN OR NOT, DR. ROBERTSON.

13   A.   I CAN'T, BUT I HAVE A MONITOR IN FRONT OF ME.  NOW I CAN

14   READ IT.

15   Q.   NOW IT SAYS IN THE FIRST SENTENCE THAT'S HIGHLIGHTED, THE

16   APPROPRIATE THRESHOLD LEVELS OF TI, OR THE OPTIMUM TI IS TERMED

17   AS TI REF OR ACTION THRESHOLD VALUE.

18       DO YOU SEE THAT?

19   A.   I DO.

20   Q.   AND WHAT'S THE SIGNIFICANCE OF THAT DISCLOSURE IN THE

21   THERANOS PROVISIONALS?

22   A.   IT SHOWS THAT THERE IS A VALUE CALLED THE THERAPEUTIC

23   INDEX, TI, AND THAT THERE ARE APPROPRIATE THRESHOLD LEVELS OF

24   IT OR OPTIMUM LEVELS OF IT.  AND SOMETIMES THAT'S ALSO TERMED

25   AS TI REFERENCE, IT'S ALSO TERMED ACTION THRESHOLD VALUES.

DIRECT EXAM BY MR. BOIES (CONT.)

1      SO IT'S BASICALLY TELLING YOU HOW THE THERAPEUTIC INDEX

2   CAN BE DEFINED, AND IN THE CONTEXT OF THIS PARTICULAR PATENT.

3   Q.   THE NEXT SENTENCE SAYS, EXPERT REVIEW, WOULD THEN DETERMINE

4   THE OPTIMUM THERAPEUTIC INDEX FOR THAT PARTICULAR PATIENT OR

5   PATIENT CLASS.  DO YOU SEE THAT?

6   A.   I DO.

7   Q.   NOW WHAT SIGNIFICANCE IF ANY DOES THAT HAVE TO THE

8   DEFENDANT'S CONTENTION THAT THE THERANOS PROVISIONALS WERE ONLY

9   CONCERNED WITH CLINICAL TRIALS?

10  A.   WELL, IT SHOWS THAT THERE IS SOMEONE WHO IS PROVIDING AN

11  EXPERT REVIEW TO DETERMINE WHAT THIS OPTIMUM THERAPEUTIC INDEX

12  SHOULD BE FOR EITHER AN INDIVIDUAL OR A CLASS OF INDIVIDUALS.

13  Q.   AND IN A CLINICAL TRIAL, IS IT CORRECT THAT YOU WOULD HAVE

14  A PATIENT CLASS OR A CLASS OF PEOPLE WHO ARE BEING TREATED?

15  A.   IT'S POSSIBLE.  YOU COULD DIVIDE A PATIENT CLASS, IT COULD

16  ALSO REFER TO PEOPLE WHO ARE IN THE SAME AGE RANGE OR IN THE

17  SAME WEIGHT RANGE, SOME PARTICULAR CHARACTERISTIC THAT WOULD

18  DEFINE A CLASS AS OPPOSED TO AN INDIVIDUAL.

19      THIS THRESHOLD VALUE, THIS THRESHOLD, THIS INDEX, IS A

20  NUMBER.  AND IT'S A NUMBER THAT CAN REFLECT THE CONCENTRATION

21  OF A DRUG AND WHAT IT'S DESIRED LEVEL SHOULD BE, OR THE

22  CONCENTRATION OF A BIOMARKER SUCH AS CHOLESTEROL AND WHAT IT'S

23  DESIRED LEVEL OR RANGE SHOULD BE.  THAT'S WHY IT'S CALLED A

24  REFERENCE OR OPTIMUM.

25      IT'S, IN A SENSE, THE STANDARD VALUE FOR THAT CLINICAL

DIRECT EXAM BY MR. BOIES (CONT.)

1    PARAMETER THAT YOU WOULD WANT TO SEE IN A PATIENT.  AND THIS

2    VALUE CAN HAVE, THIS THRESHOLD VALUE CAN HAVE AN UPPER OR LOWER

3    LIMIT.

4         AS WE HEARD EARLIER TODAY, THERE ARE SOME INSTANCES WHERE

5    YOU DON'T WANT TO HAVE A DRUG CONCENTRATION OR A BIOMARKER

6    CONCENTRATION EXCEEDING A CERTAIN LEVEL.  YOU MAY NOT WANT TO

7    HAVE A DRUG CONCENTRATION BELOW A CERTAIN LEVEL BECAUSE IT

8    WON'T BE EFFICACIOUS OR EFFECTIVE AT ALL.

9         SO THERE IS THIS OPTIMUM, APPROPRIATE RANGE FOR THE --

10   FOR THE THERAPEUTIC INDEX OR THIS THRESHOLD VALUE THAT

11   DEFINES --

12             MR. BOIES:  YOUR HONOR.

13             WITNESS:  WHERE THE INDIVIDUAL OUGHT TO BE.

14        NOW THE DEFINITION OF THAT, THE VALUE THAT YOU SELECT,

15   CAN BE BASED UPON AN INDIVIDUAL'S OWN MEASUREMENTS OVER A

16   PERIOD OF TIME WHERE YOU ESTABLISH ESSENTIALLY WHERE THAT

17   PATIENT IS PERFORMING IN THE DESIRED RANGE AND THEN YOU

18   CONTINUE TO MAKE MEASUREMENTS AND COMPARE AGAINST THAT

19   INDIVIDUAL'S OWN REFERENCED THRESHOLD.

20        OR YOU COULD TAKE A CLASS OF PATIENTS, A NUMBER OF PEOPLE

21   AND ESTABLISH A COMMON THRESHOLD VALUE REPRESENTATIVE OF THAT

22   CLASS OF PEOPLE AGAINST WHICH AN INDIVIDUAL'S MEASUREMENTS

23   WOULD BE COMPARED TO SEE WHETHER OR NOT THEY ARE IN THE DESIRED

24   RANGE OR OUTSIDE THE DESIRED RANGE.  THAT'S WHAT A BODILY FLUID

25   ANALYZER DOES, IF THAT'S CLEAR.

DIRECT EXAM BY MR. BOIES (CONT.)

1    THE COURT:  JUROR NUMBER NINE, DO YOU HAVE A.

2    JUROR:  JUST TO CLARIFY ARE WE LOOKING AT THE

3    THERANOS PROVISIONAL MATERIAL HERE OR IS THIS THE '612

4    INFORMATION?

5    MR. BOIES:  I APOLOGIZE.

6    Q.  DR. ROBERTSON, THIS IS THE THERANOS PROVISIONAL, CORRECT?

7    A.  THIS IS '192 THERANOS PROVISIONAL, THE ONE THAT WAS FILED

8    IN SEPTEMBER OF 2005.

9    JUROR:  THANK YOU.

10   BY MR. BOIES:

11   Q.  AND THIS IS THE THERANOS PROVISIONAL THAT IS -- HAS BEEN

12   INTRODUCED AS THERANOS EXHIBIT 4, CORRECT?

13   A.  THAT'S CORRECT.

14   Q.  AND AGAIN, FOCUSSING ON THIS THERANOS PROVISIONAL LANGUAGE

15   IN PARAGRAPH 37, WHEN IT SAYS IF THE COMPUTED TI EXCEEDS THE

16   PRESET TI REF, APPROPRIATE ACTION CAN BE TAKEN AND APPROPRIATE

17   ACTION COULD BE ALERTING THE PHYSICIAN, STOPPING THE MEDICATION

18   OR THE LIKE.  DO YOU SEE THAT?

19   A.  I DO.

20   Q.  WHAT IS THE SIGNIFICANCE, IF ANY, OF THAT DISCLOSURE IN THE

21   THERANOS PROVISIONALS TO THE DEFENDANT'S ARGUMENT THAT THE

22   THERANOS PROVISIONALS WERE ONLY CONCERNED WITH CLINICAL TRIALS

23   AND NOT INDIVIDUAL PATIENT TREATMENT?

24   A.  WELL, IT'S CLEAR FROM THE CONTEXT THAT YOU ARE TALKING HERE

25   ABOUT AN INDIVIDUAL AND A COMPARISON IS BEING MADE BETWEEN THE

DIRECT EXAM BY MR. BOIES (CONT.)

1    INDIVIDUAL'S THERAPEUTIC INDEX AND THE REFERENCE THAT YOU WOULD

2    WANT THE PATIENT TO BE AT OR NEAR.

3         AND IF -- IN THIS CASE IF THE THERAPEUTIC INDEX EXCEEDS

4    THE REFERENCE VALUE, THAT WOULD CAUSE CONCERN AND THE PHYSICIAN

5    WOULD BE ALERTED AND THAT WOULD BE FOR AN INDIVIDUAL.

6         NOW YOU WILL NOTICE IT SAYS COMPUTED.  SO YOU CAN IMAGINE

7    IF I HAD A THERAPEUTIC INDEX, LET'S SAY ASSIGNED FOR GLUCOSE.

8    SO SOMEBODY IS TAKING INSULIN, USER IS DIABETIC MAY ARE

9    MONITORING THEIR USER CONCENTRATION.  YOU WANT TO HAVE A

10   REFERENCE VALUE FOR THAT GLUCOSE CONCENTRATION FOR THAT

11   PATIENT, WHATEVER THAT MIGHT BE THEN YOU TAKE A MEASUREMENT OF

12   THE PATIENT AND YOU ASSESS WHERE THE PATIENT IS.

13        NOW IF THE PATIENT'S GLUCOSE IS ABOVE THE THRESHOLD, SO

14   THEY ARE HYPERGLYCEMIC, YOU MAY WANT TO ALERT THE PHYSICIAN.

15        IF HOWEVER, YOU MEASURE TWO OR MORE ANALYTES, LET'S SAY

16   YOU MEASURE FOUR, I COULD REPORT THOSE FOUR VALUES SEPARATELY

17   AND COMPARE THEM AGAINST THE REFERENCE THRESHOLD FOR EACH OF

18   THOSE.  BUT WHAT THIS THRESHOLD DESCRIBES IS A WAY TO

19   MATHEMATICALLY TAKE THOSE FOUR MEASUREMENTS, COMBINE THEM

20   TOGETHER INTO ONE NUMBER, AND THIS IS WHY WE USE THE WORD

21   THERAPEUTIC INDEX, BECAUSE THE THERAPEUTIC INDEX IS NOT JUST

22   THE MEASUREMENT NECESSARILY OF ONE ANALYTE, IT COULD BE A

23   NUMBER THAT REFLECTS THE MEASUREMENT OF MORE THAN ONE ANALYTE,

24   BUT REDUCING IT TO JUST ONE NUMBER.

25        AND THE REFERENCE THRESHOLD WOULD BE BASED ON WHERE YOU

DIRECT EXAM BY MR. BOIES (CONT.)

1    WOULD WANT THAT ONE NUMBER TO BE TO REPRESENT THE FACT THAT YOU

2    MEASURED FOUR ANALYTES AND TOGETHER THEY DEFINE THE PLACE THAT

3    YOU WOULD PREFER THE PATIENT TO BE.

4        SO THE SIMPLEST WAY TO THINK ABOUT THIS IS THAT THE

5    THERAPEUTIC INDEX CAN'T JUST BE THE MEASUREMENT OF A SINGLE

6    ANALYTE COMPARED TO WHAT YOU THINK -- WHAT YOU WANT ITS

7    REFERENCE VALUE TO BE.

8        AND A MORE COMPLICATED SCENARIO AND THE ONE THAT HAS A

9    LOT OF UTILITY IS AGGREGATING MANY MEASUREMENTS INTO ONE VALUE

10   AND COMPARING THAT AND THEN IF THE COMPARISON IS SUCH THAT

11   THERE'S DIVERGENCE FROM THE MEASURING VALUE TO WHERE THE

12   DESIRED VALUE IS, WHERE YOU WOULD LIKE IT TO BE, THEN YOU CAN

13   SEE THAT IT ALLOWS YOU TO ALERT THE PHYSICIAN.

14   Q.   LET ME ASK YOU TO LOOK AT THE NEXT SENTENCE WHERE IT SAYS,

15   AS CAN BE UNDERSTOOD, THE APPROPRIATE TI REF FOR A PATIENT

16   WOULD BE DECIDED BASED ON THE HEALTH CARE PROVIDER'S JUDGMENT

17   FOR THAT INDIVIDUAL PATIENT.

18       WHAT IS THE SIGNIFICANCE OF THIS THERANOS DISCLOSURE?

19   A.   THIS IS A VERY, VERY KEY PART OF WHAT'S REVEALED IN THIS

20   THERANOS PROVISIONAL.  AND THAT IS, THAT THE BLOOD ANALYZER CAN

21   BE SET WITH A REFERENCE VALUE THAT IS TAILORED TO THE

22   INDIVIDUAL WHO IS USING THAT BLOOD, THE BODILY FLUID ANALYZER.

23       SO WITH THE NINE OF YOU, YOU ALL MIGHT HAVE A DIFFERENT

24   TI REF, ALTHOUGH WE ARE MEASURING THE SAME THING, BECAUSE

25   WHAT'S RIGHT FOR YOU MAY NOT BE RIGHT FOR THE PERSON SITTING

DIRECT EXAM BY MR. BOIES (CONT.)

1   NEXT TO YOU.  AND THAT'S NOT THE WAY MEASUREMENTS ARE MADE

2   RIGHT NOW.  IT'S ESSENTIALLY ONE SIZE FITS ALL.

3        I KNOW MY DAUGHTER WHO I SAID WAS AN ER PHYSICIAN, SHE'S

4   VERY EXCITED ABOUT THIS BECAUSE SHE SAYS, YOU KNOW, I HAVE A

5   BLOOD ANALYSIS --

6             MS. ANDERSON:  OBJECTION, YOUR HONOR.  HEARSAY.

7             THE COURT:  SUSTAINED.  PLEASE DISREGARD THE ANSWER

8   TO THAT LAST QUESTION.

9        MR. BOIES, YOU MAY PUT ANOTHER QUESTION TO THE WITNESS

10            MR. BOIES:  THANK YOU.

11  Q.  WHEN IT REFERS TO HEALTH CARE PROVIDER'S JUDGMENT, DOES

12  THAT INCLUDE THE INDIVIDUAL PHYSICIAN FOR AN INDIVIDUAL

13  PLAINTIFF?

14  A.  YES, IT WOULD.

15  Q.  NOW LET ME ASK YOU THE LAST SENTENCE HERE WHERE IT SAYS

16  FORM AND THE FORM IS ITALICIZED, OF THE TI DERIVED AS A ONE

17  TIME EXERCISE USING EXPERT ANALYSIS OF THE DATA SET DERIVED

18  FROM CLINICAL STUDIES AND OR EXISTING CLINICAL INFORMATION.  DO

19  YOU SEE THAT SIR?

20  A.  YES, I DO.

21  Q.  AND WOULD THE EXISTING CLINICAL INFORMATION RELATE TO OR

22  INCLUDE INFORMATION RELATING TO INDIVIDUAL PATIENTS?

23  A.  YEAH, ABSOLUTELY.  IT CAN BE EITHER FROM CLINICAL STUDIES

24  AND TRIALS OR FROM THE INDIVIDUAL THEMSELVES.

25  Q.  AND WHAT IS THE SIGNIFICANCE OF THIS DISCLOSURE IN THE

DIRECT EXAM BY MR. BOIES (CONT.)

1    THERANOS '192 PROVISIONAL TO DEFENDANT'S CONTENTION THAT THE

2    THERANOS PROVISIONALS ONLY RELATED TO CLINICAL DRUG TRIALS?

3    A.  IT SHOWS THAT IT CAN BE USED IN EITHER CLINICAL TRIAL

4    SETTINGS OR WITH INDIVIDUAL PATIENTS.  IT'S NOT -- IT'S NOT

5    RELEGATED TO ONE OR THE OTHER.  BOTH CAN BE DONE.  AND IT

6    DOESN'T MAKE A CHOICE BETWEEN THE TWO.

7    Q.  NOW THERE'S A REFERENCE HERE TO THERAPEUTIC INDEX.  IS THE

8    TERM THERAPEUTIC INDEX AS USED IN THE THERANOS PROVISIONALS

9    SOMETHING THAT ONLY HAS TO DO WITH CLINICAL TRIALS?

10   A.  NO, NOT AT ALL.  THERAPEUTIC INDEX IS SIMPLY A VALUE OF A

11   MEASURED ANALYTE OR MULTIPLE ANALYTES, AND THAT COULD HAVE BEEN

12   DONE, THAT COULD HAVE BEEN DONE WITH PATIENTS IN A CLINICAL

13   TRIAL OR WITH INDIVIDUALS WHO AREN'T IN A CLINICAL TRIAL, LIKE

14   YOU AND ME.  GOING IN AND HAVING OUR BLOOD TESTED.

15   Q.  ALL RIGHT SIR, LET ME TURN NOW TO PARAGRAPH 15, AND I WANT

16   TO STAY WITH THE THERANOS PROVISIONAL.  THERANOS TRIAL

17   EXHIBIT 4; THE '192 THERANOS PROVISIONAL DATED SEPTEMBER 16,

18   2005.  CAN YOU SEE THIS PARAGRAPH 15, DR. ROBERTSON?

19   A.  YES, I CAN.

20   Q.  AND AGAIN THIS PARTICULAR PARAGRAPH, THE PRESENT INVENTION

21   IS FOR DETERMINING EFFICACY OF MEDICAL TREATMENTS AND OVER

22   COMES LIMITATIONS OF EXISTING METHODS IN PREDICTING AND

23   PREVENTING ADVERSE DRUG INTERACTIONS.

24        DO YOU SEE THAT?

25   A.  I DO.

DIRECT EXAM BY MR. BOIES (CONT.)

1    Q.   NOW WHAT SIGNIFICANCE DOES THAT DISCLOSURE IN THE THERANOS

2    PROVISIONAL HAVE TO THE DEFENDANT'S ARGUMENT THAT THERANOS

3    PROVISIONALS ONLY RELATE TO CLINICAL TRIALS?

4    A.   THIS IS SPEAKING TO THE FACT THAT THERE'S A PATIENTS WHO

5    UNDER GOING SOME KIND OF A MEDICAL TREATMENT AND YOU ARE

6    ATTEMPTING TO ASCERTAIN WHETHER THAT TREATMENT IS EFFICACIOUS

7    OR NOT, AND YOU WANT TO IN FACT DO IT IN SUCH A WAY THAT YOU

8    CAN PREDICT THE ON SET OF ADVERSE DRUG REACTIONS AT A TIME

9    BEFORE THEY CAUSE THE PATIENT TO BECOME SYMPTOMATIC AND REALLY

10   SICK.

11        SO THIS IS REALLY TALKING ABOUT PATIENT CARE.

12   Q.   I WANT TO NOW DIRECT YOUR ATTENTION TO THE SECOND SENTENCE

13   OF THIS PARAGRAPH WHICH GOES ON FOR QUITE A WHILE.  SO I'M

14   GOING TO BREAK IT UP.

15        IT SAYS THE METHOD COMPRISES COMPUTING A THERAPEUTIC

16   INDEX, TI, BY ONE MEASURING A DEFINED COMBINATION OF PARAMETERS

17   SUCH AS THE CONCENTRATION IN BLOOD AND OR BLOOD PLASMA OF ONE

18   OR MORE.

19        NOW I WANT TO STOP AT ONE OR MORE.  AND CAN YOU EXPLAIN

20   TO THE JURY HOW THAT REFERENCE TO ONE OR MORE FITS IN WITH WHAT

21   YOU WERE SAYING ABOUT HOW TI COULD EITHER BE A SINGLE REFERENCE

22   OR IT COULD REFERENCE A COMBINATION OF DIFFERENT ANALYTES OR

23   BIOMARKERS.

24   A.   SURE.  SO IT SAYS COMPUTING A THERAPEUTIC INDEX AND THEN

25   ONE SAYS MEASURING, DEFINE COMBINATION OF PARAMETERS SUCH AS

DIRECT EXAM BY MR. BOIES (CONT.)

1    THE CONCENTRATION IN BLOOD OF ONE OR MORE.

2         SO LET'S JUST TAKE ONE.  AND DRUGS THAT ARE CONSUMED BY A

3    PATIENT, LET'S JUST TAKE ONE DRUG.  AND IF THAT'S ALL YOU DO,

4    THE THERAPEUTIC INDEX WOULD SIMPLY BE THE VALUE OF THE

5    CONCENTRATION OF THAT DRUG.  THAT'S SIMPLE AND STRAIGHTFORWARD.

6         BUT IT ALSO OPENS THE DOOR FOR TAKING MORE THAN ONE

7    MEASUREMENT OF MORE THAN ONE DRUG OR A COMBINATION OF A DRUG

8    AND A METABOLITES AND MAYBE A BIOMARKER AND COMPUTING ONE

9    NUMBER FROM THAT, FROM THREE MEASUREMENTS CALLED THE

10   THERAPEUTIC INDEX.

11        SO YOU CAN SEE THAT AGGREGATION CAN BE REALLY USEFUL,

12   BECAUSE RATHER THAN THE PHYSICIAN HAVING TO SORT OUT THREE

13   INDIVIDUAL MEASUREMENTS OR 4 OR 5 OR 6 OR LET'S SAY 12, 13 OR

14   14, THEN IT BECOMES REALLY HARD FOR THE PHYSICIAN TO ASCERTAIN,

15   WELL, SOME ARE HIGH, SOME ARE LOW, SOME ARE WHERE I WANT THEM

16   TO BE, WHAT DO YOU DO WITH THAT?  BUT WITH THE ALGORITHMS

17   THERANOS DEVELOPED YOU CAN TAKE THESE MULTIPLE MEASUREMENTS AND

18   COME UP WITH A SINGLE NUMBER OF THE TOTALITY OF THE

19   MEASUREMENTS MADE AND COMPARE THEM TO A REFERENCE WHICH HAS

20   BEEN CALCULATED IN THE SAME WAY.

21        SO THAT'S MUCH EASIER TO SAY, OH, IT SHOULD BE TWO, AND

22   IT'S THREE.  RATHER THAN SAYING, WELL, I'VE GOT 12 MEASUREMENTS

23   IT'S 1, 20, 30, 100, AND THEN TRYING TO FIT THAT ALL TOGETHER.

24   YOU CAN IMAGINE HOW HARD THAT WOULD BE.  WHICH IS BASICALLY THE

25   WAY IT'S DONE NOW.

DIRECT EXAM BY MR. BOIES (CONT.)

1          SO BURIED IN THIS, WHILE THE ONE SHOWS IT CAN BE DONE FOR

2    ONE ANALYTE, THE EXTENSION OF THAT TO MULTIPLE ANALYTES IS

3    VERY, VERY POWERFUL.

4    Q.   NOW WE HAVE BEEN TALKING ABOUT THE SIGNIFICANCE OF SOME OF

5    THESE PARAGRAPHS TO DEFENDANT'S CONTENTION THAT THE THERANOS

6    PROVISIONALS ONLY DEALT WITH CLINICAL TRIALS.

7          I NOW WANT TO ASK YOU TO LOOK AT THE SAME PROVISIONS IN

8    THE CONTEXT OF THE '612 PATENT, CLAIM ONE, ELEMENT ONE.

9    REMEMBER WE TALKED ABOUT THIS AND I'M NOW SWITCHING BACK TO THE

10   '612 PATENT.  THIS IS THE '612 MEANT.  AND WHAT I WANT TO DO IS

11   COMPARE WHAT THE '612 PATENT SAYS WITH WHAT THE THERANOS

12   PROVISIONALS WERE SAYING.

13         AND WE WENT THROUGH HOW THE '612 PATENT, THERE WAS A

14   METHOD FOR PROGRAMMING BODILY FLUID ANALYZER COMPRISING AT

15   LEAST ONE THRESHOLD VALUE OF AT LEAST ONE ANALYTE, SELECTING BY

16   A PRESCRIBING PHYSICIAN OR DRUG COMPANY AT LEAST ONE THRESHOLD

17   VALUE OF AT LEAST ONE ANALYTE TO BE SENSED BY THE BODILY FLUID

18   ANALYZER; DO YOU RECALL THAT

19   A.   YES.

20   Q.   NOW KEEPING THAT IN MIND, I NOW WANT TO ASK YOU TO GO BACK

21   TO PARAGRAPH 15, AND I'M GOING TO GO TO 37 AFTERWARDS, BUT

22   STARTING WITH PARAGRAPH 15, AND WE ARE NOW BACK ON THE THERANOS

23   PROVISIONAL, CORRECT, SIR?

24   A.   YES.

25   Q.   AND HOW DOES THIS DISCLOSURE DEMONSTRATE THAT THE CLAIM IN

DIRECT EXAM BY MR. BOIES (CONT.)

1    THE '612 PATENT WAS ALREADY DISCLOSED IN THE THERANOS

2    PROVISIONALS?

3    A.   WELL, IN THE '612 PATENT YOU CAN SEE IT SAYS AT LEAST ONE

4    THRESHOLD VALUE OF AT LEAST ONE ANALYTE.  AND THAT'S CLEARLY

5    DESCRIBED HERE AS I INDICATED TO YOU, WHEN YOU TAKE THIS IN ITS

6    SIMPLEST FORM IN THE THERANOS PROVISIONAL, IT REDUCES ITSELF TO

7    A SINGLE ANALYTE AND A SINGLE THRESHOLD VALUE.

8    Q.   NOW LET ME ASK YOU TO TURN BACK TO PARAGRAPH 37 OF THE

9    THERANOS PROVISIONAL.  THIS IS THE THERANOS '192 PROVISIONAL.

10   A.   OKAY.

11   Q.   AND AGAIN, I'M GOING TO ASK YOU THE SAME QUESTION.  BUT NOW

12   IN THE CONTEXT OF PARAGRAPH 37.  HOW DOES THIS PARAGRAPH 37

13   RELATE, IF IT DOES, TO YOUR CONCLUSION THAT THE CLAIM IN THE

14   '612 PATENT WAS DISCLOSED IN THE PRIOR THERANOS PROVISIONAL?

15   A.   SO THIS MIDDLE BOX TALKS ABOUT SELECTING BY PRESCRIBING

16   PHYSICIANS AT LEAST ONE THRESHOLD VALUE OF AT LEAST ONE ANALYTE

17   TO BE ASSESSED BY THE ANALYTE --

18   Q.   LET ME STOP YOU JUST THERE JUST TO MAKE CLEAR FOR THE

19   RECORD.  WHAT YOU ARE JUST REFERRING TO NOW IS THE '612 PATENT,

20   CORRECT?

21   A.   YES, THE '612 PATENT CLAIM ONE.

22            MR. J. FUISZ:  YOUR HONOR, MAY I APPROACH?

23            THE COURT:  YOU MAY.

24   (SIDE-BAR DISCUSSION OFF THE RECORD.)

25            THE COURT:  COUNSEL, YOU NEED TO POUT THIS ON THE

DIRECT EXAM BY MR. BOIES (CONT.)

1    RECORD.

2              MR. J. FUISZ:  I WAS JUST ASKING IF -- I WAS JUST

3    ASKING IF COUNSEL COULD MAKE CLEAR THAT HE'S SHOWING AN ELEMENT

4    OF CLAIM ONE IN THE CHART AND I THINK HE INADVERTENTLY REFERRED

5    TO IT AS CLAIM ONE IN ITS ENTIRETY.

6              THE COURT:  ANY OBJECTION.

7              MR. BOIES:  NO, YOUR HONOR.

8              THE COURT:  OKAY.  THANK YOU.

9              MR. BOIES:  THE DEFENDANTS POINT OUT QUITE CORRECTLY

10   THAT WHAT WE ARE TALKING ABOUT HERE IS, AS THE BOARD SAYS,

11   ELEMENT ONE OF CLAIM ONE.  THERE ARE OTHER CLAIMS AND THERE ARE

12   OTHER ELEMENTS OF CLAIM ONE.  BUT WHAT WE ARE TALKING ABOUT

13   HERE IS ELEMENT ONE OF CLAIM ONE.  THIS IS WHAT WAS REFERRED TO

14   AS THE SELECTING ELEMENT IN SOME OF THE PRIOR TESTIMONY.

15   Q.  NOW REFERRING TO THE '612 PATENT, CLAIM ONE, ELEMENT ONE,

16   AND WHAT YOU JUST DESCRIBED, THAT COMES FROM THE '612 PATENT,

17   CORRECT?

18   A.  YES, IT DOES.

19   Q.  NOW COULD YOU EXPLAIN TO THE JURY WHAT THE SIGNIFICANCE IS,

20   IF ANY, OF PARAGRAPH 37 OF THE '192 THERANOS PROVISIONAL TO THE

21   QUESTION OF WHETHER ELEMENT ONE, CLAIM ONE, THE SELECTING STEP

22   IN CLAIM ONE OF THE '612 PATENT, IS OR IS NOT DISCLOSED IN THE

23   PRIOR THERANOS PROVISIONAL, '192.

24   A.  OKAY.  SO LET'S START WITH WHAT THE '612 PATENT SAYS.  IT

25   SAYS SELECTING BY PRESCRIBING PHYSICIAN OR DRUG COMPANY, AT

DIRECT EXAM BY MR. BOIES (CONT.)

1    LEAST ONE THRESHOLD VALUE OF AT LEAST ONE ANALYTE TO BE USED BY

2    THE BODILY FLUID ANALYZER.

3         SO THAT MEANS THAT THE PHYSICIAN IS SELECTING A THRESHOLD

4    VALUE FOR THE ANALYTE TO BE MEASURED.  MEANING THAT YOU ARE

5    GOING TO COMPARE THE MEASUREMENT OF THE ANALYTE TO THAT

6    THRESHOLD VALUE AND THAT THRESHOLD VALUE IS SELECTED BY THE

7    PHYSICIAN.

8         THE THRESHOLD VALUE IS USED HERE IN THE '612 PATENT IS

9    THE VERY SAME THING THAT WE HAVE BEEN TALKING ABOUT IN THE

10   PRIOR ART OF THE THERANOS PROVISIONALS.  REFERRED TO AS THE

11   THRESHOLD VALUE, THE APPROPRIATE VALUE, THE OPTIMUM VALUE OR

12   THE TI REF.  THEY ARE ALL THE SAME.

13        SO NOW IF YOU LOOK OVER AT THE THERANOS PROVISIONAL,

14   WHICH PRECEDED THIS, SO THIS WAS THE PRIOR ART, IT SAYS EXPERT

15   REVIEW WOULD THEN DETERMINE THE OPTIMUM THERAPEUTIC INDEX FOR

16   THAT PARTICULAR PATIENT OR PATIENT CLASS.

17        SO EXPERT REVIEW HAS TO REFER TO THE HEALTH CARE

18   PROVIDER, SOMEBODY WHO UNDERSTANDS WHAT THE THRESHOLD VALUE

19   SHOULD BE.  AND FURTHERMORE, IT GOES ON TO SAY, THE APPROPRIATE

20   TI REF, AGAIN THIS SAME THRESHOLD VALUE, FOR A PATIENT WOULD BE

21   DECIDED BASED ON THE HEALTH CARE PROVIDER'S JUDGMENT FOR THAT

22   INDIVIDUAL PATIENT.

23        SO IT SAYS VERY PLAINLY THAT IT'S THE PHYSICIAN THAT'S

24   DOING THE SELECTING OF THE THRESHOLD VALUE AGAINST WHICH THE

25   MEASUREMENT WILL BE COMPARED.

DIRECT EXAM BY MR. BOIES (CONT.)

1          SO IT'S EXACTLY THE SAME, IN MY OPINION.

2    Q.   LET ME NOW ASK YOU TO LOOK AT ANOTHER THERANOS PROVISIONAL.

3    THIS IS THERANOS TRIAL EXHIBIT 2 WHICH IS THE '801 PROVISIONAL

4    DATED MAY 9, 2005.  AND I WOULD LIKE YOU TO LOOK AT PARAGRAPH

5    SIX AND I WANT TO DO THAT IN CONNECTION WITH THE TIMELINE THAT

6    WE LOOKED AT BEFORE.

7          AND THE '801 PROVISIONAL WAS FILED MAY 9, 2005; IS THAT

8    CORRECT, SIR?

9    A.   THAT'S RIGHT.

10   Q.   AND THAT WAS OBVIOUSLY BEFORE THE FUISZ PROVISIONAL

11   APPLICATION, CORRECT?

12   A.   THAT'S RIGHT.

13   Q.   BUT IT WAS NOT MADE PUBLIC UNTIL AFTER THE FUISZ

14   PROVISIONAL WAS FILED, CORRECT?

15   A.   CORRECT.  THAT WAS NOVEMBER OF THE FOLLOWING YEAR.

16   Q.   NOVEMBER OF 2006, CORRECT?

17   A.   THAT'S RIGHT.

18   Q.   NOW LET ME ASK YOU TO LOOK AT PARAGRAPH SIX.  AND THIS IS

19   THE THERANOS PROVISIONAL '801, CORRECT?

20   A.   THAT'S RIGHT.

21   Q.   PARAGRAPH SIX OF THE THERANOS PROVISIONAL '801.  AND I

22   WOULD LIKE YOU TO LOOK AT THIS AND TELL ME WHAT THE

23   SIGNIFICANCE, IF ANY, IS OF THIS PARAGRAPH TO WHETHER OR NOT

24   THE ELEMENT ONE, CLAIM ONE, THE SELECTING STEP OF THE '612

25   PATENT, WAS OR WAS NOT DISCLOSED IN THE THERANOS PROVISIONALS?

DIRECT EXAM BY MR. BOIES (CONT.)

1    A.   SO YOU WILL SEE SOME NEW TERMINOLOGY IN THIS.  THIS IS THE

2    '801 PROVISIONAL.  AND IT'S TALKING ABOUT COMPARING IN REAL

3    TIME THE PK AND PD PARAMETERS OF THE DRUG FOR AN INDIVIDUAL

4    PATIENT AGAINST NORMALIZED PK/PD PROFILE OF AN IDEAL PATIENT.

5         SO FIRST TO TRANSLATE THAT, IT'S SAYING THE SAME THING.

6    IT'S SAYING WE ARE COMPARING MEASURED CLINICAL PARAMETERS

7    AGAINST SOME STANDARD, SOME REFERENCE VALUE.  WE ARE JUST USING

8    DIFFERENT TERMINOLOGY.  PK STANDS FOR PHARMACOKINETICS.  IT'S

9    ANOTHER WAY OF SAYING WHAT DOES THE BODY DO TO THE DRUG.

10        SO YOU TAKE A DRUG, SWALLOW IT, AND GET AN INJECTION OR

11   SHOT, IT'S DISTRIBUTED THROUGHOUT YOUR BODY AND INTO YOUR

12   BLOODSTREAM.  SO PHARMACOKINETIC PARAMETERS ARE THOSE THAT ARE

13   REFLECTED BY WHAT THE BODY HAS DONE TO THE DRUG.

14        PHARMACODYNAMIC OR PD PARAMETERS REPRESENT BIOMARKERS

15   WHICH I'VE TALKED ABOUT BEFORE.  THEY ARE REFLECTIVE OF WHAT

16   THE DRUG DOES TO THE BODY.  SO STATIN CHANGES IN CHOLESTEROL

17   LEVEL FOR INSTANCE.

18        BUT THEY ARE ANALYTES.  THAT'S THE IMPORTANT THING.  THEY

19   ARE EITHER A DRUG OR A METABOLITES OR BIOMARKER AND YOU SHOULD

20   JUST THINK OF THEM LIKE THAT.

21        AND SO IF YOU DO, THEN YOU WILL SEE THAT WHAT THIS IS

22   TALKING ABOUT IS SIMPLY THE SAME THING.  YOU ARE MEASURING ONE

23   OR MORE ANALYTES AND YOU ARE COMPARING THEM TO A, IN THIS CASE

24   WHAT THEY CALL A NORMALIZED PK/PD PROFILE, WHICH IS ESSENTIALLY

25   THE TREF FOR THAT SINGLE AN ANALYTE OR COLLECTION OF ANALYTES.

DIRECT EXAM BY MR. BOIES (CONT.)

1    SO WHILE THE WORDS ARE DIFFERENT, THE BASIC MEANING IS EXACTLY

2    THE SAME

3              THE COURT:  MR. BOIES LET ME INTERRUPT YOU.

4         DR. FUISZ WOULD YOU LIKE TO MAKE AN OBJECTION

5              MR. R. FUISZ:  SHOULD I APPROACH THE BENCH OR RAISE

6    IT HERE.

7              THE COURT:  ORDINARILY ONE RAISES AN OBJECTION BY

8    STANDING AND ARTICULATING THE OBJECTION.  IF YOU DON'T WISH TO

9    DO THAT YOU CAN'T WAVE AT ME OR SIGNAL ME.  IF YOU WISH TO HAVE

10   A SIDE BAR CONFERENCE YOU MAY MAKE THAT REQUEST I WILL GRANT

11   THAT REQUEST WOULD YOU LIKE A SIDE BAR.

12             MR. R. FUISZ:  PLEASE.

13   (SIDE-BAR DISCUSSION OFF THE RECORD.)

14             THE COURT:

15             MR. R. FUISZ:  YOUR HONOR, WHAT HE'S DOING IS HE'S

16   TAKING OMITTING THE FIRST PART OF CLAIM ONE TO GIVE THIS JURY A

17   TOTALLY FALSE IMPRESSION OF WHAT CLAIM ONE IS.  AND THAT'S NOT

18   RIGHT.

19             THE COURT:  YOU CAN RAISE THAT ISSUE DURING THE

20   CROSS-EXAMINATION.  YOU CAN NOT OBJECT TO AN ANSWER.  YOU

21   CANNOT RAISE THE OBJECTION.  YOU CANNOT OBJECT TO ANSWERS.

22        YOU NEED TO FOLLOW -- DR. FUISZ, I'M NOT GOING TO REPEAT

23   MYSELF.  I'M ALLOWING YOU TO PROCEED PRO SE HERE.  AS A PRO SE

24   PARTY, YOU NEED TO FOLLOW ALL THE SAME RULES THAT APPLY TO

25   COUNSEL OF RECORD.  COUNSEL ARE NOT ALLOWED TO OBJECT TO

DIRECT EXAM BY MR. BOIES (CONT.)

1    ANSWERS UNLESS THERE'S SOMETHING OBJECTIONABLE.  IF YOU DON'T

2    LIKE THE ANSWER, YOU CAN TAKE IT UP ON CROSS-EXAMINATION.

3              MR. J. FUISZ:  THANK YOU, YOUR HONOR.

4              THE COURT:  LET'S PROCEED.

5         MR. BOIES, YOU MAY POSE YOUR NEXT QUESTION.

6              MR. BOIES:  THANK YOU, YOUR HONOR.

7    Q.   NOW WHAT IS YOUR ULTIMATE OPINION OR CONCLUSION AS TO

8    WHETHER THE ELEMENT BEING CLAIMED IN THE '612 PATENT RELATES TO

9    THE METHOD OF --

10        WHAT IS YOUR OPINION OR CONCLUSION AS TO WHETHER OR NOT

11   THE ELEMENT OF THE '612 PATENT CLAIM THAT STATE IT IS A METHOD

12   FOR PROGRAMMING A BODILY FLUID ANALYZER COMPRISING AT LEAST ONE

13   THRESHOLD VALUE OF AT LEAST ONE ANALYTE, SELECTING BY A

14   PRESCRIBING PHYSICIAN OR DRUG COMPANY, AT LEAST ONE THRESHOLD

15   VALUE OF AT LEAST ONE ANALYTE TO BE SENSED BY THE BODILY FLUID

16   ANALYZER, AND THEN I WILL READ THE THIRD PART TOO.

17        THE AT LEAST ONE THRESHOLD VALUE OF THE AT LEAST ONE

18   ANALYTE BEING ASSOCIATED WITH A PARTICULAR DRUG BEING OR TO BE

19   TAKEN BY THE PATIENT OR A COURSE OF TREATMENT FOR THE PATIENT.

20        WHAT IS YOUR CONCLUSION AS TO WHETHER THAT IS DISCLOSED

21   IN THE THERANOS PROVISIONALS THAT WE'VE JUST GONE OVER THE '192

22   AND THE '801?

23   A.   YES, THIS FIRST ELEMENT IS DISCLOSED IN ITS ENTIRETY IN THE

24   '801 AND '192 PROVISIONALS.  THERANOS'S '801 AND '192

25   PROVISIONALS.

DIRECT EXAM BY MR. BOIES (CONT.)

1    Q.   PRIOR TO THE FILING OF THE FOUR THERANOS PROVISIONALS IN

2    2005, WERE YOU AWARE OF ANYONE IN THE INDUSTRY WITH A PRODUCT

3    OR OFFERING IN THE POSITION OF A DRUG COMPANY SELECTING ON AN

4    INDIVIDUALIZED BASIS FOR A PARTICULAR BODILY FLUID ANALYZER, AT

5    LEAST ONE THRESHOLD VALUE OF AT LEAST ONE ANALYTE?

6    A.   I WAS NOT.

7    Q.   LET ME -- LET ME DIRECT YOUR ATTENTION TO PARAGRAPH TEN OF

8    THE '801 PROVISIONAL.  AND THIS AGAIN IS THE THERANOS

9    PROVISIONAL, CORRECT?

10   A.   THAT'S RIGHT.

11   Q.   AND IT BEGINS A METHOD OF MONITORING THE -- CAN YOU

12   PRONOUNCE THOSE TWO WORDS?

13   A.   PHARMACOKINETIC AND PHARMACODYNAMIC.

14   Q.   PARAMETERS OF THE DRUG IN A PATIENT BY A, MEASURING THE

15   CONCENTRATION OF ONE OR MORE TARGET DRUGS AND THEIR ANALYTES IN

16   MICRO LITER QUANTITIES OF THE PATIENT'S BLOOD.  AND B,

17   MEASURING THE PHARMACODYNAMIC PARAMETERS RELATED TO ONE OR MORE

18   OF THE TARGET DRUGS IN THEIR METABOLITES, WHERE IN THE FARM --

19   CAN YOU PRONOUNCE THAT WORD FOR ME?

20   A.   PHARMACODYNAMIC.

21   Q.   PARAMETERS INCLUDE VITALS OF THE PATIENT AND ONE OR MORE

22   BIOMARKERS THAT ARE INFLUENCED BY THE PRESENCE OF ONE OR MORE

23   DRUGS AND THEIR METABOLITES.

24        NOW WHAT IS THE SIGNIFICANCE IN ANY IN THAT DISCLOSURE OF

25   THE THERANOS PROVISIONALS?

DIRECT EXAM BY MR. BOIES (CONT.)

1   A.   AS I SAID BEFORE IN THE '801 PROVISIONAL, REFERENCES TO

2   SUCH THINGS AS DRUGS AND METABOLITES AND BIOMARKERS ARE

3   ENCOMPASSED IN THE WORDS PHARMACOKINETIC AND PHARMACODYNAMIC.

4   AND YOU CAN SEE IN A, ABOUT MEASURING THE CONCENTRATION.

5        SO YOU CAN SEE RIGHT AWAY THAT'S WHAT THOSE ARE THE

6   CONCENTRATIONS OF ONE OR MORE TARGET DRUGS.

7        THAT'S AT LEAST ONE THRESHOLD ANALYTES.  AND THEY ARE

8   ANALYTES IN MICRO QUANTITIES OF THE PATIENT'S BLOOD.

9        SO AGAIN, WE ARE TALKING ABOUT THE PATIENT AND

10  EMPHASIZING A VERY SMALL AMOUNTS OF BLOOD THAT WE ARE TALKING

11  ABOUT HERE.  A LITTLE DROP OF BLOOD ON THE END OF YOUR FINGER

12  IS ABOUT 40 MICRO LITERS.  AND B TALKS ABOUT MEASURING THE

13  PHARMACODYNAMIC PARAMETERS WHICH I HAVE REFERRED TO EARLIER AS

14  BIOMARKERS.

15       AND YOU WILL NOTICE THAT IT ALSO SAYS VITALS OF THE

16  PATIENT.  SO BIOMARKERS COMPRISE ANALYTES TALKING ABOUT

17  CHOLESTEROL FOR EXAMPLE.  BUT BIOMARKERS CAN ALSO BE VITAL

18  SIGNS LIKE CARDIAC RATE, HEART RATE, RESPIRATION RATE,

19  TEMPERATURE, BLOOD PRESSURE.  WE CAN ALSO INCORPORATE THAT INTO

20  THE MEASUREMENTS AS WELL INTO THE PHARMACODYNAMIC PARAMETERS TO

21  ASSESS A PATIENT'S CLINICAL CONDITION RELATIVE TO A STANDARD

22  REFERENCE VALUE THAT YOU HOPE THEY WERE IN A RANGE OR VALUE.

23  Q.   THANK YOU.  I WOULD NOW LIKE TO TURN TO THE REMAINING

24  ELEMENTS OF CLAIM ONE.  ALL OF THIS CONVERSATION HAD JUST BEEN

25  ABOUT THE FIRST ELEMENT OF CLAIM ONE, CORRECT SIR?

DIRECT EXAM BY MR. BOIES (CONT.)

1    A.   THAT'S RIGHT.  THERE'S SIX ELEMENTS.

2    Q.   NOW MAYBE WE CAN PUT ON THE BOARD THE ENTIRE CLAIM ONE.

3         AND AT THE BEGINNING YOU SEE THE FIRST ELEMENT I'VE JUST

4    GONE THROUGH, CORRECT SIR

5    A.   YES, WE WENT THROUGH THAT ENTIRE ELEMENT.  THIS NOW WE ARE

6    LOOKING AT THE '612 PATENT.

7    Q.   YES, THIS IS THE '612 PATENT.  THIS IS CLAIM ONE OF THE

8    '612 PATENT, CORRECT?

9    A.   THAT'S RIGHT.  IT'S THE ENTIRE CLAIM.

10   Q.   AND YOU HAVE IDENTIFIED SIX ELEMENTS OF THAT CLAIM,

11   CORRECT?

12   A.   IN THE SIX BOXES THAT ARE UP THERE, YES.

13   Q.   AND WE'VE JUST GONE THROUGH THE FIRST ELEMENT.  AND WITH

14   RESPECT TO THAT JUST SUMMARIZE YOUR OPINION FOR THE JURY AS TO

15   WHETHER THAT WAS FULLY DISCLOSED IN THE THERANOS PROVISIONALS?

16   A.   SO WE SAW IN LOOKING AT THE '801 PROVISIONAL AND THE '192

17   PROVISIONAL, WE FOUND EVERYTHING THAT'S DISCLOSED IN THIS FIRST

18   ELEMENT WE FOUND THAT IN THE '801 AND THE '192 THERANOS

19   PROVISIONALS.

20   Q.   NOW LET ME TURN TO THE SECOND ELEMENT, THIS IS FROM THE

21   '612 PATENT, PROVIDING A DATA STORAGE UNIT SEPARATELY FROM THE

22   BODILY FLUID ANALYZER AND CONTAINING STORED INFORMATION

23   INCLUDING THE AT LEAST ONE THRESHOLD VALUE OF AT LEAST ONE

24   ANALYTE TO BE SENSED BY THE BODILY FLUID ANALYZER SELECTED BY

25   THE PRESCRIBING PHYSICIAN OR THE DRUG COMPANY.

DIRECT EXAM BY MR. BOIES (CONT.)

1          DO YOU SEE THAT?

2     A.   I DO.

3     Q.   NOW, HAVE YOU REACHED A CONCLUSION AS TO WHETHER OR NOT

4     THIS ELEMENT OF THE FUISZ'S '612 PATENT CLAIM WAS PREVIOUSLY

5     DISCLOSED IN THE THERANOS PROVISIONALS?

6     A.   YES, IN MY EXAMINATION I FOUND THAT THIS SECOND ELEMENT OF

7     CLAIM ONE IS INDEED DISCLOSED IN THE THERANOS PROVISIONALS.

8     Q.   OKAY.  IN THAT CONNECTION LET ME ASK YOU TO LOOK AT

9     PARAGRAPH EIGHT OF THE '801 PROVISIONAL.  THIS IS PARAGRAPH

10    EIGHT OF THE THERANOS '801 PROVISIONAL THAT WAS FILED MAY 9,

11    2005.

12    A.   OKAY.

13    Q.   AND IT SAYS THE PRESENT INVENTION OVER COMES THE

14    LIMITATIONS OF THE PRIOR ART BY PROVIDING A DISPOSABLE SYSTEM

15    THAT IS CAPABLE OF DRAWING MICRO LITER QUANTITIES OF BLOOD IN

16    AMBULATORY PATIENTS AND DETERMINING THE IN SITU AND OR REAL

17    TIME CONCENTRATIONS OF TARGETED ANALYTES AND BIOMARKERS.

18    ADDITIONALLY, THE SYSTEM HAS THE CAPABILITY OF ENGAGING IN TWO

19    WAY COMMUNICATION WITH EXTERNAL DATABASES AND OTHER DATA

20    REPOSITORIES.  DO YOU SEE THAT?

21    A.   I DO, YES.

22    Q.   WHAT IS THE SIGNIFICANCE, IF ANY, OF THIS DISCLOSURE IN THE

23    THERANOS '801 PROVISIONAL TO THE QUESTION OF WHETHER OR NOT THE

24    SECOND ELEMENT OF THE FUISZ'S '612 PATENT CLAIM ONE WAS

25    DISCLOSED PREVIOUSLY IN THE THERANOS PROVISIONALS?

DIRECT EXAM BY MR. BOIES (CONT.)

1    A.   SO THIS WAS DISCLOSED -- LET'S LOOK AT WHAT'S UP THERE ON

2    THE BOARD.  IT SAYS THE SYSTEM HAS THE CAPABILITY OF ENGAGING

3    IN TWO WAY COMMUNICATIONS WITH AN EXTERNAL DATABASE.  SO THE

4    DIAGRAM HAS AN ANALYZER AND SOMEWHERE OUT HERE ETERNAL IS A

5    DATABASE.  THE DATABASE CONTAINS STORED INFORMATION.  AND THE

6    TWO CAN TALK.  TO ONE ANOTHER.

7         IN THE '612 PATENT IT SAYS PROVIDING A DATA STORAGE UNIT

8    SEPARATELY FROM THE BODILY FLUID ANALYZER CONTAINING STORED

9    INFORMATION.

10        SO YOU CAN SEE THAT WHAT IS DESCRIBED IN PARAGRAPH EIGHT

11   OF THE THERANOS PROVISIONAL IS THE SAME THAT IS BEING DESCRIBED

12   IN THE '612 PATENT.  YOU HAVE AN ANALYZER, YOU HAVE A DATA

13   STORAGE UNIT.  INFORMATION IS STORED IN THE DATA STORAGE UNIT

14   AND IT CAN COMMUNICATE THROUGH TWO WAY COMMUNICATION BACK AND

15   FORTH TO THE ANALYZER.  SAME CONCEPT.

16   Q.   LET ME ASK YOU NEXT TO LOOK AT PARAGRAPH 31 OF THE '801

17   PROVISIONAL.  AND I WANT TO PARTICULARLY FOCUS ON THE SENTENCE

18   HERE THAT SAYS THE HAND HELD COULD TRANSMIT THE RESULTS OF THE

19   ANALYSIS TO AN EXTERNAL DATABASE AND IS ALSO CAPABLE OF

20   RECEIVING DATA FROM SUCH DATABASES.  DO YOU SEE THAT?

21   A.   YES, I DO.

22   Q.   WHAT IS THE SIGNIFICANCE, IF ANY, OF THAT DISCLOSURE TO THE

23   QUESTION OF WHETHER THE '612 PATENT CLAIM, ELEMENT TWO, WAS

24   DISCLOSED PREVIOUSLY BY THERANOS?

25   A.   AGAIN IT SIMPLY REITERATES THAT'S WHAT'S ENVISIONED HERE IN

DIRECT EXAM BY MR. BOIES (CONT.)

1   THE THERANOS PROVISIONAL IS A HAND HELD ANALYZER UNIT THAT CAN

2   TRANSMIT TO AN EXTERNAL DATABASE AND CAN RECEIVE DATA FROM THE

3   EXTERNAL DATABASE, THAT'S THE TWO WAY COMMUNICATION.

4        SO IT'S SAYING, AGAIN, THE SAME THING.

5   Q.  I NOW WANT TO ASK YOU TO LOOK AT THERANOS PROVISIONAL '192,

6   PARAGRAPH 16.  THIS IS THERANOS TRIAL EXHIBIT 4, PARAGRAPH 16.

7   DO YOU HAVE THAT?

8   A.  YES, I DO.

9   Q.  AND THIS SAYS THAT A SYSTEM FOR COMPUTING THE THERAPEUTIC

10  INDEX AND THERAPY IN AN AMBULATORY PATIENT BY MEASURING A

11  PORTABLE INSTRUMENT THE CONCENTRATION IN BLOOD OF ONE OR MORE

12  A, DRUGS THAT ARE CONSUMED BY A PATIENT AND THEIR METABOLITES,

13  B, ANALYTES OR C, BIOMARKERS, AND COMPARING THE COMPUTED

14  THERAPEUTIC INDEX WITH AN ACTION THRESHOLD VALUE STORED IN A

15  DATABASE.

16       DO YOU SEE THAT?

17  A.  YES.

18  Q.  WHAT IS THE SIGNIFICANCE OF THIS PARAGRAPH TO WHETHER WHAT

19  IS CLAIMED IN THE FUISZ'S '612 PATENT CLAIM 1, ELEMENT 2, HAVE

20  ALREADY BEEN FULLY DISCLOSED IN THE THERANOS PROVISIONALS?

21  A.  SO THIS GOES ON TO TELL YOU THAT THE COMPUTER THERAPEUTIC

22  INDEX, IF YOU RECALL THAT'S WHAT'S BEING MEASURED.

23       IT CAN BE ONE THING, IT'S ONE NUMBER BUT IT CAN REPRESENT

24  ONE MEASUREMENT OR MULTIPLE MEASUREMENTS.

25       AND NOW WE HAVE TO COMPARE IT WITH THE REFERENCE VALUE TO

DIRECT EXAM BY MR. BOIES (CONT.)

1  SEE WHERE THE PATIENT IS WITH REGARD TO HIS OR HER PHYSIOLOGIC

2  CONDITION.

3       AND YOU CAN SEE IT'S COMPARING THE COMPUTED THERAPEUTIC

4  INDEX, THAT'S THE MEASUREMENT.  WITH THE ACTION THRESHOLD

5  VALUE, THAT'S THE REFERENCE VALUE.  AND IT TELLS YOU THAT THE

6  ACTION THRESHOLD VALUE IS STORED IN THE DATABASE.

7       SO THAT'S WHERE YOU HAVE TO GO TO LOCATE WHERE THE

8  THRESHOLD VALUE IS, IT'S STORED IN THE DATABASE AND HANDHELD

9  ANALYZERS MAKING THE MEASUREMENT.

10           MR. BOIES:  MAY I HAVE JUST ONE MOMENT, YOUR HONOR?

11           THE COURT:  YOU MAY.

12  Q.  ALL RIGHT.  LET ME GO BACK NOW TO CLAIM ONE OF THE '612

13  PATENT.  AND WE WERE TALKING ABOUT THE SECOND ELEMENT WHICH WAS

14  TALKING ABOUT, AMONG OTHER THINGS, CONTAINING STORED

15  INFORMATION.  DO YOU SEE THAT?

16  A.  YES.

17  Q.  AND WHAT IS THE SIGNIFICANCE OF WHAT YOU JUST LOOKED AT IN

18  THE '801 PATENT ABOUT THE STORED DATABASE TO THAT ELEMENT OF

19  THE '612 PATENT CLAIM?

20  A.  WELL, THE '612 PATENT TELLS YOU THAT YOU, YOU WANT TO

21  PICTURE IT IN YOUR HEAD, YOU HAVE A DATABASE SEPARATE FROM THE

22  ANALYZER.  AND IT CONTAINS THESE STORED INFORMATION INCLUDING

23  THE AT LEAST ONE THRESHOLD VALUE OF AT LEAST ONE ANALYTE.

24       SO IT'S TELLING YOU THAT'S WHERE THE THRESHOLD VALUE IS

25  KEPT.  SO IF YOU ARE GOING TO MAKE A COMPARISON, YOU HAVE TO

DIRECT EXAM BY MR. BOIES (CONT.)

1    INTERROGATE THE DATABASE.

2        YOU EITHER SHIP THE MEASURED INFORMATION OUT TO THE

3    DATABASE AND MAKE THE COMPARISON THERE OR YOU DOWNLOAD THE

4    INFORMATION FROM THE DATABASE TO THE HANDHELD ANALYZER AND YOU

5    MAKE THE COMPARISON THERE.

6    Q.   AND NOW LET ME GO TO PARAGRAPH 16 OF THE '192 PROVISIONAL

7    WHERE IT TALKS ABOUT "COMPARING THE COMPUTED THERAPEUTIC INDEX

8    WITH AN ACTION THRESHOLD VALUE STORED IN A DATABASE".

9        DO YOU SEE THAT?

10   A.   I DO.

11   Q.   AND AGAIN, WHAT IS THE SIGNIFICANCE OF THAT TO YOUR

12   OPINION?

13   A.   IT SAYS EXACTLY THE SAME THING AS I JUST TOLD YOU, THAT

14   YOU'RE COMPARING THE COMPUTED THERAPEUTIC INDEX OR THE

15   MEASUREMENT OF ONE OR MORE ANALYTES WITH THE REFERENCE

16   THRESHOLD VALUE WHICH IS STORED IN THE DATABASE.  THAT'S WHERE

17   YOU WOULD GO FIND IT.

18   Q.   NOW LET ME GO BACK TO THE CLAIM ONE.

19       AND WE HAVE NOW GONE THROUGH ELEMENT, THE FIRST ELEMENT, WE

20   HAVE GONE THROUGH THE SECOND ELEMENT AND NOW I WANT TO GO TO

21   THE THIRD ELEMENT WHICH IS READING THE STORED INFORMATION

22   STORED ON THE DATA STORAGE UNIT INTO A DATA READER ASSOCIATED

23   WITH A BODILY FLUID ANALYZER?

24       DO YOU SEE THAT?

25   A.   YES.

DIRECT EXAM BY MR. BOIES (CONT.)

1    Q.   NOW IS THIS ELEMENT, AND THAT OF COURSE IS READING FROM THE

2    '612 PATENT CLAIM, CORRECT?

3    A.   THAT'S CORRECT.

4    Q.   IS THIS ELEMENT OF THE '612 PATENT CLAIM SOMETHING THAT IN

5    YOUR OPINION WAS PREVIOUSLY DISCLOSED IN THE THERANOS

6    PROVISIONALS?

7    A.   YES, IT WAS.

8    Q.   LET ME ASK YOU TO LOOK AT PARAGRAPH 31 OF THE '801

9    PROVISIONAL.

10   A.   ALL RIGHT.

11   Q.   DOES THIS DISCLOSURE RELATE TO YOUR OPINION THAT THE

12   THERANOS PROVISIONAL DISCLOSES AND TEACHES THE THIRD ELEMENT OF

13   CLAIM ONE OF THE '612 FUISZ PATENT?

14   A.   YES, IT DOES.

15   Q.   IN WHAT WAY?

16   A.   THE THIRD ELEMENT TALKS ABOUT READING THE INFORMATION

17   THAT'S STORED IN THE DATABASE, AND WE KNOW THAT AT LEAST A

18   PIECE OF THAT INFORMATION IS THE REFERENCE VALUE.  AND IT TALKS

19   ABOUT READING IT INTO A DATA READER ASSOCIATED WITH THE BODILY

20   FLUID ANALYZER.

21        SO IT'S TALKING ABOUT ACQUIRING THAT REFERENCE VALUE AND

22   ESSENTIALLY TRANSFERRING IT OVER TO THE HAND HELD.  HERE IT

23   SAYS THE HAND HELD IN THE THERANOS PROVISIONAL UP ON THE

24   SCREEN, THE HAND HELD HAS CAPABILITIES OF WIRELESS

25   COMMUNICATION WITH THE EXTERNAL WORLD.

DIRECT EXAM BY MR. BOIES (CONT.)

1          WE TALKED ABOUT THAT, IT CAN GO BOTH WAYS.  THE HAND HELD

2    COULD TRANSMIT THE RESULTS OF THE ANALYSIS TO AN EXTERNAL

3    DATABASE, THAT IS THE MEASUREMENT, AND IS ALSO CAPABLE OF

4    RECEIVING DATA FROM SUCH DATABASES, MEANING THAT WHATEVER

5    INFORMATION WAS ON THE DATABASE, IT CAN ALSO COME DOWN TO THE

6    HANDHELD ANALYZER.

7          AND THAT WOULD ENCOMPASS READING THE REFERENCE THRESHOLD

8    VALUE STORED IN THE DATABASE DOWN ON TO THE HANDHELD ANALYZER

9    WHICH IS EXACTLY WHAT ELEMENT 3 OF THE CLAIM ONE SAYS IN THE

10   '612 PATENT.

11         AND YOU FIND THE SAME THING HERE IN THE THERANOS

12   PROVISIONAL.

13   Q.  LET ME ASK YOU TO LOOK AT A FIGURE THAT MAY OR MAY NOT BE

14   PRODUCTIVE TO GO THROUGH.  BUT IT'S FIGURE THREE OF THE '801

15   PROVISIONAL.

16         NOW, CAN YOU EXPLAIN WHAT THE SIGNIFICANCE, IF ANY, OF

17   THIS FIGURE HAS TO THE QUESTION OF WHETHER THE THERANOS

18   PROVISIONALS, OF WHICH THIS IS A PART, DISCLOSED WHAT IS

19   CLAIMED IN THE FUISZ'S '612 PATENT?

20   A.  SO YOU CAN SEE THAT THE MIDDLE BOX, THE ANALYZER, THAT'S

21   THE DEVICE THAT'S MAKING THE MEASUREMENT.  AND YOU CAN SEE THAT

22   IT'S SHOWING HERE TO BE IN SOME SORT OF CONNECTION WITH THE

23   INTERNET OR A CLOUD OR A DATABASE.  AND YOU CAN SEE THAT IT'S A

24   TWO WAY COMMUNICATION WHICH WE HAVE ALREADY DESCRIBED.

25         YOU CAN SEE THAT THE -- COMING FROM THE ANALYZER IS THE

DIRECT EXAM BY MR. BOIES (CONT.)

1   RESULT OF HAVING MADE THE COMPARISON BETWEEN THE REFERENCE

2   VALUE WHICH WE KNOW IS STORED OUT ON THE CLOUD, AND THE

3   MEASURED VALUE WHICH WAS MADE BY THE ANALYZER.

4        SO THAT COMPARISON IS THE MEASURED VALUE ABOVE THE

5   THRESHOLD, BELOW THE THRESHOLD, IS IT AT THE THRESHOLD?  THAT'S

6   GOING TO GIVE TWO POSSIBILITIES.  A CAUSE FOR ACTION IF THEY

7   ARE DIVERGENT, SO YOU CAN SEE RESULTS DEVIATE FROM ACCEPTABLE

8   RANGE THEN ACTION, IT COULD ALTER THE DOSE.

9        THE OTHER POSSIBILITY IS THE RESULTS ARE EXPECTED, THAT

10  IS THE MEASURED RESULTS ARE IN LINE WITH AND COINCIDENT WITH

11  THE REFERENCE VALUE THAT WAS STORED OUT ON THE CLOUD.  AND THE

12  RESULT OF THAT IS NO ACTION.

13       SO THE ANALYZER DOES THE MEASUREMENT, A COMPARISON IS

14  MADE, AND THEN A RESULT IS PROVIDED.

15  Q.  SO THE ARROWS GO BOTH INTO AND OUT OF THE ANALYZER AND BOTH

16  INTO AND OUT OF THE CLOUD.  DO YOU SEE THAT?

17  A.  YES.

18  Q.  WHAT DOES THAT SIGNIFY?

19  A.  IT SIGNIFIES THAT INFORMATION IS FLOWING IN BOTH DIRECTIONS

20  FROM THE ANALYZER TO THE DATABASE OF THE CLOUD AND FROM THE

21  CLOUD TO THE DATABASE.

22  Q.  AND WHAT IS THE SIGNIFICANCE OF THAT TO YOUR CONCLUSION

23  THAT WHAT WAS CLAIMED IN THE '612 FUISZ PATENT HAD ALREADY BEEN

24  DISCLOSED IN THE THERANOS PROVISIONALS PATENTS?

25  A.  IT SHOWS THAT THE ANALYZER IS CONNECTED IN SUCH A WAY TO

DIRECT EXAM BY MR. BOIES (CONT.)

1    THE CLOUD THAT INFORMATION ON THE CLOUD CAN BE READ DOWN TO,

2    CAN BE TRANSMITTED DOWN AND READ BY THE ANALYZER WHICH IS THE

3    THIRD ELEMENT OF THE '612 PATENT.

4    Q.   NOW LET ME GO BACK TO THE '612 PATENT CLAIMS.  AND WE NOW

5    GO ON THROUGH THE FIRST ELEMENT, THE SECOND ELEMENT AND THE

6    THIRD ELEMENT AND IN EACH CASE YOU HAVE CONCLUDED THAT THOSE

7    ELEMENTS WERE FULLY CLOSED IN THE THERANOS PROVISIONALS,

8    CORRECT, SIR?

9    A.   THAT'S CORRECT.

10   Q.   AND NOW I WANT TO DIRECT YOUR ATTENTION TO THE FOURTH

11   ELEMENT.  WHICH IS SETTING THE BODILY FLUID ANALYZER WITH THE

12   AT LEAST ONE THRESHOLD VALUE FOR THE AT LEAST ONE ANALYTE TO BE

13   SENSED BY THE BODILY FLUID ANALYZER WITH THE INFORMATION READ

14   BY THE DATA READER FROM THE DATA STORAGE UNIT, WHERE IN THE AT

15   LEAST ONE THRESHOLD VALUE IS A VALUE SUCH THAT A SENSED ANALYTE

16   LEVEL BEYOND THE VALUE WILL CAUSE THE DISPLAY TO DISPLAY AN

17   ALERT.

18        DO YOU SEE THAT?

19   A.   YES, I DO.

20   Q.   NOW, DO YOU HAVE AN OPINION OR CONCLUSION AS TO WHETHER

21   THIS ELEMENT OF CLAIM ONE OF THE FUISZ'S '612 PATENT WAS FULLY

22   DISCLOSED IN THE THERANOS PRIOR PROVISIONALS?

23   A.   IT WAS DISCLOSED, YES.

24   Q.   LET ME ASK YOU TO BEGIN BY LOOKING AT FIGURE 4-A FROM THE

25   '801 PROVISIONAL?

DIRECT EXAM BY MR. BOIES (CONT.)

1    A.   OKAY.

2    Q.   LET ME SEE IF I CAN -- LET ME READ THAT OFF THERE, BUT I'VE

3    GOT THEM, THIS IS KIND OF A COMPLICATED FIGURE AND -- CAN YOU

4    ALL SEE IT UP ON THE SCREEN OKAY.

5         THIS IS A FIGURE FROM THE THERANOS PROVISIONALS, CORRECT

6    A.   YES, IT'S THE FIGURE FOLLOWING THE ONE WE JUST SAW, FIGURE

7    THREE.

8    Q.   AND WHAT IS THE SIGNIFICANCE OF THIS FIGURE AS TO WHETHER

9    OR NOT THE THERANOS PROVISIONALS DISCLOSED THE CLAIMS OF THE

10   '612 PATENT?

11   A.   IT GRAPHICALLY DISCLOSES WHAT'S CLAIMED IN THE '612 PATENT.

12   Q.   FOCUSSING IN PARTICULAR ON THE FOURTH ELEMENT OF THE FIRST

13   CLAIM OF THE '612 PATENT, HOW DOES THIS FIGURE 4-A DISCLOSE

14   WHAT THE FUISZ'S CLAIM IN THAT ELEMENT?

15   A.   WHAT'S CLAIMED IN THAT ELEMENT IS THAT THE THRESHOLD VALUE,

16   THAT'S IN THE DATA STORAGE UNIT, IS READ BY THE ANALYZER.  AND

17   THAT COMPARISON IS MADE AND THE RESULTS OF THAT COMPARISON IS

18   DISPLAYED AND DEPENDING ON WHETHER OR NOT IT'S DIVERGENT FROM

19   THE DESIRED VALUE THE RESULT WILL BE GIVEN.

20        NOW WHAT MAY BE HARD FOR YOU TO SEE IN THE ANALYZER, THIS

21   IS A FLOW DIAGRAM THAT IS CONVEYING THE SAME INFORMATION THAT'S

22   IN THE FIGURE THREE THAT YOU SAW THAT HAD THE BOXES SET TO

23   ANALYZER.

24        SO IT MIGHT BE HELPFUL, MR. BOIES, IF YOU BUTT THE POSTER

25   BACK UP AND GIVE ME A MARKING PEN AND I WILL SHOW THE JURY

1    WHERE THE ANALYZER IS SO YOU CAN SEE THE COMPARISON OF THE TWO

2    FIGURES AND PERHAPS UNDERSTAND BETTER THIS IN FACT DOES TELL US

3    WHAT IS IN THE THERANOS PROVISIONAL IS THE SAME AS IN THIS --

4         MR. BOIES:  WITH THE COURT'S PERMISSION LET ME ASK

5    YOU TO STEP DOWN FROM THE STAND.

6         THE COURT:  AS IT TURNS OUT MR. BOIES WE HAVE

7    ACTUALLY REACHED THE END OF THE TRIAL DAY.  SO WE WILL TAKE OUR

8    BREAK AT THIS POINT IN TIME LADIES AND GENTLEMEN OF THE JURY

9    IT'S BEEN A LONG DAY BUT I APPRECIATE YOUR PATIENCE AND FOCUS

10   THROUGHOUT THE TRIAL PROCEEDING.

11        AS I'VE INSTRUCTED YOU BEFORE AND WILL CONTINUE TO

12   INSTRUCT YOU, DO NOT DISCUSS THE CASE WHILE WE ARE OUT ON

13   BREAK.

14        ONCE AGAIN WE WILL SEE YOU BACK HERE TOMORROW MORNING

15   READY TO GO AT 9:00, AND WE WILL BEGIN AS QUICKLY AS WE CAN

16   AFTER THAT POINT.

17        HAVE A WONDERFUL EVENING.  WE WILL SEE YOU BACK HERE AT

18   9:00.

19        (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD OUT OF

20   THE PRESENCE OF THE JURY:)

21        THE COURT:  DR. ROBERTSON, BEFORE I EXCUSE YOU FOR

22   THE DAY, I DO WANT TO REMIND YOU THAT YOU REMAIN UNDER OATH, AS

23   A RESULT DO NOT DISCUSS YOUR TESTIMONY OVER THE BREAK, WE WILL

24   RESUME YOUR EXAMINATION IN THE MORNING.

25        COUNSEL, ARE THERE ANY OTHER ISSUES TO ADDRESS BEFORE WE

1      ADJOURN?

2                    MR. BOIES:  I DON'T THINK SO, FROM OUR STANDPOINT.

3                    THE COURT:  ALL RIGHT.

4            I WILL WISH YOU ALL A VERY GOOD EVENING.

5            (WHEREUPON, THE PROCEEDINGS IN THIS MATTER WERE CONCLUDED.)

1

2

3

4                    **CERTIFICATE OF REPORTER**

5

6

7

8            I, THE UNDERSIGNED OFFICIAL COURT

9    REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10   THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11   FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12   CERTIFY:

13            THAT THE FOREGOING TRANSCRIPT,

14   CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16   SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17   HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18   TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21

22

23

24   _____

25   SUMMER A. FISHER, CSR, CRR
     CERTIFICATE NUMBER 13185          DATED: 3/13/14