1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                   SAN JOSE DIVISION

4

5

THERANOS, INC., ET AL,          )  CV-11-5236-PSG
6                                 )
                    PLAINTIFF,    )  SAN JOSE, CALIFORNIA
7                                 )
              VS.                 )  MARCH 14, 2014
8                                 )
FUISZ PHARMA, LLC, ET AL,         )  VOLUME 3
9                                 )
                    DEFENDANT     )  PAGES 178-382
10                                )

11

12             TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE PAUL S. GREWAL
13            UNITED STATES DISTRICT JUDGE

14

15  A P P E A R A N C E S:

16  FOR THE PLAINTIFF:     BOIES, SCHILLER & FLEXNER, LLP
                           BY:  MICHAEL UNDERHILL
17                         5301 WISCONSIN AVENUE, N.W.
                           WASHINGTON, D.C. 20015
18

19  FOR THE DEFENDANT:     PRO SE
                           BY:  JOSEPH MATUS FUISZ
20                         10350 W. BAY HARBOR DRIVE, 8C
                           BAY HARBOR ISLAND, FL 33154
21

22  PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
    PRODUCED WITH COMPUTER.
23
               APPEARANCES CONTINUED ON NEXT PAGE
24

25  OFFICIAL COURT REPORTER:    SUMMER FISHER, CSR, CRR
                                CERTIFICATE NUMBER 13185

```
 1    FOR THE PLAINTIFF:        BOIES SCHILLER FLEXNER, LLP
                                BY:  DAVID BOIES
 2                                   WILLIAM MARSILLO
                                333 MAIN STREET
 3                              ARMONK, NY 10504

 4    FOR THE PLAINTIFF:        BOIES, SCHILLER & FLEXNER, LLP
                                BY:  MEREDITH DEARBORN
 5                              1999 HARRISON STREET, STE 900
                                OAKLAND, CA 94612
 6

 7    FOR THE DEFENDANT:        ATTORNEY AT LAW
                                BY:  RHONDA ANDERSON
 8                              2655 LEJUNE RD, STE 540
                                CORAL GABLES, FL 33134
 9

10    FOR THE DEFENDANT:        PRO SE
                                BY:  RICHARD CARL FUISZ
11                              1238 COLDWATER CANYON DRIVE
                                BEVERLY HILLS, CA 90210
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1

2                          INDEX OF WITNESSES

3        PLAINTIFF'S

4        DR. CHANNING ROBERTSON
                DIRECT EXAM BY MR. BOIES (CONT.)        P. 182
5               CROSS-EXAM BY MR. J. FUISZ              P. 202
                CROSS-EXAM BY MR. R. FUISZ              P. 250
6               CROSS-EXAM BY MS. ANDERSON              P. 258
                REDIRECT EXAM BY MR. BOIES              P. 272
7               RECROSS-EXAM BY MR. J. FUISZ            P. 285
                RECROSS-EXAM BY MR. R. FUISZ            P. 286
8

9        DR. RICHARD FUISZ
                DIRECT EXAM BY MR. BOIES                P. 289
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        INDEX OF EXHIBITS

2                                    MARKED      ADMITTED

3       PLAINTIFF'S

4       98                                        P. 318

5       59                                        P. 337

6       120                                       P. 341

7       7                                         P. 369

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1    SAN JOSE, CALIFORNIA                    MARCH 14, 2014

2                    P R O C E E D I N G S

3        (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD OUT OF THE

4    PRESENCE OF THE JURY:)

5             THE COURT:  MR. RIVERA, WOULD YOU PLEASE CALL THE

6    MATTER THAT'S SET FOR TRIAL.

7             THE CLERK:  YES, YOUR HONOR.

8        CALLING THERANOS, INC., ET AL VERSUS FUISZ PHARMA, LLC, ET

9    AL.  CASE CV 115236 PSG.  MATTER ON FOR TRIAL.

10       COUNSEL, PLEASE STATE YOUR APPEARANCES.

11            MR. BOIES:  GOOD MORNING, YOUR HONOR.

12       DAVID BOIES REPRESENTING THE PLAINTIFFS.  WITH ME AT

13   COUNSEL TABLE I HAVE MEREDITH DEARBORN AND MICHAEL UNDERHILL

14   FROM MY OFFICE AS WELL AS OUR CLIENT.

15            THE COURT:  MR. BOIES, GOOD MORNING TO YOU AND YOUR

16   COLLEAGUES.

17            MS. ANDERSON:  GOOD MORNING, YOUR HONOR.

18       RHONDA ANDERSON ON BEHALF OF FUISZ PHARMA.

19            MR. J. FUISZ:  JOSEPH FUISZ PRO SE.

20            MR. R. FUISZ:  RICHARD FUISZ PRO SE.

21            MS. BALTA:  ATHINA BALTA.

22            THE COURT:  GOOD MORNING AND WELCOME BACK.

23       I PRESUME EVERYONE IS READY TO RESUME EXAMINATION AND

24   TESTIMONY OF DR. ROBERTSON.  IF THERE ARE NO OTHER ISSUES, I

25   WOULD LIKE TO GET STARTED.
```

DIRECT EXAM BY MR. BOIES

1        (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN THE

2    PRESENCE OF THE JURY:)

3            THE COURT:  GOOD MORNING, LADIES AND GENTLEMEN.

4        OBVIOUSLY WE ARE WAITING FOR JUROR NUMBER SIX.  SO IT

5    WILL BE JUST ANOTHER MINUTE OR TWO.  PLEASE BE SEATED AGAIN.

6        GOOD MORNING.  WELCOME BACK.  LADIES AND GENTLEMEN OF THE

7    JURY, YOU WILL RECALL THAT AT THE CLOSE OF BUSINESS YESTERDAY

8    WE WERE HEARING TESTIMONY FROM DR. ROBERTSON.  I WOULD LIKE TO

9    RESUME WITH THAT TESTIMONY AT THIS TIME.

10        MR. BOIES, IF YOU WOULD RECALL DR. ROBERTSON.

11            MR. BOIES:  THANK YOU, YOUR HONOR.  DR. ROBERTSON,

12    PLEASE RESUME THE STAND.

13            THE COURT:  MR. ROBERTSON, AS YOU APPROACH THE

14    WITNESS STAND I WILL JUST REMIND YOU SIR THAT YOU REMAIN UNDER

15    OATH.  YOU MAY BE SEATED, SIR.

16        MR. BOIES, YOU MAY PROCEED

17            MR. BOIES:  THANK YOU, YOUR HONOR.

18

19            **DIRECT-EXAMINATION BY MR. BOIES (CONT.)**

20

21    Q.  GOOD MORNING, DR. ROBERTSON.

22    A.  GOOD MORNING.

23    Q.  I WOULD LIKE TO REMIND EVERYBODY ONCE AGAIN WHERE WE WERE

24    WHEN WE BROKE YESTERDAY.

25        I WOULD LIKE TO PUT UP ON THE SCREEN THE SIX ELEMENTS OF

DIRECT EXAM BY MR. BOIES

1    CLAIM NUMBER ONE. AND WE HAD DISCUSSED THE FIRST THREE

2    ELEMENTS THAT ARE UP HERE. AND YOU HAVE GIVEN YOUR TESTIMONY

3    ABOUT THE EXTENT TO WHICH ALL OF THOSE ELEMENTS WERE INCLUDED

4    IN THE THERANOS PROVISIONALS, DO YOU RECALL THAT?

5    A.  YES, SIR.

6    Q.  AND THEN WE WERE ABOUT TO START LOOKING AT THE FOURTH

7    ELEMENT OF CLAIM ONE, I THINK, SETTING THE BODILY FLUID

8    ANALYZER WITH AT LEAST ONE THRESHOLD VALUE WITH THE AT LEAST

9    ONE THRESHOLD VALUE FOR AT LEAST ONE ANALYTE TO BE SENSED BY

10   THE BODILY FLUID ANALYZER WITH THE INFORMATION READ BY THE DATA

11   READER FROM THE DATA STORAGE UNIT WHERE IN THE AT LEAST ONE

12   THRESHOLD VALUE IS A VALUE SUCH THAT A SENSED ANALYTE LEVEL

13   BEYOND THE VALUE WILL CAUSE THE DISPLAY TO DISPLAY AN ALERT.

14       DO YOU SEE THAT

15   A.  YES.

16   Q.  NOW YOU TALKED ABOUT FIGURE FOUR THAT COMES FROM ONE OF THE

17   THERANOS PROVISIONALS?

18   A.  YES, SIR IT COMES FROM THE '801.

19   Q.  AND I THINK YOU WERE ABOUT TO COME DOWN AND SHOW WHERE IN

20   YOUR TESTIMONY THIS STEP IN THE '612 PATENT WAS DISCLOSED IN

21   THE '801 THERANOS PROVISIONAL PATENT?

22   A.  YES, SIR.

23   Q.  COULD YOU DO THAT NOW?

24   A.  YES.  IT WOULD BE HELPFUL TO HAVE THE FIGURE THREE UP ON

25   THE SCREEN JUST FOR CONTEXT.

DIRECT EXAM BY MR. BOIES

1    Q.   OKAY.

2    A.   THEN YOU COULD PUT THIS BACK UP SO I COULD.

3    Q.   OKAY.  IF WE COULD PUT FIGURE THREE UP ON THE SCREEN.  AND

4    THEN WE HAVE FIGURE 4-A ON THE BOARD.

5         AND JUST TO REMIND EVERYBODY, WOULD YOU EXPLAIN WHAT

6    FIGURE THREE IS, THE ONE THAT WE'VE DISPLAYED UP ON THE BOARD,

7    UP ON THE SCREEN

8    A.   SO FIGURE THREE IS ALSO IN THE '801 THERANOS PROVISIONAL

9    AND AS WE DISCUSSED YESTERDAY THIS SHOWS GRAPHICALLY THE

10   CONFIGURATION OF THE SYSTEM OF THE BODILY FLUID ANALYZER SHOWN

11   IN THE BOX, IT SAYS ANALYZER.  AND HOW IT IS IN A TWO-WAY

12   COMMUNICATION WITH AN EXTERNAL DATABASE.  THAT'S THE CLOUD AND

13   THE LITTLE COMPUTERS.

14        AND YOU CAN SEE THAT INFORMATION IS FLOWING TO AND FROM

15   THE ANALYZER FROM THE EXTERNAL DATABASE AND THAT SOME DECISIONS

16   ARE BEING MADE ON THE ANALYZER.  IT'S TO DETERMINE IN THIS CASE

17   A COMPARISON BETWEEN THE MEASUREMENT THAT HAS BEEN MADE BY THE

18   BODILY FLUID ANALYZER OF THE ANALYTE AND COMPARING THAT TO A

19   REFERENCE THRESHOLD.  AND IF THERE'S DEPARTURE FROM THE

20   REFERENCE THRESHOLD WITH THE MEASUREMENT THAT WAS TAKEN, THEN

21   SOME ACTION WOULD HAVE TO BE TAKEN TO REMEDY THAT.

22        IF ON THE OTHER HAND THE MEASUREMENT WAS WITHIN THE

23   BOUNDS OF THE REFERENCE VALUE THEN NO ACTION WOULD BE TAKEN.

24        SO WHAT THIS NEXT FIGURE DOES WHICH, AND THE PROVISIONAL

25   FOLLOWS THIS FIGURE, IT SHOWS THE SAME SYSTEM BUT YOU CAN SEE

DIRECT EXAM BY MR. BOIES

1    THAT IT'S NOT REAL EVIDENT WHERE THE ANALYZER IS ANYMORE

2    BECAUSE WHAT THIS FIGURE SHOWS IS WHAT'S HAPPENING IN THE

3    ANALYZER.

4         SO I WILL COME DOWN AND SHOW YOU WHERE THAT IS.

5         THE COURT:  GO AHEAD, SIR.  YOU MAY.  OF COURSE.

6    I SHOULD SAY, COUNSEL AND EACH OF THE PARTIES, IF YOU CAN'T

7    SEE SOMETHING, YOU ARE FREE TO WALK AROUND.

8         MS. ANDERSON:  THANK YOU, YOUR HONOR.

9         THE WITNESS:  SO IF YOU COMPARE THAT FIGURE WITH THIS

10   FIGURE YOU WILL SEE THAT THIS ACTUALLY SHOWS THAT THE PATIENT,

11   THAT ONE DOESN'T, BUT THE PATIENT OBVIOUSLY IS IN COMMUNICATION

12   WITH THE ANALYZER BECAUSE A SAMPLE HAS BEEN TAKEN AND MEASURED.

13        AND HERE YOU SEE VERY CLEARLY THE CLOUD AND THE DATABASE.

14   HERE YOU SEE THE ONE POSSIBLE OUTCOME WHICH IS NO ACTION WHICH

15   YOU SEE ON THE RIGHT-HAND SIDE.

16        AND OVER HERE YOU SEE SOME SEVERAL FORMS OF ACTION THAT

17   CAN BE TAKEN IF THE MEASURED VALUE DEPARTS FROM THE REFERENCE

18   VALUE EITHER IN A SMALL AMOUNT OR A LARGER AMOUNT.

19        SO THIS IS THE ACTION AFTER THE ACTION WHERE IT SAYS

20   ALTERED DOSE WOULD BE OVER HERE

21   BY MR. BOIES:

22   Q.  JUST SO THE RECORD IS CLEAR, WHEN YOU SAY OVER HERE CAN YOU

23   SHOW THE STEPS YOU ARE TALKING ABOUT?

24   A.  SO STEPS 5, 6 AND 7 WOULD CORRESPOND TO THE ACTION BOX.  SO

25   STEPS 1, 2 AND 4 HAPPEN, JUST COMPARING THE TWO ON THE ANALYZER

DIRECT EXAM BY MR. BOIES

1     YOU CAN SEE STEP THREE IS A NO ACTION ALTERNATIVE.

2          SO I WILL DRAW THIS TO SHOW YOU WHERE.  SO THE ANALYZER

3     IS EVERYTHING THAT'S INSIDE THIS BLUE BOX THAT I'VE DRAWN.  AND

4     YOU CAN SEE THE CORRESPONDENCE BETWEEN THE TWO.

5     Q.   THANK YOU.  NOW IF WE COULD PUT THE LIST OF THE ELEMENTS OF

6     CLAIM ONE BACK UP ON THE BOARD.  CAN YOU EXPLAIN WHAT THE

7     SIGNIFICANCE IS OF THE ANALYZER STEPS THAT YOU HAVE JUST GONE

8     THROUGH TO THE QUESTION AS TO WHETHER OR NOT THE THERANOS

9     PROVISIONALS DISCLOSED STEP FOUR OF CLAIM NUMBER 1 OF THE '612

10    PATENT?

11    A.   YES, SO I WILL JUST TAKE YOU THROUGH IT.

12         SO THE FIRST PART IS SETTING THE BODILY FLUID ANALYZER

13    WITH THE, AT LEAST ONE THRESHOLD VALUE FOR THE AT LEAST ONE

14    ANALYTE TO BE SENSED BY THE ANALYZER.

15         SO THAT'S THE THRESHOLD VALUE WE HAVE BEEN TALKING ABOUT

16    WHICH WE KNOW IS STORED IN THE EXTERNAL DATABASE.  NOW YOU ARE

17    GOING TO SET THE BODILY FLUID ANALYZER, THAT MEANS YOU

18    COMMUNICATE THAT INFORMATION FROM THE DATABASE TO THE ANALYZER.

19    AND YOU CAN SEE ON THE CHART TO YOUR LEFT THAT IT SHOWS

20    INFORMATION COMING FROM THE CLOUD DOWN ON TO THE ANALYZER WHICH

21    IS IN THE BLUE CIRCLE THAT I DREW, TO A LITTLE BOX THAT SAYS, I

22    THINK IT SAYS RUNNING MAPPING ALGORITHMS, I CAN'T READ IT FROM

23    HERE BUT THAT'S WHAT I RECALL IT SAYING

24    Q.   YOUR MEMORY IS VERY GOOD?

25    A.   BETTER THAN MY IT EYESIGHT APPARENTLY.

DIRECT EXAM BY MR. BOIES

1    SO THAT'S SETTING THE BODILY FLUID ANALYZER WITH AT LEAST

2    ONE THRESHOLD VALUE.  YOU RECALL THERE COULD BE MORE THAN ONE,

3    BUT IT COMES DOWN FROM THE CLOUD ON TO THE ANALYZER.  THE

4    ANALYZER IS THE DEVICE THAT IS SAMPLE IS PLACED INTO AND WHERE

5    ITS MEASURED.

6    SO TO BE SENSED BY THE BODILY FLUID ANALYZER.  SO

7    OBVIOUSLY THE BODILY FLUID ANALYZER IS MEASURING AN ANALYTE,

8    AND THE THRESHOLD VALUE FOR THAT ANALYTE HAS NOW BEEN DELIVERED

9    TO THE ANALYZER AS WELL.

10    YOU SAY IT'S WITH THE INFORMATION READ BY THE DATA READER

11    FROM THE DATA STORAGE UNIT.  SO THE DATA READER JUST IMPLIES

12    THAT THE ANALYZER HAS THE ABILITY TO READ THAT DATA FROM THE

13    CLOUD AND TO TAKE IT INTO ITS OWN STORAGE OR ITS OWN PROCESSING

14    UNIT.  AND IT HAS ANOTHER PIECE OF DATA TOO AND THAT'S THE DATA

15    THAT WAS OBTAINED FROM THE MEASUREMENT OF THE SAMPLE FROM THE

16    PATIENT.

17    SO WHERE IN THE AT LEAST ONE THRESHOLD VALUE IS A VALUE

18    SUCH THAT A SENSED ANALYTE LEVEL BEYOND THE VALUE WILL CAUSE

19    THE DISPLAY TO DISPLAY AN ALERT.

20    SO WHAT YOU SEE WITH IN THE BLUE CIRCLE IS YOU IS SEE THE

21    PATIENT, THE PATIENT DELIVERS THE SAMPLE, IT GOES ON TO THE

22    ANALYZER, THE DATA IS TAKEN, THE ANALYTE IS MEASURED.  THE

23    REFERENCE THRESHOLD VALUE COMES DOWN FROM THE CLOUD.  THE TWO

24    IN A SENSE MEET IN A RUNNING MAPPING ALGORITHMS BOX IMPLYING

25    THAT'S WHERE A COMPARISON IS BEING MADE NOW BETWEEN THE TWO.

DIRECT EXAM BY MR. BOIES

1          AND THEN IN THE NEXT BOX, IF SOMEONE COULD READ WHAT IT

2     DOES, I DON'T WANT TO GUESS AT IT

3     Q.   WHICH BOX ARE YOU TALKING ABOUT?

4     A.   THE STEP -- SHOULD I JUST GO DOWN THERE.

5     Q.   YES.

6               THE COURT:  GO AHEAD.

7               THE WITNESS:  IT'S NOT THAT MY EYESIGHT IS THAT BAD,

8     IT'S THAT THIS PRINT IS SO SMALL.

9               MS. ANDERSON:  I AGREE.

10              MR. BOIES:  ME TOO.

11              THE WITNESS:  SO THE DATA IS COMING FROM THE PATIENT,

12    IT'S -- THE TEST IS DONE AND SOME SIGNAL IS GENERATED AS TO THE

13    LEVEL OF THAT ANALYTE, SUCH THAT THIS IS CALLED PK OR PD DATA.

14    YOU REMEMBER IN THE '801 THIS IS THE SAME AS ANALYTES.

15         IT FLOWS DOWN INTO THIS BOX WHICH IS DOING THE COMPARISON

16    WITH THE REFERENCE VALUE THAT CAME DOWN FROM THE CLOUD.  AND

17    NOW IN THIS LITTLE BOX HERE IS AN ALGORITHM, A PROGRAM.  AND

18    WHAT IT'S DOING IS IT'S MAKING A DECISION.  IS THE VALUE THAT

19    CAME FROM THE PATIENT NOT SIGNIFICANTLY DIFFERENT FROM THE

20    REFERENCE VALUE?  AND IF SO, I DETERMINE THERE'S NO SIGNIFICANT

21    DIFFERENCE AND THAT WILL RESULT IN NO ACTION BEING TAKEN.

22         ON THE OTHER HAND, IF THERE IS A SIGNIFICANT DIFFERENCE

23    BETWEEN THE RDX OUTPUT, THAT IS THE MEASUREMENT MADE IN THE

24    PATIENT AND THIS STORED DATA WHICH CAME DOWN FROM THE CLOUD

25    WHICH IS A REFERENCE VALUE, THEN IT SAYS IF THERE IS, HOW

DIRECT EXAM BY MR. BOIES

1    DIFFERENT IS IT.

2         SO ANOTHER ANALYSIS IS DONE TO MAKE A DETERMINATION OF,

3    IS THAT DIFFERENCE SIGNIFICANT OR NOT.

4         THEN IT SAYS IF THE DIFFERENCE IS SMALL, THEN I'M GOING

5    TO GO TO EITHER STEP 6 OR 7.  IF THE DIFFERENCE IS LARGE, WHICH

6    WOULD BE A CAUSE FOR OF CONCERN, THEN THERE'S GOING TO BE

7    IMMEDIATE ACTION.  BUT IN ANY CASE, WHATEVER IT IS, THERE'S

8    GOING TO BE AN ALERT TO THE PHYSICIAN THAT SOME MITIGATION IS

9    GOING TO HAVE TO BE TAKEN.

10         SO THAT'S HOW THE SYSTEM WORKS, WHAT WE HAVE BEEN TALKING

11    ABOUT FOR A GREAT DEAL OF TIME YESTERDAY.

12              MR. BOIES:  THANK YOU, DOCTOR.

13    Q.  FROM YOUR EXPERIENCE WITH PATENTS THAT YOU DESCRIBED

14    YESTERDAY, IS IT TYPICAL OR ROUTINE TO HAVE FIGURES SUCH AS

15    THIS THAT DISCLOSE WHAT THE INVENTION IS?

16    A.  YES, IT'S VERY COMMON.

17    Q.  NOW LET ME ASK YOU IN THE SAME CONNECTION, TO LOOK AT A

18    PARAGRAPH OF THE '192 PROVISIONAL THAT WE HAVE LOOKED AT BEFORE

19    WHICH IS PARAGRAPH 37.  AND THIS IS THE PARAGRAPH 37 OF THE

20    THERANOS PROVISIONAL.

21         AND I WILL KEEP THIS UP FOR A MOMENT BECAUSE WHAT I'M

22    GOING TO DO IS I'M GOING TO ASK YOU, YOU'VE JUST SHOWN HOW

23    ELEMENT FOUR OF THE THERANOS -- I MEAN OF THE '612 CLAIM, WAS

24    THIS THE THERANOS PROVISIONALS.

25         NOW I'M GOING TO ASK YOU TO DO THE SAME THING USING THE

DIRECT EXAM BY MR. BOIES

1    TEXT OF THE THERANOS PROVISIONAL '192, DO YOU UNDERSTAND WHAT

2    I'M ASKING?

3    A.  YES.

4    Q.  OKAY.  SO LET'S PUT UP PARAGRAPH 37 OF THE '192

5    PROVISIONAL.  THIS IS A PARAGRAPH WE HAVE LOOKED AT BEFORE.

6        I'M NOW GOING TO ASK YOU, WHAT IN THIS PARAGRAPH, IF ANY,

7    HELPS YOU DETERMINE WHETHER OR NOT ELEMENT FOUR OF THE FUISZ

8    '612 PATENT WAS ALREADY DISCLOSED IN THE THERANOS PROVISIONAL

9    A.  OKAY.  SO IN THIS PARAGRAPH, I THINK I WILL JUST START WITH

10   THE EXPERT REVIEW.

11       SO THE EXPERT REVIEW WOULD DETERMINE THE OPTIMUM

12   THERAPEUTIC INDEX FOR EITHER THE PATIENT OR THE PATIENT CLASS.

13   THAT'S THE VALUE THAT'S SITTING IN THE EXTERNAL STORED

14   DATABASE, THE REFERENCE VALUE.

15       THAT REFERENCE VALUE COMES DOWN ON TO THE ANALYZER.  SO

16   IF THE COMPUTED TI EXCEEDS THE PRESET TIREF, APPROPRIATE ACTION

17   CAN BE TAKE KNOW.  SO WHAT THAT MEANS IS THE COMPUTED TI, IF

18   YOU RECALL IS THE MEASUREMENT.  IT'S A VALUE THAT WAS

19   REPRESENTATIVE OF ONE OR MORE ANALYTES.  THAT'S THE VALUE

20   THAT'S BEING COMPARED WITH THE REFERENCE.

21       SO IT SAYS, IF THE COMPUTED TI, THAT IS THE MEASURED

22   VALUE, EXCEEDS THE PRESET TIREF, APPROPRIATE ACTION CAN BE

23   TAKEN.  AND APPROPRIATE ACTION COULD BE ALERTING THE PHYSICIAN.

24   AND THAT'S SHOWN, SORRY, THAT'S SHOWN ON THE CHART IN FRONT OF

25   YOU.  YOU CAN SEE THAT IF THE DIFFERENCE WAS SIGNIFICANT THEN

DIRECT EXAM BY MR. BOIES

1    IN EITHER CASE WHETHER IT'S A LARGE DIFFERENCE OR A SMALL

2    DIFFERENCE, IT RESULTS IN ALERTING THE PHYSICIAN.  AND THEN AN

3    ACTION WOULD BE TAKEN.  SO IT'S DESCRIBING THE SAME SET OF

4    EVENTS.

5    Q.   THANK YOU, DR. ROBERTSON.

6         NOW I WOULD LIKE TO GO TO THE FIFTH ELEMENT OF THE '612

7    PATENT CLAIM NUMBER ONE.  AND THAT IS SENSING THE ANALYTE

8    LEVEL.

9         AND IN YOUR OPINION, WAS THIS ELEMENT OF THE FUISZ '612

10   PATENT ALREADY DISCLOSED IN THE THERANOS PROVISIONALS?

11   A.   YES.  IT'S ACTUALLY DISCLOSED IN ALL FOUR OF THE

12   PROVISIONALS.

13   Q.   LET ME ASK YOU TO LOOK AT JUST A COUPLE OF EXAMPLES.

14        FIRST, LET ME ASK YOU TO LOOK AT ONE FROM THE '801

15   PROVISIONAL, PARAGRAPH TEN.  AND PARAGRAPH TEN IS FROM THE '801

16   PROVISIONAL OF THERANOS, CORRECT, SIR?

17   A.   YES.

18   Q.   AND CAN YOU EXPLAIN WHERE IN HERE THERANOS DISCLOSED THE

19   ELEMENT OF SENSING THE ANALYTE?

20   A.   IT'S PRETTY OBVIOUS HERE.  YOU CAN SEE THAT IT TALKS IN B

21   ABOUT MEASURING THE CONCENTRATION OF ONE OR MORE TARGET DRUGS.

22   THAT'S CLEARLY SENSING AN ANALYTE.

23        AND B, IS MEASURING PHARMACODYNAMIC PARAMETERS.  IF YOU

24   RECALL THOSE ARE ALSO REFERRED TO AS BIOMARKERS, RELATED TO ONE

25   OR MORE DRUGS.

DIRECT EXAM BY MR. BOIES

1       SO CLEARLY THE NOTION OF SENSING AN ANALYTE IS CONTAINED

2   IN THAT, WHAT'S SHOWN HERE IN YELLOW.

3   Q.   LET ME ASK YOU TO LOOK AT A PARAGRAPH FROM THERANOS '192

4   PROVISION.   PARAGRAPH 15.

5       AND CAN YOU LOOK AT PARAGRAPH 15 AND THIS IS FROM THE '192

6   THERANOS PROVISIONAL, AND EXPLAIN TO THE JURY HOW THIS

7   DEMONSTRATES THAT THE FIFTH ELEMENT OF THE FUISZ CLAIM, THAT IS

8   SENSING THE ANALYTE, WAS PREVIOUSLY DISCLOSED IN THE THERANOS

9   PROVISIONALS.

10  A.   YES.   I THINK IT'S CLEAR THAT WHEN SOMEONE SAYS THEY ARE

11  SENSING THE ANALYTE THEY ARE ALSO TALKING ABOUT MEASURING THE

12  ANALYTE.

13      SO IN THIS PROVISIONAL, THE FIRST YELLOW AREA, SO THIS

14  METHOD COMPRISES COMPUTING THE THERAPEUTIC INDEX, AND REMEMBER

15  THAT IT CAN EITHER BE COMPUTED OR IT IS IN FACT THE ANALYTE, BY

16  WHAT, BY MEASURING.   DEFINE THE COMBINATION OF PARAMETERS SUCH

17  AS THE CONCENTRATION IN BLOOD OF ONE OR MORE DRUGS, SO THAT'S

18  WHAT YOU ARE MEASURING, OR THE METABOLITES.   OR OTHER ANALYTES.

19  OR BIOMARKERS.

20      AND THEN IT GOES ON TO SAY, CALCULATING THE THERAPEUTIC

21  INDEX USING AN EQUATION INVOLVING MEASUREMENT OF THE ANALYTICAL

22  PARAMETERS.

23      SO AGAIN THIS PARAGRAPH SPEAKS TO SENSING ANALYTES.

24  Q.   LET ME ASK YOU TO LOOK AT ONE MORE PARAGRAPH.   THIS IS FROM

25  A THIRD THERANOS PROVISIONAL, PROVISIONAL '097.   AND IT'S

DIRECT EXAM BY MR. BOIES

1    PARAGRAPH 29.

2         AND CAN YOU BRIEFLY EXPLAIN HOW PARAGRAPH 29 OF THERANOS

3    PROVISIONAL '097 DEMONSTRATES THAT THE SENSING THE ANALYTE

4    ELEMENT OF THE FUISZ'S '612 PATENT CLAIM WAS ALREADY DISCLOSED

5    IN THERANOS PROVISIONALS.

6    A.   SO I WILL REMIND YOU THE '097 PROVISIONAL IS THE ONE THAT

7    TALKS IN SOME DETAIL ABOUT THE CARTRIDGE DESIGN, PART OF THE

8    ANALYZER SYSTEM WITH WHERE THE SAMPLE IS APPLIED AND THE

9    ANALYTES ARE DETECTED.

10        AND YOU CAN SEE THE MICRO FLUIDIC BASED CARTRIDGE SYSTEM

11   CAN BE USED.  AND THE QUESTION IS WHAT'S IT'S USED FOR?  IT'S

12   USED FOR ANALYTE CONCENTRATIONS OR SENSING ANALYTE

13   CONCENTRATIONS.

14        SO AGAIN, IT'S THE SAME CONCEPT.

15   Q.   THANK YOU.

16        NOW LET ME TURN TO THE SIXTH AND FINAL, THANKFULLY ELEMENT

17   OF THE '612 PATENT.  AND THAT IS DISPLAYING AN ALERT IF THE

18   SENSED ANALYTE LEVEL IS BEYOND THE THRESHOLD VALUE.

19        NOW FIRST, IN YOUR OPINION AND CONCLUSION, IS THIS

20   ELEMENT OF THE '612 PATENT CLAIM ONE SOMETHING THAT WAS

21   PREVIOUSLY DISCLOSED IN THE THERANOS PROVISIONALS?

22   A.   YES, IT WAS.

23   Q.   LET ME ASK YOU TO GO BACK TO FIGURE 4-A, WHICH IS THE

24   PROCESS FLOW CHART FOR RDX?

25   A.   YES.

DIRECT EXAM BY MR. BOIES

1    Q.   AND THAT CAME FROM ONE OF THE THERANOS PROVISIONALS,

2    CORRECT?

3    A.   FROM THE '801.

4    Q.   FROM THE '801.  AND CAN YOU EXPLAIN HOW, IF AT ALL, THIS

5    FIGURE 4-A DISCLOSES THE STEP OF DISPLAYING AN ALERT IF THE

6    SENSED ANALYTE LEVEL IS BEYOND THE THRESHOLD LEVEL?

7    A.   SO WE SAW IN THE BLUE BOUNDARY THAT I DREW, THAT A DECISION

8    WAS, DATA WAS BEING PROCESSED AND A DECISION WAS BEING MADE AS

9    TO WHETHER OR NOT THE MEASURED VALUE DEPARTED FROM THE

10   REFERENCE VALUE.  IF IT DID THE INFORMATION FLOW GOES TO THE

11   RIGHT.

12        AND IT'S THEN FURTHER EVALUATED TO SEE IF THAT DIFFERENCE

13   BETWEEN THE MEASURED VALUE AND THE REFERENCE VALUE IS

14   SIGNIFICANT AND IF IT IS HOW DIFFERENT ARE THEY.

15        BUT NO MATTER IF IT'S A LARGE DIFFERENCE OR A SMALL

16   DIFFERENCE, WHILE YOU MAKE TAKE DIFFERENT COURSES OF ACTION YOU

17   END UP ALWAYS ALERTING THE PHYSICIAN AND THAT'S PRETTY CLEAR

18   FROM WHAT YOU SEE IN THE UPPER RIGHT-HAND CORNER WHEN IT SAYS

19   ALERT PHYSICIAN.

20   Q.   NOW I WOULD LIKE TO HAVE YOU FOCUS ON THE TEXTURAL LANGUAGE

21   NOT JUST THE FIGURES BUT THE WORDS USED IN THE '801

22   PROVISIONAL.  AND THAT CONNECTION I WOULD LIKE YOU TO LOOK AT

23   PARAGRAPH 35 OF THE THERANOS '801 PROVISIONAL.

24        AND I WOULD ASK YOU HOW, IF AT ALL, WHETHER LOOKING IN

25   PARAGRAPH 35 OF THE THERANOS '801 PROVISIONAL, DEMONSTRATES

DIRECT EXAM BY MR. BOIES

1    THAT THE SIXTH STEP OF CLAIM ONE OF THE FUISZ '612 PATENT, THAT

2    IS DISPLAYING AN ALERT IF THE SENSED ANALYTE LEVEL IS BEYOND

3    THE THRESHOLD LEVEL WAS PREVIOUSLY AND ORIGINALLY DISCLOSED BY

4    THERANOS.

5    A.   YES.  THIS IS A TEXT SET OF COMPANIES, FIGURE FOUR.  AND IT

6    REFERS TO THE VARIOUS STEPS THAT YOU CAN SEE DISPLAY ON FIGURE

7    FOUR.  SO YOU CAN SEE IT SAYS, IF THE ANALYSIS DONE IN STEP

8    TWO, AND YOU CAN SEE STEP TWO, SUGGESTS THAT THERE ARE NO

9    SIGNIFICANT DIFFERENCE BETWEEN THE PATIENT'S DATA AND THE

10   STORED DATA, AS DETERMINED BY USING APPROPRIATE ALGORITHMS, AND

11   YOU SEE THE BOX THAT SAYS MAPPING ALGORITHMS, THEN WE ARRIVE AT

12   STEP THREE.  NO ACTION IS TAKEN.  HOWEVER, THE OUTCOME OF THE

13   ANALYSIS IN STEP TWO, IF THAT IS THAT THERE IS A SIGNIFICANT

14   DIFFERENCE, THEN STEP FOUR DETERMINES HOW LARGE THAT DIFFERENCE

15   IS SO YOU CAN FOLLOW ALONG IN THE FIGURE THERE.

16        IF IT IS A LARGE DIFFERENCE, IMMEDIATE ACTION IS TAKEN

17   AND ONE KIND OF IMMEDIATE ACTION COULD BE TO PROVIDE AN

18   EMERGENCY ALERT TO THE PATIENT'S HEALTH CARE PROVIDER.

19        SO WHAT IS DESCRIBED IN THE TEXT BASICALLY IS DESCRIBED

20   IN THE FIGURE.

21   Q.   LET ME ASK YOU TO LOOK AT ANOTHER THERANOS PROVISIONAL,

22   THIS IS '192 AND I'M GOING BACK TO PARAGRAPH 37 WHICH WE LOOKED

23   AT EARLIER THIS MORNING AND YESTERDAY.  AND I WANT TO

24   PARTICULARLY FOCUS YOUR ATTENTION ON THE HIGHLIGHTED PORTION OF

25   THIS PARAGRAPH, SINCE WE HAVE DEALT WITH THE REST OF IT

DIRECT EXAM BY MR. BOIES

1    EARLIER, WHICH SAYS IF THE COMPUTED TI EXCEEDS THE PRESET TIREF

2    APPROPRIATE ACTION CAN BE TAKEN AND APPROPRIATE ACTION COULD BE

3    ALERTING THE PHYSICIAN, STOPPING THE MEDICATION OR THE LIKE.

4         DO YOU SEE THAT

5    A.   YES.

6    Q.   NOW HOW, IF AT ALL, DOES THAT DISCLOSURE IN THE THERANOS

7    PROVISIONALS INDICATE OR DEMONSTRATE THAT STEP SIX OF THE FUISZ

8    '612 PATENT WAS ALREADY DISCLOSED IN THE THERANOS PROVISIONALS?

9    A.   WELL, JUST TO REMIND YOU, ELEMENT SIX OF CLAIM ONE IS

10   DISPLAYING AN ALERT IF THE SENSED ANALYTE LEVEL IS BEYOND THE

11   THRESHOLD VALUE.  SO THAT'S EXACTLY WHAT THIS IS SAYING IN THE

12   THERANOS PROVISIONAL, IF THE COMPUTED TI EXCEEDS THE PRESET

13   TIREF THE APPROPRIATE ACTION CAN BE TAKEN AND THE APPROPRIATE

14   ACTION COULD BE ALERTING THE PHYSICIAN.

15        THAT'S ALSO SHOWN IN THE FIGURE '801 PROVISIONALS FIGURE

16   4-A, EXACTLY THE SAME THING.

17   Q.   NOW IN SUMMARY, DR. ROBERTSON, WERE THERE ANY ELEMENTS OF

18   CLAIM ONE OF THE '612 PATENT THAT WERE NOT PREVIOUSLY DISCLOSED

19   IN THE THERANOS PROVISIONALS?

20   A.   NO.

21   Q.   NOW WE TALKED ABOUT HOW THERE WERE TWO INDEPENDENT CLAIMS

22   IN THE '612 PATENT, CLAIM ONE AND CLAIM NINE, DO YOU RECALL

23   THAT?

24   A.   YES.

25   Q.   I NOW WANT TO TURN TO CLAIM NINE.  HAVE YOU REACHED A

DIRECT EXAM BY MR. BOIES

1  CONCLUSION WHETHER OR NOT THE THERANOS PROVISIONALS DISCLOSE

2  EVERYTHING THAT WAS CLAIMED IN CLAIM NINE OF THE '612 PATENT?

3  A.  I HAVE.

4  Q.  AND WHAT IS THAT CONCLUSION?

5  A.  THAT THE THERANOS PROVISIONALS DISCLOSE ALL THE ELEMENTS

6  AND THE OTHER INDEPENDENT CLAIM LANGUAGE.

7  Q.  DID YOU COMPARE CLAIM ONE AND CLAIM NINE OF THE '612 PATENT

8  WITH EACH OTHER?

9  A.  I DID.

10  Q.  AND WHAT DID YOU FIND?

11  A.  CLAIM ONE IS A -- ACTUALLY DISCUSSES A METHOD OF BODILY

12  FLUID ANALYZER.  CLAIM NINE DESCRIBED A SYSTEM OF HOW THAT

13  METHOD CAN BE USED.

14      BUT WHEN YOU LOOK AT ALL THE ELEMENTS THAT ARE CONTAINED,

15  THE SIX ELEMENTS THAT ARE CONTAINED WITHIN CLAIM ONE, I WAS

16  ABLE TO IDENTIFY THOSE SAME CONCEPTS, ALTHOUGH THEY ARE

17  EXPRESSED A LITTLE DIFFERENTLY IN DIFFERENT ORDER, BUT THEY ARE

18  ALL IN CLAIM NINE AS WELL.

19  Q.  ARE THERE ANY ELEMENTS OF CLAIM NINE OF THE '612 PATENT

20  THAT ARE NOT FOUND IN CLAIM ONE?

21  A.  NO.

22  Q.  WHAT DOES THAT MEAN IN TERMS OF YOUR CONCLUSION THAT ALL OF

23  THE ELEMENTS OF CLAIM NINE WERE ALSO PREVIOUSLY DISCLOSED IN

24  THE THERANOS PROVISIONALS?

25  A.  WELL, THAT CONFIRMS THE CONCLUSION BECAUSE THERE WAS

DIRECT EXAM BY MR. BOIES

1    NOTHING DIFFERENT IN TERMS OF CONCEPTS IN CLAIM NINE THAT

2    WEREN'T ALREADY EXPRESSED IN CLAIM ONE.

3         AND AS I SAID, THOSE HAD ALREADY BEEN EXPRESSED IN THE

4    THERANOS PROVISIONALS.

5    Q.   THANK YOU, DR. ROBERTSON.

6         LET ME MOVE TO A DIFFERENT BUT RELATED QUESTION.

7         DID YOU INVESTIGATE AND ANALYZE WHETHER OR NOT IT WAS

8    LIKELY THAT RICHARD AND JOSEPH FUISZ COULD HAVE INVENTED WHAT

9    IS CLAIMED IN THE '612 PATENT WITHOUT ACCESSING THE

10   CONFIDENTIAL THERANOS PROVISIONALS THAT HAD BEEN PROVIDED TO

11   MWE?

12   A.   YES.

13   Q.   AND WHAT WAS YOUR CONCLUSION?

14   A.   MY CONCLUSION IS THAT IT IS UNLIKELY THAT RICHARD AND

15   JOSEPH FUISZ COULD HAVE INVENTED THE IDEAS CLAIMED IN THE '612

16   PATENT WITHOUT HAVING HAD ACCESS TO THE CONFIDENTIAL THERANOS

17   PROVISIONALS.

18   Q.   WHAT IS THE BASIS OF THAT CONCLUSION?

19   A.   THE FIRST BASIS IS THAT THE SIMILARITY BETWEEN WHAT IS

20   DISCLOSED IN THE THERANOS PROVISIONALS COMPARED TO WHAT'S

21   DISCLOSED IN THE '612 SIMPLY IS SO REMARKABLE THAT IT RISES TO

22   BEYOND THE LEVEL OF IN MY MIND, POSSIBLE COINCIDENCE.

23        EVERYTHING THAT'S IN THE THERANOS PROVISIONALS CAN BE

24   FOUND IN THESE TWO INDEPENDENT CLAIMS IN THE '612 PATENT.  NEXT

25   IS THE, WHAT I WOULD CALL A REVOLUTIONARY TECHNOLOGY THAT

DIRECT EXAM BY MR. BOIES

1    THERANOS WAS PURSUING AND THAT'S DESCRIBED IN THESE

2    PROVISIONALS, AND ALSO IN THE '612 PATENT, AN APPROACH TO

3    HEALTH CARE MONITORING THAT WAS NEW AND UNIQUE AND TO MY

4    KNOWLEDGE, AND I HAVE BEEN IN THE FIELD A LONG TIME, NO ONE

5    ELSE WAS THINKING ABOUT OR WORKING ON.

6         THERE WAS NO EVIDENCE AT THE TIME, IN FACT, THAT THERE

7    WAS ANYONE ELSE CONSIDERING THIS OTHER THAN THERANOS.

8         AND THEN THERE'S THIS VACUUM, THIS LACK OF DOCUMENTATION

9    WHICH I WANTED TO SEE WHICH THE FUISZ'S, IN MY OPINION, BEING

10   CONSISTENT WITH WHAT I KNOW AND WHAT I'VE SEEN WITH INVENTIONS

11   IS THIS INVENTED PROCESS THAT LEADS UP TO THE POINT OF ONE

12   BEING ABLE TO ARTICULATE THE INVENTION.

13        THERE'S ALWAYS SOME TRAIL, SOME RECORD, SOMETHING THAT

14   SHOWS YOU THE PATH THAT SOMEONE TOOK FROM MENTAL CONCEPT TO THE

15   MOMENT WHERE YOU CAN ACTUALLY PUT IT ON PAPER.

16        AND THERE WAS THE FACT THAT THERANOS HAD SPENT TWO AND A

17   HALF YEARS OF RESEARCH AND DEVELOPMENT TO GO FROM THAT POINT OF

18   A MENTAL CONCEPT TO DO THE EXPERIMENTS, TO DO THE RESEARCH, TO

19   DOCUMENT AND VALIDATE THE CONCEPTS TO THE POINT THAT THE

20   PROVISIONALS COULD BE WRITTEN AND FILED.

21        THERE'S NOTHING TO SUGGEST THAT THE FUISZES ENGAGED IN

22   THAT PROCESS FOR ANY LENGTH OF TIME, IT JUST HAPPENED.

23        SO WHEN I TAKE THE REVOLUTIONARY NATURE OF THE TECHNOLOGY

24   MAPPED AGAINST THE STRIKING SIMILARITIES OF THE PROVISIONALS

25   WITH THE PATENT, AND THE ABSENCE OF ANY INDICATION OF THE

CROSS-EXAM BY MR. FUISZ

1    PROCESS THAT WAS PURSUED BY THE FUISZES TO GET TO THE POINT

2    WHERE THEY COULD SUBMIT IN WRITING THE INVENTION, IF YOU WILL,

3    I FIND THAT JUST -- I CANNOT IMAGINE HOW THAT COULD HAVE

4    HAPPENED WITHOUT THEM HAVING HAD ACCESS TO THE PROVISIONALS.

5    Q.   THANK YOU, DR. ROBERTSON.

6         YOU INDICATED IN A LOT OF YOUR TESTIMONY THAT EVERY

7    ELEMENT OF THE '612 PATENT CLAIMS WAS INCLUDED IN THE THERANOS

8    PROVISIONALS, AM I CORRECT?

9    A.   YES.

10   Q.   AND WHAT IS THE SIGNIFICANCE OF THAT TO YOUR CONCLUSION

11   THAT RICHARD AND JOSEPH FUISZ ACCESSED THE THERANOS

12   CONFIDENTIAL PROVISIONALS AS PART OF PREPARING THE '612 PATENT

13   APPLICATION?

14   A.   I THINK IT JUST STRENGTHENS THE CONCLUSIONS AND CONFIRMS

15   THEM.

16            MR. BOIES:  WE HAVE NO MORE QUESTIONS, YOUR HONOR.

17         THANK YOU VERY MUCH.

18            THE COURT:  THANK YOU, MR. BOIES.

19         ANY CROSS-EXAMINATION FROM THE DEFENDANTS?

20            MS. ANDERSON:  WE WILL.  WE NEED A MOMENT TO SET UP,

21   YOUR HONOR.

22            THE COURT:  YOU MAY TAKE A MOMENT, OF COURSE.

23         (OFF THE RECORD.)

24

25

CROSS-EXAM BY MR. FUISZ

1              **CROSS-EXAMINATION BY MR. J. FUISZ**

2

3                    MR. J. FUISZ:

4       Q.   GOOD MORNING.  I'M JOE FUISZ, WE'VE NEVER MET BEFORE, HAVE

5       WE, SIR?

6       A.   NOT OFFICIALLY.

7       Q.   THE FIRST QUESTION I WANT TO ASK YOU AND I APOLOGIZE FOR

8       ASKING PERSONAL FINANCIAL INFORMATION BUT I FEEL I NEED TO.

9            YOU TESTIFIED YOU ARE NOT BEING COMPENSATED FOR THIS

10      REPORT; IS THAT CORRECT?

11      A.   NO, SIR.  NOT DIRECTLY.

12      Q.   OKAY.  BUT YOU ARE A FULL TIME CONSULTANT TO THERANOS?

13      A.   I AM.

14      Q.   AND YOU YOUR CURRENT COMPENSATION LEVEL IS?

15      A.   RECEIVING APPROXIMATELY $500,000 A YEAR ANNUALLY.

16      Q.   OKAY.  AND THAT -- YOUR DEPOSITION YOU SAID YOU ENTERED

17      INTO THAT AGREEMENT IN JULY OF 2013?

18      A.   THAT'S CORRECT.

19      Q.   AND YOU FIRST LEARNED YOU WOULD BE A WITNESS OR EXPERT IN

20      THIS CASE IN THE PRECEDING MONTH I BELIEVE YOU TESTIFIED,

21      JUNE 2013; IS THAT CORRECT?

22      A.   YES.

23      Q.   OKAY.  YOU TESTIFIED AT YOUR DEPOSITION IN SEPTEMBER THAT

24      YOU HAD, I HAVE TO CONFESS THE RECORD WASN'T ENTIRELY CLEAR TO

25      ME, 700,000 STOCK OPTIONS OR -- I DIDN'T KNOW IF IT WAS SHARES

CROSS-EXAM BY MR. FUISZ

1    ACTUALLY GRANTED.

2         I'M WONDERING IF YOU CAN CLARIFY THAT.  LET'S START WITH

3    THE 700,000 IS THAT THE RIGHT NUMBER.

4    A.   YES.

5    Q.   NOW THOSE ARE OPTIONS OR GRANTED SHARES?

6    A.   I REFER TO THEM AS OPTIONS, I BELIEVE.  AND I EARLY

7    EXERCISED THOSE OPTIONS.

8    Q.   OKAY.  SO I GUESS WHAT I'M TRYING TO ASK YOU SIR, IS THE

9    WAY I WOULD UNDERSTAND AN OPTION TYPICALLY YOU HAVE A STRIKE

10   PRICE THEN YOU WOULD BE ENTITLED TO THE DIFFERENCE BETWEEN THE

11   STRIKE PRICE AND THE ULTIMATE MARKET PRICE, BUT FROM WHAT I'M

12   HEARING IS SOUNDS LIKE YOU ARE ENTITLED TO THE ENTIRE VALUE OF

13   EACH OF THOSE SHARES BECAUSE YOU'VE ALREADY EXERCISED THEM; IS

14   THAT CORRECT?

15   A.   WHATEVER THE VALUE MIGHT BE AT SOME POINT IN TIME.

16   Q.   OKAY.  SO YOU WILL BE ENTITLED TO THE FULL VALUE OF THOSE

17   ENTIRE 700,000 SHARES?

18   A.   IF THEY END UP HAVING A VALUE, YES.

19   Q.   OKAY.  ARE YOU ABLE FOR THE BENEFIT OF THE JURY, TO IMPUTE

20   ANY ESTIMATE OF THE VALUE OF THOSE SHARES AT THE CURRENT TIME?

21   A.   NO.

22   Q.   AND WHY IS THAT, SIR?

23   A.   I DON'T KNOW WHAT THEY ARE WORTH.

24   Q.   OKAY.  IS IT NOT THE CASE THAT THE COMPANY HAS RECENTLY

25   CONCLUDED A FINANCING ROUND?

CROSS-EXAM BY MR. FUISZ

1   A.   I'M AWARE OF IT BUT I DON'T KNOW THE DETAILS.

2   Q.   YOU HAVE NO IDEA WHAT THE VALUATION OF THE COMPANY WAS TO

3   IMPLY VALUATION FOR YOUR SHARES?

4   A.   I KNOW THAT THE VALLATE, THE INTERNAL EVALUATION WAS $15 A

5   SHARE.

6   Q.   OKAY.  IF WE WERE TO, AND ADMITTEDLY IT'S AN ASSUMPTION, IF

7   WE WERE TO SAY THAT THE MARKET VALUE OF THE COMPANY WOULD BE

8   $15 A SHARE THEN COULD WE SAY THAT 700,000 TIMES 15 WOULD BE AN

9   APPROXIMATE NUMBER, A POSSIBILITY?

10  A.   THAT WOULD BE THE INTERNAL EVALUATION BUT THAT'S NO OPEN

11  MARKET FOR THOSE SHARES.

12  Q.   UNDERSTOOD.  THE COMPANY COULD BE BOUGHT FOR MORE OR LESS.

13  BUT IF SOMEBODY BOUGHT THE ENTIRE COMPANY AT THE SAME VALUE

14  THAT THE INVESTORS RECENTLY BOUGHT SHARES FOR, YOU WOULD

15  RECEIVE AND MY MATH IS NOT VERY GOOD, IT SOUNDS LIKE

16  $13 MILLION MORE OR LESS?

17  A.   IF THAT'S THE CONVERSION RATE, WE CAN DO THE MATH, YES.

18  Q.   THAT SEEMS LIKE A REASONABLE ASSUMPTION FOR TODAY?

19         MR. BOIES:  YOUR HONOR, I THINK THAT'S A LITTLE OFF.

20  WE CAN STIPULATE TO IT.

21         MR. J. FUISZ:  PLEASE.  I DON'T HAVE A CALCULATOR.

22         THE COURT:  I WILL OVERRULE THE OBJECTION.

23     BUT I THINK THE POINT HAS BEEN MADE.  WHY DON'T YOU

24  CONTINUE.

25         MR. J. FUISZ:  OKAY.  THANK YOU, YOUR HONOR.

CROSS-EXAM BY MR. FUISZ

1    Q.   WHILE YOU GUYS ARE SETTING UP, CAN YOU -- BEFORE YOU GO TO

2    BECAUSE I WANTED TO TALK ABOUT SOME OF THE DEPENDENT CLAIMS

3    WITH YOU.

4         BUT BEFORE YOU DO THAT I WANTED TO USE YOUR CHART A

5    LITTLE BIT.

6         YOUR TESTIMONY IS ALL OF THIS IS HAPPENING ON THE

7    ANALYZER; IS THAT CORRECT?  EVERYTHING IN THIS BLUE BOX THAT

8    YOU DREW, SIR, RIGHT

9    A.   YES.

10   Q.   OKAY.  IF IT WERE THE CASE, AND I UNDERSTAND IT'S CONTRARY

11   TO YOUR TESTIMONY SO I'M NOT TRYING TO MISCAST WHAT I

12   UNDERSTOOD YOU TO SAY, BUT IF IT WERE THE CASE THAT THE -- THAT

13   THE COMPARISON OF THE THRESHOLD VALUE -- IT'S ASSUME FOR THE

14   SAKE OF ARGUMENT THAT YOUR PK PD IS AN ANALYTE ET CETERA AND

15   YOU ARE RIGHT ABOUT THAT, LET'S ASSUME THAT FOR THE SAKE OF

16   ARGUMENT.

17        IF THE COMPARISON TO THE THRESHOLD VALUE OCCURS OFF THE

18   ANALYZE, OKAY, NOT ON THE ANALYZER, BUT LET'S SAY IT OCCURS AT

19   THERANOS.COM OR SEPARATE SERVER, OKAY.  IF YOU COULD IMAGINE

20   THAT ARCHITECTURE.

21        COULD YOU IMAGINE THAT ARCHITECTURE IS THE QUESTION

22   CLEAR?

23   A.   YES.

24   Q.   IF THAT WERE THE CASE, DO YOU AGREE THAT THIS ARCHITECTURE

25   WOULD NOT READ ON CLAIM ONE OF THE '612?

CROSS-EXAM BY MR. FUISZ

1    A.   THE '612 TALKS ABOUT THE REFERENCE VALUES BEING

2    COMMUNICATED TO THE ANALYZER AND THAT'S WHERE THE PROCESSING

3    IS.  THAT'S WHAT THIS FIGURE HAPPENS TO SHOW.

4    Q.   WASN'T MY QUESTION.

5         I WILL TRY TO BE MORE CLEAR.  MY QUESTION IS, IF THE '801

6    IS MAKING THE COMPARISON OFF THE DEVICE, LET'S SAY ON A SERVER,

7    IF THAT'S THE CASE, ALL RIGHT, WOULD THAT NOT MEAN THAT THE

8    '801 DOES NOT READ ON CLAIM ONE OF THE '612?

9    A.   I BELIEVE THAT THE '801 ACTUALLY HAS WITHIN IT BOTH

10   POSSIBILITIES.

11   Q.   WELL, OKAY.  THAT'S NOT ENTIRELY THE ANSWER TO MY QUESTION.

12        JUST TO BE CLEAR FOR THE SAKE OF THE JURY.  YOU AGREE IN

13   THE '612 THE SENSED ANALYTE IS COMPARED WITH THE PROGRAMMED

14   ANALYTE ON THE ANALYZER ITSELF.  THAT'S CLEAR?

15   A.   AND THAT'S CLEAR IN THE '801 PROVISIONAL THAT'S BEFORE YOU.

16   Q.   THAT'S NOT MY QUESTION, SIR, I'M ASKING YOU SIMPLY IF YOU

17   AGREE WITH MY READING IN THE '612?

18   A.   I THINK I SAID THAT ALREADY.

19   Q.   OKAY.  AND YOU ALSO AGREE THE '612 DOESN'T CONTEMPLATE A

20   COMPARISON OCCURRING OFF OF THE ANALYZER?

21   A.   NOT THAT I RECALL, I THINK IT'S -- I DON'T RECALL THAT, NO.

22   Q.   OKAY.  NOW CAN I ASK YOU, HAVE YOU REVIEWED TIMOTHY KEMP'S

23   DEPOSITION TESTIMONY IN THIS CASE?

24   A.   I HAVEN'T REVIEWED IT, NO.

25   Q.   OKAY.  TIMOTHY KEMP WAS A SOFTWARE ENGINEER AT IBM FOR

CROSS-EXAM BY MR. FUISZ

1    30 YEARS?

2    A.   I DON'T KNOW IF IT WAS THAT LONG BUT YES, THAT'S WHERE HE

3    WAS.

4    Q.   SO IN DEFERENCE IF YOU WILL TO YOUR RESUME, WHICH IS QUITE

5    CONSIDERABLE, WOULD IT BE FAIR TO SAY THAT TIMOTHY KEMP LIKELY

6    HAS A BETTER UNDERSTANDING OF SOFTWARE ARCHITECTURE THAN YOU

7    DO?

8    A.   I WOULD THINK SO, YES.

9    Q.   OKAY.  SO IN TIMOTHY KEMP TESTIFIED, THAT THE COMPARISON

10   HAPPENS AT THE SERVER LEVEL IN THIS CHART, WOULD THAT CHANGE

11   ANY CONCLUSION FOR YOU IN YOUR REPORT?

12   A.   NO, IT WOULDN'T.

13   Q.   AND WHY NOT, SIR?

14   A.   BECAUSE BOTH THE POSSIBILITIES ARE EVIDENT, AND HE MOST

15   LIKELY WAS THINKING ABOUT THE OTHER POSSIBILITY OF WHETHER IT

16   WAS OR NOT.

17   Q.   OKAY.  WELL, MAYBE WE COULD READ TOGETHER, MAYBE ACTUALLY

18   IF THE PLAINTIFFS WOULD HELP ME.

19        I WOULD LIKE TO ACTUALLY READ TOGETHER 34 AND 35 OF THE

20   '801.  CAN I IMPOSE ON COUNSEL TO PUT IT UP.

21            MR. BOIES:  ALL RIGHT.

22            MR. J. FUISZ:  IF YOU DON'T WANT TO I --

23            (OFF-THE-RECORD DISCUSSION.)

24            THE COURT:  I BELIEVE THE REQUEST IS FOR TRIAL

25   EXHIBIT NUMBER 2.

CROSS-EXAM BY MR. FUISZ

1          MR. BOIES:  TRIAL EXHIBIT NUMBER 2.

2          MS. ANDERSON:  THANK YOU, YOUR HONOR.

3          MR. BOIES:  AND PARAGRAPHS 34 AND 35.

4          MR. J. FUISZ:  RIGHT.  THANK YOU.

5    Q.  AND, WELL, ADMITTEDLY THIS IS GOING TO BE -- CAN YOU DO ONE

6    AT A TIME BECAUSE I THINK IT'S HARD ENOUGH FOR THE JURY TO

7    READ.

8         OKAY.  SO THE RDX METABOLIC PROFILER, IS THAT THE

9    ANALYZER?

10   A.  NO, YOU CAN SEE FROM THE FIGURE THE RDX PROFILE IS

11   CONTAINED AS PART OF THE ANALYZER.

12   Q.  OKAY.  AS PART OF THE ANALYZER.  OKAY.

13        WELL, IF IT'S -- IT BUT IT'S CAPABLE OF COLLECTING DATA.

14   SO IT HAS THE CENSOR.

15   A.  IT COLLECTS THE DATA FROM THE PATIENT AND IT HAS A

16   DETECTOR, YES.

17   Q.  AND IT'S WIRELESSLY LINKED THROUGH A TRANSMITTER OR OTHER

18   KNOWN MEANS TO A COMPUTER NETWORK.

19   A.  YES.

20   Q.  NOW IS THAT COMPUTER NETWORK OFF THE ANALYZER OR DO YOU

21   BELIEVE THAT COMPUTER NETWORK IS CONTAINED ON THE ANALYZER?

22   A.  I THINK WHAT IT'S REFERRING THERE IT'S WIRELESSLY LINKED,

23   AND WE DESCRIBED THIS TO AN EXTERNAL DATABASE AND THAT HAS

24   COMPUTATIONAL CAPABILITY.

25   Q.  OKAY.  SO WE ARE OFF THE ANALYZER.  AT LEAST WHEN WE ARE

CROSS-EXAM BY MR. FUISZ

1   THINKING ABOUT THE NETWORK IS THAT A FAIR WAY TO READ THAT

2   PARAGRAPH SIR?

3   A.   YOU ARE THINKING ABOUT THE NETWORK BUT THE ANALYZER HAS

4   PROCESSING CAPABILITIES.

5   Q.   THAT WASN'T MY QUESTION, YOU ARE VERY SMART SO YOU ARE

6   GETTING AHEAD.  YOU WILL GO TO GO A LITTLE SLOWER WITH ME.

7        SO THE COMPUTER NETWORK HOSTS VARIETY OF DATABASES WHICH

8   CONTAIN INFORMATION RELATING TO THE VERDICT PATIENT,

9   PHARMACOGENOMIC DATA AND THE LIKE.  THE DATA TRANSMITTED BY THE

10  METABOLIC PROFILER IS ANALYZED USING ALGORITHMS AND A

11  CONCLUSION IS REACHED.

12       NOW, THE PLAIN READING TO ME, AND THAT'S WHY I'M VERY

13  CONFUSED HONESTLY BY YOUR REPORT, BECAUSE TO ME WHEN IT SAYS

14  THE DATA IS TRANSMITTED BY THE PROFILER, TO ME IT SAYS THE DATA

15  IS LEAVING THE ANALYZER.

16  A.   YES.

17  Q.   OKAY.  AND IT'S BEING ANALYZED USING ALGORITHMS AND THE

18  CONCLUSION ABOUT THE PARAMETERS IS BEING REACHED THAT'S ALSO

19  OFF THE ANALYZER IS THAT RIGHT?

20  A.   IN THIS PARTICULAR EMBODIMENT, YES.

21  Q.   OKAY.  AND THEN THIS SERVER ACTIVITY IS THEN GOING TO BE

22  TRANSMITTED TO APPROPRIATE RECIPIENTS.  SO IT'S GOING TO THEN,

23  THEN THE NETWORK IS GOING TO PUSH IT SOME OTHER DIRECTIONS,

24  RIGHT.  AND THERE ARE A VARIETY OF OTHER DIRECTIONS IT GOES IN

25  THE '801?

CROSS-EXAM BY MR. FUISZ

1    A.   WELL, IT'S PRETTY CLEAR AT LEAST IN THOSE FIGURES THAT IT'S

2    COMING FROM THE ANALYZER.

3    Q.   I THOUGHT YOU JUST AGREED WITH ME THAT WE WERE ON THE

4    NETWORK?

5    A.   YES, THERE'S TWO WAY COMMUNICATION BETWEEN THE ANALYZER

6    AND -- THE NETWORKS SO INFORMATION FLOWS IN BOTH DIRECTIONS.

7    Q.   IT WOULD BE EASIER FOR ME PROFESSOR IF YOU WOULD ANSWER MY

8    QUESTION BECAUSE THEN WE COULD GET THIS DONE FASTER?

9             MR. BOIES:  OBJECTION YOUR HONOR.  THAT'S AN

10   INAPPROPRIATE COMMENT.  I SUBMIT HE IS ANSWERING THE QUESTION.

11            THE COURT:  I WILL SUSTAIN THE OBJECTION LET'S MOVE

12   ON TO THE NEXT QUESTION.

13            MR. J. FUISZ:  I DIDN'T MEAN ANY DISCOURTESY EXCUSE

14   ME.

15       SO THE CONCLUSION IS THEN TRANSMITTED TO ME PLAIN MEANING

16   MENS THE SERVER ASK TRANSMITTING IT AND PUSHING IT SOMEWHERE

17   ELSE.

18       IF WE COULD GO TO 35, IF YOU COULD HIGHLIGHT THAT TOO.

19       SO THIS IS GOING TO DESCRIBE

20            MR. BOIES:  YOUR HONOR, IF THAT STATEMENT WAS NOT A

21   QUESTION I OBJECT TO IT AND MOVE TO STRIKE.  THIS IS NOT A TIME

22   FOR HIM TO BE MAKING STATEMENTS.

23            THE COURT:  ALL RIGHT.  I WILL SUSTAIN THE OBJECTION

24   ASK THE PREVIOUS COMMENT BE STRUCK.

25            MR. J. FUISZ:  SORRY YOUR HONOR.  I WILL TRY TO

CROSS-EXAM BY MR. FUISZ

1    PROCEED MORE APPROPRIATELY.  OKAY.  THANK YOU.  SORRY

2    DR. ROBERTSON.

3    Q.   OKAY.  SO THIS IS, PARAGRAPH 35 AGREES IS DESCRIBING THE

4    ACTIVITY OF FIGURE FOUR THE FLOW CHART?

5    A.   YES, IN GENERAL, YES.

6    Q.   IT SAYS USING THE HAND HELD PROFILER.  IS THAT THE DEVICE,

7    THE HAND HELD PROFILER.  COULD I THINK OF THAT AS THE DEVICE OR

8    THE METER?

9    A.   DO YOU MEAN THE ANALYZER.

10   Q.   YEAH, COULD I THINK OF IT AS THE ANALYZER?

11   A.   YES.

12   Q.   OKAY.  AS DESCRIBED ABOVE THESE DATA ARE THEN SECURELY

13   TRANSMITTED OVER A NETWORK OR THE INTERNET.  OKAY.  SO DO I

14   READ THIS CORRECTLY, THE PK AND PD PARAMETERS FROM THIS PATIENT

15   ARE NOW LEAVING THE ANALYZER.  WOULD YOU AGREE WITH THAT, SIR?

16   A.   AS WRITTEN, AGAIN, I SAID THIS IS ONE OF THE OPTIONS.

17   Q.   OKAY.  AND THEN WE HAVE INTERPRETATION FOR THE DATA DERIVED

18   THROUGH COMPUTATIONS IN A SERIES OF BIOSTATISTICAL ALGORITHMS

19   ON THE SERVER, RIGHT, SO WE ARE STILL ON THE SEARCHER OFF THE

20   ANALYZER, RIGHT; IS THAT CORRECT?

21   A.   IN THIS REPRESENTATION, YES.

22   Q.   AND THAT DATA IS GOING TO BE COMPARED WITH INFORMATION

23   STORED IN THE DATABASES; IS THAT CORRECT?

24   A.   SO WHAT THIS SAYS IS THAT THE PROFILER GATHERS THE PK AND

25   PD PARAMETERS AND THEN THESE DATA ARE THEN SECURELY TRANSMITTED

CROSS-EXAM BY MR. FUISZ

1    OVER, FOR EXAMPLE, CELLULAR NETWORK OR THE INTERNET AND

2    INTERPRETATIONS OF THE DATA ARE DERIVED THROUGH COMPUTATIONS IN

3    A SERIES OF ALGORITHMS ON THE SERVER WHICH CORRELATE THE

4    PHARMACODYNAMIC, PHARMACOKINETIC AND PHARMACOGENOMIC PROFILES,

5    CORRELATED.

6         ADDITIONALLY, THE DATA CAN BE COMPARED WITH INFORMATION

7    STORED IN DATABASES, IT DOESN'T SAY WHETHER THAT COMPARISON

8    NECESSARILY IS TAKING PLACE.

9    Q.   LET ME ASK YOU -- I'M SORRY.  PLEASE FINISH?

10   A.   SO WE SAID THAT THE STORED INFORMATION COULD BE THE

11   PATIENT'S OWN PK AND PD DATA OR THE PREVIOUS TREATMENT REGIMEN.

12   SO THAT MEANS THE PREVIOUS REFERENCE VALUES ARE DETERMINED

13   BASED ON THE INDIVIDUAL.

14        AND THEN IT GOES ON TO TALK ABOUT THE ANALYSIS DONE IN

15   STEP TWO SUGGESTING AND SO FORTH WHICH WE HAVE DISCUSSED.

16        SO WHEN YOU TAKE THIS TEXT AND YOU PUT IT AGAINST THE

17   GRAPHIC CAL REPRESENTATION OF THIS SYSTEM, IT CLEARLY DESCRIBES

18   TWO POSSIBILITIES.

19        ONE POSSIBILITY WHERE THIS COMPARISON IS MADE ON THE

20   SERVER WHICH IS DESCRIBED IN THE TEXT OR WHERE THIS COMPARISON

21   IS MADE ON THE ANALYZER WHICH IS DESCRIBED IN THE FIGURE.

22   THERE'S NO OTHER WAY, IN MY OPINION, TO DESCRIBE WHAT IS

23   REPRESENTED ON THE FIGURE OTHER THAN WHAT I'VE ALREADY

24   DESCRIBED AND THAT IS THAT THERE ARE ALGORITHMS, CAPABILITY OF

25   DOING COMPARISON BETWEEN THE REFERENCE VALUE AND THE MEASURED

CROSS-EXAM BY MR. FUISZ

1    VALUE, AND THAT EMBODIMENT IS DESCRIBED IN THE FIGURE AND

2    HAVING THAT DONE ON THE ANALYZER.

3         AND I CAN ALSO SEE THAT THE TEXT DESCRIBES AN OPTION OF

4    WHERE ONE COULD CONSIDER AN ARCHITECTURE WHERE THE COMPUTATIONS

5    AND COMPARISONS ARE NOT DONE ON THE ANALYZER.  THERE'S TWO

6    OPTIONS

7    Q.  DOCTOR --

8    A.  AND THE THERANOS PROVISIONALS DO NOT DISCRIMINATE AS ONE

9    OVER THE OTHER IT SIMPLY OFFERS THEM BOTH.

10   Q.  OKAY, DR. ROBERTSON, I WANT TO DIRECT YOU TO THE END OF

11   LATTER PART OF 35.  ANOTHER KIND OF IMMEDIATE ACTION COULD BE

12   TO SEND DISTRIBUTIONS TO THE PROFILER TO ALTER THE DOSING OF

13   THE DRUG.  RIGHT.  SO THAT AT LEAST -- THAT CERTAINLY IS

14   DESCRIBING WHERE THE COMPARISON IS MADE OFF OF THE ANALYZER,

15   RIGHT?  AT THE SERVER.  THE SERVER DETERMINES THAT ACTIONS IS

16   NECESSARY AND IT'S GOING TO TELL THE ANALYZER TO DO SOMETHING

17   DIFFERENTLY.  EITHER TO PRESUMABLY REDUCING THE DOSE; IS THAT

18   CORRECT?

19   A.  WHAT IT MEANS TO ME IS IN THE CONTEXT OF THE FIGURE FOUR OF

20   THAT DECISION IS MADE AS I'VE SHOWN IT IS MADE ON THE ANALYZER.

21   THERE'S TWO WAY COMMUNICATIONS OUT TO THE EXTERNAL DATABASES.

22   THE EXTERNAL DATABASES THEMSELVES COULD HAVE INSTRUCTIONS AS TO

23   WHAT TO DO IN THE CIRCUMSTANCES WHERE AN ACTION WOULD HAVE TO

24   BE TAKEN.  THERE'S TWO WAY COMMUNICATION, THERE'S DATA FLOWING

25   IN BOTH DIRECTIONS.

CROSS-EXAM BY MR. FUISZ

1    Q.  BUT YOU WOULD AGREE THAT DATA FLOWING IN BOTH DIRECTIONS IS

2    NOT INCONSISTENT WITH ALL THE COMPARISONS OCCURRING OVER THE

3    SERVER, BECAUSE FOR EXAMPLE YOU DESCRIBE THE POSSIBILITY OR NOT

4    YOU, THE 31 DESCRIBES THE POSSIBILITY THAT THE ANALYZER COULD

5    BE A DRUG DELIVERY DEVICE, IN WHICH CASE THE SERVER WOULD NEED

6    TO TELL THE DEVICE TO REDUCE THE DOSE, IS THAT NOT A FAIR

7    READING?

8    A.  AS I SAID IT'S A TWO WAY COMMUNICATIONS OPTION, IT DEPENDS

9    ON WHERE THE DATA IS STORED THAT'S REQUIRED TO MAKE THOSE

10   DECISIONS.  NOTHING IS INCONSISTENT.

11   Q.  COULD YOU POINT ME TO ANY TEXT IN THE '801 WHICH MAKES IT

12   CLEAR, THAT CLEARLY STATES YOUR ALTERNATIVE?

13   A.  YES, I CONSIDER THIS PART OF THE '801.

14   Q.  I ASKED FOR TEXT.  IS THERE ANY TEXT WRITTEN ENGLISH WORDS

15   IN THE EIGHT WHERE 801 THAT CLEARLY DESCRIBE THE COMPARISON

16   BEING MADE ON THE DEVICE?

17   A.  I DON'T THINK THAT THE LANGUAGE FOR INSTANCE ADDITIONALLY

18   THE DATA CAN BE COMPARED WITH INFORMATION STORED IN DATABASES.

19   THAT REALLY OPENS THE DOOR IN MY MIND IN THE TEXT FOR WHAT IS

20   ACTUALLY SHOWN HERE IN FIGURE FOUR.  I SEE THESE AS BOTH EQUAL

21   POSSIBILITIES.

22   Q.  I UNDERSTAND THAT.  I UNDERSTAND THAT'S YOUR TESTIMONY.

23   BUT ALL I WANT TO MAKE CLEAR, WE ARE NOT GOING TO AGREE SO I

24   CAN MOVE ON AT SOME POINT, I DON'T WANT TO BORE OUR JURY.

25   ALL -- ALL I WANT TO MAKE CLEAR IS THIS, YOU'RE RELYING IN YOUR

CROSS-EXAM BY MR. FUISZ

1    CONCLUSION ON THE WAY YOU PERCEIVE THIS FLOW CHART TO WORK,

2    YOUR CONCLUSIONS, RIGHT?  AND YOU CANNOT POINT ME TO ANY ACTUAL

3    TEXT IN THE '801 THAT WOULD DESCRIBE THE COMPARISON BEING MADE

4    ON THE ANALYZER ITSELF?

5    A.   I THINK THE SENTENCE ADDITIONALLY THE DATA CAN BE COMPARED

6    WITH INFORMATION STORED IN DATABASES CLEARLY OPENS THE DOOR FOR

7    THE OPTION THAT'S DESCRIBED IN FIGURE 4-A.  SO MY ANSWER TO YOU

8    IS YES THE TEXT DOES SHOW.

9    Q.   OKAY.  ALL RIGHT.  WELL, I DON'T WANT TO BE OVERLY

10   ARGUMENTATIVE SO I WILL MOVE ON.  I THINK YOU UNDERSTAND MY

11   POINT.

12        CAN YOU -- RHONDA CAN YOU BRING UP THE --

13        (OFF-THE-RECORD DISCUSSION.)

14   BY MR. J. FUISZ:

15   Q.   DO YOU RECOGNIZE THIS FIGURE, DR. ROBERTSON -- WELL, LET ME

16   GIVE YOU A HINT IT'S FROM OUR '612 PATENT, DO YOU HAVE A COPY

17   OF THAT IN YOUR BOOK, I THINK YOU DO?

18   A.   IT IS NOT THE FIGURE SHOWN IN THE PATENT.

19   Q.   OKAY.  CAN I SEE WHAT FIGURE YOU ARE LOOKING AT.  OKAY.

20   YOU KNOW YOU ARE RIGHT.  I'M SORRY, LET ME EXPLAIN WHAT I DID

21   TO EVERYBODY AND LET ME EXPLAIN TO COUNSEL WHAT I DID.  AND IF

22   YOU WANT WE CAN INSTRUCT THE JURY TO PRETEND THESE DON'T EXIST?

23        THE COURT:  MR. FUISZ BEFORE YOU POSE YOUR QUESTION

24   DO YOU WISH TO RAISE AN OBJECTION.

25        MR. BOIES:  YES, HE TOLD ME THESE ARE UPON JUST

CROSS-EXAM BY MR. FUISZ

1    QUOTES FROM THE PATENT AND I DIDN'T HAVE A PROBLEM.  IF THESE

2    ARE SOMETHING BEING CREATED BY THE DEFENDANTS THEN I WOULD LIKE

3    TO UNDERSTAND BEFORE IT'S BEING USED WITH THE WITNESS WHAT THEY

4    HAVE DONE.

5            THE COURT:  MR. IT FUISZ.

6            MR. J. FUISZ:  MAY I EXPLAIN.  IN THE DETAILED

7    DESCRIPTION OF THE SPECIFICATION, OKAY, IT GIVES YOU TEXT

8    CORRELATING TO THESE NUMBERS, ALL RIGHT.

9        SO IT SAYS FIGURE TWO REPRESENTS THE CENSOR, FIGURE THREE

10   REPRESENTS THE DISPLAY, SO TO MAKE IT CLEAR FOR THE JURY I

11   SIMPLY WENT AND PUT THOSE IDENTICAL WORDS FROM THE

12   SPECIFICATION INTO THOSE BOXES.

13           MR. BOIES:  YOUR HONOR, PERHAPS IT WOULD BE BEST IF

14   WE COULD JUST SHOW THE JURY WHAT IS ACTUALLY IN THE PATENT AND

15   THEN HE CAN SHOW THIS IF HE WANTS TO, BUT AT LEAST THEY WILL

16   KNOW WHAT'S ACTUALLY IN THE PATENT.

17           THE COURT:  COULD WE BRING UP FIGURE ONE FROM THE

18   ACTUAL PATENT IN TRIAL EXHIBIT NUMBER 1.  THANK YOU, SIR.

19           MR. J. FUISZ:  COUNSEL, CAN I JUST ASK YOU, I WANT TO

20   KNOW IF YOU ARE GOING TO ALLOW THE USE --

21           (OFF-THE-RECORD DISCUSSION.)

22           THE COURT:  MR. FUISZ, MR. BOIES, ARE WE READY TO

23   PROCEED?

24           MR. BOIES:  LET ME JUST ASK HIM ONE MORE QUESTION.

25           THE COURT:  GO AHEAD.

CROSS-EXAM BY MR. FUISZ

```
 1              (OFF-THE-RECORD DISCUSSION.)

 2         MR. BOIES:  GO AHEAD.

 3         MR. J. FUISZ:  SORRY FOR THE DELAY.

 4    Q.   OKAY.  COULD WE BRING BACK UP THE -- OKAY.

 5         SO WITH THAT -- BASICALLY, LADIES AND GENTLEMEN OF THE

 6    JURY, WHAT I DID WAS THIS IS FIGURE ONE AND, EXCUSE ME I

 7    SHOULDN'T ADDRESS THE JURY THAT WAY, THE WITNESS, EXCUSE ME,

 8    DR. ROBERTSON.

 9         THIS IS FIGURE ONE AND THE WAY I READ THE '612, THIS IS

10    THE, ITEM TWO IS DESCRIBED AS THE CENSOR, ITEM THREE IS

11    DESCRIBED AS THE DISPLACE.  ITEM FOUR IS DESCRIBED AS THE DATA

12    READER.  ITEM FIVE IS THE PROCESSOR.  SIX IS THE DRUG

13    CONTAINER.  AND I -- SEVEN IS A BAR CODE, ACTUALLY IN ONE OF

14    THE DEPENDENT CLAIMS SOMETIMES IT'S JUST THE DATA STORAGE UNIT.

15    SO I APOLOGIZE, I INADVERTENTLY CREATED A LITTLE CONFUSION WITH

16    SEVEN.  SO INDULGE ME IF YOU WILL A LITTLE BIT

17         NOW I'M GOING TO ASK YOU A QUESTION ABOUT CLAIM TWO.  SO

18    YOU MIGHT -- IF YOU WANT TO DIRECT YOUR ATTENTION TO CLAIM TWO.

19         WE HAVE SPENT A LOT OF TIME OBVIOUSLY WITH YOU TALKING

20    ABOUT CLAIM ONE.  SO I WILL TRY NOT TO RE PLOW IT AT LEAST AT

21    THIS TIME.

22         BUT I WOULD LIKE TO DIRECT YOUR ATTENTION TO DEPENDENT

23    CLAIM TWO WHERE THE DATA STORAGE UNIT IS PROVIDED WITH A DRUG

24    CONTAINER.

25         AND THEN ON THE -- IF YOU GO TO THE NEXT PAGE -- THE WORD
```

CROSS-EXAM BY MR. FUISZ

1    DRUG CONTAINER IS REFERRED TO QUITE A FEW TIMES IN THE

2    SPECIFICATION.

3         OKAY.  SO THE DATA STORAGE UNIT MAY BE PROVIDED WITH THE

4    DRUG CONTAINER, THAT'S ONE EXAMPLE.  COULD YOU GO TO THE NEXT

5    ONE.  SCROLL DOWN THEN IT GIVES YOU AN EXAMPLE.

6         THE DATA STORAGE UNIT ASSOCIATED WITH THE DRUG CONTAINER

7    AND IT GIVES YOU THE EXAMPLE OF LIPITOR, WITH DOCTOR SET

8    THRESHOLD LIMIT.

9         LOOKING AT THAT, BASED ON THE REFERENCES IN THE

10   SPECIFICATION YOU LOOKED AT THEN LOOKING AT THE PICTURE, IS

11   THIS THE WAY WE CAN UNDERSTAND THE DRUG CONTAINER, WOULD YOU

12   AGREE WITH THAT?  IS THAT WHAT THAT IS A DRUG CONTAINER?

13   A.  I THINK WHAT YOU ARE HOLDING IS A DRUG CONTAINER.

14   Q.  OKAY.  BUT YOU UNDERSTAND THAT TO BE SOMETHING DIFFERENT,

15   THAT PICTURE?

16   A.  I THINK IT'S A SOURCE OF THE DRUG.  CONTAINS THE DRUG.

17   Q.  A SOURCE OF THE DRUG?

18   A.  OR THE DRUG, I GUESS IF THAT'S WHAT YOU ARE SAYING.  IF YOU

19   ARE GRABBING A BOTTLE OF WHAT APPEARS TO BE.

20   Q.  I APOLOGIZE.  IT'S -- I USE IT TO SLEEP.

21        NOW IN YOUR ANALYSIS IN YOUR REPORT, I WOULD LIKE TO

22   DIRECT YOU TO PARAGRAPH 36 OF YOUR REPORT -- AND RHONDA CAN YOU

23   GO TO PARAGRAPH 36.

24        YOU REFERENCE THE THERANOS 937 PROVISIONAL.

25             (OFF-THE-RECORD DISCUSSION.)

CROSS-EXAM BY MR. FUISZ

1        OKAY.  THE THERANOS 937 PROVISIONAL WHICH INCIDENTALLY

2   WAS, OF COURSE WAS PUBLISHED IN MAY 2005, SO IT'S, I BELIEVE

3   IT'S, WOULD YOU AGREE IT'S PRIOR ART TO ALL YOUR PROVISIONALS?

4        WELL, FORGET THAT QUESTION.  STRIKE.  LET ME STRIKE.

5        BUT YOU AGREE THE 937 WAS PUBLISHED IN MAY OF 2005, TO

6   YOUR KNOWLEDGE IS THAT ACCURATE?

7   A.   I DON'T KNOW FOR SURE.

8   Q.   FAIR ENOUGH.  IT'S NOT THAT IMPORTANT.  IT'S ACTUALLY MUCH

9   MORE IMPORTANT TO ME TO READ THE DISCLOSURES.  SO I APOLOGIZE

10  FOR TAKING IT IN THAT DIRECTION.

11       IT DESCRIBES AN INGESTIBLE, IMPLANTABLE OR WEARABLE

12  MEDICAL DEVICE COMPRISING A MICROARRAY WHICH COMPRISES A

13  BIOACTIVE AGENT CAPABLE OF INTERACTING WITH A DISEASE MARKER

14  BIOLOGICAL ANALYTE RESERVOIR WHICH COMPRISES AT LEAST ONE

15  THERAPEUTIC AGENT AND IS CAPABLE OF RELEASING THERAPEUTIC

16  AGENTS FROM THE MEDICAL DEVICE, ETC.

17       I'M JUST CURIOUS WHY YOU CITED THAT RELATIVE TO DRUG

18  CONTAINER BECAUSE IT SEEMS TO ME WHEN YOU READ THE

19  SPECIFICATION, AT LEAST THE WAY I READ IT, IT SEEMS TO ME IT'S

20  PRETTY CLEAR IT'S TALKING ABOUT A BOTTLE OF CONVENTIONAL DOSAGE

21  FORMS?

22  A.   NO.

23  Q.   WHY DID YOU CITE THAT?

24  A.   IT'S SHOWING THE CAPABILITY OF A RESPONSE TO WHAT THE

25  DEVICE HAS IN THE CASE WHERE THE DEVICE HAS THE ABILITY TO

CROSS-EXAM BY MR. FUISZ

1    INFORM THE ANALYZER TO THE MITIGATION THAT SHOULD TAKE PLACE

2    WHICH MIGHT BE AN ALTERED DRUG DOSE.  THAT'S WHAT THIS IS

3    DESCRIBING.

4    Q.   BUT YOU HAD AGREE -- YOU WOULD AGREE DEPENDENT CLAIM TWO IS

5    REALLY, DEPENDENT CLAIM TWO IS REALLY ABOUT WHERE THE DATA

6    STORAGE UNIT IS, RIGHT, IT'S ABOUT METHOD ACCORDING TO CLAIM

7    ONE WRITTEN THE DATA STORAGE UNIT IS PROVIDED WITH A DRUG

8    CONTAINER.  ISN'T IT JUST A QUESTION OF WHERE IT IS, WHERE I

9    PUT THE DATA STORAGE UNIT?

10   A.   I THINK WHEN YOU LOOK AT THE 937 YOU WILL SEE THAT IT

11   DISCUSSES HAVING THE CAPABILITY TO RELEASE DRUGS IN RESPONSE TO

12   MEASUREMENTS THAT HAVE BEEN MADE.  IT'S THE SAME THING.

13   Q.   OKAY.  BUT YOU WOULD AGREE I DON'T INGEST THIS OR WEAR THIS

14   OR IMPLANT THIS, RIGHT?

15   A.   I THINK YOU PROBABLY DO INGEST THAT.

16   Q.   WELL, NOT THE CONTAINER.  BECAUSE THE CLAIM REFERS TO THE

17   CONTAINER SIR.  DATA STORAGE UNIT PROVIDED WITH THE DRUG

18   CONTAINER?

19   A.   AS I SAID THAT'S DESCRIBED IN THIS '937 PROVISIONAL.

20   THAT'S WHAT IT WAS TALKING ABOUT.

21   Q.   OKAY.  SO NOW WE ARE BACK NOW WE ARE GOING TO TALK ABOUT

22   CLAIM 3 AND THIS TIME MR. BOIES, THANKS FOR POINTING IT OUT,

23   BEFORE I WAS WRONG.

24        I THINK NOW, AND COUNSEL BELIEVES NOW THE REFERENCE SEVEN

25   IS APPROPRIATE TO BAR CODE BECAUSE IN THIS INDEPENDENT CLAIM

CROSS-EXAM BY MR. FUISZ

1   IT'S GOING TO BE EXPRESSED THAT THE STORAGE UNIT IS BAR CODE.

2   SO I THINK IT IS CORRECTLY IDENTIFIED THERE.

3        DEPENDENT CLAIM 3 INVOLVES ALL THE ELEMENTS OF CLAIM ONE.

4   THE METHOD ACCORDING TO CLAIM TWO.  AND I WILL REREAD THAT FOR

5   THE JURY BECAUSE SOMETIMES I THINK I MOVE TOO QUICKLY THROUGH

6   THIS STUFF.  SO WE HAVE ALL THE CLAIM ELEMENTS OF CLAIM ONE.

7   IN ADDITION, THE WHERE IN THE DATA STORAGE UNIT IS PROVIDED

8   WITH THE DRUG CONTAINER.  AND THEN WHERE IN, AND THEN WHERE IN

9   THE DATA READER IS A BAR CODE READER AND THE DATA STORAGE UNIT

10  IS A BAR CODE.  WHICH WE COULD ACTUALLY IMAGINE, IF WE IMAGINE

11  CERTAINLY YOU WOULD AGREE THIS COULD BE A TYPE OF DRUG

12  CONTAINER AND THIS HAS A BODY ON IT WHICH OF COURSE ISN'T THE

13  DATA STORAGE UNIT WITH A DOCTOR SET ALERT BUT WE COULD PRETEND

14  IT IS.

15       AND THEN I WOULD LIKE TO GO TO WHAT YOU IN YOUR REPORT,

16  THE TWO CITATIONS THAT YOU GAVE.  IF YOU COULD EXPLAIN THEM TO

17  ME BECAUSE HONESTLY I DIDN'T FOLLOW THEM.

18       THAT'S, AGAIN UNLESS THE JURY NEEDS TO SEE THE CLAIM

19  AGAIN.

20       SO REMEMBER ALL THE ELEMENTS OF CLAIM ONE, DATA STORAGE

21  UNIT IS WITH THE DRUG CONTAINER.  AND THE DATA READER IS A BAR

22  CODE READER AND THE DATA STORAGE UNIT IS A BAR CODE.

23       NOW, OBVIOUSLY IF WE INGEST IT OR IMPLANTED THE CONTAINER

24  THEN WE COULDN'T OPTICALLY SCAN THE BAR CODE, CORRECT?  YOU

25  WOULD AGREE WITH THAT?

CROSS-EXAM BY MR. FUISZ

1   A.   CERTAINLY NOT IN A CONVENTIONAL SENSE.  I DON'T KNOW IF I

2   COULDN'T COME UP WITH A WAY OF DOING IT.

3   Q.   I SUSPECT YOU COULD.  FAIR ENOUGH.

4        SO OKAY.  SO WE ARE NOT GOING TO INGEST THIS ONE.

5        RHONDA COULD YOU GO DOWN TO SLIDE -- I WANTED TO ASK

6   DR. ROBERTSON ABOUT WHERE SOME OF THESE -- MAYBE I SHOULD JUST

7   SAY, AGAIN I DON'T WANT TO DRIVE THE JURY CRAZY BUT THIS IS THE

8   ENTIRETY OF DEPARTMENT CLAIM 3.

9        SO WE'VE GOT ALL THE ELEMENTS OF CLAIM ONE, DATA STORAGE

10  UNIT PROVIDED WITH THE DRUG CONTAINER.  THEN AN ADDITIONAL

11  ELEMENT THE -- WHEREIN THE DATA READER SIDE A BAR CODE READER

12  AND THE STORAGE UNIT IS A BAR CODE.

13       AND RHONDA IF WE COULD GO TO THE NEXT SLIDE.

14       LET'S GO TO THE CITATION THE EXPERT REPORT IT'S PARAGRAPH

15  EIGHT.  AND I HOPE MY CITATION IS RIGHT, TO MIKE YOUR LIFE

16  EASIER PARAGRAPH 132.  AND YOU SAY TOOLS LIKE COMPUTERIZED

17  PHYSICIAN ORDER AND PRESCRIPTION ENTRY AND BAR CODING SYSTEMS

18  HAVE DEMONSTRATED TANGIBLE BENEFITS.

19       AND I WISH I HAD ACTUALLY BROUGHT IT UP OVER THE ENTIRETY

20  OF YOUR REPORT BUT, NOT YOUR REPORT I SHOULDN'T SAY THAT, THE

21  '192.

22       BECAUSE I UNDERSTAND THE '192 AT THAT POINT TO JUST SORT

23  OF GENERICALLY BE TALKING ABOUT THE HISTORY OF RECENT ART.

24       BUT LET ME ASK YOU THIS QUESTION, IS IT YOUR CONTENTION,

25  IS IT YOUR CONTENTION THAT THAT SENTENCE SUPPORTS, WOULD

CROSS-EXAM BY MR. FUISZ

1    SUPPORT INVENTORSHIP FOR CLAIM 3, FOR THE '192?

2    A.   WELL I THINK WHAT WOULD BE HELPFUL IF YOU COULD GIVE ME A

3    COPY OF MY EXPERT REPORT SO I CAN SEE MY RESPONSE TO THIS

4    ANALYSIS OF THIS.

5    Q.   I THOUGHT YOU HAD IT.  I WOULDN'T HAVE --

6         THE COURT:  DR. ROBERTSON, I BELIEVE THIS IS TAB 273

7    IN YOUR BINDER.

8         THE WITNESS:  YEAH, I HAVE IT HERE.

9         MR. J. FUISZ:  OKAY.  LET'S GO BACK AND WE CAN GET IT

10   TOGETHER BECAUSE I HAVEN'T SEEN IT IN A WHILE MYSELF.

11   Q.

12   A.   SO MY ANALYSIS OF CLAIM 3 IS MORE EXTENSIVE THAN WHAT YOU

13   WERE ALLUDING TO.  AND I THINK IF WE WANTED TO INFORM THE JURY

14   OF MY OPINION I SHOULD READ MY ANALYSIS OF CLAIM 3.

15   Q.   PLEASE.

16   A.   AS I SAY CLAIM 3 OF THE '612 PATENT IS DEPENDENT ON CLAIM

17   TWO.  IT CONTAINS THE ADDITIONAL LIMITATION WHEREIN THE DATA

18   READER IS A BAR CODE READER AND THE DATA STORAGE UNIT IS A BAR

19   CODE.

20        AND MY OPINION, THE ADDITIONAL LIMITATION IS NOT NOVEL.

21   AS BAR CODES WERE WELL KNOWN IN THE ART AT THE TIME OF THE

22   ALLEGED CONCEPTION OF THE '612 PATENT.  BAR CODES HAD BEEN IN

23   USE BEFORE THE ALLEGED CONCEPTION OF THE '612 PATENT.  ONE

24   SKILLED IN THE ART WOULD FIND IT TO BE RUDIMENTARY AND OBVIOUS

25   TO PROGRAM A BAR CODE WITH THE THRESHOLD VALUE.  SPECIFICALLY,

CROSS-EXAM BY MR. FUISZ

1    THE PRIOR ART THAT DR. FUISZ CITED TO THE PATENT AND TRADEMARK

2    OFFICE CLEARLY DEMONSTRATED THE USE OF BAR CODES IN CONNECTION

3    WITH ANALYSIS SYSTEMS.

4         AND THERE'S A NUMBER OF CITATIONS TO OTHER PRIOR ART AND

5    OTHER PATENTS THAT DEMONSTRATE THAT.

6         ONE SUCH REFERENCE EXPRESSLY NOTED "THE OPERATING

7    PARAMETERS MAY THEN BE PRINTED IN A BAR CODE FORMATTED BY THE

8    PRINTER ON A MEDICATION LABEL IN A MANNER THAT WAS KNOWN TO

9    THOSE AS HAVING ORDINARY SKILL IN THE ART.

10        HEIDT WHICH IS ANOTHER PATENT REFERENCE ALSO DISCLOSES

11   USE OF BAR CODES AND IN PARTICULAR HEIDT DESCRIBES TEST SLIDES

12   THAT INCLUDE A BAR CODE CONTAINING INFORMATION REGARDING THE

13   ANALYTE AND ITS OWN SLIDE.  IT ALSO DESCRIBES A BAR CODE READER

14   THAT READS THE BAR CODE INFORMATION TO DETERMINE WHAT TESTS ARE

15   TO BE PERFORMED ON THE ANALYTE.

16        IT DESCRIBED ABOVE WHAT IT ALSO DISCLOSES THE USE OF BAR

17   CODES THAT STORE SUCH THINGS AS PATIENT IDENTIFYING

18   INFORMATION.

19        IN ADDITION, LIKE OTHER PRIOR ART, THE THERANOS

20   PROVISIONALS EXPRESSLY DISCLOSE BAR CODES AND THE '192

21   PROVISIONAL FOR EXAMPLE, THERANOS NOTED THE BAR CODE AND

22   TECHNOLOGY USED IN CONJUNCTION WITH TECHNOLOGY USED TO PREVENT

23   ADVERSE DRUG REACTIONS HAVE BEEN WELL KNOWN FOR A LONG TIME.

24   TOOLS LIKE COMPUTERIZED PHYSICIAN ORDER AND PRESCRIPTION ENTRY

25   AND BAR CODING SYSTEMS HAVE DEMONSTRATED TANGIBLE BENEFITS.

CROSS-EXAM BY MR. FUISZ

1      SO THAT'S THE QUOTE THAT HE'S SHOWING COMING FROM THIS

2  ANALYSIS.

3      ADDITIONALLY, THE '489 PROVISIONAL DISCLOSED THAT THE

4  SOFTWARE PRESENT IN THERANOS'S ANALYZERS ALLOWED "READING OF

5  THE BAR CODE WHICH DETERMINES THE CALIBRATION PROTOCOLS,

6  LANGUAGE AND ALIGNMENT OF THE VALVES AND PHOTODIODES IN THE

7  SYSTEM.

8      SO THAT'S MY COMPLETE ANALYSIS TO SHOW THAT THIS

9  DEPENDENT CLAIM DOES NOT ADD ANYTHING UN EXPECTED IN THIS

10  BODILY ANALYZER FLUID SYSTEM

11  Q.  I APPRECIATE YOU READING THAT TO THE JURY BUT IF I COULD

12  BRING YOU BACK TO MY QUESTION.

13      WHAT I WAS TRYING TO ASK YOU BEFORE, MAYBE IT WASN'T

14  CLEAR, WHAT I WAS TRYING TO ASK YOU IS WHETHER OR NOT YOU FEEL

15  THAT THAT, THAT SENTENCE IN THE '192 WOULD STATE A SUFFICIENT

16  SPECIFICATION TO SUPPORT CLAIM 3?  BECAUSE YOU KNOW THAT YOUR

17  CLIENT IS ASKING TO BE NAMED AS INVENTOR OF ALL THE CLAIMS OF

18  THE '612 PATENT AND I HONESTLY CAN'T TELL FROM YOUR REPORT

19  WHETHER YOU FEEL THAT CLAIM 3 SHOULDN'T EXIST BECAUSE IT'S

20  NOT -- IT FAILS A NOVELTY BECAUSE BAR CODES ARE KNOWN OR IF YOU

21  ARE TRYING TO SAY THAT THE ONE -- THAT LANGUAGE FROM THE '192

22  IS SUFFICIENT TO SUPPORT THAT CLAIM.  THAT'S REALLY WHAT I WANT

23  I'M CONDUCED ABOUT

24      MR. BOIES:  OBJECTION YOUR HONOR.  THAT HAS TO DO

25  WITH LEGAL CONTENTIONS.  THAT HAS NOTHING TO DO WITH THIS

CROSS-EXAM BY MR. FUISZ

1    WITNESS'S TESTIMONY E. HE'S HERE AS AN EXPERT.

2              THE COURT:  OKAY.  I WILL SUSTAIN THE OBJECTION BUT

3    INVITE MR. FUISZ TO ASK REPORTED QUESTION IN A SLIGHTLY MORE

4    REFINED FORM.

5          PUT THE QUESTION TO THE WITNESS IF YOU WOULD MR. FUISZ.

6    AND GET AN ANSWER

7    BY MR. J. FUISZ:

8    Q.   IS THAT SENTENCE FROM THE 192 SUFFICIENT TO SUPPORT CLAIM 3

9    IN YOUR OPINION?

10             MR. BOIES:  OBJECTION YOUR HONOR TO THE FORM OF THAT

11   QUESTION.

12             THE COURT:  I WILL OVERRULE THAT OBJECTION.  YOU CAN

13   ANSWER THAT, DR. ROBERTSON.

14             THE WITNESS:  MY OPINION WAS FORMED ON A MUCH OF OUR

15   COMPLETE ANALYSIS OF THAT AND I READ THAT TO YOU.  THIS IS IN

16   PART, PART OF THAT ANALYSIS BUT IT'S NOT THE COMPLETE ANALYSIS.

17   BY MR. J. FUISZ:

18   Q.   DR. ROBERTSON, I'M JUST TRYING TO ASK A QUESTION, I'M NOT

19   TRYING TO FORCE AN ANSWER FROM YOU.  I'M SIMPLY TRYING TO ASK

20   YOU IF THAT SPECIFICATION WOULD SUPPORT, WOULD SUPPORT

21   INVENTORSHIP OF CLAIM 3 BY YOUR CLIENT, THAT'S WHAT I'M ASKING?

22   A.   I HAVEN'T CONSIDERED THAT, THE ANALYSIS I DID, IN LIGHT OF

23   THAT PARTICULAR QUESTION.  I DID IT IN LIGHT OF WHETHER OR NOT

24   CLAIM 3 TAKEN AS A WHOLE, IT WAS NOVEL OR KNOWN AND WHETHER OR

25   NOT IT ADDED AN UN EXPECTED ATTRIBUTE TO WHAT WAS DESCRIBED IN

CROSS-EXAM BY MR. FUISZ

1    THE INDEPENDENT CLAIM.  THAT'S WHAT I WAS ASKED TO DO AND

2    THAT'S WHAT I DID.

3    Q.  SO AND PLEASE CORRECT ME IF I'M MISCHARACTERIZING YOUR

4    TESTIMONY.

5        YOU ARE SAYING THAT CLAIM 3 SHOULD FAIL FOR LACK OF

6    NOVELTY?  REGARDLESS OF WHETHER WE'RE THE INVENTORS OR YOUR

7    CLIENT IS THE INVENTOR?

8    A.  I'M SAYING THAT THERE WAS PRIOR ART THAT COVERS CLAIM 3 IS

9    WHAT I'M SAYING.  AND PART OF THE PRIOR ART COULD BE KNOWN IN

10   THE THERANOS PROVISIONALS.

11   Q.  OKAY.  I DON'T FEEL LIKE I GOT AN ANSWER.  ARE YOU NOT SURE

12   OR ARE YOU -- AM I CONFUSED?  I'M -- NOT TRYING TO BE

13   ARGUMENTATIVE.  I'M SORRY, I'M NOT GOOD AT ASKING THESE

14   QUESTIONS, COUNSEL, I'M JUST TRYING TO FIND OUT.  LET ME ASK

15   YOU ONE MORE TIME AND I WON'T BADGER YOU I PROMISE IT WILL BE

16   THE LAST TIME?

17          MR. BOIES:  CAN I JUST MAKE A SUGGESTION.

18          THE COURT:  GO AHEAD SIR.

19          MR. BOIES:  I THINK IF YOU ASK HIM WHETHER OR NOT HE

20   THINKS THE PRIOR ART COVERED IT, HE CAN ANSWER THAT AS AN

21   EXPERT.

22       I THINK WHAT THE ISSUE IS NOVELTY IS A LEGAL CONCLUSION,

23   AND I THINK WHAT HE'S INTERPRETING YOU AS DOING IS ASKING FOR

24   THE LEGAL CONCLUSION AS TO WHETHER THE FACT OF THE PRIOR ART

25   COVERED IT MEANS IT'S NOT NOVEL UNDER THE LAW.

CROSS-EXAM BY MR. FUISZ

1    NOW I WOULD BE -- I THINK IT DOES, I THINK YOU THINK IT

2    DOES, I THINK WE ALL THINK IT DOES, BUT HE'S NOT A LEGAL EXPERT

3    THE COURT:  ALL RIGHT.  WHY DON'T WE PROCEED IN THIS

4    FASHION.

5    MR. FUISZ, WHY DON'T YOU PUT YOUR QUESTION TO THE

6    WITNESS.  IF MR. BOIES FINDS IT OBJECTIONABLE, HE WILL RAISE AN

7    OBJECTION.  I WILL RULE ON THE OBJECTION AND WE WILL PROCEED IN

8    THAT FASHION.

9    GO AHEAD AND ASK YOUR QUESTION.

10   BY MR. J. FUISZ:

11   Q.   THE QUESTION I'M ASKING YOU, IT'S A TWO-PART QUESTION.  IS

12   THAT LANGUAGE FROM THE '192, IS THAT SUFFICIENT, IS THAT ENOUGH

13   SPECIFICATION TO SUPPORT CLAIM 3 IN THE '612?  THAT'S THE FIRST

14   PART?

15   MR. BOIES:  I WILL OBJECT TO THAT PART YOUR HONOR

16   BECAUSE I DON'T KNOW WHAT IT MEANS TO SUPPORT CLAIM 3 IN THE

17   '612.

18   MR. J. FUISZ:  WELL.

19   THE COURT:  ALL RIGHT.  LET ME.

20   MR. J. FUISZ:  CAN WE APPROACH?

21   THE COURT:  SURE.

22   (SIDE-BAR DISCUSSION OFF THE RECORD.)

23   MR. J. FUISZ:  I DON'T WANT TO WASTE ANYBODY'S

24   TIME -- I DON'T WANT TO WASTE THE COURT'S TIME IF THE JUDGE --

25   IF YOUR HONOR FEELS I'M ASKING QUESTIONS INAPPROPRIATELY.

CROSS-EXAM BY MR. FUISZ

1      I THOUGHT GIVEN WHAT I TAKE TO BE THE SCOPE OF THE REPORT,

2    I THINK IT'S A FAIR QUESTION.

3          THE COURT:  OKAY.  LET ME MAKE A SUGGESTION, IF I

4    COULD.

5      YOU CAN ASK THIS WITNESS IF HE HAS AN OPINION AS TO

6    WHETHER CLAIM 3 IS VALID IN LIGHT OF THIS DISCLOSURE IN THIS

7    PARTICULAR DOCUMENT.  IF THE ANSWER TO THE QUESTION IS YES,

8    GREAT.  IF THE ANSWER TO THE QUESTION IS NO, THAT'S GREAT TOO.

9      BUT YOU'VE GOT TO FOCUS ON THE QUESTION, IS THIS CLAIM

10   VALID IN LIGHT OF THIS PRIOR ART, AND IN PARTICULAR, THIS

11   DISCLOSURE IN THIS PRIOR ART.  HE'S OFFERING AN OPINION ON HIS

12   SECTION OF THE REPORT.

13     HE JUST TESTIFIED HE BELIEVED CLAIM 3 IS DISCLOSED IN THE

14   PRIOR ART.  THAT'S AN OPINION ON THE VALIDITY OF THE CLAIM.

15   WHAT AM I MISSING.

16          MR. BOIES:  I THINK -- -- I ACTUALLY DON'T THINK YOU

17   ARE MISSING ANYTHING IN THE SENSE THAT I THINK EVERYBODY HERE

18   AGREES THAT THAT IS EXACTLY RIGHT.  THAT IF IT'S COVERED IN THE

19   PRIOR ART, IT'S INVALID.

20     BUT WHAT I'M SAYING IS THAT THE WITNESS WAS ASKED WAS IT

21   COVERED IN THE PRIOR ART.  HE WASN'T ASKED TO REACH THE LEGAL

22   CONCLUSION HERE.  DOES THAT MEAN IT'S INVALID?

23     I THINK WE ALL WOULD AGREE THAT ONCE YOU HAVE ESTABLISHED

24   THAT PREDICATE, THAT'S A FACTUAL MATTER, THE LEGAL CONCLUSION

25   FOLLOWS.  BUT THAT'S THE ONLY --

CROSS-EXAM BY MR. FUISZ

1      THE COURT:  SO WHY DON'T YOU ASK THE WITNESS IF HE

2  BELIEVES CLAIM 3 IS DISCLOSED IN THE PRIOR ART OR TAUGHT BY THE

3  PRIOR ART.

4      MR. J. FUISZ:  YES.

5      THE COURT:  LET'S PROCEED.

6  BY MR. J. FUISZ:

7  Q.   DR. ROBERTSON, JUST TO CONTINUE, DO YOU BELIEVE THAT CLAIM

8  3 IS DISCLOSED BY THE PRIOR ART?

9  A.   YES, I DO.

10 Q.   OKAY.  YOU WOULD -- YOU WOULD AGREE, HOWEVER, YOU WOULD

11 AGREE, HOWEVER, THAT ALL OF THE ELEMENTS OF CLAIM 3 ARE NOT --

12 ARE NOT PRESENT IN ANY OF THE THERANOS, FOUR THERANOS

13 PROVISIONALS IN THIS CASE?

14 A.   ALL THE ELEMENTS.

15 Q.   ALL THE ELEMENTS?

16 A.   IT JUST SAYS IT DISCLOSES A BAR CODE READER.

17 Q.   WELL, NOW CLAIM 3 CLOUDS ALL THE ELEMENTS -- IN FACT, I

18 MEAN MAYBE I'M MAKING THINGS TOO COMPLEX.  BUT I BELIEVE, I

19 BELIEVE THAT, AND I DON'T WANT TO MISCHARACTERIZE YOUR REPORT.

20 I BELIEVE THAT YOU HAVE STATED THAT ALL OF THE ELEMENTS OF EVEN

21 CLAIM ONE OF THE '612 ARE NOT PRESENT IN ANY OF THE FOUR

22 THERANOS PROVISIONALS THAT ARE AT ISSUE IN THIS CASE?

23      MR. BOIES:  OBJECTION, YOUR HONOR.

24    I THINK THAT MISCHARACTERIZES THE WITNESS'S TESTIMONY.

25      MR. J. FUISZ:  LET ME ASK IT DIFFERENTLY, I'M SORRY.

CROSS-EXAM BY MR. FUISZ

1          THE COURT:  LET ME SUSTAIN THE OBJECTION AND INVITE

2     MR. FUISZ TO ASK ANOTHER QUESTION.

3     BY MR. J. FUISZ:

4     Q.   ARE ALL OF THE ELEMENTS OF THE CLAIM ONE OF THE '612

5     PRESENT IN ANY SINGLE ONE OF THE FOUR THERANOS PROVISIONALS AT

6     ISSUE IN THIS CASE?

7     A.   THAT'S A DIFFERENT QUESTION.

8     Q.   I KNOW.  THAT'S WHAT I'M ASKING?

9     A.   SO I THINK IT'S EVIDENT IN MY EARLIER TESTIMONY THAT ONE

10    FINDS THE ELEMENTS OF CLAIM ONE IN ONE OR MORE OF THE THERANOS

11    PROVISIONALS.

12    Q.   IN ONE OR MORE, SO THERE IS ONE THERANOS PROVISIONALS THAT

13    HAS ALL THE ELEMENTS OF CLAIM ONE?

14    A.   NO, THAT'S NOT WHAT I MEANT.  I MEANT THAT IN EXAMINING THE

15    FOUR THERANOS PROVISIONALS, I COULD FIND ALL THE ELEMENTS OF

16    CLAIM ONE, IN FACT WE WENT THROUGH THAT IN DETAIL.

17    Q.   RIGHT.  SO THE SAME CONCLUSION WOULD APPLY, SINCE CLAIM 3

18    HAS TWO ADDITIONAL ELEMENTS, THEN THE SAME CONCLUSION WOULD

19    APPLY TO CLAIM 3?

20    A.   NO, AS YOU CAN SEE IN MY ANALYSIS OF CLAIM 3 I MAKE

21    REFERENCE TO TWO OF THE THERANOS PROVISIONALS BUT I ALSO MADE

22    REFERENCE TO OTHER PRIOR ART THAT GOES BEYOND THE THERANOS

23    PROVISIONALS.

24    Q.   THAT'S NOT WHAT I'M ASKING, I'M SORRY.

25          WHAT I'M ASKING YOU IS, I THINK AND AN OBVIOUS ANSWER IN

CROSS-EXAM BY MR. FUISZ

1    VIEW OF WHAT YOU SAID FOR CLAIM ONE, DO YOU AGREE THAT ALL OF

2    THE ELEMENTS OF CLAIM 3, AND BY ALL THE ELEMENTS OF CLAIM 3 I

3    MEAN CLAIM 3 IS A DEPENDENT CLAIM MEANING ALL THE ELEMENTS OF

4    CLAIM ONE, THE ADDITION OF CLAIM TWO AND THE ADDITION OF CLAIM

5    3, THAT ALL OF THOSE ELEMENTS EMBODIED IN CLAIM 3 ARE NOT

6    PRESENT IN ANY SINGLE THERANOS PROVISIONAL?

7    A.   I THINK IF YOU ARE TALKING ABOUT A DESCRIPTION OF HOW DATA

8    IS STORED AND DATA IS READ, BAR CODES IS AN OPTION.  AND BAR

9    CODES ARE MENTIONED IN TWO OF THE THERANOS PROVISIONALS AS

10   MEANS OF STORING AND TRANSFERRING DATA.

11   Q.   BUT DR. ROBERTSON, I DIDN'T ASK YOU ABOUT BAR CODES.  AND

12   I'M SORRY IF IT SOUNDED LIKE I DID.

13       I ASKED YOU ABOUT ALL OF THE ELEMENTS OF CLAIM 3.  WELL WE

14   HAVE ALREADY BEEN THROUGH ALL THE ELEMENTS OF CLAIM 1 THEN

15   CLAIM 2 AND NOW CLAIM 3?

16       RIGHT.  I THINK IT'S AN EASY QUESTION.  I THINK YOU ARE

17   GOING TO SAY NO, ALL OF THE ELEMENTS OF CLAIM 3 ARE NOT PRESENT

18   IN ANY SINGLE ONE OF THE THERANOS PROVISIONALS.  I THINK THAT'S

19   WHAT YOU ARE GOING TO SAY BUT I DON'T WANT TO ANSWER YOUR

20   QUESTION FOR YOU.

21   A.   IF, WHEN YOU SAY THAT ALL THE ELEMENTS OF CLAIM 3 AND

22   YOU'RE ADDING 2 AND 1 IN IT I THINK WE HAVE ALREADY BEEN THERE.

23   Q.   OKAY.  THANK YOU.  SORRY.  COULD WE CONTINUE --

24   A.   OF ALL THE ELEMENTS.

25   Q.   SORRY I DIDN'T MEAN TO CUT YOU OFF.

CROSS-EXAM BY MR. FUISZ

1    A.   IN CLAIM 1, ARE DISCLOSED IN THE THERANOS PROVISIONALS.

2         THE COURT:  MR. FUISZ, WE NEED TO TAKE OUR MORNING

3    BREAK AT THIS TIME.  LADIES AND GENTLEMEN OF THE JURY IT IS

4    TIME FOR THAT MORNING BREAK.  LET'S TAKE TEN MINUTES.

5         ONCE AGAIN, DO NOT DISCUSS THE CASE WHILE WE ARE OUT ON

6    BREAK.  WE WILL SEE YOU BACK HERE SHORTLY.

7         (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD OUT OF

8    THE PRESENCE OF THE JURY:)

9         THE COURT:  DR. ROBERTSON, BEFORE YOU STEP DOWN I

10   WILL REMIND YOU ONCE AGAIN BECAUSE YOU REMAIN UNDER OATH YOU

11   ARE NOT TO DISCUSS THE SUBSTANCE OF YOUR TESTIMONY WHILE WE ARE

12   OUT ON BREAK.  WE WILL SEE YOU BACK HERE IN TEN MINUTES.

13        (WHEREUPON A RECESS WAS TAKEN.)

14        (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN THE

15   PRESENCE OF THE JURY:)

16        THE COURT:  PLEASE BE SEATED.

17        MR. FUISZ, YOU MAY RESUME YOUR CROSS-EXAMINATION

18        MR. J. FUISZ:  THANK YOU, YOUR HONOR.

19        I'M GOING TO TRY TO FINISH THE CLAIMS QUICKLY

20   Q.   DR. ROBERTSON, IF I COULD DIRECT YOU TO CLAIM 4 OF THE

21   '612.  OKAY.  SO THAT'S THE METHOD ACCORDING TO CLAIM TWO.

22        SO ALL THE ELEMENTS OF CLAIM 1 WHICH WE HAVE BEEN THROUGH,

23   THE DATA STORAGE UNIT IS WITH THE DRUG CONTAINER.  AND THE DATA

24   STORAGE UNIT -- AND WHEREIN THE DATA READER IS A RADIO

25   FREQUENCY RECEIVER AND THE DATA STORAGE UNIT AND A RADIO

CROSS-EXAM BY MR. FUISZ

1    FREQUENCY IDENTIFICATION TAG.

2          IF WE COULD GO TO THE NEXT SLIDE.  DR. ROBERTSON, I DON'T

3    WANT TO MISREPRESENT YOUR CONCLUSIONS IN YOUR REPORT IN ANY

4    WAY, BUT YOU HAD TWO REFERENCES TO THERANOS MATERIALS AND I

5    WANTED TO ASK YOU ABOUT.

6          ONE IS THIS, I GUESS IT'S A QUOTE FROM LOOKS LIKE AN

7    INTERNET ARTICLE FROM MARCH 2005 THAT THERANOS IS DEVELOPING A

8    PATCH WITH AN EMBEDDED RFID.

9          AND I WANTED TO ASK YOU IF IT'S YOUR VIEW THAT CLAIM 4 IS

10   INVALID IN VIEW OF THAT DISCLOSURE?

11   A.   I BELIEVE THAT THAT REPRESENTS, AS I SAID, THAT THIS

12   LIMITATION ISN'T NOVEL BECAUSE RFID DEVICES WERE WELL KNOWN IN

13   THE ART AT THE TIME OF THE ALLEGED CONCEPTION OF THE '612

14   PATENT.  AND THIS IS AN EXAMPLE OF WHERE THERANOS HAD ACTUALLY

15   BEEN INVOLVED IN DEVELOPING IN THIS CASE A PATCH THAT HAD AN

16   RFID-BASED COMMUNICATIONS DEVICE.

17   Q.   LET ME ASK YOU A DIFFERENT QUESTION, BECAUSE YOU WERE

18   TESTIFYING EARLIER TO EXTENSIVE EXPERIENCE WORKING WITH THE

19   STANFORD PORTFOLIO.  IS IT YOUR VIEW WHEN YOU ASSEMBLE ELEMENTS

20   TOGETHER IN A NEW WAY THAT ONE OF THOSE ELEMENTS NEEDS TO BE

21   SORT OF SPECTACULARLY NOVEL OR REVOLUTIONARY IN SOME WAY IN

22   ORDER TO GET A PATENT?

23   A.   I THINK YOU HAVE TO DEMONSTRATE THAT SOMETHING IN WHAT

24   YOU'VE CLAIMED IN THE INVENTION HAS TO BE -- PASS THE TEST OF,

25   WHICH IS WHAT THE USPTO IS THEREFORE FOR TO PASS THE TEST THAT

CROSS-EXAM BY MR. FUISZ

1    THERE IS SOMETHING UN EXPECTED AND NEW AND DIFFERENT IN THE

2    CLAIMS.

3    Q.   BUT IN YOUR EXPERIENCE, YOU CAN'T SEE A -- AN UN EXPECTED

4    ASSEMBLY, IF YOU WILL, OF COMMON ELEMENTS?

5    A.   NO, I THINK YOU CAN SEE KIND OF AN UNEXPECTED ASSEMBLY OF

6    COMMON ELEMENTS.

7    Q.   OKAY.  LET ME JUST ASK YOU THE SAME QUESTION ABOUT THE

8    DISCLOSURE FROM THE '801 PROVISIONAL THAT YOU CITED IN YOUR

9    REPORT.

10        IS IT YOUR CONTENTION THAT CLAIM 4 IS INVALID IN LIGHT OF

11   THAT DISCLOSURE FROM THE '801 INPUT/OUTPUT ASSEMBLY?

12        MR. BOIES:  YOUR HONOR, I'M GOING TO OBJECT.

13        AGAIN, I HAD BEEN TOLD ORIGINALLY THAT THIS WAS JUST A

14   SERIES OF QUOTATIONS.  I'VE CHECKED THIS AGAINST PARAGRAPH 137

15   AND IT'S NOT A QUOTATION FROM PARAGRAPH 137

16        MR. J. FUISZ:  BY ALL MEANS APOLOGIES.  CAN YOU GIVE

17   ME THE REPORT.

18        THE COURT:  I WILL SUSTAIN THE OBJECTION.  LET'S

19   FOCUS ON THE ACTUAL LANGUAGE IF WE COULD.

20        MR. J. FUISZ:  I'M SORRY FOR THAT, DR. ROBERTSON.

21   Q.   OKAY.  WOULD YOU LIKE ME TO READ PARAGRAPH 137 OR WOULD YOU

22   LIKE TO READ IT IN YOUR VOICE, AS YOU WISH, SIR?

23   A.   WELL I WAS TRYING TO FIND WHAT YOU HAD WRITTEN AND I

24   COULDN'T FIND IT.  I'M SORRY.

25   Q.   I'M SORRY, IT'S REFERRING -- I'M SORRY, THAT WAS A FAILED

CROSS-EXAM BY MR. FUISZ

1    ATTEMPT, IF YOU WILL TO REFER TO PARAGRAPH 137 WHERE YOU WRITE

2    IN ADDITIONAL TO THERANOS PROVISIONALS DISCLOSE AN INPUT OUTPUT

3    ASSEMBLY.  THIS COULD RESULT IN A RELATIONSHIP BETWEEN THE DATA

4    STORAGE UNIT AND THE READER OF ANY TYPE INCLUDING ONE USING A

5    RADIO FREQUENCY IDENTIFICATION TAG AND RADIO FREQUENCY RECEIVER

6    WHICH WERE WELL KNOWN IN THE ART AT THE TIME OF THE ALLEGED

7    CONCEPTION OF THE '612 PATENT.

8    A.   WHAT'S YOUR QUESTION?

9    Q.   MY QUESTION IS WHETHER OR NOT YOU THINK THAT CLAIM FOUR IS

10   INVALID IN VIEW OF THOSE THERANOS DISCLOSURES, COMBINED WITH --

11   AS YOU COMBINED IT IN 137, I GUESS?

12   A.   WELL, IN THE ANALYSIS I COVER OTHER MATERIALS IT GOES TO

13   THE TOTALITY OF MY ANALYSIS OF CLAIM FOUR TO ARRIVE AT THE

14   CONCLUSION THAT THIS WAS KNOWN PREVIOUSLY SO THIS WOULD BE

15   PRIOR ART.

16   Q.   OKAY.  LET ME TURN YOU TO CLAIM FIVE WHICH IS THE METHOD

17   ACCORDING TO CLAIM FOUR WHEREIN THE DRUG IS PROVIDED IN A

18   CLOSED CONTAINER AND THE METHOD FURTHER COMPRISES OPENING THE

19   CONTAINER AND ACTIVATING THE RADIO FREQUENCY IDENTIFICATION TAG

20   UPON OPENING OF THE CONTAINER.

21       AND AGAIN, I DON'T WANT TO MISCHARACTERIZE YOUR TESTIMONY

22   BUT IN PARAGRAPH 142 YOU CITED THE EXAMPLE OF TUTTLE.  THE 263

23   PATENT WHICH IS IN THE FIVE MISDEMEANOR SERIES SO IT'S QUITE

24   OLD.

25       AND THAT'S A PATENT THAT RELATES TO SHIPPING CONTAINER

CROSS-EXAM BY MR. FUISZ

1    MONITOR CONTINUITY.  I DON'T WANT TO MISREPRESENT THE ABSTRACT

2    BUT YOU COULD LOOK AT THE WHOLE THING IF YOU LIKE.

3         BUT I WAS CURIOUS WHY YOU FELT THAT TUTTLE RELATED TO

4    DEVICE ART ANALYZER ART, MORE SPECIFICALLY

5    A.  I THINK ANYONE SKILLED IN THE ART WOULD UNDERSTAND THAT

6    ACTION, THE CONCEPT OF THESE IN AN RFID TAG, IT WOULD BE

7    TRIGGERED BY THE OPENING OF THE CONTAINER, WOULD BE EASILY

8    APPLICABLE TO AN APPLICATION OR IN A BODILY FLUID ANALYZER.

9    Q.  OKAY.  MOVING ON TO CLAIM 6, THEN WE WILL ALMOST BE DONE.

10        METHOD ACCORDING TO CLAIM 2 WHEREIN THE DATA READER IS A

11   MAGNETIC STRIPE READER AND THE DATA STORAGE UNIT IS A MAGNETIC

12   STRIPE.

13        AND YOU IF I DIRECT YOU TO PARAGRAPH 146 OF YOUR REPORT,

14   YOU CITED BUI FOR THE PROPOSITION, BUI BEING THE U.S. PATENT

15   PUBLICATION 2003, 0141981 WHICH SHOULD HAVE PUBLISHED IN 2003

16   PRESUMABLY.

17        ARE YOU CITING BUI FOR THE PROPOSITION THAT CLAIM 6 IS

18   INVALID?

19   A.  I WILL HAVE TO REFER -- LET ME SEE IF I CAN FIND IT.  GIVE

20   THREE CITATIONS TO BUI.

21        THERE'S NO INDEX TO MY BINDER SO --

22   Q.  I'M SORRY, IT'S PAGE 40 IF IT HELPS.  IT STARTS ON PAGE 39

23   THEN GOES TO 40, YOUR ANALYSIS ON CLAIM SIX?

24   A.  I'M ACTUALLY LOOKING FOR BUI.

25   Q.  OH, I'M SORRY.

CROSS-EXAM BY MR. FUISZ

1        MR. BOIES:  YOUR HONOR, I DON'T THINK BUI IS IN THE

2    BINDER THAT HE HAS IN FRONT OF HIM.  WE CAN HAND ONE UP.

3        THE COURT:  IF YOU HAVE A COPY, SURELY THAT WILL

4    SPEED THINGS ALONG.  THANK YOU.

5        MR. J. FUISZ:  HERE, DR. ROBERTSON.  SORRY ABOUT

6    THAT.

7        THE COURT:  MR. FUISZ, IF YOU ARE ABOUT TO SHOW THIS

8    JURY A DOCUMENT THAT HAS NOT YET BEEN ADMITTED INTO EVIDENCE,

9    YOU NEED TO AT FIRST MOVE THE DOCUMENT INTO EVIDENCE BEFORE YOU

10   SHOW IT.

11       MR. J. FUISZ:  I'M SORRY.

12       THE WITNESS:  SO THIS IS A PATENT BUI, IT'S A

13   PUBLICATION DATE OF JULY 31ST, 2003.

14       AND IT'S ENTITLED A SYSTEM AND METHOD FOR OPERATING

15   MEDICAL DEVICES.  SO IT'S IN THE SAME FIELD OF INVENTION.  AND

16   IT DESCRIBES IN THREE PLACES, WHICH I NOTE IN MY REPORT, WHERE

17   COMMUNICATION BETWEEN THE OPERATING SYSTEM AND THE DEVICE CAN

18   BE IMPLEMENTED BY WRITE OF TECHNOLOGIES INCLUDING RFID.

19       AND I REFER TO IT IN TWO PLACES IN THE SPECIFICATION AND

20   81 PLACE IN THE CLAIM.  AN EXAMPLE THAT'S GIVEN IS FOR INSTANCE

21   A WRIT BAND THAT'S HELD AND COMMUNICATING EXTERNALLY.

22   Q.   OKAY.  SO IT'S YOUR CONCLUSION THAT CLAIM SIX IS INVALID IN

23   LIGHT OF BUI?

24   A.   IT'S PRIOR ART TO THIS NOTION THAT A DATA READER IS A

25   MAGNETIC STRIPE READER AND A DATA STORAGE IS A MAGNETIC STRIPE.

CROSS-EXAM BY MR. FUISZ

1    Q.  LET ME ASK YOU ONE LAST QUESTION.

2        YOU ARE AWARE THAT BUI WAS CITED IN THE PROSECUTION

3    HISTORY IN THE '612?

4    A.  I DON'T RECALL THAT, IT COULD HAVE BEEN.

5    Q.  OKAY.  WHILE WE ARE GETTING THE EXHIBITS, IF I REPRESENTED

6    TO YOU THAT THERANOS WAS FORMED AS A CORPORATE ENTITY ON

7    APRIL 12, 2004, WOULD YOU HAVE ANY REASON TO DISAGREE OR DOUBT

8    THAT DATE IS REASONABLY CORRECT?

9            MR. BOIES:  WE WILL STIPULATE TO THAT YOUR HONOR.

10           THE COURT:  ALL RIGHT.  THE STIPULATION IS NOTED.

11       GO AHEAD TO YOUR NEXT QUESTION.

12   BY MR. J. FUISZ:

13   Q.  ISN'T IS IT TRUE YOU WERE INITIALLY ON THE BOARD OF

14   ADVISORS OF THERANOS IN 2004 BEFORE YOU JOINED THE OFFICIAL

15   BOARD OF DIRECTORS?

16   A.  I DON'T RECALL SOMETHING OFFICIALLY CALLED THE BOARD OF

17   ADVISORS BUT I WAS CERTAINLY INVOLVED WITH THE COMPANY.

18   Q.  OKAY.  I'M GOING TO SHOW YOU DEFENDANT'S EXHIBIT 1188

19   AND --

20           THE COURT:  DO YOU HAPPEN TO HAVE A COPY FOR ME.

21           MR. J. FUISZ:  I HOPE SO.

22           MR. BOIES:  YOUR HONOR, I THINK WE HAVE A COPY IN THE

23   BACK OF THE COURTROOM.

24           THE COURT:  IF YOU WOULDN'T MIND, I WOULD APPRECIATE

25   IT.  THANK YOU.

CROSS-EXAM BY MR. FUISZ

1    BY MR. J. FUISZ:  SO I WOULD LIKE TO MOVE INTO EVIDENCE

2    DEFENDANT'S EXHIBIT 1188?

3              MR. BOIES:  OBJECTION, YOUR HONOR.

4         THERE'S NO FOUNDATION.

5              MR. J. FUISZ:  WELL, DO YOU RECOGNIZE THIS DOCUMENT,

6    DR. ROBERTSON?

7              THE COURT:  BEFORE YOU ANSWER THAT, LET ME SUSTAIN

8    THE OBJECTION.

9         YOU MAY REPEAT THE QUESTION THEN THE WITNESS MAY ANSWER IF

10   HE KNOWS IT.

11   BY MR. J. FUISZ:

12   Q.   DO YOU RECOGNIZE THIS DOCUMENT, SIR?

13   A.   I DON'T RECALL IT, NO.

14   Q.   OKAY.  WE WILL MOVE ALONG.

15        YOUR EXPERT REPORT STATES IN PARAGRAPH 48 THAT THERANOS

16   SPENT TEN YEARS DEVELOPING ITS TECHNOLOGIES BUT I THINK IT WAS

17   YOUR EARLIER TESTIMONY, BUT I JUST WANT TO CONFIRM AGAIN ON THE

18   RECORD THAT WITH RESPECT TO THERANOS PROVISIONAL ISSUES IN THIS

19   CASE THAT THERANOS AT MOST SPENT APPROXIMATELY, WELL, 1 TO

20   2 YEARS, IT SEEMS TO ME BUT I WILL LET YOU ANSWER THE QUESTION,

21   WHAT TIME FRAME DO YOU THINK IT WAS?

22   A.   WELL, WE BEGAN WORKING, AS I RECALL IN 2003 BUT I DON'T

23   RECALL WHETHER IT WAS WINTER OR SPRING WHEN ELIZABETH DEPARTED

24   STANFORD.  SO LET'S SAY IT WAS ROUGHLY IN THAT TIME PERIOD.

25   Q.   AND DO YOU THINK IT WOULD -- DO YOU THINK IT -- DO YOU

CROSS-EXAM BY MR. FUISZ

1    THINK THAT THE EARLIER WORK IN THAT TIME FRAME WOULD HAVE BEEN

2    REFLECTED IN THE TWO THERANOS PROVISIONALS THAT HAD BEEN

3    PUBLISHED AT THE TIME OF THE FILING OF THE '612?

4    A.   I THINK WHAT'S REFLECTED IN THOSE PROVISIONALS GOES BACK TO

5    ELIZABETH'S FIRST COMING UP WITH THESE REVOLUTIONARY IDEAS,

6    WHICH I BELIEVE PROBABLY HAPPENED EVEN EARLIER WHEN SHE WAS

7    WORKING IN MY LABORATORY, BECAUSE THAT'S WHY SHE CONSIDERED OF

8    OPTION OF LEAVING STANFORD.

9        SO I THINK THE KERNEL OF THE IDEAS THAT ARE PRESENT IN

10   THOSE PROVISIONALS WOULD EXTEND BACK INTO 2002 TIME FRAME.

11   Q.   I WOULD LIKE TO NEXT ASK YOU SOME QUESTIONS ABOUT THE

12   FOUNDATION FOR YOUR -- THE FOUNDATIONS FOR YOUR CONCLUSION THAT

13   WE LACK THE CAPABILITY TO DEVELOP THE '612 PATENT, WITHOUT

14   ACCESS TO THE THERANOS CONFIDENTIAL INFORMATION.

15   A.   I NEVER SAID THAT.

16   Q.   I DIDN'T MEAN TO MISSTATE.  YOU SAID IT WAS UNLIKELY

17   THAT -- IT WAS UNLIKELY.  I WILL FIND THE LANGUAGE, I'M SORRY?

18   A.   I SAID IT WAS UNLIKELY.

19   Q.   UNLIKELY.  OKAY.

20       IN REACHING THE CONCLUSION THAT IT WAS UNLIKELY BASED

21   UPON THE MATERIALS YOU INDICATED YOU REVIEWED, IT DID NOT

22   APPEAR TO ME THAT YOU REVIEWED ANY OTHER OF MY OR MY FATHER

23   DR. FUISZ'S INVENTIONS, IS THAT THE CASE?

24   A.   THAT'S CORRECT.

25   Q.   AND WHY IS THAT?

CROSS-EXAM BY MR. FUISZ

```
 1    A.   WELL, BECAUSE WHAT I HAD BEFORE ME WAS THE FOUR

 2    PROVISIONALS AND THE PATENT AT ISSUE, THE '612.  AND THAT'S

 3    WHEN THE PROCESS BEGAN.  AND AFTER I DETERMINED THAT THE '612

 4    PATENT WAS REVEALED OR THE DISCLOSURES IN THE FOUR THERANOS

 5    PROVISIONALS WERE TO BE FOUND IN THE '612 PATENT, THAT WAS AS I

 6    SAID, ONE OF THE CORNERSTONES OF THIS PROCESS AND THE NEXT WAS

 7    CONSIDERING THE FACT THAT THIS TECHNOLOGY WAS, AS REVOLUTIONARY

 8    AS IT IS, THAT MEANS THAT THERE WEREN'T, AS FAR AS I KNEW,

 9    ANYONE ELSE ENGAGED IN THINKING ABOUT IT IN THIS WAY.

10         AND THEN AS I SAID, JUST THE PROFOUND ABSENCE OF ANY

11    DOCUMENTATION FROM THE POINT OF THE MENTAL CONCEPT TO YOUR

12    ABILITY TO ARTICULATE IT WAS TOTALLY INCONSISTENT WITH WHAT I

13    HAVE EVER SEEN IN 45 YEARS OF DEALING WITH PATENTS EITHER AT

14    STANFORD OR OUTSIDE OF STANFORD.

15         AND SO THAT WAS SUFFICIENT FOR ME TO ARRIVE AT THE

16    CONCLUSION AT THAT YOU AND YOUR FATHER HAD ACCESS TO THE

17    INFORMATION CONTAINED IN THE THERANOS PROVISIONALS.

18         AND WHATEVER ELSE YOU HAVE PATENTED OR IN THE PAST, I

19    DIDN'T SEE IT HAVING A BEARING ON THAT.

20    Q.   NO BEARING WHATSOEVER?

21    A.   NOT AT THAT POINT, NOT GIVEN WHAT WAS IN FRONT OF ME, NO.

22    Q.   OKAY.  SO AS YOU STAND HERE TODAY YOU ARE THE NAMED

23    INVENTOR ON FOUR PATENTS I BELIEVE THAT WAS YOUR TESTIMONY?

24    A.   NO.

25    Q.   SIX, DID I MISSTATE?
```

CROSS-EXAM BY MR. FUISZ

1   A.   SIX.

2   Q.   SIX PATENTS SO THAT'S APPROXIMATELY 108 FEWER PATENTS THAN

3   RICHARD FUISZ, AND THAT WAS OF NO INTEREST TO YOU?

4   A.   I WAS FOCUSED ON A VERY PARTICULAR ISSUE.  THAT IS THE '612

5   PATENT, NOT ANY OF YOUR OTHER PATENTS.  AND THE FOUR

6   PROVISIONALS DIDN'T BEAR ON THAT ANALYSIS AS TO AN ISSUE OF

7   CAPABILITY OR THINGS YOU HAD DONE IN THE PAST.

8        I WAS FOCUSED ON WHAT HAD HAPPENED WITH REGARD TO THE

9   FOUR PROVISIONALS AND THE PATENT.  THAT WAS THE ISSUE THAT I

10  WAS ASKED TO EXAMINE.

11  Q.   OKAY.  IS IT FAIR TO SAY THEN AS WELL THAT YOU HAVE NO

12  KNOWLEDGE OF MY FATHER'S CLINICAL EXPERIENCE AS A PHYSICIAN; IS

13  THAT FAIR TO SAY?  OR VERY LITTLE?

14  A.   I WOULD SAY VERY LITTLE, YES.

15  Q.   AND WOULD IT ALSO BE FAIR TO SAY THAT YOU HAVE VIRTUALLY NO

16  KNOWLEDGE OF HIS EXPERIENCE WITH CLINICAL TRIALS?

17  A.   NO, I DON'T.

18  Q.   WOULD IT BE FAIR TO SAY YOU HAVE VIRTUALLY NO KNOWLEDGE OF

19  HIS DRUG DELIVERY WORK?

20  A.   WELL I HAVE SOME KNOWLEDGE, YES, BECAUSE YOU DESCRIBED IT.

21  Q.   THAT WAS THE SUM TOTAL OF YOUR KNOWLEDGE WAS WHAT I

22  DESCRIBED IN MY OPENING STATEMENT OR MY FATHER, WHAT HE

23  DESCRIBED?

24  A.   NO, ACTUALLY I AT ONE POINT LOOKED AT THE PATENTS THAT HAVE

25  BEEN ASSIGNED TO HIM AND I SAW THAT LARGE AMOUNT OF NUMBER OF

CROSS-EXAM BY MR. FUISZ

1   THEM WERE ASSOCIATED WITH DRUG DELIVERY, SO I KNEW THAT.

2   Q.   BUT YOU DIDN'T INVESTIGATE -- EVEN THOUGH YOU HAVE WORKED

3   IN THE DRUG DELIVERY INDUSTRY YOURSELF, IT WASN'T OF ANY

4   INTEREST OF YOU TO LOOK AT THE WORK HE HAD DONE IN DRUG

5   DELIVERY?

6   A.   NO, WHAT WAS PERTINENT WAS THE INVESTIGATING WHETHER OR NOT

7   THE DISCLOSURES MADE IN THE '612 PATENT WERE PRESENT IN THE

8   THERANOS PROVISIONALS.

9   Q.   OKAY.  SO YOU KNOW VIRTUALLY, YOU HAVE VIRTUALLY NO

10  KNOWLEDGE THEN OF DR. FUISZ'S MEDICAL DEVICE INVENTIONS; IS

11  THAT CORRECT?

12  A.   NOT NO KNOWLEDGE.  HE DESCRIBED AN INVENTION YESTERDAY.

13  Q.   IN REACHING THE CONCLUSION IN YOUR REPORT, I'M SORRY.  IN

14  REACHING THE OPINIONS EXPRESSED IN YOUR REPORT YOU HAD NO

15  KNOWLEDGE?

16  A.   NO, MY ISSUE WAS NOT ONE OF CAPABILITY OF DOING ONE THING

17  OR ANOTHER.  THE ISSUE WAS JUST LOOKING AT THE OBJECTIVE

18  MATERIALS THAT I HAD IN FRONT OF ME.

19  Q.   AND THOSE MATERIALS WERE SELECTED BY COUNSEL FOR YOU?

20  A.   I WAS PROVIDED THOSE MATERIALS BY COUNSEL, THE 401, THE

21  FOUR THERANOS PROVISIONALS AND THE '612 PATENT.  ALSO THE 117

22  PROVISIONAL, THE PATENT PROSECUTION HISTORY AND SOME MATERIAL

23  ARE REGARD TO PRIOR ART.

24  Q.   SO YOU HAD, IN REACHING YOUR REPORT YOU HAVE VIRTUALLY NO

25  KNOWLEDGE OF DR. FUISZ'S E-COMMERCE RELATED INVENTIONS?

CROSS-EXAM BY MR. FUISZ

1    A.   OTHER THAN I COULD SEE THEM LISTED ON THE --

2    Q.   DID YOU REVIEW THEM?

3    A.   NO.

4    Q.   YOU KNOW NOTHING ABOUT DR. FUISZ'S ATTEMPT TO PATENT

5    ELECTRONIC CURRENCY?

6    A.   NO, I DON'T.

7    Q.   YOU KNOW NOTHING ABOUT OUR NEWLY PATENTED SOLID DOSAGE FORM

8    WITH IMPROVED ESOPHAGEAL TRANSIT PROPERTIES?

9    A.   NOTHING OTHER THAN WHAT I BELIEVE YOU DESCRIBED YESTERDAY.

10   Q.   OKAY.  AND AGAIN, APART FROM WHAT I DESCRIBED YESTERDAY IN

11   REACHING YOUR REPORT YOU KNOW NOTHING ABOUT HIS VIDEO SEQUENCE

12   E-COMMERCE INVENTION CALLED VISUAL E-MARKETING?

13   A.   AS I SAID, IT WASN'T AN ISSUE OF CAPABILITY IT WAS AN ISSUE

14   OF LOOKING AT THE OBJECTIVE MATERIALS AND MAKING A

15   DETERMINATION BASED ON THAT.  THAT'S WHAT I DID.

16   Q.   OKAY.  WELL LET ME MOVE ALONG THEN.

17        IT'S FAIR TO SAY THAT YOU, WHEN YOU REACHED YOUR REPORT

18   YOU HAD VIRTUALLY NO IDEA OF ARTS MASTERED BY DR. FUISZ OVER

19   THE LAST 40 YEARS, IS THAT A FAIR STATEMENT?

20   A.   AS I SAID I DID NOT INVESTIGATE HIS PAST OR HIS PAST

21   ACCOMPLISHMENTS IN DETAIL, NO.

22   Q.   SO AS A RESULT YOU CAN'T SAY FROM WHAT PERSPECTIVE AND WHAT

23   BACKGROUND AND WHAT ART AND SKILLS HE WAS APPROACHING MEDICAL

24   ANALYZERS?

25   A.   WHATEVER THEY WERE IT RESULTED IN THE '612 PATENT, AND WHEN

CROSS-EXAM BY MR. FUISZ

```
1    I DID MY ANALYSIS, I FOUND THAT THE THERANOS PROVISIONALS

2    DISCLOSED WHAT WAS IN THE '612 PATENT.  I DIDN'T INVESTIGATE

3    HOW THE '612 PATENT CAME ABOUT.

4         AND IN FACT, I WAS INTERESTED IN THAT.  AND I ASKED FOR ANY

5    DOCUMENTATION THAT WOULD BE AVAILABLE THAT WOULD SHOW THIS PATH

6    TO THE INVENTION.  AND I WAS TOLD NOTHING EXISTS.

7         AND THAT, AS I'VE SAID SEVERAL TIMES, IS ENTIRELY

8    INCONSISTENT WITH MY OWN EXPERIENCE FOR A VERY LONG TIME IN

9    DEALING WITH PATENTS OF ALL KINDS.

10   Q.  AND DOES THAT PERSONAL EXPERIENCE EXTEND TO CLOSE WORK WITH

11   INDIVIDUAL INVENTORS WHO PATENT PROLIFICALLY ACROSS MULTIPLE

12   SUBJECT AREAS?

13   A.  I HAVE CERTAINLY AT STANFORD ENCOUNTERED INVENTORS WHO HAVE

14   MULTIPLE, MANY PATENTS, YES.

15   Q.  BY MANY YOU MEAN HOW MANY?

16   A.  I CAN'T GIVE YOU A NUMBER.

17   Q.  OKAY.  NOW, AND PLEASE CORRECT ME IF I'M MISSTATING YOUR

18   TESTIMONY, DR. ROBERTSON.  I BELIEVE YOU'VE STATED YOUR VIEW

19   THAT THERE'S ONLY ONE NOVEL IDEA IN THE '612 PATENT.  THE

20   SELECTING BY A PRESCRIBING PHYSICIAN OR DRUG COMPANY AT LEAST

21   ONE THRESHOLD VALUE OF AT LEAST ONE ANALYTE TO BE SENSED BY THE

22   BODILY FLUID ANALYZER, THE THRESHOLD VALUE OF THE AT LEAST ONE

23   ANALYTE ASSOCIATED WITH A PARTICULAR DRUG.  BEING OR BEING

24   TAKEN BY A PATIENT OR -- SORRY, I HAVE A TYPO IN MY QUOTE OF

25   YOU.  COURSE OF TREATMENT FOR THE PATIENT.
```

CROSS-EXAM BY MR. FUISZ

1          AND THAT'S PARAGRAPH 20 OF YOUR REPORT.

2              MR. BOIES:  OBJECTION YOUR HONOR.

3          I DON'T HAVE ANY OBJECTION TO HIS PUTTING THE PARAGRAPH

4     OF THE REPORT UP.  I THINK IT MISSTATES WHAT'S IN IT

5              MR. J. FUISZ:  I THINK I D. MY NOTES MISSTATE IT.

6              THE COURT:  LET ME SUSTAIN THE OBJECTION AND INVITE

7     MR. FUISZ TO PUT ANOTHER QUESTION TO THE WITNESS THAT FOCUSES

8     ON THE ACTUAL LANGUAGE.

9     BY MR. J. FUISZ:

10    Q.  SO PARAGRAPH 20, YOU OPINE, I WILL READ FULLY YOUR QUOTE.

11         IN MY OPINION, ACTUALLY EXCUSE ME PARAGRAPH 19.

12         IT IS MY OPINION THAT THERE WAS ONLY ONE LIMITATION IN

13    THE '612 PATENT THAT WAS NOVEL AS OF SEPTEMBER 23RD, 2005.

14    SELECTING BY A PRESCRIBING PHYSICIAN OR A DRUG COMPANY AT LEAST

15    ONE THRESHOLD VALUE OF AT LEAST ONE ANALYTE TO BE SENSED BY THE

16    BODILY FLUID ANALYZER, AT LEAST ONE THRESHOLD VALUE OF THE AT

17    LEAST ONE ANALYTE BEING ASSOCIATED WITH A PARTICULAR DRUG BEING

18    OR BEING TAKEN BY THE PATIENT OR COURSE OF TREATMENT FOR THE

19    PATIENT.

20         DID I READ THAT CORRECTLY?

21    A.  YES, YOU DID.

22    Q.  IS THAT -- IS THAT ELEMENT, IS THAT TERRIBLY COMPLEX?

23    A.  TERRIBLY COMPLEX, NOW LET ME SEE IF I CAN ANSWER THAT.

24         WHEN YOU READ IT OR WHEN WE HEAR IT, IT SOUNDS SIMPLE.

25    CONCEIVING OF THAT IS NOT SIMPLE, IT'S DIFFICULT.  AND IT TAKES

CROSS-EXAM BY MR. FUISZ

1    TIME, ENERGY, EFFORT TO WORK YOUR WAY TO A POINT TO WHERE THIS

2    CONCEPT IS ELIMINATED.  I KNOW THAT FOR A FACT BECAUSE THAT'S

3    WHAT HAPPENED OVER THE TWO PLUS YEARS AT THERANOS WHICH FINALLY

4    ALLOWED THE COMPANY TO REACH THE POINT WHERE IT COULD

5    ARTICULATE THIS.

6         I WILL GIVE YOU AN EXAMPLE.  TAKE THE WHEEL.  THAT'S A

7    SIMPLE THING TO DESCRIBE.  HUMANS WERE ON THE FACE OF THIS

8    EARTH FOR TENS OF THOUSANDS OF YEARS BEFORE SOMEONE CONCEIVED

9    OF, IMPLEMENTED THE WHEEL.

10        SO THE ELEGANCE OF MANY INVENTIONS AND PROFOUND

11   INVENTIONS, IN MY VIEW, IS THAT THEY MAY BE SIMPLE TO

12   COMMUNICATE, BUT UNDERLYING THAT IS A GREAT DEAL OF COMPLEXITY.

13   SO YES, I DO CONSIDER THIS COMPLEX.

14   Q.  SO YOU THINK IT'S LIKE THE WHEEL.  OKAY.  I'M SORRY, THAT

15   WASN'T A QUESTION.  I APOLOGIZE.

16        JUST A QUICK QUESTION FOR YOU.  THE 489 PROVISIONALS

17   DIRECTED TO MINIMIZING CALIBRATION ERRORS.  WOULD YOU AGREE

18   WITH THAT?  THE '489 PROVISIONAL.  THE THERANOS 489, MINIMIZING

19   CALIBRATION ERRORS.

20        DR. ROBERTSON, I DON'T WANT TO INTERRUPT YOU, BUT MAYBE

21   IT WILL HELP US MOVE ALONG FASTER.

22        ALL I WANTED TO REALLY FOLLOW UP WITH IS THE '489

23   ADDRESSES CALIBRATION AND THE CALIBRATION IS NOT DISCUSSED IN

24   THE '612.  IS THAT CORRECT, TO YOUR KNOWLEDGE?  MAYBE THAT'S AN

25   EASIER QUESTION TO ANSWER.

CROSS-EXAM BY MR. FUISZ

1    A.   IT DOES FOCUS ON CALIBRATION OF BLOOD ANALYZER DEVICES.

2    BUT IT ALSO, IN SEVERAL PLACES ALSO LAYS OUT THE CONCEPT THAT

3    THE HANDHELD ANALYZER ITSELF, THIS HANDHELD ANALYZER WE HAVE

4    BEEN TALKING ABOUT HAS THE CAPACITY FOR COMPUTATION, HAS MICRO

5    PROCESSORS BUILT INTO IT, AND OF COURSE THAT'S VERY CONSISTENT

6    WITH WHAT WE HAVE HERE IN THE '801 IS HAVING THAT CAPACITY TO

7    MAKE THOSE ANALYSIS, AS OPPOSED TO THE ANALYZER SIMPLY BEING A

8    DUMB BOX THROUGH INFORMATION IS TRANSMITTED BACK AND FORTH

9    WITHOUT HAVING THE ABILITY TO DO ANYTHING.  SO THAT'S ANOTHER

10   ASPECT OF THE '489 THAT IS IMPORTANT.

11   Q.   OKAY.  THANK YOU, DR. ROBERTSON.

12        THE '801 WHICH IS -- I UNDERSTAND TO BE DIRECTED TOWARDS

13   PK AND PD, YOU WOULD AGREE OF COURSE WITH THE STATEMENT THAT

14   THE '612 PATENT DOESN'T CONTEMPLATE PROGRAMMING ANALYZERS IN

15   CONNECTIONS WITH THRESHOLDS OF PHYSICAL PARAMETERS LIKE BLOOD

16   PRESSURE, TEMPERATURE, RESPIRATORY RATE AND OTHERS OF THE LIKE.

17   THOSE WOULDN'T BE ANALYTES SO THEY ARE OUT OF THE '612

18   A.   THEY ARE NOT ANALYTES.

19   Q.   RIGHT.  DO YOU BELIEVE THAT THE '612 COVERS THE MEASUREMENT

20   OF NON ANALYTES?

21   A.   I DON'T BELIEVE IT DOES.

22   Q.   OKAY.  I'M ALMOST DONE, IF YOU WILL JUST BEAR WITH ME.

23        DR. ROBERTSON, I KNOW YOU WORK WITH PATENTS A LOT.  DO

24   YOU CONSIDER YOURSELF FAMILIAR WITH PATENT PROSECUTION

25   PROCEDURES?

CROSS-EXAM BY MR. R. FUISZ

1   A.   WELL, IN WHAT SENSE.

2   Q.   THE DOCUMENTATION ASSOCIATED WITH FILING PATENTS.

3   DOCUMENTS THAT GO INTO FILING A PROVISION.  SPECIFICALLY, THE

4   POWER OF ATTORNEY TO THE PROSECUTING LAW FIRM?

5   A.   IF THAT'S YOUR QUESTION, I'M NOT FAMILIAR WITH THAT ASPECT,

6   NO.

7           THE COURT:  ARE YOU FINISHED MR. FUISZ.

8           MR. J. FUISZ:  I AM, DR. ROBERTSON, I APPRECIATE IT.

9           THE COURT:  THANK YOU, MR. FUISZ.

10      MS. ANDERSON, DR. FUISZ, DO YOU HAVE ANY QUESTIONS?

11

12          **CROSS-EXAMINATION BY MR. RICHARD FUISZ**

13

14  BY MR. R. FUISZ:

15  Q.   HELLO DR. ROBERTSON, I'M DOCTOR RICHARD FUISZ, SON OF JOHN.

16      YOU KNOW I HAVE JUST SOMETHING THAT CONFUSES ME A BIT AND

17  I'M HOPING YOU CAN HELP ME.

18      WOULD YOU AGREE THAT IN THE THERANOS PROVISIONALS IT'S

19  VERY COMMON TO USE THE TERM THERAPEUTIC INDEX?

20  A.   IT'S USED IN THE '192 PROVISIONAL.

21  Q.   IS THAT THE ONLY PLACE YOU FEEL IT'S USED IN THE

22  PROVISIONAL?

23  A.   IT'S THE PLACE I'M MOST FAMILIAR WITH IT BEING USED, YES.

24  Q.   LET ME ASK YOU A QUESTION.  WHAT IS THE THERAPEUTIC INDEX

25  OF BILIRUBIN?

CROSS-EXAM BY MR. R. FUISZ

1    A.   YOU MEAN THE NUMBER?

2    Q.   NO, DOES BILIRUBIN HAVE A THERAPEUTIC INDEX?

3    A.   DEPENDS ON HOW YOU DEFINE THERAPEUTIC INDEX.

4    Q.   WELL I'M DEFINING IT --

5    A.   I THINK THE QUESTION WOULD BE YES, IN THE CONTEXT OF THE

6    WAY IT'S DESCRIBED.

7    Q.   WHAT IF I --

8    A.   AND IF IT DOES HAVE A VALUE.

9    Q.   IF I WERE TO TELL YOU THAT THE AMERICAN PHARMACOPEDIA AND

10   THE MERRIAM WEBSTER NONE OF WHICH SAY BILIRUBIN HAS ANY

11   THERAPEUTIC INDEX, BECAUSE IT'S NOT A DRUG?

12   A.   NO, IT'S -- THERAPEUTIC INDEX AS USED IN THE THERANOS

13   PROVISIONALS, THAT WOULD REFER TO ITS CONCENTRATION OF BODILY

14   FLUID.  THAT'S HOW A THERAPEUTIC INDEX IS USED IN THESE

15   PROVISIONALS.

16   Q.   ALL RIGHT.  NOW, THE MOST COMMON TESTS I ORDER ARE

17   BILIRUBIN CREATINE, LEAD, ARSONIC, FILTRATION RATE IN A KIDNEY,

18   BUN, TO MY KNOWLEDGE NONE OF THOSE HAVE A THERAPEUTIC INDEX

19   OUTSIDE OF THE VERY UNIQUE DEFINITION THAT THERANOS SEEMS TO

20   HAVE GIVEN BY VIRTUE OF ITS PROVISIONALS AND WHAT YOU ARE JUST

21   SAYING.

22        THERAPEUTIC INDEX, I THINK YOU -- WELL, GO AHEAD AND

23   ANSWER THAT PART, PLEASE

24            MR. BOIES:  OBJECTION.  TO THE FORM OF THE QUESTION,

25   YOUR HONOR.

CROSS-EXAM BY MR. R. FUISZ

1          THE COURT:  I WILL SUSTAIN THE OBJECTION.  DR. FUISZ,

2     YOU MAY ASK YOUR QUESTION IF A SLIGHTLY DIFFERENT FORM, GO

3     AHEAD.

4     BY MR. R. FUISZ:

5     Q.  WELL, LET'S BACK UP A SECOND THEN.

6          THERAPEUTIC INDEX, I'M A PHYSICIAN FOR 55 YEARS, MEANS TO

7     ME A PRACTICING PHYSICIAN

8          MR. BOIES:  OBJECTION, YOUR HONOR.

9          THE COURT:  ALL RIGHT.  LET ME HEAR THE FULL QUESTION

10    THEN I WILL ENTERTAIN THE OBJECTION.

11    BY MR. R. FUISZ:

12    Q.  THE FULL QUESTION IS SIMPLY THE GENERALLY MEANING OF

13    THERAPEUTIC INDEX IS WHAT DOSAGE OF A DRUG BEGINS TO HELP A

14    PERSON AND WHAT DOSAGE WILL BASICALLY HARM OR KILL THE PERSON.

15         AND THAT IS CALLED A THERAPEUTIC INDEX OF THE DRUG AND IT

16    IS UNIQUE TO NEW DRUGS THAT ARE BEING DEVELOPED WHEN THE DRUG

17    COMPANY IS TRYING TO DECIPHER FOR THE FOOD AND DRUG

18    ADMINISTRATION WHAT DOSAGES THAT DRUG IS TO BE AVAILABLE IN.

19    THAT'S THE ORIGIN OF THE TERM THERAPEUTIC INDEX?

20    A.  I UNDERSTAND THAT, BUT I AM QUITE AWARE OF THE USE OF

21    THERAPEUTIC INDEX IN THAT FORM.  I KNOW THAT IT'S A LETHAL DOSE

22    OR A REALLY EFFECTIVE DOSE, AND I KNOW 92 HUMANS IT'S NOT THE

23    LETHAL DOSE BECAUSE YOU DON'T TAKE CLINICAL TRIALS TO LETHALITY

24    AS YOU KNOW YOU DO THAT IN ANIMAL STUDIES.

25         I'M FULLY AWARE OF THAT.  BUT THAT'S NOT HOW THERAPEUTIC

CROSS-EXAM BY MR. R. FUISZ

1    INDEX IS USED IN THE THERANOS PROVISIONALS.  AND IT'S VERY WELL

2    DESCRIBED.  IT'S VERY WELL DEFINED AND IT HAS A MEANING.  IT

3    HAS A MEANING THAT IS SPECIFIC TO WHAT IS DESCRIBED IN THE '192

4    AND IT DOESN'T MAKE ANY ATTEMPT TO RELATE IT TO HOW THAT TERM

5    MIGHT BE USED IN A DIFFERENT WAY, AS YOU KNOW IT AND AS I KNOW

6    IT.

7    Q.   DR. ROBERTSON, WOULD YOU STRONGLY DENY OR WHAT IS YOUR

8    FEELING ON IS IT A COINCIDENCE THAT THE THERANOS PROVISIONALS

9    AT THAT POINT IN TIME WHEN THE COMPANY'S BUSINESS MODEL WAS

10   ORIENTED TOWARDS CLINICAL TRIALS, IS IT AN ACCIDENT THAT

11   THERAPEUTIC INDEX IS SO COMMONLY USED, AS WELL AS PK AND PD?

12        MR. BOIES:  OBJECTION YOUR HONOR.  IT ASSERTS FACTS

13   NOT IN EVIDENCE.

14        THE COURT:  ALL RIGHT.  I WILL SUSTAIN THE OBJECTION.

15        DR. FUISZ YOU MAY ASK YOUR QUESTION AGAIN IN A SLIGHTLY

16   DIFFERENT FORM.  GO AHEAD, SIR.

17   BY MR. R. FUISZ:

18   Q.   WOULD YOU AGREE THAT THERAPEUTIC INDEX IS A VERY COMMON

19   TERM IN NEW DRUG DEVELOPMENT?

20   A.   I AGREE IT HAS BEEN IN NEW DRUG DEVELOPMENT JUST AS IT HAS

21   BEEN IN THE THERANOS PROVISIONALS '192 PROVISIONAL.  WHICH IS

22   VERY WELL DEFINED.

23   Q.   BUT SIR THAT'S NOT WHAT I ASKED.  WHAT I'M ASKING YOU IS

24   WOULD THERAPEUTIC INDEX HAVE A PARTICULAR MEANING AND ORIGIN IN

25   CLINICAL TRIALS?

CROSS-EXAM BY MR. R. FUISZ

1    A.  I KNOW THAT THERAPEUTIC INDEX, AS YOU'RE TALKING ABOUT IT,

2    CERTAINLY IS USED IN CLINICAL TRIALS.  I'M NOT DENYING THAT,

3    AND I UNDERSTAND THE TERMINOLOGY AND I UNDERSTAND THAT

4    DEFINITION OF IT.  IT'S SIMPLY, IT'S THE SAME WORD USED FOR

5    DIFFERENT PURPOSES IN THE '192.

6    Q.  COULD YOU UNDERSTAND AS A CLINICIAN, AS SOMEONE WHO TWO

7    NIGHTS AGO TOOK CARE OF A PATIENT AND HAD TO ORDER A BILIRUBIN,

8    WHY I HAVE A PARTICULAR PROBLEM WITH THE TERM THERAPEUTIC INDEX

9    RELATIVE TO THE '612, WHERE I'M DEFINING A LIMITATION THAT HAS

10   NOTHING TO DO WITH THE THERAPEUTIC INDEX.  I DON'T KNOW WHAT

11   THE THERAPEUTIC INDEX IS FOR BILIRUBIN AND I'M PRACTICING FOR

12   50 YEARS?

13          THE WITNESS:  BUT YOU'RE --

14          MR. BOIES:  OBJECTION YOUR HONOR.

15          THE COURT:  THE OBJECTION IS SUSTAINED.

16      AGAIN, DR. FUISZ IF YOU WANT TO ASK YOUR QUESTIONS IN A

17   MORE REFINED FORM YOU MAY.  GO AHEAD SIR

18   BY MR. R. FUISZ:

19   Q.  AS A PRACTICING PHYSICIAN I DON'T KNOW THE THERAPEUTIC

20   INDEX FOR BILIRUBIN.  IS THAT A FAULT OF MINE, IN YOUR OPINION?

21          MR. BOIES:  MY WE APPROACH, YOUR HONOR.

22          THE COURT:  YOU MAY.

23   (SIDE-BAR DISCUSSION OFF THE RECORD.)

24          THE COURT:

25          MR. BOIES:  MAY I ASK FOR THE COURT TO INSTRUCT

255

CROSS-EXAM BY MR. R. FUISZ

1    MR. FUISZ THAT IN QUESTIONING THE WITNESS AS OPPOSED TO ASKING

2    A WITNESS QUESTIONS HE'S NOT SUPPOSED TO MAKE ASSERTIONS ABOUT

3    HIS PERSONAL LIFE.

4             MR. R. FUISZ:  SORRY.

5             THE COURT:  LET ME JUST EXPLAIN SO WE CAN MOVE THIS

6    ALONG.  WHEN YOU ASK FOR QUESTIONS OF THE WITNESS, THE QUESTION

7    HAS TO BE FOCUSSED ON WHAT HE KNOWS OR DOESN'T KNOW.  YOU

8    CANNOT TESTIFY.  YOU WILL HAVE THAT OPPORTUNITY AT A LATER

9    TIME.

10        THANK YOU.

11        PLEASE CONTINUE, DR. FUISZ.

12   BY MR. R. FUISZ:

13   Q.  THAT'S MY LAST QUESTION AND THEN I WILL LEAVE THIS.

14        DO YOU THINK THERE'S SOMETHING WRONG FOR EXAMPLE WITH A

15   MEDICAL TEXTBOOK THAT STATES THAT THE THERAPEUTIC INDEX IS --

16   DOES NOT EXIST FOR BILIRUBIN

17   A.  IN THE CONTEXT IF WE ARE HAVING THAT DISCUSSION, I CAN

18   UNDERSTAND THAT.  BUT THAT DOESN'T BEAR ON HOW THERAPEUTIC

19   INDEX WAS DEFINED AND USED IN THE '192.  IT'S JUST DIFFERENT.

20   IT'S TWO DIFFERENT THINGS.

21   Q.  SO IN EFFECT, AND WE WILL LEAVE IT THERE, YOU WOULD SAY

22   THAT THERANOS IN ITS PROVISIONALS HAS A SOMEWHAT, DO YOU AGREE

23   OR DISAGREE, YES OR NO, HAS A SOMEWHAT UNIQUE VIEW OF HOW YOU

24   DEFINE A THERAPEUTIC INDEX?

25   A.  IT HAS ITS WAY OF HAVING DONE IT AND IT DESCRIBE ITS SO

CROSS-EXAM BY MR. R. FUISZ

1    THAT THERE'S NO AMBIGUITY IN TERMS OF WHAT IT MEANS.

2    Q.   YOU WERE TESTIFYING YESTERDAY ABOUT WALGREENS AND THE

3    EXCELLENCE SYSTEM THAT WAS BEING WORKED OUT BY THERANOS FOR

4    PHYSICIANS AT WALGREENS, DO YOU RECALL THAT?

5    A.   I WOULDN'T CHARACTERIZE IT THE WAY YOU JUST DID.

6    PHYSICIANS AT WALGREENS.

7    Q.   NOW HOW WOULD YOU -- IS THERANOS OPERATING AT WALGREENS?

8    A.   YES.

9    Q.   HOW WOULD YOU -- JUDGE, YOU MAY WANT TO STOP ME ON THIS BUT

10   I DIDN'T KNOW HOW ELSE TO PUT IT.

11       ON MARCH 5TH AT 2:00 P.M. I NEEDED A HOTEL IN PALO ALTO.

12   I NEEDED A CREATINE LEVEL DONE.  AND I CALLED WALGREENS, I WAS

13   PUT TO THE THERANOS PEOPLE AND I WAS ASKED AND TOLD IF I WAS A

14   PHYSICIAN IF I COULD SEND SOMEONE OVER WITH A SCRIPT FOR

15   CREATINE.  AND I WAS TOLD THEY DON'T DO CREATINES THAT WOULD

16   HAVE TO BE APPROVED BY CORPORATE.

17       SO I SAID OKAY I WILL LOOK UP THE NUMBER AND I WILL CALL

18   CORPORATE.  AND I SAID IF IT'S APPROVED BY CORPORATE SINCE WE

19   ARE AT THIS HOTEL, HOW LONG WILL IT TAKE UNTIL I GET A RESULT,

20   BECAUSE I'M USED TO LAB CORP WHICH IS GENERALLY 4 TO 6 HOURS I

21   CAN GET A CREATINE.  THE ANSWER WAS OH, IT WOULD TAKE AT LEAST

22   A FEW DAYS.

23       IS THAT YOUR COMMON EXPERIENCE?

24       MR. BOIES:  MAY WE APPROACH, YOUR HONOR?

25       THE COURT:  YOU MAY.

CROSS-EXAM BY MR. R. FUISZ

1    (SIDE-BAR DISCUSSION OFF THE RECORD.)

2         MR. R. FUISZ:  I OBJECT AND MOVE TO STRIKE.  THIS IS

3    EXACTLY WHAT YOU TOLD HIM NOT TO DO THREE SECONDS AGO.

4         THE COURT:  LET ME CUT TO THE CHASE.

5       YOU CANNOT TESTIFY AND ASK YOUR QUESTION, YOU HAVE TO ASK

6    THE QUESTION OF THE WITNESS, QUESTIONS ABOUT WHAT HE KNOWS OR

7    WHAT HE DOESN'T KNOW --

8         MR. R. FUISZ:  I'M SORRY.  I THOUGHT HE WAS ASKING --

9         THE COURT:  I WILL STRIKE THE LAST QUESTION AND

10   ENCOURAGE YOU TO MOVE ON.

11       LADIES AND GENTLEMEN OF THE JURY, PLEASE DISREGARD THAT

12   LAST QUESTION.

13       DR. FUISZ, YOU MAY ASK YOUR NEXT QUESTION.

14   BY MR. R. FUISZ:

15   Q.  TO YOUR KNOWLEDGE, DR. ROBERTSON, WHAT AREAS OF THE BODY

16   HAVE THE MOST -- I KNOW YOU ARE NOT A PHYSICIAN BUT YOU HAVE

17   PROBABLY TAKEN PHYSIOLOGY AT SOME POINT.  WHAT AREAS OF THE

18   BODY HAVE THE MOST NERVE FIBERS FOR PAIN?

19   A.  I DON'T KNOW, SPECIFICALLY.

20   Q.  WOULD YOU HAVE A QUARREL IF I SAID THE AREAS ARE THE

21   GENITALS AND THE FINGERTIPS?

22   A.  WOULD I ARGUE?  BECAUSE I DON'T HAVE A BASIS TO ARGUE.

23   Q.  OKAY.  SO I WILL TELL YOU A LITTLE STORY?

24        MR. J. FUISZ:  POP, YOU CAN'T TELL STORIES.  YOU

25   CAN'T TELL STORIES.

CROSS-EXAM BY MS. ANDERSON

1        MR. R. FUISZ:  OH, OKAY, I'M SORRY.  THANK YOU.

2     THANK YOU VERY MUCH.

3        THE COURT:  THANK YOU, DR. FUISZ.

4     MS. ANDERSON, DO YOU HAVE ANY QUESTIONS?

5        MS. ANDERSON:  YES, I DO.

6        THE COURT:  YOU MAY PROCEED.

7

8        **CROSS-EXAMINATION BY MS. ANDERSON**

9

10   MS. ANDERSON:

11   Q.  DR. ROBERTSON, YOU NOTED THAT IN YOUR TESTIMONY THAT YOU

12   WANTED TO LOOK AT ALL THE OBJECTIVE EVIDENCE.  AND YOU

13   INDICATED THAT YOU DIDN'T REVIEW THE PRIOR PATENT APPLICATIONS

14   OF THE DEFENDANTS HERE, MR. FUISZ, DR. FUISZ, JOE FUISZ,

15   CORRECT?

16   A.  APPLICATIONS FOR WHAT.

17   Q.  APPLICATIONS, I SHOULD SAY THE PATENT FILINGS OF JOE FUISZ

18   AND DOCTOR RICHARD FUISZ, YOU DID NOT REVIEW THOSE, CORRECT?

19   A.  OUTSIDE OF THE '612, NO.

20   Q.  THAT'S THE ONLY ONE YOU REVIEWED.  AND DID YOU REVIEW THE

21   LAB NOTEBOOKS FOR MS. HOLMES WITH REGARD TO THE PROVISIONAL

22   APPLICATIONS THAT YOU REVIEWED FOR THE JURY HERE TODAY AND

23   YESTERDAY?

24   A.  NO, I DIDN'T.

25   Q.  AND THAT WOULD BE OBJECTIVE EVIDENCE AS WELL, WOULDN'T IT?

CROSS-EXAM BY MS. ANDERSON

1    A.   YES, IT WOULD, BUT I KNOW SUCH LAB NOTEBOOKS EXIST.

2    Q.   OKAY.  BUT YOU DIDN'T REVIEW THEM AND COMPARE THEM?

3    A.   COMPARE THEM WITH WHAT?

4    Q.   WITH THE PATENT FILINGS THAT WE HAD FOR THE COURT?

5    A.   WHAT I COMPARED WAS THE INFORMATION IN THE FOUR THERANOS

6    PROVISIONALS WHICH AROSE FROM TWO AND A HALF YEARS OF WORK,

7    WHICH I KNOW IF I SUBSTANTIATE IT WITH A CONSIDERABLE OF

8    DOCUMENTATION.  I KNOW THAT BECAUSE I WAS THERE WATCHING PEOPLE

9    MAKE ENTRIES INTO LAB NOTEBOOKS AND DOING EXPERIMENTS AND SO

10   FORTH.

11       SO I KNOW THAT THAT PATH WAS FOLLOWED.

12   Q.   SO YOU HAVE PERSONAL KNOWLEDGE OF COURSE BECAUSE YOU ARE

13   THERE AT THERANOS?

14   A.   I AM.

15   Q.   BUT YOU ARE NOT AT THE OFFICES OF DR. FUISZ OR JOE FUISZ TO

16   SEE WHAT THEY'RE DISCUSSING, ARE YOU?

17   A.   I CAN'T HEAR WHAT THEY ARE DISCUSSING SO I SIMPLY WAS

18   LOOKING FOR DOCUMENTARY EVIDENCE THAT WOULD HELP ME UNDERSTAND

19   HOW THE PATH WAS FORGED FROM THE MENTAL CONCEPT TO THE POINT OF

20   ARTICULATION.  A PATH THAT I KNOW TOOK US AT LEAST TWO AND A

21   HALF YEARS TO GET TO THAT POINT.

22       I DIDN'T SEE ANY EVIDENCE OF THAT ON THE PART OF THE

23   FUISZES.  AND I ASKED FOR IT AND I WAS TOLD THERE WAS NOTHING

24   THERE'S NOTHING ELSE I COULD DO.  HOW COULD I POSSIBLY HEAR

25   WHAT THEY ARE TALKING ABOUT WHEN I'M NOT EACH IN THE ROOM WITH

CROSS-EXAM BY MS. ANDERSON

1    THEM?

2    Q.   THAT'S TRUE.  YOU WEREN'T.

3         YOU SAY TO THAT POINT, AND I WANT TO DISCUSS THE POINTS

4    THAT WERE REACHED BECAUSE, WOULD YOU DEGREE WITH ME THAT WHAT'S

5    DISPLAYED IN FRONT OF THE JURY FIGURE 4-A IS A COMPLETE

6    DESCRIPTION OF THE '801 PROVISIONAL, AT LEAST IN A 3-D OR 2-D

7    MANNER THAT THE JURY CAN VIEW?

8    A.   I DON'T KNOW THAT IT --

9    Q.   IT SHOWS THE FULL SCHEMATIC?

10   A.   IT SHOWS A SCHEMATIC OF A WAY IN WHICH THOSE CONCEPTS COULD

11   BE EXPRESSED.  THAT'S WHAT IT SHOWS.

12   Q.   OKAY.  WELL, LET'S TAKE A LOOK AT THE '801 BECAUSE I WANT

13   TO AT LEAST LOOK AT EACH OF THE SCHEMATICS WITH THE JURY.

14        AND IT IS IN EVIDENCE, YOUR HONOR

15             THE COURT:  YOU MAY PROCEED, MS. ANDERSON.  GO AHEAD.

16             MS. ANDERSON:

17   Q.   I'M GOING TO BRING IT UP ON SCREEN FOR YOU.

18        OKAY.  IT DOESN'T ROTATE PROPERLY, I APOLOGIZE, BUT THIS

19   IS ACTUALLY FROM THE COMPLAINT.

20        SO YOU CAN HAVE IT IN FRONT OF YOU AND YOU HAVE IT IN

21   YOUR BINDER AS WELL, CORRECT?

22   A.   YES.

23   Q.   AND WE START WITH THE FIRST PAGES, AND I DON'T SEE ANY

24   DIAGRAMS HERE, STARTING WITH THE FIRST PAGES, RIGHT?  WE HAVE

25   PAGE ONE IS YOUR NOTICE REGARDING CHANGE OF POWER OF ATTORNEY.

CROSS-EXAM BY MS. ANDERSON

1    IS THAT WHAT YOU HAVE IN FRONT OF YOU?

2    A.   YES.

3    Q.   OKAY.  AND THEN WE GO TO PAGE TWO, YOU HAVE SIGNATURES

4    THERE ON PAGE TWO ON THE CHANGE OF POWER OF ATTORNEY?

5    A.   YES.

6    Q.   AND THERE'S SOME SIGNATURES DOWN THERE, DO YOU RECOGNIZE

7    MS. HOLMES'S SIGNATURE?

8    A.   ON THE NOTICE REGARDING CHANGE OF POWER OF ATTORNEY, NO.

9    Q.   I WILL BRING IT UP FOR YOU A LITTLE LARGER ON THE SCREEN.

10           THE WITNESS:  THAT'S THE ASSIGNMENT OF APPLICATION.

11           MR. BOIES:  THIS IS PAGE THREE.

12           THE COURT:  ALL RIGHT.  I BELIEVE THE REFERENCE IS TO

13   PAGE THREE, DR. ROBERTSON.  IS THAT CORRECT?

14           MS. ANDERSON:  YES, IT'S PAGE THREE, I DIDN'T COUNT

15   THE EXHIBIT COVER SHEET.

16           THE COURT:  WHY DON'T YOU GO AHEAD.

17           MS. ANDERSON:  OKAY.

18   Q.   THE SIGNATURE THAT'S ON THE SCREEN IN FRONT OF YOU ON THE

19   LINE THAT'S TYPED BELOW IT, ELIZABETH HOLMES.  IS THAT

20   ELIZABETH HOLMES'S SIGNATURE, IF YOU RECOGNIZE IT?

21   A.   ACTUALLY, I DON'T RECOGNIZE IT.  I MEAN, I'M NOT SAYING

22   THAT'S NOT HER SIGNATURE, BUT --

23   Q.   OKAY.  THIS WOULD BE --

24           MR. BOIES:  WE WILL STIPULATE THAT IT'S HER

25   SIGNATURE, YOUR HONOR.

CROSS-EXAM BY MS. ANDERSON

```
 1              (OFF-THE-RECORD DISCUSSION.)

 2              THE COURT:  I BELIEVE THERE ARE BATES NUMBERS AS WELL

 3    THAT MIGHT BE MORE PRECISE.  IN ANY EVENT, WHY DON'T WE SEE IF

 4    WE CAN MOVE THIS ALONG.

 5              MS. ANDERSON:

 6    Q.  ALL RIGHT.  I'M GOING TO SCROLL TO THE FIRST DIAGRAM,

 7    BECAUSE THAT'S WHAT I'M TRYING TO BRING UP.  SO FAR I DON'T SEE

 8    ANY DIAGRAMS.

 9              THIS IS TO ASSIST THE JURY SO THAT THEY CAN UNDERSTAND

10    THE INVENTION, CORRECT?  DO YOU UNDERSTAND?

11    A.  DO I UNDERSTAND WHAT FIGURE IS USED FOR, IS THAT WHAT YOU

12    ARE ASKING?

13    Q.  I'M ASKING YOU TO IDENTIFY WHAT THE FIRST FIGURE IS IN THIS

14    PROVISIONAL APPLICATION?

15    A.  WELL, AT THE END.

16    Q.  OKAY.  UP ON THE SCREEN WAS THE FIRST ONE I FOUND.  WOULD

17    YOU AGREE THAT THAT IS THE FIRST FIGURE, ALTHOUGH IT'S SIDE

18    WAYS?

19    A.  YES THAT'S FIGURE ONE.

20    Q.  AND IT DISPLAYS SOMETHING THAT'S READING, APPARENTLY, THE

21    BLOOD?

22    A.  WELL I THINK IT SHOWS A SUBJECT, A PATIENT INTERACTING WITH

23    A HAND HELD, WHAT'S CALLED THE RDX METABOLIC PROFILER.  AND YOU

24    CAN SEE THE BLOW UP IN THE LITTLE CIRCLE THAT DOESN'T SHOW VERY

25    WELL IS A RECEPTACLE TO RECEIVE THE DROP OF BLOOD FROM THE
```

CROSS-EXAM BY MS. ANDERSON

1    FINGERPRINT.

2    Q.   WOULD YOU AGREE THAT'S THE SAME WAY THE BLOOD GLUCOSE

3    READER OPERATES, IT DETECTS THE BLOOD?

4    A.   A GLUCOMETER.

5    Q.   GLUCOMETER, I HAVE A LITTLE DIFFERENT ACCENT ON IT?

6    A.   GLUCOMETER CAN WORK IN A NUMBER OF WAYS.  THE BLOOD CAN BE

7    PUT ON A STRIP AND THE STRIP IS THEN INSERTED INTO A READER

8    ANALYZER DEVICE.

9    Q.   OKAY.  MUCH LIKE THIS DEVICE RIGHT HERE?  I WILL SHOW IT TO

10   YOU.

11         MAY I APPROACH?

12             THE COURT:  YOU MAY.

13   Q.   IS IT MUCH LIKE THIS DEVICE, OTHER THAN THE FACT THIS A

14   TEST STRIP IS REQUIRED?

15   A.   WELL, I CAN'T ANSWER THAT, I DON'T KNOW ALL THE

16   CAPABILITIES OF THIS DEVICE ARE AND WHETHER THEY ARE INCLUDED

17   WITH ALL THE CAPABILITIES OF THE ONE THAT'S SHOWN IN THE

18   FIGURE.

19   Q.   YOU CAN -- YOU HAD INDICATED AT SOME POINT YOU WERE

20   FAMILIAR WITH GLUCOMETERS?

21   A.   YES, I CONSULTED WITH LIFE SCAN WHICH IS ONE OF THE LONGEST

22   MANUFACTURES OF GLUCOMETERS.

23   Q.   THE ONE I HANDED YOU FOR THE RECORD IS AN OMNIPOD, CORRECT?

24   A.   THAT'S WHAT IT SAYS, YES.

25   Q.   AND JUST USING THAT FOR DEMONSTRATIVE PURPOSES, THESE TYPES

CROSS-EXAM BY MS. ANDERSON

1    OF DEVICES READ THE BLOOD WITHIN THE UNIT ITSELF ANALYZE THE

2    BLOOD?

3    A.  YES.

4    Q.  THE DATA IS NOT SENT UP TO THE INTERNET?

5    A.  I DO NOT KNOW THAT THAT'S THE CASE WITH EVERY DEVICE OUT

6    THERE.  I DON'T KNOW ALL THE DEVICES.

7    Q.  OKAY.  ARE YOU AWARE AT ALL, YOU SAID YOU ARE NOT FAMILIAR

8    WITH ALL THE DEVICES THAT ARE OUT THERE.

9         WHEN OMNIPID FIRST PUT THIS TYPE OF DEVICE ON THE MARKET

10   AND I WILL SHOW YOU, IF I MAY APPROACH, THE POD THAT GOES WITH

11   THAT

12   A.  NO, I'M NOT FAMILIAR WITH THIS PARTICULAR DEVICE.

13   Q.  OKAY.  SO YOU HAVEN'T SEEN THE PODS THAT GO WITH -- I CALL

14   THEM GLUCOMETERS, YOU CALL THEM GLUCOMETER?

15   A.  AS I SAID I HAVEN'T SEEN THIS PARTICULAR DEVICE, NO.

16   Q.  OKAY.  USING THAT DEVICE AS AN EXAMPLE AND LOOKING AT

17   FIGURE 4-A, AND ASSUMING FOR THE MOMENT THAT IT DOESN'T

18   DIRECTLY COMMUNICATE WITH THE INTERNET, OKAY, WOULD YOU AGREE

19   THAT WHAT WE ARE TALKING ABOUT IS COMMUNICATION BETWEEN THE

20   ANALYZER ITSELF, READING WITHIN THE ANALYZER ITSELF GIVING THE

21   DATA AND GIVING THE READING, THAT'S WHAT THE FUNCTION IS OF THE

22   GLUCOMETER?

23   A.  I DON'T UNDERSTAND YOUR QUESTION.

24   Q.  IT DOESN'T NEED TO COMMUNICATE WITH THE INTERNET TO GIVE

25   YOU A READING, DOES IT?

CROSS-EXAM BY MS. ANDERSON

1    A.  AS I SAID I'M NOT FAMILIAR WITH THIS DEVICE, I DON'T KNOW

2    HOW IT OPERATES.

3    Q.  YOU'VE SEEN GLUCOMETERS BEFORE, CORRECT?

4    A.  I HAVE -- AS I TOLD YOU I CONSULTED WITH LIFE SCAN A NUMBER

5    OF YEARS AGO ON GLUCOMETERS, YES.

6    Q.  AND ALL GLUCOMETERS COMMUNICATE WITHIN THE DEVICE ITSELF TO

7    GIVE THE PATIENT A READING IMMEDIATELY WITHIN THIS DEVICE?

8    A.  I PERSONALLY DON'T KNOW THAT.

9    Q.  NOW YOU SAID YOU HAD INDICATED THAT YOU HAD STUDIED THE

10   PRIOR ART IN THIS AREA.  AND YOU DIDN'T STUDY THE PRIOR ART

11   INVOLVING GLUCOMETERS?

12   A.  I STUDIED THE PRIOR ART, THE PRIOR ART THAT I USED IN MY

13   REPORT, THAT WAS THE EXTENT OF IT.

14   Q.  AND YOU STOPPED THERE?

15   A.  IT'S NOT A QUESTION OF STOPPING, IT'S A QUESTION OF HAVING

16   REACHED A POINT WHERE I WAS SATISFIED THAT THE ANALYSIS I WAS

17   DOING WAS COMPLETE.

18        THERE'S, AS YOU KNOW, ONE COULD GO ON FOREVER AND EVER.

19   Q.  AND YOU WEREN'T AWARE THAT MEDTRONIC AND OTHER PROVIDERS

20   OUT THERE HAD GLUCOMETERS ON THE MARKET FOR CLOSE TO AT LEAST

21   THE LATE NINETIES?

22   A.  I'M FAMILIAR THERE ARE GLUCOMETERS ON THE MARKET, YES.

23   Q.  AND THEY READ THE BLOOD AND ANALYZE THE BLOOD ON THE UNIT

24   ITSELF?

25   A.  YES, MANY OF THEM DO.  YOUR QUESTION WAS MIGHT THEY DO IT

CROSS-EXAM BY MS. ANDERSON

1    SOME OTHER WAY, AND MIGHT THEY INTERACT IN SOME WAY WITH AN

2    EXTERNAL DATABASE OR THE INTERNET WITH TWO-WAY COMMUNICATIONS.

3    THAT'S POSSIBLE, I JUST DON'T KNOW.  SO I'M NOT GOING TO GIVE

4    YOU A CATEGORICAL ANSWER THAT SAYS THEY DON'T EXIST BECAUSE I

5    DON'T KNOW.

6    Q.   WELL, LET'S TAKE THEM FROM A PARTICULAR TIME FRAME AND

7    LIMIT THE ART THAT YOU HAD TO KNOW.

8        LET'S START FROM THE YEAR 2,000 UNTIL ABOUT 2010.  ARE

9    YOU AWARE OF A SINGLE GLUCOMETER OUT THERE THAT COMMUNICATED

10   DIRECTLY FROM THE DEVICE ITSELF, NOT FROM THE POD, BUT FROM THE

11   DEVICE ITSELF, TO THE INTERNET?

12   A.   AS I SAID I DIDN'T INVESTIGATE THAT SO I CAN'T GIVE YOU AN

13   ANSWER ONE WAY OR THE OTHER.

14   Q.   IF WE LIMIT THE TIME FRAME FROM BETWEEN 2000 AND 2005, ARE

15   YOU AWARE OF A SINGLE UNIT THAT COMMUNICATED WITH THE INTERNET?

16   A.   THAT'S NOT A QUESTION I CAN ANSWER BECAUSE I HAVEN'T

17   INVESTIGATED IT.  HOW COULD I POSSIBLY ANSWER THAT QUESTION

18   WHEN I HAVEN'T LOOKED?  I'M NOT GOING TO SPECULATE.

19   Q.   OKAY.  WOULD YOU AGREE THEN THAT IF THE GLUCOMETER DO NOT

20   COMMUNICATE DIRECTLY WITH THE INTERNET, THAT IT SETS THEM APART

21   FROM WHAT THERANOS DID THAT IN MAKING A DEVICE THAT IN ORDER TO

22   ANALYZE THE DATA, IT HAS TO SEND IT TO THERANOS?

23   A.   SO I DON'T AGREE WITH YOUR PREMISE SO THE ANSWER IS I CAN'T

24   ANSWER THAT.

25       YOU KNOW, I TEACH A COURSE IN CRITICAL AND ANALYTICAL

CROSS-EXAM BY MS. ANDERSON

1    THINKING AND I'M TRYING TO FOLLOW THAT PROCESS IN ANSWERING

2    YOUR QUESTIONS.

3         AND I'M NOT GOING TO AGREE WITH PRINCIPLES I CAN'T AGREE

4    WITH BECAUSE I HAVE NO WAY OF ASCERTAINING THE VORACITY.

5    Q.   OKAY.  WELL LET'S START WITH THE PREMISE AGAIN.  WE HAVE A

6    UNIT, IT'S SELF CONTAINED.

7    A.   WHAT IS THAT YOU ARE HOLDING?

8    Q.   IT COULD BE ANYTHING, IT COULD BE THIS PAD OF PAPER.  WE

9    HAVE A UNIT THAT'S SELF CONTAINED.  IT GETS THE BLOOD.  IT

10   READS THE BLOOD, AND IT PROVIDES A READING ON A SCREEN,

11   CORRECT?  OF A BLOOD GLUCOSE READING.  AND IS THAT THE BASIC

12   FUNCTION OF A GLUCOMETER?

13   A.   WELL, YOU'VE DESCRIBED AN EXAMPLE, YES.

14   Q.   OKAY.  I'VE DESCRIBED AN EXAMPLE.  NOW WOULD YOU AGREE THAT

15   THE RDX UNIT, THAT IS DESCRIBED IN THIS DIAGRAM, DOES NOT

16   DETECT THE BLOOD AND GIVE A READING ON THE SCREEN WITHOUT

17   HAVING A CONNECTION TO THE INTERNET?

18   A.   THIS HAS A TWO-WAY CONNECTION TO THE INTERNET AND IT'S

19   DESCRIBED ON THE DIAGRAM.

20   Q.   OKAY.  SO YOU AGREE IT REQUIRES A TWO-WAY CONNECTION TO THE

21   INTERNET TO GIVE A READING?

22   A.   WELL IN THIS CASE, YES, BECAUSE IT HAS TO DOWNLOAD THE

23   REFERENCE VALUE FROM THE INTERNET IN ORDER TO MAKE THE

24   COMPARISON, AT LEAST WHAT'S DESCRIBED ON FIGURE FOUR.

25   Q.   WELL, WE'VE GONE THROUGH THE FIRST SCREEN.  WE RECEIVE GONE

CROSS-EXAM BY MS. ANDERSON

1    THROUGH THE SECOND SCREEN.  AND HERE WE SHOW A MANAGED NETWORK

2    COMMUNICATING WITH A COMPUTER, CORRECT.

3        THE NEXT SCREEN HAS NO PICTURES.  THE NEXT SCREEN DOESN'T

4    LOOK LIKE A DEVICE IT'S MORE OF THE DETAILS, WOULD YOU AGREE,

5    FIGURE TWO B

6    A.   FIGURE TWO B SHOWS YOU THE DISTINCTION BETWEEN

7    PHARMACODYNAMIC PARAMETERS AND PHARMACOKINETIC PARAMETERS.

8    Q.   OKAY.  SO IT DOESN'T DESCRIBE THE TOTAL ARCHITECTURE OF THE

9    DEVICE, CORRECT?

10   A.   IT DOESN'T SAY ANYTHING ABOUT THE ARCHITECTURE OF THE

11   DEVICE.

12   Q.   THEN WE GO TO FIGURE THREE.  WE START AT THE BOTTOM OF THE

13   SCREEN AND YOU HAVE -- IF YOU COULD LOOK AT THE SCREEN, DOCTOR,

14   FIRST WE READ THE -- SORRY.  LET ME START HERE.

15       WE HAVE THE ANALYZER IN THE CENTER, CORRECT

16   A.   YES.

17   Q.   OKAY.  AND IT ANALYZES AND THEN THE ARROWS ON THE LEFT-HAND

18   SIDE INDICATE THAT DATA IS FLOWING TO THE INTERNET TO SOME

19   COMPUTER SOMEWHERE.  THE CLOUD THERE IS THE INTERNET, RIGHT?

20   A.   IT SHOWS SOME INFORMATION, DATA IS BEING TRANSMITTED TO THE

21   INTERNET AND THAT SOME CAN BE RECEIVED FROM THE INTERNET.

22   Q.   AND THEN SOME DATA IS RECEIVED BACK FROM THE INTERNET.

23   HERE IT DOES NOT SHOW THAT THE ANALYZER IS GIVING THE RESULT

24   WITHIN ITSELF WITHOUT THE NECESSITY OF CONNECTING WITH THE

25   INTERNET?

CROSS-EXAM BY MS. ANDERSON

1    A.   YOU CAN'T TELL FROM THAT PICTURE ALONE.  YOU SEE THE

2    RESULTS ARE COMING OUT OF THE ANALYZER AND FROM THIS THERE

3    COULD BE TWO POSSIBILITIES IN MY MIND.

4         ONE WOULD BE THAT THE ANALYSIS WAS DONE ON THE ANALYZER

5    AND MICRO PROCESSORS ON THE ANALYZER.  AND THE OUT WARD FLOW OF

6    DATA COULD BE THE RESULTS OF THAT.

7         ANOTHER POSSIBILITY IS THAT INFORMATION IS COMING DOWN

8    FROM THE INTERNET ON TO THE ANALYZER SO IT CAN FORM THE

9    ANALYSIS OR IT COULD BE THE RESULTS OF THE ANALYSIS GOING OUT

10   TO THE INTERNET WHERE THE ANALYSIS IS PERFORMED THERE.

11        SO IT'S -- IT EMBODIES TWO POSSIBILITIES.

12   Q.   THAT'S YOUR OPINION?

13   A.   NO, IT'S NOT MY OPINION, THAT'S WHAT IT SHOWS.

14   Q.   THAT'S YOUR OPINION?

15   A.   NO --

16   Q.   THOSE WOULD SHOW THE RESULTS ARE THERE WITHOUT THE USE OF

17   THE INTERNET.  AND LASTLY --

18   A.   I DON'T THINK YOU COULD MAKE THAT DETERMINATION BY LOOKING

19   AT THAT FIGURE.

20   Q.   YOU COULDN'T?

21   A.   BECAUSE YOU DON'T KNOW WHAT NECESSARILY IS BEING

22   COMMUNICATED TO THE INTERNET.  IT'S JUST NOT POSSIBLE UNLESS

23   YOU HAVE A CONTEXT FOR IT.  AND I'VE ALREADY TOLD YOU WHAT THE

24   CONTEXT IS.  THE CONTEXT IS THAT INFORMATION CAN FLOW IN EITHER

25   DIRECTION, RESULTS CAN FLOW OUT, REFERENCE VALUES COULD FLOW

CROSS-EXAM BY MS. ANDERSON

1    IN, THE ANALYSIS COULD BE DONE IN EITHER PLACE.

2    Q.  ALL RIGHT.  WELL, WE ARE LOOKING AT 4-A.  WE HAVE ALREADY

3    DISCUSSED 4-A.

4        AGAIN, WE HAVE INFORMATION BEING ANALYZED AT

5    THERANOS.COM, CORRECT?

6    A.  I WILL SAY IT AGAIN ON THIS PARTICULAR --

7    Q.  I DON'T WANT YOU TO REPEAT, IS IT BEING ANALYZED AS

8    THERANOS ON THIS, INFORMATION FLOWING FROM THERANOS?

9    A.  THE -- AS I DESCRIBED IN THE FIGURE THE MAPPING ALGORITHMS

10   AND THE DECISION, THE COMPUTATION IS BEING DONE --

11       MR. BOIES:  YOUR HONOR SHE'S CHANGED PAGES UP HERE.

12   SHE'S GONE FROM FIGURE 4-A WHICH THE WITNESS WAS TALKING ABOUT

13   TO FIGURE FOUR-B.  AND I THINK THAT IS NOT APPROPRIATE.  I

14   OBJECT.

15       THE COURT:  ALL RIGHT.  I WILL OVERRULE THE

16   OBJECTION.  THE WITNESS CAN COMPLETE HIS ANSWER THEN CAN WE

17   MOVE ON TO ANOTHER FIGURE.  LET'S TRY TO KEEP THIS MOVING IF WE

18   CAN.

19       MS. ANDERSON:  I AM.  I'M TRYING TO GET TO THE FINAL

20   QUESTION, YOUR HONOR.

21   Q.  LAST FIGURE THAT'S IN '801 AGAIN SHOWS THERANOS AT THE HUB,

22   CORRECT?

23   A.  IT SHOWS WHAT WOULD BE A WEBSITE.

24   Q.  IT SHOWS A WEBSITE?

25       MR. BOIES:  YOUR HONOR, I'M GOING TO OBJECT UNLESS

CROSS-EXAM BY MS. ANDERSON

1    THE RECORD IS CLEAR WHAT SHE'S REFERRING TO WHEN SHE SAYS THE

2    LAST FIGURE.

3                 THE COURT:  ALL RIGHT.

4                 MS. ANDERSON:  FIGURE FOUR-B.

5                 THE COURT:  THE OBJECTION IS SUSTAINED.  I THINK THE

6    ISSUE HAS BEEN ADDRESSED.  WE ARE TALKING ABOUT FIGURE FOUR-B

7    OF THE PROVISIONAL APPLICATION.

8         GO AHEAD, COUNSEL

9                 MS. ANDERSON:  FOUR-B.

10   Q.   IT SHOWS THERANOS AT THE HUB; IS THAT CORRECT?

11   A.   IT SHOWS A CIRCLE WITH AN ADDRESS IN THE MIDDLE OF IT, IS

12   WHAT IT SHOWS.

13   Q.   OF THERANOS.COM?

14   A.   YES.

15   Q.   THANK YOU?

16                MS. ANDERSON:  I THINK EVERYBODY IS PROBABLY HUNGRY

17   AT THIS TIME, YOUR HONOR.

18                THE COURT:  ALL RIGHT.  THANK YOU, MS. ANDERSON.  I

19   THINK I UNDERSTAND FROM YOUR COMMENT YOU ARE FINISHED WITH YOUR

20   CROSS-EXAMINATION.

21                MS. ANDERSON:  THANK YOU.

22                THE COURT:  MR. BOIES, DO YOU HAVE FURTHER QUESTIONS

23   OF THE WITNESS.

24                MR. BOIES:  I DO YOUR HONOR.

25                THE COURT:  MIGHT I SUGGEST YOU PROCEED WITH YOUR

REDIRECT EXAM BY MR. BOIES

1    EXAMINATION.  WE WILL TAKE OUR LUNCH BREAK AFTER YOU ARE DONE.

2            MR. BOIES:  THANK YOU, YOUR HONOR.

3        THAT TELL ENCOURAGE ME TO BE BRIEF

4            THE COURT:  THAT MAY HAVE BEEN THE IDEA, MR. BOIES.

5            MR. BOIES:  I SUSPECTED.

6

7            **REDIRECT EXAMINATION BY MR. BOIES**

8

9    BY MR. BOIES:

10   Q.  GOOD AFTERNOON, DR. ROBERTSON.

11          I'M GOING TO TRY TO GO THROUGH SOME OF THIS VERY QUICKLY.

12          ONE OF THE DEFENDANTS SHOWED YOU '801 AND PARAGRAPHS 34

13   AND 35 OF THAT PROVISIONAL.  AND I WOULD LIKE YOU TO GET THAT

14   IN FRONT OF YOU.

15          AND LET'S PUT UP PARAGRAPH 34, FIRST.

16          AND YOU SAID THAT THIS WAS ONE EMBODIMENT OF WHAT

17   THERANOS WAS TEACHING, DO YOU RECALL THAT?

18   A.  THIS IS REGARDING FIGURE THREE?

19   Q.  I'M SORRY.  THIS IS PARAGRAPH 34 OF THE '801 PROVISION.  IT

20   DEALS WITH FIGURE THREE?

21   A.  YES.

22   Q.  AND THERE'S REFERENCE AT THE END TO FIGURE FOUR.  BUT WHEN

23   YOU WERE BEING ASKED ABOUT THIS, YOU TOLD THE OTHER SIDE THAT

24   THIS WAS ONE EMBODIMENT, DO YOU RECALL THAT?

25   A.  ACTUALLY, I DON'T REMEMBER USING THOSE WORDS.

REDIRECT EXAM BY MR. BOIES

1    Q.   OKAY.  LET ME ASK YOU, ARE THERE OTHER PORTIONS OF THE '801

2    AND THE OTHER THERANOS PROVISIONALS THAT TEACH OTHER

3    EMBODIMENTS OF THE INVENTION?

4    A.   LET ME LOOK THIS OVER.  YOU WOULD INTERPRET THIS ONE WHEN

5    IT SAYS THE DATA IS TRANSMITTED BYE THE PROFILER AND IS

6    ANALYZED USING THE APPROPRIATE ALGORITHMS, YOU WOULD, AND YOU

7    HAVE BEFORE THAT THE COMPUTER NETWORK HOSTING DATABASES.

8        ONE WAY TO INTERPRET THIS IS THAT THE ANALYSIS COULD BE

9    ACCOMPLISHED EXTERNALLY, BUT THERE ARE OTHER INSTANCES WHICH

10   PARTICULARLY FIGURE 4-A, WHICH WOULD SUGGEST THAT IT COULD ALSO

11   BE DONE ON THE ANALYZER.

12       AS I SAID, I BELIEVE THAT THE PROVISIONAL SHOWS BOTH

13   OPTIONS AS BEING POSSIBLE.

14   Q.   OKAY.  NOW LET ME ASK YOU TO LOOK AT PARAGRAPH 35 OF THE

15   THERANOS '801 PROVISIONAL.

16       YOU RECALL THAT I BELIEVE IT WAS MR. JOSEPH FUISZ ASKED

17   YOU ABOUT A DRUG CONTAINER AND HE HAD A BOTTLE OF SOME PILLS,

18   DO YOU RECALL THAT?

19   A.   YES.  I DO REMEMBER THAT, YES.

20   Q.   AND AS YOU UNDERSTAND IT, IS A DRUG CONTAINER ANYTHING THAT

21   COULD CONTAIN DRUGS, WHETHER THEY WERE IN A TABLET FORM OR SOME

22   OTHER FORM?

23   A.   THEY COULD BE IN A TABLET FORM WHICH IS WHAT HE SHOWED ME.

24   THEY COULD BE IN AN INGESTIBLE DRUG RELEASING FORM, A TABLET

25   DOESN'T HAVE TO NECESSARILY BE CONTROLLED DRUG RELEASE,

REDIRECT EXAM BY MR. BOIES

1    ALTHOUGH SOMETIMES I THINK ABOUT THEM AS BEING DRUG RELEASABLE.

2         IT COULD BE A PATCH, IT COULD BE ACTUALLY SOMETHING THAT

3    YOU WEAR.  OR IT COULD BE A CONTAINER WHICH IS ACTUALLY

4    IMPLANTED UNDER THE SKIN, FOR INSTANCE, SO THERE'S MANY

5    POSSIBILITIES WHEN YOU TALK ABOUT A DRUG CONTAINER.

6         I THINK WHAT SHE SHOWED US WHAT I THINK DRUGS IN A

7    CONTAINER, BUT THAT'S CERTAINLY NOT LIMITED TO THAT, THERE'S

8    MANY OTHER POSSIBILITIES.

9    Q.  I WOULD LIKE TO DIRECT YOUR ATTENTION TO THE NEXT TO LAST

10   SENTENCE OF PARAGRAPH 34 AND THERANOS '801 PROVISIONAL WHERE IT

11   SAYS, ANOTHER KIND OF IMMEDIATE ACTION WOULD BE TO SEND

12   INSTRUCTIONS TO THE PROFILER TO ALTER THE DOSING OF THE DRUG IF

13   THE PROFILER HAS THE BUILT IN DRUG DELIVERY CAPACITY, DO YOU

14   SEE THAT, SIR?

15   A.  YES.

16   Q.  AND COULD THE BUILT IN DRUG DELIVERY CAPACITY CONSTITUTE A

17   DRUG CONTAINER?

18   A.  ABSOLUTELY.  BECAUSE THAT'S WHERE THE DRUG WOULD BE

19   LOCATED.

20   Q.  NOW YOU WERE ASKED IN YOUR DISCUSSION OF CLAIM FIVE OF YOUR

21   REPORT.  IF YOU GO TO PARAGRAPH 142 OF YOUR REPORT, AND MAYBE

22   WE CAN PUT THAT UP ON THE SCREEN.  142.

23   A.  YES.

24   Q.  AND YOU REFERENCED THIS TUTTLE PATENT?

25   A.  I DID.

REDIRECT EXAM BY MR. BOIES

1    Q.   AND I POINTED OUT TO YOU THAT WAS A PATENT REGARDING

2    SHIPPING CONTAINERS, DO YOU RECALL THAT?

3    A.   YES, THAT'S WHAT HE SAID.

4    Q.   AND YOU WERE ASKED WHY WERE YOU LOOKING AT PATENTS RELATED

5    TO SHIPPING CONTAINERS FOR PRIOR ART FOR THINGS THAT RELATED TO

6    DRUG CONTAINERS, DO YOU RECALL THAT?

7    A.   YES, I DO.

8    Q.   AND YOU GAVE AN EXPLANATION?

9    A.   YES.

10   Q.   NOW IN ADDITION, HOWEVER, WHAT YOU WERE NOT SHOWN IS THE

11   NEXT PARAGRAPH, 143, AND IN 143, DO YOU TALK ABOUT PRIOR ART,

12   THAT DID TALK ABOUT DEVICES THAT ARE ACTIVATED ON VARIOUS

13   SIGNALS UPON OPENING A DRUG CONTAINER.

14   A.   YES, I'M AWARE OF THAT.  HE JUST DIDN'T ASK ME THAT,

15   THOUGH.

16   Q.   AND INDEED, WITHOUT HAVING YOU READ THE ENTIRE DISCUSSION

17   INTO THE RECORD, IS IT THE CASE THAT YOU GO ON FOR A NUMBER OF

18   PARAGRAPHS TALKING ABOUT THE PRIOR ART WITH RESPECT TO THE

19   CLAIM FIVE?

20             MR. J. FUISZ:  MAY I APPROACH, YOUR HONOR.

21             THE COURT:  YOU MAY.

22   (SIDE-BAR DISCUSSION OFF THE RECORD.)

23             MR. J. FUISZ:  I APOLOGIZE FOR BY WASTING THE COURT'S

24   TIME BUT THAT HE CANNOT ALTOGETHER AUTHENTICATE THAT REFERENCE

25   HE DOESN'T HAVE SUPPORT TO TO DO IT IN THE PRODUCTION SO I JUST

REDIRECT EXAM BY MR. BOIES

1    WANT TO MAKE THAT OBJECTION.

2              THE COURT:  MR. BOIES, ANY RESPONSE.

3              MR. BOIES:  NO THAT DOESN'T GO TO EITHER THE QUESTION

4    OR THE ANSWER, YOUR HONOR.

5              THE COURT:  ALL RIGHT.  THE OBJECTION IS OVERRULED.

6    LET'S CONTINUE.

7    BY MR. BOIES:

8    Q.  YOU WERE ASKED SOME QUESTIONS ABOUT HOW MANY PATENTS DOCTOR

9    RICHARD FUISZ HAS, DO YOU RECALL THAT?

10   A.  I THINK I WAS TOLD HOW MANY HE HAD.

11   Q.  NOW IN YOUR EXPERIENCE DOES THE VALUE OF PATENTS VARY VERY

12   WIDELY?

13   A.  OF COURSE IT DOES.

14   Q.  CAN YOU TELL ANYTHING ABOUT THE VALUE OF A GROUP OF PATENTS

15   JUST BY KNOWING THE NUMBER OF PATENTS?

16   A.  ABSOLUTELY NOT.

17   Q.  LET ME ASK YOU TO GO TO YOUR REPORT, PARAGRAPH 19.  IF WE

18   COULD PUT THAT UP.  AND IN THAT PARAGRAPH WE TALKED ABOUT THERE

19   WAS ONLY ONE LIMITATION IN THE '612 PATENT THAT WAS NOVEL AS OF

20   SEPTEMBER 23, 2005, AND THEN YOU DESCRIBE IT.  DO YOU SEE THAT?

21   A.  YES.

22   Q.  AND YOU THEN GO ON IN THE NEXT PARAGRAPHS WHICH YOU WERE

23   NOT SHOWN, TO TALK ABOUT THERANOS PROVISIONALS, DO YOU SEE

24   THAT?

25   A.  YES.

REDIRECT EXAM BY MR. BOIES

1    Q.   AND AS OF SEPTEMBER 2005, AS OF SEPTEMBER 232005, 3 OF THE

2    THERANOS PROVISIONALS HAD ALREADY BEEN FILED, CORRECT?

3    A.   CORRECT.

4    Q.   AND WHEN YOU TALKED ABOUT THE NOVEL ELEMENT, WERE YOU

5    TALKING ABOUT NOVEL COMPARED TO WHAT WAS PUBLICLY AVAILABLE AS

6    OF SEPTEMBER 23, 2005?

7    A.   WELL, THAT WAS THE ONLY -- IT WAS NOVEL PRIOR TO

8    SEPTEMBER 23RD, 2005, BUT IT WAS ALSO DISCLOSED IN THE THERANOS

9    PROVISIONALS PRIOR TO THAT, IF THAT'S WHAT YOU ARE ASKING ME.

10   Q.   YES.

11   A.   OKAY.  YEAH.

12   Q.   YOU WERE ALSO ASKED ABOUT THE THERAPEUTIC INDEX AS IT IS

13   USED IN THE THERANOS PROVISIONALS, DO YOU RECALL THAT?

14   A.   YES.

15   Q.   DO THE THERANOS PROVISIONALS MAKE CLEAR THAT SOME OF WHAT

16   IS BEING ANALYZED ARE THINGS OTHER THAN DRUGS?

17   A.   YES, AS WE'VE DISCUSSED, IT'S DRUGS, METABOLITES OF DRUGS,

18   BIOMARKERS, AND IT'S ALSO BIOMARKERS THAT INCLUDE ANALYTES AND

19   BIOMARKERS THAT INCLUDE WHAT ARE CALLED VITALS SUCH AS BLOOD

20   PRESSURE, RESPIRATION RATE, CARDIAC RATE AND SO FORTH.

21   Q.   AND WOULD THESE NECESSARILY INCLUDE ANALYTES OR SUBSTANCES

22   THAT FOR WHICH THERE WOULD NOT BE A THERAPEUTIC INDEX IN THE

23   WAY THAT DR. FUISZ WAS REFERRING TO IT?

24   A.   YES, THAT'S TRUE.  BUT THE THERAPEUTIC INDEX AS WE HAVE

25   DEFINED IN THE '192 HAS MEANING FOR DRUGS, METABOLITES AND

REDIRECT EXAM BY MR. BOIES

1     BIOMARKERS, ANYTHING WHERE ITS CONCENTRATION CAN BE MEASURED.

2          AND IN FACT, BILIRUBIN, THE COMPOUND HE WAS TALKING

3     ABOUT, CAN BE MEASURED IN THE BODILY FLUID.  AND THERANOS WOULD

4     HAVE A THERAPEUTIC INDEX FOR IT.

5          MR. BOIES:  THANK YOU, YOUR HONOR.  NO MORE

6     QUESTIONS.

7          THE COURT:  THANK YOU, MR. BOIES.

8          LADIES AND GENTLEMEN OF THE JURY, DO YOU HAVE ANY

9     QUESTIONS OF DR. ROBERTSON?

10         MR. RIVERA, IF YOU WOULD PLEASE RETRIEVE THE QUESTION.

11         THANK YOU, SIR.

12         WOULD YOU APPROACH, PLEASE.

13    (SIDE-BAR DISCUSSION OFF THE RECORD.)

14         THE COURT:  WE HAVE A SERIES OF QUESTIONS FROM THE

15    JURY.

16         THE FIRST QUESTION IS:  CAN YOU DESCRIBE THERANOS'S

17    STRATEGY, POLICY, PROCEDURES FOR PROTECTING ITS IP?

18         I BELIEVE THAT'S AN APPROPRIATE QUESTION.

19         THE SECOND QUESTION, DID THERANOS'S INVENTORS OF THE

20    DISPUTED BFA DOCUMENT INVENTIONS LEADING TO THE -- THE BODILY

21    FLUID ANALYZER, WERE IN A NOTEBOOK, AND IF SO WHAT WERE THE

22    DATES?

23         I THINK HE CAN ANSWER.

24         MR. J. FUISZ:  NONE OF THIS HAS BEEN PRODUCED.  I DO

25    NOT THINK HE CAN ANSWER.

REDIRECT EXAM BY MR. BOIES

1      THE COURT:  WELL, HE CAN BE ASKED THE QUESTION.  IF

2   THE ANSWER IS NO OR I DON'T KNOW, THE ANSWER CAN STAND.

3      THREE, DID ELIZABETH HOLMES OR YOU INVOLVE A STANFORD

4   OFFICE OF TECHNOLOGY LICENSING IN HER WORK THAT LEAD TO THE BFA

5   DEVICE IN QUESTION, WHY OR WHY NOT?

6      HE CAN ANSWER THAT.

7      FOUR, DO CLINICAL TRIALS MEASURE MORE THAN ONE ANALYTE OR

8   BIOMARKER AS A GENERAL?

9      FIVE, WHAT KIND OF EFFORT IN YOUR EXPERIENCE WOULD BE

10  NECESSARY TO INVENT THE BFA CLAIMED IN THE '612 PATENT AND HOW

11  LONG WOULD THAT TAKE?

12     I DON'T SEE ANY PROBLEM WITH THAT.

13     SIX, DID THE PATENT EXAMINER FOR THE '612 PATENT CONSIDER

14  THE PROVISIONAL PATENTS FOR THERANOS?  IF YES, WHY WERE THE

15  CLAIMS OF THE '612 PATENT ALLOWED?  IF NOT, WHY NOT?  WAS THIS

16  AN OVERSIGHT?  WILL THE EXAMINER BE CALLED AS A WITNESS?

17     I DON'T BELIEVE THAT'S AN APPROPRIATE QUESTION.

18      MR. J. FUISZ:  I AGREE.

19      THE COURT:  SEVEN.

20    IS THE PROVISIONAL PATENT INFORMATION PRIOR ART?

21    I DON'T THINK HE'S IN THE POSITION -- THAT'S A LEGAL

22  QUESTION, SO I CAN SUSTAIN THE OBJECTION.

23    EIGHT, IS REDUCTION OF PRACTICE REQUIRED TO GAIN THE

24  PATENT?

25      SO I'M GOING TO ASK THE QUESTIONS 1 THROUGH 5 AND OMIT

REDIRECT EXAM BY MR. BOIES

1    QUESTIONS 6 THROUGH 8.  ANY OBJECTION?

2         MR. J. FUISZ:  NO.

3         THE COURT:  ALL RIGHT.  LET'S PROCEED.

4    DR. ROBERTSON, WE HAVE A NUMBER OF QUESTIONS FROM THE

5    JURY THAT I HAVE THE RESPONSIBILITY TO ASK YOU ON THEIR BEHALF.

6    LET ME BEGIN, SIR, BY ASKING YOU TO DESCRIBE THERANOS'S

7    STRATEGY FOR PROTECTING ITS INTELLECTUAL PROPERTY.

8         WHAT IN YOUR MIND IS THAT STRATEGY?

9         THE WITNESS:  WELL, FIRST OF ALL, I'M NOT SURE I CAN

10   SPEAK FOR THEM FOR THE MANAGEMENT OF THE COMPANY.  I CAN GIVE

11   YOU MY PERSONAL IMPRESSION.

12        THE COURT:  I WOULD LIKE YOU TO SPEAK BASED ON YOUR

13   EXPERIENCE AS A MEMBER OF THE BOARD AND AS AN ADVISOR TO THE

14   COMPANY.

15   IF YOU KNOW, AND ONLY IF YOU KNOW, WHAT IS THE THERANOS

16   STRATEGY FOR PROTECTING ITS INTELLECTUAL PROPERTY?

17        THE WITNESS:  GENERALLY SPEAKING, THE COMPANY IS, I

18   THINK RIGHTFULLY SO, VERY PROTECTIVE OF ITS INTELLECTUAL

19   PROPERTY BECAUSE THAT'S WHAT THE COMPANY IS BEING BUILT ON.

20        AND THERE ARE A VARIETY OF WAYS OF PREVENTING THE

21   INADVERTENT DISTRIBUTION OF ONE'S INTELLECTUAL PROPERTY.

22        FOR INSTANCE, THE WAY THAT OUR FACILITIES ARE OPERATED

23   ARE IN SUCH A WAY THAT IT'S DIFFICULT TO ENTER UNLESS YOU HAVE

24   APPROPRIATE PERMISSIONS.  THAT'S ONE WAY.

25        ANOTHER IS TO BUILD A COMMITMENT AMONG THE EMPLOYEES THAT

REDIRECT EXAM BY MR. BOIES

1    THEY UNDERSTAND THE CRITICAL NATURE OF WHAT IT IS THEY'RE DOING

2    AND CREATING AND BEING SURE THAT THAT'S NOT DISTRIBUTED.

3         SO ONE IS THE, YOU MIGHT CALL IT THE DAY-TO-DAY

4    PROTECTION OF THE INTELLECTUAL PROPERTY.  AND OF COURSE THE

5    OTHER -- OR ANOTHER WAY IS TO USE THE PATHWAY OF PATENTS TO

6    PROVIDE PROTECTION OF THEIR INTELLECTUAL PROPERTY SO THAT IT'S

7    CLEAR WHAT GROUND YOU'VE STAKED OUT AND THAT YOU'VE PUT IN WHAT

8    YOU WANT TO PROTECT.

9         SO I THINK THE OVERALL STRATEGY IS TO, IS NOT TO

10   DISSEMINATE WHAT IT IS WE ARE DOING IN ANY WAY, SHAPE OR FORM

11   SO THAT OTHERS CAN LEARN ABOUT IT, I THINK THAT'S A VERY

12   TYPICAL STRATEGY THAT ONE WOULD TAKE.

13        AND SO IT ENCOMPASSES EVERYTHING FROM OUR DAY-TO-DAY

14   BEHAVIOR TO A LITTLE PROTECTION OF IT IN PATENTS.

15        I'M NOT QUITE SURE WHAT ELSE TO SAY TO THAT.

16            THE COURT:  I THINK I UNDERSTAND YOUR RESPONSE.

17        THANK YOU, SIR.

18        LET ME NEXT ASK YOU A QUESTION ABOUT THE FOUR THERANOS

19   PROVISIONAL PATENTS WE HAVE BEEN DISCUSSING IN THIS TRIAL TO

20   DATE.

21        TO YOUR KNOWLEDGE, DID THE INVENTORS FROM THERANOS ON

22   THESE FOUR PROVISIONAL PATENTS DOCUMENT THE INVENTIONS OR THEIR

23   WORK LEADING UP TO THE FILING OF THE PROVISIONS IN ANY KIND OF

24   NOTEBOOK OR OTHER WRITTEN RECORD?

25            THE WITNESS:  IN MY OPINION, YES, THEY DID, YES,

REDIRECT EXAM BY MR. BOIES

1    BECAUSE IT INVOLVED YEARS OF WORK AND I SPENT -- I SPENT

2    ACTUALLY MOST OF MY TIME THERE IN THE LABORATORIES IN THE R&D

3    FACILITIES WORKING SIDE BY SIDE WITH THE ENGINEERS AND THE

4    CHEMISTS IN THE BIOLOGISTS.  I SAW THEIR NOTEBOOKS.  I KNOW

5    THEY EXIST AND I SAW THEM MAKING ENTRIES INTO THEM.

6         SO THE ANSWER IS CERTAINLY YES.  YOU CAN WALK AROUND THE

7    COMPANY TODAY AND YOU WILL SEE PILES OF LABORATORY NOTEBOOKS ON

8    PEOPLE'S DESKS AND YOU WILL SEE THEM CARRYING THEM BACK AND

9    FORTH INTO THE LABORATORIES.

10        IT'S SIMPLY A WAY OF THE WAY ONE DOES SCIENCE AND

11   TECHNOLOGY IS YOU DO RECORD ALL YOUR -- THE RESULTS OF YOUR

12   EXPERIMENTS AND YOU RECORD YOUR IDEAS AND CREATE A DOCUMENTARY

13   PATH.  THAT'S JUST THE WAY WE EXIST.

14             THE COURT:  DO YOU KNOW THE DATES OF ANY OF THOSE

15   NOTEBOOKS OR RECORDS?

16             THE WITNESS:  DATES IN WHAT -- THEY WOULD BE DATED

17   FOR THE PERIOD OF TIME THAT WE BEGAN DOING WORK UP UNTIL THE

18   VERY -- TO THIS VERY DAY.

19             THE COURT:  HAVE YOU REVIEWED ANY OF THOSE NOTEBOOKS

20   OR RECORDS IN FORMING ANY OPINIONS YOU HAVE IN THIS CASE OR

21   OTHERWISE PREPARING YOUR TESTIMONY TODAY?

22             THE WITNESS:  NO, I HAVE NOT.

23             THE COURT:  I WANT TO NEXT ASK YOU ABOUT THE STANFORD

24   OFFICE OF TECHNOLOGY LICENSING.

25        TO YOUR KNOWLEDGE, WAS STANFORD'S OFFICE OF TECHNOLOGY

REDIRECT EXAM BY MR. BOIES

1    LICENSING INVOLVED IN ELIZABETH HOLMES'S WORK, THE WORK THAT

2    LEAD TO THE PROVISIONAL APPLICATIONS AND THE BODILY FLUID

3    ANALYZER DEVICE THAT WE ARE TALKING ABOUT IN THIS TRIAL?

4            THE WITNESS:  MY RECOLLECTION IS THAT THIS

5    INTELLECTUAL PROPERTY THAT, AND IDEAS AND CONCEPTS THAT LEAD UP

6    TO THE '937 PUBLICATION, WAS REVIEWED BY STANFORD TO SEE IF

7    THEY FELT THEY, IT'S DIFFICULT, TO SEE IF THEY FELT THEY HAD

8    ANY OWNERSHIP OF THAT SINCE ELIZABETH HAD BEEN AT STANFORD.

9         SO AS I RECALL WE WERE VERY CAREFUL TO DISCLOSE THAT AND

10   HAVE THEM MAKE AN ASSESSMENT OF WHETHER OR NOT THEY FELT THAT

11   INTELLECTUAL PROPERTY WAS AT LEAST IN PART OWNED BY THEM AND

12   THEY DECIDED IT WASN'T.

13           THE COURT:  THE NEXT QUESTION HAS TO DO WITH CLINICAL

14   TRIALS --

15           THE WITNESS:  IF I COULD, JUST SO THEY UNDERSTAND.

16           THE COURT:  GO AHEAD.

17           THE WITNESS:  THE LITMUS TEST FOR THAT IS WHETHER

18   STANFORD'S RESOURCES HAVE BEEN USED MORE THAN INCIDENTALLY IN

19   THE DEVELOPMENT OF AN INVENTION.

20        AND SO THAT'S -- SO THERE IS THE POSSIBILITY THAT SOME WORK

21   COULD BE DONE AT STANFORD AND YET THEY DON'T CLAIM OWNERSHIP TO

22   THAT INVENTION BECAUSE THEY CONSIDER IT TO BE INCIDENTAL.  AND

23   THAT'S THE WORD OR THE TERM THAT'S USED IN MAKING THAT

24   DETERMINATION.

25           THE COURT:  THANK YOU, DR. ROBERTSON.

REDIRECT EXAM BY MR. BOIES

1          LET ME NEXT TURN TO THE CLINICAL TRIALS THAT HAVE BEEN

2    REFERENCED HERE IN THIS TRIAL.

3          AS A GENERAL MATTER, IN YOUR EXPERIENCE, DO CLINICAL

4    TRIALS MEASURE MORE THAN ONE ANALYTE OR BIOMARKER?

5          THE WITNESS:  I WILL HAVE TO ANSWER IT IN THIS WAY,

6    I'M TRYING TO THINK OF A SPECIFIC EXAMPLE.

7          BUT GENERALLY IN A CLINICAL TRIAL YOU MAY BE LOOKING AT

8    THE EFFECT OF A SINGLE DRUG OR A COMBINATION OF DRUGS.  AN

9    EXAMPLE WOULD BE IN CANCER THERAPY WHERE, AS YOU MAY KNOW,

10   DRUGS ARE GIVEN IN MULTIPLE, 3 OR 4 DIFFERENT DRUGS.  AND SO

11   THOSE WOULD BE EXAMINED IN A CLINICAL TRIAL.

12        SO IT'S CERTAINLY VERY POSSIBLE THAT ONE COULD BE

13   MEASURING THOSE DRUGS.

14        NOW THE ELICITATION OF BIOMARKERS WOULD BE HOW THE BODY

15   IS REACTING TO THE DRUG.  AND IF THERE'S A KNOWLEDGE IN THE,

16   CERTAINLY FOR ANIMAL STUDIES BEFORE YOU DO IT IN HUMAN CLINICAL

17   TRIALS, THERE'S A KNOWLEDGE THAT MORE THAN ONE BIOMARKER IS,

18   CHANGES ITS CONCENTRATION AS A RESULT OF THAT THERAPY THEN YOU

19   MEASURE THOSE MULTIPLE BIOMARKERS.

20        SO I WOULD SAY YES TO THAT QUESTION.

21        THE COURT:  THE NEXT QUESTION I HAD FOR YOU, SIR, HAS

22   TO DO WITH THE EFFORT REQUIRED TO COME UP WITH THE INVENTION

23   CLAIMED IN THE '612 PATENT.

24        IN YOUR EXPERIENCE AND IN YOUR OPINION, WHAT KIND OF

25   EFFORT OR HOW LONG WOULD IT TAKE TO COME UP WITH OR INVENT THE

RE-CROSS EXAMINATION BY MR. J. FUISZ

1    ANALYZER AND RELATED METHOD AS CLAIMED IN THE '612 PATENT?

2              THE WITNESS:  WELL, I HAVE ONLY ONE REAL DATA POINT

3    ON THAT.  AND THAT IS IT TOOK THERANOS ALMOST TWO AND A HALF

4    YEARS TO REACH THE POINT OF THE DISCLOSURES THAT ARE IN THE

5    FOUR PROVISIONALS AND CAN BE FOUND IN THE '612.

6         SO I CAN TELL YOU FOR SURE AT LEAST TWO AND A HALF YEARS.

7              THE COURT:  ALL RIGHT.

8         THAT IS THE LAST QUESTION SUBMITTED THAT I WISH TO ASK OF

9    YOU THIS MORNING OR THIS AFTERNOON.

10        COUNSEL, MAY I ASK, DO YOU HAVE ANY FURTHER QUESTIONS OF

11   THIS WITNESS?

12             MR. BOIES:  NO, YOUR HONOR.

13             MR. J. FUISZ:  JUST ONE ON RECROSS.

14

15              **RE-CROSS EXAMINATION BY MR. J. FUISZ**

16

17   BY MR. J. FUISZ:

18   Q.  DR. ROBERTSON, WOULDN'T YOU AGREE THAT THERE IS AN

19   EXTENSIVE MATTER OF SUBJECT MATTER INCLUDING TECHNOLOGY RELATED

20   TO ASSAY METHODS, DEVICES ET CETERA, WHICH IS IN THE FOUR

21   PROVISIONALS OF THERANOS BUT WHICH IS NOT FOUND IN THE '612?

22   A.  I DON'T FOLLOW --

23   Q.  LET ME ASK IT IN SIMPLE TERMS.  THERE'S A LOT OF WORK,

24   THERE'S A LOT OF STUFF SUBJECT MATTER IN THE THERANOS

25   PROVISIONALS WHICH IS NOT IN THE '612.  WOULD YOU AGREE WITH

RE-CROSS EXAM BY MR. R. FUISZ

1    THAT?

2    A.   YES, I WOULD AGREE THAT NOT A LOT, THERE IS MATERIAL.  I

3    DON'T KNOW HOW YOU CATEGORIZE A LOT BUT THERE CERTAINLY IS

4    MATERIAL IN THE -- IN THOSE FOUR PROVISIONALS TAKEN AS AN

5    AGGREGATE THAT THAT INFORMATION DOES NOT APPEAR IF THE '612,

6    YES.

7            MR. J. FUISZ:  THANK YOU.

8            THE COURT:  DR. FUISZ, GO AHEAD.

9

10           **RE-CROSS EXAMINATION BY MR. R. FUISZ**

11

12    BY MR. R. FUISZ:

13    Q.   DR. ROBERTSON, TO JUST FOLLOW UP ON THAT.

14         WOULD YOU SAY THAT THE '612 PATENT IS MORE THE

15    PROGRAMMING OF THE ANALYZER AS OPPOSED TO THE DEVELOPMENT OF

16    THE ANALYZER ITSELF?

17    A.   I WOULDN'T CATEGORIZE IT THAT WAY, NO.

18    Q.   PARDON?

19    A.   I WOULDN'T CATEGORIZE IT THAT WAY.

20    Q.   HOW WOULD YOU CATEGORIZE IT?

21    A.   I WOULD SAY THAT THE '612 PRESENTS A BODILY FLUID ANALYZER

22    THAT'S CAPABLE OF MEASURING ANALYTES AND ENABLES REAL TIME

23    THERAPEUTIC MONITORING OF PATIENTS BASED UPON INDIVIDUAL

24    THRESHOLDS.  THAT'S EXACTLY WHAT IS DISCLOSED IN THE 401

25    PROVISIONALS.

RE-CROSS EXAM BY MR. R. FUISZ

1    Q.    WOULD YOU AGREE THE '612 COULD BE MATED TO THE MEDTRONIC

2    SYSTEM, COULD BE MATED TO THE ROCHE SYSTEM OR THE BAXTER OR

3    DOES IT VARY ON SYSTEM OR COULD BE MATED TO THERANOS'S SYSTEM

4    OF ANALYTICS?

5    A.    I DON'T UNDERSTAND THAT QUESTION, WHAT YOU SAY MATED.

6    Q.    WHAT I'M TRYING TO POINT OUT IS THE THERANOS PATENT

7    INCLUDES METHOD OF ANALYSIS, THE '612 DOES NOT INCLUDE METHOD

8    OF ANALYSIS IT IS THE METHOD THE DOCTOR PROGRAMS AN ANALYZER

9    WITH?

10   A.    OH, THAT MAY BE YOUR CHARACTERIZATION, BUT IT'S NOT MINE.

11          MR. R. FUISZ:  THANK YOU.

12          THE COURT:  THANK YOU, DR. FUISZ.

13      MR. BOIES DO YOU HAVE ANY QUESTIONS?

14          MR. BOIES:  NO, YOUR HONOR.

15          THE COURT:  ALL RIGHT.

16      DR. ROBERTSON, YOU MAY STEP DOWN, SIR.

17          LADIES AND GENTLEMEN OF THE JURY, WE HAVE REACHED THE

18   LUNCH HOUR.  WE WILL TAKE AN HOUR FOR LUNCH.  DO NOT DISCUSS

19   THE CASE WHILE YOU ARE OUT ON BREAK.  HAVE A GOOD LUNCH.

20          WE WILL SEE YOU BACK HERE SHORTLY.

21          (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD OUT OF

22   THE PRESENCE OF THE JURY:)

23          THE COURT:  WE WILL SEE YOU BACK HERE IN AN HOUR.

24   YOU MAY STEP DOWN, SIR.  THANK YOU.

25          (WHEREUPON A RECESS WAS TAKEN.)

RE-CROSS EXAM BY MR. R. FUISZ

1          (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD OUT OF

2     THE PRESENCE OF THE JURY:)

3               THE COURT:  GOOD AFTERNOON.  ALL RIGHT.  UNLESS THERE

4     ARE ANY OTHER ISSUES I WOULD LIKE TO BRING THE JURY BACK IN.

5          (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN THE

6     PRESENCE OF THE JURY:)

7               THE COURT:  LADIES AND GENTLEMEN, WELCOME BACK.  I

8     HOPE YOU HAD A GOOD LUNCH.

9          IT'S TIME TO CONTINUE WITH TESTIMONY IN THIS TRIAL.

10    MR. BOIES, YOU MAY CALL YOUR NEXT WITNESS.

11               MR. BOIES:  THANK YOU, YOUR HONOR.

12          THE PLAINTIFFS NOW CALL DOCTOR RICHARD FUISZ TO THE

13    STAND.

14               THE COURT:  DR. FUISZ.  SIR, IF YOU WOULD JUST MAKE

15    YOUR WAY AS BEST YOU CAN TO THE WITNESS STAND.  MR. RIVERA WILL

16    NEED TO SWEAR YOU BEFORE YOU BEGIN YOUR TESTIMONY.

17

18                    **DR. RICHARD FUISZ,**

19    BEING CALLED AS A WITNESS ON BEHALF OF THE

20    PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND

21    TESTIFIED AS FOLLOWS:

22               THE WITNESS:  YES, I DO.

23               THE CLERK:  THANK YOU.  PLEASE BE SEATED.

24               MR. BOIES:  MAY I PROCEED, YOUR HONOR.

25               THE COURT:  YOU MAY.

DIRECT EXAM BY MR. BOIES

1          MR. BOIES:  THANK YOU, YOUR HONOR.

2

3                **DIRECT-EXAMINATION BY MR. BOIES**

4

5     BY MR. BOIES:

6     Q.  GOOD AFTERNOON, DR. FUISZ.

7     A.  GOOD AFTERNOON.

8     Q.  I WOULD LIKE TO BEGIN WITH SOME BACKGROUND QUESTIONS?

9     A.  SURE.

10    Q.  HAVE YOU TESTIFIED BEFORE?

11    A.  YES.

12    Q.  HOW MANY TIMES?

13    A.  OH, I'M NOT SURE EXACTLY THE NUMBER.

14    Q.  APPROXIMATELY.

15    A.  3 OR 4.

16    Q.  ARE YOU COUNTING DEPOSITIONS AS WELL AS TRIAL?

17    A.  IF YOU COUNT DEPOSITION AND TRIALS, PROBABLY SIX.

18    Q.  HOW MANY TIMES HAVE YOU BEEN A PARTY TO A LAWSUIT YOURSELF?

19    A.  CORPORATELY?

20    Q.  YOURSELF.  YOUR OWN PERSONAL SELF.

21    A.  I DON'T KNOW, PERHAPS FOUR.

22    Q.  AND HOW MANY TIMES HAVE YOU BEEN A PARTY TO A LAWSUIT

23    THROUGH YOUR CORPORATIONS?

24    A.  POSSIBLY 3, 4.

25    Q.  NOW IN ANY OF THE TIMES THAT YOU HAVE PREVIOUSLY BEEN A

DIRECT EXAM BY MR. BOIES

1    PARTY TO A LAWSUIT, HAVE YOU EVER PROCEEDED PRO SE?

2    A.  I MIGHT JUST AS WELL HAVE, I DON'T THINK I OFFICIALLY DID.

3    Q.  IS THAT BECAUSE YOU DIDN'T LIKE YOUR LAWYER?

4    A.  THEY WEREN'T COMPETENT.

5    Q.  NOW THROUGHOUT MOST OF THIS LITIGATION YOU DID HAVE LAW

6    FIRMS REPRESENT YOU, CORRECT?

7    A.  NO, I DON'T THINK THAT'S CORRECT.

8    Q.  WELL, WHEN DID THIS LAWSUIT START, SIR?

9    A.  ABOUT TWO AND A HALF YEARS AGO.

10   Q.  AND FOR THE FIRST TWO YEARS, YOU WEREN'T PRO SE, CORRECT?

11   A.  WE WEREN'T OFFICIALLY PRO SE, WE WERE PRACTICALLY PRO SE.

12   Q.  WELL, YOU HAD LAWYERS WHO WERE TAKING THE DEPOSITIONS FOR

13   YOU, CORRECT?

14   A.  CORRECT.  AND SLEEPING.

15   Q.  IS IT YOUR TESTIMONY THAT YOU TERMINATED YOUR LAWYERS

16   BECAUSE THEY WERE NOT COMPETENT?

17   A.  NO, I DON'T WANT TO SAY THAT.

18   Q.  WHY DID YOU TERMINATE YOUR LAWYERS?

19   A.  BECAUSE I DIDN'T THINK THEY COULD REPRESENT US AS WELL AS

20   WE COULD REPRESENT OURSELVES IN THIS MATTER.  AND I THINK THAT

21   BECAUSE OF YOUR LARGE SIZE, WE COULDN'T AFFORD THE TYPE OF LAW

22   FIRM THAT COULD ACTUALLY GO AGAINST YOU.

23   Q.  WELL, SIR, WHEN YOU SAY YOU COULDN'T AFFORD IT --

24   A.  YES.

25   Q.  I DON'T MEAN TO PRY UNNECESSARILY, BUT JUST APPROXIMATELY,

DIRECT EXAM BY MR. BOIES

1    WHAT IS YOUR NET WORTH?

2    A.   I HAVE NO IDEA.  MOST OF IT I GAVE AWAY TO MY CHILDREN AND

3    TRUST.

4    Q.   WELL, YOU DIDN'T GIVE AWAY YOUR HOUSE, CORRECT?

5    A.   NO, I STILL HAVE A HOME.

6    Q.   AND YOU STILL HAVE, STILL HAVE YOUR ROLLS ROYCE'S?

7    A.   NO, I NEVER HAD ROLLS ROYCE'S.

8    Q.   BENTLEY IS IT?

9    A.   I HAVE A 50-YEAR OLD BENTLEY, 1967.

10   Q.   OKAY.  NOW I'M GOING TO ASK YOU AGAIN, APPROXIMATELY, WHAT

11   IS YOUR NET WORTH?

12   A.   DO I HAVE TO ANSWER THAT QUESTION.

13            THE COURT:  YOU DO, DR. FUISZ, PLEASE ANSWER.

14            THE WITNESS:  PERHAPS 6 MILLION, 7 MILLION.

15   Q.   NOW YOU AND YOUR SON ARE THE ONLY OWNERS OF FUISZ PHARMA,

16   CORRECT?

17   A.   YES.

18   Q.   AND HOW MUCH HAS FUISZ PHARMA RECEIVED IN THE LAST 2 OR

19   3 YEARS?

20   A.   IT DEPENDS ON RECEIVE.  ACTUALLY RECEIVED OR OWED TO US?

21   Q.   WELL, LET'S BEGIN WITH THAT -- LET ME BEGIN WITH BOTH OF

22   THOSE WHILE I FIND WHERE YOU TALKED ABOUT THIS IN YOUR

23   DEPOSITION?

24   A.   NO, I REMEMBER, YOU DON'T HAVE TO LOOK.  IT'S ROUGHLY, I

25   THINK IT'S ABOUT 4 OR 5 MILLION, BUT THAT INCLUDES LARGE

292

DIRECT EXAM BY MR. BOIES

1    LICENSING CONTRACTS WHICH ARE PARTIALLY PAID.

2    Q.   LET ME SHOW YOU YOUR DEPOSITION, AT PAGE 287.

3    A.   RIGHT.

4         THE COURT:  MR. BOIES, I APOLOGIZE FOR INTERRUPTING

5    YOU, SIR.  I DON'T PEER TO HAVE A COPY OF DR. FUISZ'S

6    TRANSCRIPT.

7         MR. BOIES:  I APOLOGIZE, YOUR HONOR.  I WILL GET ONE

8    RIGHT AWAY.

9         MS. ANDERSON:  YOUR HONOR, THIS IS OBJECTION.  NOT IN

10   EVIDENCE.

11        THE COURT:  ALL RIGHT.  WELL LET ME TAKE A LOOK AT

12   THE TRANSCRIPT FIRST.  I WOULD LIKE TO SEE WHAT WE ARE TALKING

13   ABOUT THEN I WILL RULE ON THE OBJECTION.

14   Q.   DR. FUISZ, WHILE WE ARE ATE GETTING THAT OUT, LET ME ASK

15   JUST A COUPLE OF QUESTIONS.

16        YOU TESTIFIED, WELL, NOT TESTIFIED, YOU'VE TALKED A

17   NUMBER OF TIME IT IS ABOUT THE PATENTS YOU HAD.  HOW MUCH DO

18   YOU ESTIMATE THAT THE PATENTS THAT YOU NOW HAVE ARE WORTH

19   TODAY?

20   A.   YOU KNOW I WOULD HAVE TO CALCULATE THAT BECAUSE THEY ARE

21   OVER SO MANY YEARS AND MANY OF THEM ARE SOLD, MANY OF THEM ARE

22   IN COMPANIES IN WHICH WE OWN A PORTION OF THE COMPANIES.

23        FOR EXAMPLE, IF YOU TAKE OUR --

24   Q.   ALL I'M ASKING IS HOW MUCH YOU THINK THEY ARE WORTH?

25   A.   SITTING HERE I HONESTLY DON'T KNOW.

DIRECT EXAM BY MR. BOIES

1    Q.   CAN YOU GIVE ME ANY APPROXIMATION AT ALL?

2    A.   NO BECAUSE THEY ARE IN COMPANIES IN WHICH THERE'S NO VALUE

3    ESTABLISHED YET.

4         FOR EXAMPLE, WE HAVE -- WE DOMINATE MEDICAL FILM

5         MR. BOIES:  YOUR HONOR I MOVE TO STRIKE AS

6    NONRESPONSIVE.

7         THE COURT:  ALL RIGHT.  I WILL GRANT THAT MOTION.

8         YOU SHOULD DISREGARD THE ANSWER TO THE LAST QUESTION.

9         GO AHEAD MR. BOIES

10   BY MR. BOIES:

11   Q.   CAN YOU GIVE ME ANY DOLLAR RANGE AT ALL AS TO HOW MUCH YOU

12   THINK THE PATENTS THAT YOU ARE THE INVENTOR OF ARE WORTH TODAY,

13   WHETHER THEY ARE IN YOUR OWN NAME OR IN ONE OF YOUR COMPANY'S

14   NAMES?

15   A.   IF I HAD TO GIVE A RANGE, 2 MILLION TO 14 MILLION.

16   Q.   AND OVER THE LAST 20 YEARS, YOU AND COMPANIES THAT YOU OWN

17   OR CONTROL HAVE RECEIVED LICENSING REVENUES FROM PATENTS,

18   CORRECT?

19   A.   YES.

20   Q.   OVER THE LAST 20 YEARS WHAT HAS BEEN THAT TOTAL AMOUNT OF

21   MONEY THAT YOU AND THE COMPANIES THAT YOU OWN OR CONTROL HAVE

22   RECEIVED, FOR YOUR PATENTS?

23   A.   COUNSEL, I WOULD ACTUALLY HAVE TO THINK ABOUT THAT AND TAKE

24   A PENCIL AND TRY TO FIGURE IT OUT.

25   Q.   COULD YOU GIVE ME ANY RANGE OR APPROXIMATION RIGHT NOW?

DIRECT EXAM BY MR. BOIES

1   A.   IT WOULD BE DIFFICULT.  6 MILLION, 7 MILLION.

2   Q.   OKAY.  NOW, YOU SHOULD HAVE UP THERE A COPY OF YOUR

3   DEPOSITION BUT IT DOESN'T LOOK LIKE THAT YOU DO?

4   A.   YEAH, I HAVE IT HERE.

5   Q.   LET ME ASK YOU TO LOOK AT PAGE 287 OF YOUR DEPOSITION.

6        I'M GOING TO BEGIN AT LINE 19 AND CARRY OVER TO LINE 15

7   ON THE NEXT PAGE.

8             MR. BOIES:  AND YOUR HONOR I WOULD OFFER THIS AS AN

9   ADMISSION.

10            THE WITNESS:  287?

11            MR. BOIES:  287, LINE 19 THROUGH 288, LINE 15.

12            THE COURT:  YOU MAY PROCEED, MR. BOIES.

13            MR. BOIES:  OKAY.

14  Q.   LET ME DIRECT YOUR ATTENTION TO PAGE 287.

15            "QUESTION:  WHAT IS THE APPROXIMATE AMOUNT OF

16  LICENSING REVENUES THAT FUISZ PHARMA HAS RECEIVED IN THE LAST

17  TWO YEARS?

18            "ANSWER:  MY DIFFICULTY IS WITH THE CALENDAR.

19            "QUESTION:  YOU CAN PUT IT IN ANY TIME FRAME THAT'S

20  MORE CONVENIENT TO YOU.

21            "ANSWER:  WELL, IT'S EASIER FOR ME IF I GIVE YOU THAT

22  FIGURE AS OWED TO US AS PAYMENT OWED TO US.

23            "QUESTION:  OKAY.  THAT'S FINE.

24            "ANSWER:  IS THAT OKAY?

25            "QUESTION:  YES.

DIRECT EXAM BY MR. BOIES

1      "ANSWER:  IF I DID IT THAT WAY, APPROXIMATELY

2   $6 MILLION.

3      "QUESTION:  THAT'S PER YEAR OR THAT'S OVER A TWO YEAR

4   PERIOD.

5      "ANSWER:  THAT'S OVER A TWO-YEAR.

6      "QUESTION:  SO IS ANY OF THAT SIX MILLION DOLLARS

7   ASSOCIATED WITH THE LICENSING OF THE '612 PATENT.

8      "ANSWER:  NO, I DIDN'T ADD THAT IN.  THEN YOU WOULD

9   HAVE TO ADD ANOTHER HALF MILLION FROM NONEXCLUSIVE FOR

10  MEDTRONIC THEN IT WOULD BECOME 6.5 MILLION, AND THAT'S A

11  NONEXCLUSIVE THAT WOULD MEAN WE'RE FREE TO LICENSE IT TO

12  OTHERS.

13  Q.  DID YOU GIVE THAT TESTIMONY?

14  A.  YES.

15  Q.  AND WAS IT ACCURATE AT THE TIME YOU GAVE IT?

16  A.  YES.

17  Q.  NOW YOU HAVE ALSO TALKED ABOUT THE FACT THAT YOU ARE A

18  MEDICAL DOCTOR AND THAT YOU TREAT PATIENTS, DO YOU RECALL THAT?

19  A.  YES.

20  Q.  OVER THE LAST 30 YEARS, HOW MANY PATIENTS DO YOU ASSERT

21  THAT YOU HAVE TREATED?

22  A.  I WOULD SAY MINIMALLY IT WOULD BE TWO A MONTH.  THAT'S 24 A

23  YEAR TIMES 30, WHATEVER THAT FIGURE COMES TO.  SOME OF THESE

24  WOULD BE THE SAME PERSON.

25  Q.  HOW MANY DIFFERENT PATIENTS OVER THE LAST 30 YEARS?

DIRECT EXAM BY MR. BOIES

1    A.   MOSTLY ALL OF THEM.

2    Q.   NOW YOU ARE MARRIED, CORRECT?

3    A.   YES.

4    Q.   AND HOW LONG HAVE YOU BEEN MARRIED?

5    A.   33 YEARS.

6    Q.   NOW, DO YOU HAVE ANY EXPLANATION FOR WHY YOUR WIFE OF

7    33 YEARS WOULD TESTIFY THAT DURING YOUR MARRIAGE YOU HAD NOT

8    SEEN PATIENTS?

9    A.   I COULD UNDERSTAND THAT THE REASON IS BECAUSE THE TYPE OF

10   PRACTICE I HAVE, PEOPLE DO NOT COME TO ME, PHYSICIANS OR

11   PATIENTS CALL ME FOR ADVICE.  SO IT'S MY PRACTICE, AN OUTGOING

12   PRACTICE.

13        IT'S BASICALLY BY -- VERY DIFFICULT PATIENTS THAT OTHER

14   PHYSICIANS HAVE TROUBLE WITH.  I DON'T MAINTAIN A TYPICAL

15   MEDICAL OFFICE, SO THAT'S PROBABLY WHAT SHE WAS REFERRING TO.

16   Q.   IS IT YOUR TESTIMONY THAT YOU KEPT THIS PART OF YOUR

17   PRACTICE AWAY FROM YOUR WIFE, THAT SHE DIDN'T KNOW ABOUT IT?

18   A.   NO, PLEASE DON'T SAY THAT.

19   Q.   WELL THEN LET ME -- DO YOU HAVE HER DEPOSITION UP THERE IN

20   FRONT OF YOU?  I THINK WE --

21   A.   I DON'T -- DEPOSITION OF RICHARD FUISZ, DEPOSITION OF --

22   Q.   IS THERE A DEPOSITION OF LORRAINE FUISZ?

23   A.   THIS ONE IS LORRAINE.  I DO.  I DO.

24   Q.   LET ME DIRECT YOUR ATTENTION TO PAGES 117, LINE TWO -- 117,

25   LINE 2 THROUGH 22.

DIRECT EXAM BY MR. BOIES

1    A.   OKAY.

2              MR. BOIES:  AND YOUR HONOR, LORRAINE FUISZ IS OUTSIDE

3    THE JURISDICTION OF THE COURT.  THIS IS SWORN TESTIMONY TAKEN

4    SUBJECT TO CROSS-EXAMINATION IN THIS CASE.

5              THE COURT:  YOU MAY PROCEED, GO AHEAD.

6              MR. BOIES:  WOULD YOU PUT THAT UP.  STARTING AT LINE

7    TWO.

8              "QUESTION:  DR. FUISZ IS A MEDICAL DOCTOR; IS THAT

9    RIGHT?

10              "ANSWER:  THAT'S CORRECT.  HE GOT HIS MEDICAL DEGREE

11    FROM GEORGETOWN UNIVERSITY.

12              "QUESTION:  DOES HE SEE PATIENTS?

13              "ANSWER:  HE'S BASICALLY AN INVENTOR.

14              "QUESTION:  HAS HE EVER SEEN PATIENTS?

15              "ANSWER:  WELL, YEARS AGO, I GUESS, WHEN HE WAS IN

16    THE NAVY AND AT SOME POINT IN HIS LIFE MAYBE EARLY ON.  BUT

17    MY -- I MEAN, HE WAS -- MY KNOWLEDGE IS THAT HE'S ALWAYS BEEN

18    DEALING IN PATENT WORK AND BUSINESS IN THE MEDICAL AREA.

19              "QUESTION:  AND THOSE INSTANCES THAT YOU IDENTIFIED

20    WHEN HE HAD SEEN PATIENTS, THOSE WERE BEFORE YOU WERE MARRIED

21    TO HIM?

22              "ANSWER:  YES, THAT'S CORRECT.  I'M GATHERING.  I'VE

23    SEEN PICTURES OF HIM IN HIS NAVY UNIFORM AT THE NAVY CENTER,

24    YOU KNOW.

25              "QUESTION:  OKAY.  SO DURING THE TIME WHEN YOU HAVE

DIRECT EXAM BY MR. BOIES

1    BEEN MARRIED TO DR. FUISZ, HE HAS NOT SEEN PATIENTS?

2            "ANSWER:  NO.  HE WAS NOT A DOCTOR THAT -- HE WORKED

3    IN BUSINESS, AND HE WORKED IN INVENTING."

4    Q.   DO YOU SEE THAT, SIR?

5    A.   YES.

6    Q.   NOW, I TAKE IT IT IS YOUR TESTIMONY THAT YOUR WIFE WAS

7    AWARE OF WHAT YOU WERE DOING, CORRECT?

8    A.   ABSOLUTELY.  BUT THIS IS CONSISTENT.  THIS IS PERFECTLY

9    CONSISTENT, WHAT YOU JUST READ TO ME.

10   Q.   IS IT YOUR TESTIMONY TO THE JURY?

11   A.   YES.

12   Q.   THAT THE STATEMENT?

13           "QUESTION:  SO DURING THE TIME WHEN YOU HAVE BEEN

14   MARRIED TO DR. FUISZ, HE HAS NOT SEEN PATIENTS?

15           "ANSWER:  NO.

16     IS CONSISTENT WITH YOUR TESTIMONY THAT YOU HAVE BEEN

17   SEEING PATIENTS FOR THE LAST 30 YEARS?

18   A.   YES, BECAUSE AS I SAID TO YOU, THESE PATIENTS DO NOT COME

19   TO MY HOME OR TO MY OFFICE.

20     SO FOR EXAMPLE, WHEN WE START VOIR DIRE, I RECEIVED A CALL

21   FROM A PATIENT AT 1:30 IN THE MORNING, THAT MORNING, WHO WAS

22   DRIVING A TRACTOR TRAILER BETWEEN DES MOINES IOWA AND MONTANA

23   AND STARTED TO BLEED RECTALLY.

24     WHAT WAS THE NAME OF THIS PATIENT?

25   A.   MR. BRUNS.

DIRECT EXAM BY MR. BOIES

1   Q.  EXCUSE ME?

2          MR. J. FUISZ:  OBJECTION YOUR HONOR.  HIPAA ISSUES.

3          THE WITNESS:  YEAH, IT IS A HIPAA ISSUE.  I DON'T

4   THINK I SHOULD TELL YOU HIS NAME.

5          THE COURT:  THE OBJECTION IS OVERRULED.  YOU NEED TO

6   ANSWER THE QUESTION SIR, GO AHEAD.

7          MR. BOIES:  WHAT WAS HIS NAME.

8          THE WITNESS:  BRUNS.

9   Q.  HOW DO YOU SPELL THAT?

10  A.  B-R-U-N-S.

11  Q.  WHAT'S HIS FIRST NAME?

12  A.  GREG.

13  Q.  AND HOW LONG HAVE YOU BEEN SEEING THIS PERSON AS A PATIENT?

14  A.  TEN YEARS.

15  Q.  AND IS THIS THE KIND OF PATIENT THAT YOUR WIFE WOULD HAVE

16  KNOWN THAT YOU WERE SEEING, ACCORDING TO YOUR TESTIMONY?

17  A.  NOT NECESSARILY, BECAUSE SHE WOULDN'T CONSIDER THAT SEEING

18  A PATIENT.

19      IT'S AN A-TYPICAL WAY DOCTOR PRACTICE.  MOST DOCTORS HAVE

20  AN OFFICE AND OR AN OFFICE IN THEIR HOME.  VERY FEW HAVE A

21  REFERRAL TYPE PRACTICE.

22  Q.  RIGHT.  AND WOULD YOU AGREE WITH ME THAT MOST DOCTORS WHO

23  DO HAVE A REFERRAL-TYPE PRACTICE, THEIR WIFE OF 33 YEARS WOULD

24  KNOW ABOUT IT?

25  A.  WELL, I'M NOT SPEAKING FOR MY WIFE.  I JUST, I THINK I CAN

DIRECT EXAM BY MR. BOIES

1    UNDERSTAND WHY SHE SAID THAT.  I DON'T THINK THAT'S BEING

2    DECEPTIVE.

3    Q.  NO, I WANT TO BE CLEAR, I WAS NOT SUGGESTING THAT YOUR WIFE

4    WAS BEING DECEPTIVE AT ALL, SIR.

5    A.  NOR AM I BEING DECEPTIVE.

6    Q.  LET ME DIRECT YOUR ATTENTION TO SOMETHING THAT YOU HAD SAID

7    AT YOUR DEPOSITION -- NOT AT YOUR DEPOSITION, I'M SORRY.  IT

8    WAS AT THE OPENING STATEMENT HERE WHEN YOU WERE TALKING TO THE

9    JURY.

10         CAN WE PUT UP PAGE 54.  THIS IS WHAT YOU TOLD THE JURY IN

11   YOUR OPENING STATEMENT.

12         WHAT OUR PATENT IS ABOUT, OUR '612 HAS NOTHING TO DO WITH

13   THE THERANOS PATENTS.

14   A.  YES.

15   Q.  DO YOU RECALL TELLING THE JURY THAT?

16   A.  SURE.  YEAH.

17   Q.  AND THERE'S ANOTHER POINT DOWN HERE IS ANOTHER PART OF THAT

18   SAME PAGE.

19         WHERE YOU TELL THE JURY, NOW THIS IS INTERESTING TO ME,

20   AND THIS IS TRULY HOW THIS PATENT STARTED, IT HAD NOTHING TO DO

21   WITH THERANOS, WASN'T EVEN AWARE OF THERANOS AT THE TIME,

22   DIDN'T KNOW THEY HAD A PATENT.

23   A.  YES.

24   Q.  DO YOU SEE THAT?

25   A.  YES.

DIRECT EXAM BY MR. BOIES

1    Q.   NOW, WHEN YOU SAY IT HAD NOTHING TO DO WITH THERANOS,

2    WASN'T EVEN AWARE OF THERANOS AT THE TIME, WHAT YOU WERE SAYING

3    IS THAT YOU WERE NOT EVEN AWARE OF THERANOS AT THE TIME OF YOUR

4    PATENT, '612; IS THAT CORRECT?

5    A.   NO.   INCORRECT.   IF YOU READ THAT SENTENCE IT SAYS NOW,

6    THIS IS INTERESTING TO ME, AND THIS IS TRULY HOW THIS PATENT

7    STARTED.   IT HAD NOTHING TO DO WITH THERANOS, WASN'T EVEN AWARE

8    OF THERANOS AT THE TIME.   DIDN'T KNOW THEY HAD A PATENT.

9         OKAY.   REFERRING TO THE PATENT.

10   Q.   WELL, LET'S BE CLEAR SO WE UNDERSTAND WHAT YOU ARE SAYING.

11   WHEN YOU SAY THIS IS TRULY HOW THIS PATENT STARTED, THIS PATENT

12   STARTED.

13   A.   THAT'S A -- HOW WOULD YOU SAY -- I'M -- THAT'S A TRANSCRIPT

14   OF ME SPEAKING.   WHAT THAT REALLY PROBABLY SHOULD SAY IS THIS

15   IS HOW THIS CASE STARTED.

16   Q.   WELL, WHEN YOU SAY THIS PATENT STARTED --

17   A.   YEAH.

18   Q.   THE PATENT --

19   A.   NO, THAT'S RIGHT.   IT COULD MEAN THE PATENT.   I TAKE THAT

20   BACK, IT COULD MEAN THE PATENT.

21   Q.   WHEN YOU SAY THAT'S HOW THIS PATENT STARTED --

22   A.   CORRECT.

23   Q.   THIS PATENT IS THE '612 PATENT, CORRECT SIR?

24   A.   YES.

25   Q.   SO WHAT YOU ARE SAYING IS WHEN THE '612 PATENT STARTED, IT

DIRECT EXAM BY MR. BOIES

1    HAD NOTHING TO DO WITH THERANOS, CORRECT?

2    A.   CORRECT.

3    Q.   AND YOU WEREN'T EVEN AWARE OF THERANOS AT THE TIME,

4    CORRECT?

5    A.   I WASN'T AWARE OF ANY PATENTS OF THERANOS AT THAT TIME.

6    Q.   WELL, YOU SAY TWO THINGS.

7         YOU SAY WASN'T EVEN AWARE OF THERANOS AT THE TIME; DO YOU

8    SEE THAT?  DO YOU SEE THAT, SIR?

9    A.   YEAH, NO, NO, I SEE IT.  I SEE IT.

10   Q.   AT THE TIME THAT YOU APPLIED FOR YOUR '612 PATENT, WERE YOU

11   AWARE OF THERANOS?

12   A.   YOU KNOW, TO ME YOU ARE PARSING WORDS.

13        WAS I AWARE OF THERANOS, OF COURSE BECAUSE OF THE PARENT

14   I KNEW THE NAME.  BUT I'M NOT EVEN SURE I KNEW IT WAS SPELLED

15   THAT WAY.  SO OF COURSE I WAS AWARE.  IN THIS SENSE, THAT'S NOT

16   A TRUE STATEMENT.  BUT IT'S NOT A FALSE STATEMENT EITHER.  YOU

17   ARE PARSING SOMETHING THAT WAS SAID SPONTANEOUSLY RIGHT HERE.

18   Q.   YOU ARE CORRECT, SIR, I AM ASKING YOU ABOUT SOMETHING THAT

19   YOU SAID SPONTANEOUSLY?

20   A.   YEAH.

21   Q.   AND WHEN YOU WERE SPEAKING SPONTANEOUSLY TO THIS JURY --

22   A.   RIGHT.

23   Q.   YOU WERE TRYING TO BE TRUTHFUL AND ACCURATE, CORRECT?

24   A.   CORRECT.

25   Q.   AND WHEN YOU TOLD THIS JURY THAT WHEN YOUR '612 PATENT

DIRECT EXAM BY MR. BOIES

1    STARTED, YOU WEREN'T EVEN AWARE OF THERANOS AT THE TIME --

2    A.  WELL, I THINK I'M MODIFYING WHAT CAME ABOUT IT, BECAUSE IN

3    FACT WHAT I TOLD THE JURY AND I WILL STILL TELL THE JURY, IT

4    HAD NOTHING TO DO WITH THE THERANOS PATENT.

5    Q.  LET ME TAKE THOSE ONE AT A TIME, OKAY.

6        YOU SAY THREE THINGS HERE.  YOU SAY WHEN THE '612 PATENT

7    STARTED, ONE IT HAD NOTHING TO DO WITH THERANOS.

8        TWO, YOU WEREN'T EVEN AWARE OF THERANOS AT THE TIME.

9        AND THREE YOU DIDN'T KNOW THAT THERANOS HAD A PATENT.

10   A.  CORRECT.

11   Q.  AND I WANT TO TAKE THEM ONE AT A TIME?

12   A.  OKAY.

13   Q.  AND I WANT TO BEGIN WITH THE BROADER STATEMENT WHICH IS

14   THAT YOU WEREN'T EVEN AWARE OF THERANOS AT THE TIME.

15       AT THE TIME THAT YOU FILED YOUR '612 PATENT APPLICATION,

16   IS IT FAIR TO SAY THAT YOU KNEW THE NAME THERANOS?

17   A.  I THINK THAT'S FAIR TO SAY THAT, YES, I KNEW THE NAME

18   THERANOS.

19   Q.  DID YOU KNOW THAT IT WAS A COMPANY?

20   A.  I KNEW THAT THE PARENTS HAD A COMPANY -- I'M NOT SURE I

21   KNEW THE EXACT NAME WAS THERANOS, BUT YEAH, I WOULD SAY THAT'S

22   TRUE.

23   Q.  AND --

24   A.  I DIDN'T KNOW IT WAS A CORPORATE ENTITY AT THIS POINT IN

25   TIME.  IT WAS A NAME.  THE NAME COULD JUST AS WELL BE -- I

DIRECT EXAM BY MR. BOIES

1    COULD MAKE UP THE NAME.  IN OTHER WORDS, IT -- YOU ARE OUT

2    LINING IT IN YELLOW AND PUTTING UNDUE WEIGHT ON IT.

3        WHAT I REALLY MEANT, THIS LAWSUIT HAD NOTHING TO DO WITH

4    THERANOS.

5    Q.   NOW CAN YOU SEE THIS, SIR?

6    A.   NO.

7    Q.   CAN YOU PUT THIS UP ON THE SCREEN --

8    A.   NO NO, IF YOU COULD JUST TURN IT A LITTLE BIT.  I HAVE

9    ARTIFICIAL EYES, SO I SEE VERY WELL.

10   Q.   CAN YOU SEE IT?

11   A.   YEAH, I CAN SEE IT.

12   Q.   OKAY.  NOW, YOUR APPLICATION FOR THE PATENT WAS FILED

13   APRIL 24TH, 2006, CORRECT, SIR?

14   A.   APRIL 24TH I THINK THAT WAS THE DATE OF THE E-MAIL.

15   Q.   I THINK THE E-MAIL WAS SEPTEMBER 23, 2005?

16   A.   RIGHT.  OKAY.  OKAY.  THAT'S THE FILING DATE.  YOU ARE

17   RIGHT.

18   Q.   NOW, ON NOVEMBER 23, 2006, THERANOS'S '409 PATENT

19   APPLICATION WAS PUBLISHED?

20   A.   RIGHT.

21   Q.   AND THAT WAS THE APPLICATION THAT MADE PUBLIC THE MATERIAL

22   IN THE FOUR THERANOS PROVISIONALS WE'VE TALKED ABOUT.

23        YOU KNOW THAT, CORRECT?

24   A.   I DON'T KNOW THAT AS WE SPEAK HERE, BUT I WILL ACCEPT IT.

25   YOU HAVE IT UP THERE.

DIRECT EXAM BY MR. BOIES

1    Q.  WELL, IN NOVEMBER 2006 YOU WERE AWARE WHEN THE THERANOS

2    '409 PATENT APPLICATION WAS PUBLISHED, CORRECT?

3    A.  I'M NOT SURE I DID.  AND I'M NOT TRYING TO BE EVASIVE BUT

4    MY RECOLLECTION IS THAT I LEARNED ABOUT THIS FROM MY PATENT

5    ATTORNEY.

6    Q.  YOU LEARNED ABOUT --

7    A.  HE WAS THE ONE THAT BROUGHT UP THAT THERANOS HAD PATENTS,

8    TO MY RECOLLECTION.

9    Q.  OKAY.  NOW, AND IS IT YOUR TESTIMONY THAT HE DID THAT AFTER

10   THE THERANOS '409 APPLICATION WAS PUBLISHED?

11   A.  YOU KNOW, COUNSEL, I'M 74 YEARS OLD.  I CAN'T GO BACK THAT

12   FAR AND RECALL THE EXACT DATE.

13        WHAT I TOLD YOU IS I BELIEVE MY BEST RECOLLECTION IS I

14   WAS TOLD THIS BY OUR PATENT ATTORNEY.

15   Q.  THAT IS THE FIRST TIME THAT YOU HEARD THAT THERANOS HAD

16   PATENTS WAS FROM YOUR PATENT ATTORNEY, IS THAT WHAT YOU ARE

17   SAYING?

18   A.  NO, NO.

19   Q.  WHAT ARE YOU SAYING?

20   A.  WHAT I'M SAYING IS THE FIRST TIME I BECAME AWARE, I THINK,

21   OF THEIR PATENT NUMBERS AND THE ACTUAL PATENT, WAS THROUGH MY

22   PATENT ATTORNEY.

23   Q.  WELL, SIR, WITH ALL YOUR PATENTS --

24   A.  YEAH.

25   Q.  YOU KNOW THAT PROVISIONAL PATENTS ARE NOT PUBLIC UNTIL THE

DIRECT EXAM BY MR. BOIES

1    ACTUAL PATENT APPLICATION IS FILED, CORRECT?

2    A.   CORRECT.

3    Q.   AND ACCEPTING THAT THE THERANOS ACTUAL PATENT APPLICATION

4    '409 WAS FILED NOVEMBER 23, 2000, --

5    A.   IS THAT THE PROVISIONAL.

6    Q.   NO, THAT'S NOT THE PROVISIONAL.  WHAT I'M --

7    A.   HAD IT PUBLISHED BEFORE THAT DATE?  IF IT HADN'T PUBLISHED

8    BEFORE THAT DATE THEN I COULDN'T KNOW ABOUT IT.

9    Q.   EXACTLY.

10   A.   WELL, CORRECT.  I HAD NO FOREKNOWLEDGE OF ANY THERANOS

11   PATENTS.

12   Q.   SO ASSUMING THAT THIS NOVEMBER 23, 2006, DATE IS THE DATE

13   THAT THE ACTUAL PATENT APPLICATION, NOT THE PROVISIONAL, BUT

14   THE ACTUAL PATENT APPLICATION WAS PUBLISHED?

15   A.   RIGHT.

16   Q.   IT WAS YOUR TESTIMONY THAT YOU WOULD NOT HAVE KNOWN ABOUT

17   THEIR PATENT ACTIVITY BEFORE THEN, IS THAT YOUR TESTIMONY?

18   A.   IF THAT IS THE DATE IN WHICH IT WAS PUBLISHED AND BECAME

19   PUBLIC, TO MY BEST RECOLLECTION, I DON'T KNOW IF I KNEW IT ON

20   THAT DATE, AND THE REASON IS BECAUSE MY RECOLLECTION IS THAT I

21   WAS TOLD IT BY GHIAVELLI.

22   Q.   LET ME BEGIN THIS QUESTION.  BEFORE THAT DATE, WERE YOU

23   AWARE OF ANY OF THE THERANOS PATENTS OR PATENT APPLICATIONS

24   BEFORE THAT DATE?

25   A.   I DON'T THINK THAT I WAS BECAUSE BASICALLY THEY WERE

DIRECT EXAM BY MR. BOIES

1  UNSEARCHABLE ON GOOGLE.  I RECALL ONCE TRYING TO SEARCH FOR ANY

2  APPLICATION OR PATENT.  AND IF YOU PUT IN HOLMES, I COULDN'T

3  RETRIEVE ANYTHING.  AND SO I COULDN'T FIND THEM UNTIL MY PATENT

4  ATTORNEY TOLD ME ABOUT THEM.  THAT'S MY BEST RECOLLECTION.

5  Q.  AND IT IS YOUR TESTIMONY, I TAKE IT, THAT YOU WERE UNAWARE

6  OF THE FOUR THERANOS PROVISIONALS THAT WE HAVE TALKED A LOT

7  ABOUT AT THIS TRIAL.  YOU WERE UNAWARE OF THEIR EXISTENCE PRIOR

8  TO THE TIME THAT THE '409 ACTUAL APPLICATION WAS PUBLISHED ON

9  NOVEMBER 23, 2006?

10  A.  THERE WAS NO WAY I WAS AWARE OF ANY THERANOS MATERIALS

11  UNTIL THEY BECAME PUBLIC.

12  Q.  LET ME ASK YOU, SIR, TO LOOK AT A DOCUMENT THAT HAS BEEN

13  MARKED AS THERANOS EXHIBIT 98.

14      WHILE WE ARE GETTING OUT COPIES, DID I UNDERSTAND YOU TO

15  SAY THAT YOU HAD GOOGLED HOLMES?

16  A.  NO -- YES, BECAUSE I WAS LOOKING FOR WHETHER THERE HAD --

17  NOT JUST THEM, I MEAN, DISCLOSED THE MEDTRONICS BAYER, ROCHE,

18  GENERALLY WHENEVER WE ARE PATENTING WE ARE SEARCHING WHAT HAS

19  PUBLISHED FROM WHAT COMPANY IN THIS PARTICULAR ANALYZER FIELD.

20      SO THEY WOULD HAVE BEEN ONE OF THE PARTIES WE SEARCHED.

21  BUT MY RECOLLECTION IS WE GOT NO HIT IN TERMS OF A RETURN.

22  Q.  NOW I UNDERSTAND WHY YOU MIGHT IF YOU WERE DOING A PATENT

23  SEARCH FOR AN ANALYZER GOOGLE ROCHE OR SOME OF THE OTHER NAMES.

24  BUT WHY HOLMES, SIR, DID YOU KNOW THAT HOLMES WAS DOING

25  ANALYZER WORK BEFORE NOVEMBER 23, 2006?

DIRECT EXAM BY MR. BOIES

1    A.   NOT SPECIFICALLY, EXCEPT YOU RECALL THEY WERE OUR

2    NEIGHBORS, AND WE MUST HAVE HAD 30 DINNERS WITH THEM AND MY

3    WIFE MUST HAVE TAKEN 65 TRIPS WITH THEM.  THEY WERE ALWAYS AT

4    OUR HOUSE.

5    Q.   AND IS IT YOUR TESTIMONY THAT BEFORE NOVEMBER 232006, 1 OF

6    ELIZABETH HOLMES'S PARENTS TOLD YOU THAT SHE WAS INVOLVED IN

7    THE ANALYZER BUSINESS?

8    A.   NOT PER SE.  AND I'VE TESTIFIED TO THAT.  WHAT I WAS TOLD,

9    FIRST OF ALL, AND I MEAN IT AS NO NEGATIVE TO ELIZABETH'S

10   PARENTS, I DON'T MEAN IT THAT WAY AT ALL, NEITHER OF THEM

11   STRUCK ME AS INTELLECTUALLY BENT TOWARDS EITHER BEING ABLE TO

12   EXPLAIN SOMETHING TECHNICAL OR BEING PARTICULARLY OPEN TO

13   DISCUSS IN DETAIL.

14       SO I KNEW SOME THINGS THAT THEY VOLUNTEERED.

15       SO FOR EXAMPLE, I KNEW THEY INVESTED OR I WAS TOLD BY

16   CHRIS AND I THINK NOEL WAS PRESENT THAT THEY INVESTED THIRD

17   THOUSAND IN THEIR DAUGHTER'S COMPANY.  AND I'M GOING ON MY

18   RECOLLECTION, I'M SURE I'M FORGETTING A LOT.  I WAS TOLD THAT,

19   CHRIS TOLD ME HE RAISED ALL THE MONEY FOR IT THROUGH A MAN

20   CALLED LIPSKI WHO OWED HIM A FAVOR, AND THAT HE WENT TO HIM AND

21   LINED UP SOME INVESTORS.

22       LORRAINE CAME BACK FROM ONE OF HER NUMEROUS TRIPS AND IN

23   THE TALKS HUSBANDS AND WIVES HAVE AT DINNER SHE TOLD ME THAT

24   ELIZABETH, I MEAN, NOEL WAS VERY, VERY EXCITED ABOUT SOME KIND

25   OF BRACELET THAT YOU WORE -- AND SOMEHOW THAT BRACELET GAVE YOU

DIRECT EXAM BY MR. BOIES

1   INFORMATION.  AND FOR SURE NOEL FELT THAT IT WAS GOING TO BE

2   REGARDING A CONTRACT.

3        AND WHEN A WIFE TELLS A HUSBAND THAT, THAT'S LIKE TELLING

4   ME NOTHING.  I DON'T KNOW WHAT A MAGIC BRACELET IS

5   Q.   DO YOU REMEMBER THE QUESTION, SIR, THAT YOU ARE ANSWERING?

6   A.   YOU KNOW, I DON'T KNOW ANYMORE.

7   Q.   OKAY.  IF AT ANY POINT WHEN YOU ARE TALKING YOU REALIZE

8   THAT YOU DON'T KNOW WHAT THE QUESTION IS -- PLEASE LET ME KNOW?

9   A.   NO, NO, I'M ANSWERING YOUR QUESTION.  YOU ASKED ME WHAT I

10  KNEW.

11  Q.   NO, SIR.

12  A.   OKAY.

13  Q.   WHAT I ASKED YOU IS WHETHER BEFORE NOVEMBER 23, 2006, YOU

14  KNEW ABOUT ELIZABETH HOLMES OR THERANOS'S PATENT ACTIVITY OR

15  ANALYZER WORK?

16  A.   I WOULD NOT HAVE KNOWN.  I MIGHT HAVE KNOWN SHE HAD COMPANY

17  BECAUSE OF WHAT I JUST TOLD YOU.  ALL RIGHT.

18  Q.   DID YOU KNOW -- AND THIS COMES, SIR, YOU SAID YOU GOOGLED

19  HOLMES, ALONG WITH ROCHE AND ALL THESE OTHER BIG COMPANIES WHEN

20  YOU ARE DOING THE WORK TO MAKE YOUR PATENT APPLICATION YOU

21  GOOGLED HOLMES, YOU TOLD ME THAT, RIGHT?

22  A.   RIGHT.

23  Q.   NOW, WHAT I'M TRYING TO FIGURE OUT IS IF YOU DIDN'T KNOW

24  THAT SHE WAS WORKING ON ANALYZERS, BEFORE NOVEMBER 23, 2006,

25  BECAUSE YOU FILED YOUR APPLICATION APRIL 24TH, 2006, IF YOU

DIRECT EXAM BY MR. BOIES

1    DIDN'T KNOW BACK HERE THAT SHE WAS WORKING ON ANALYZERS, WHY

2    DID YOU GOOGLE HER NAME?

3    A.   BECAUSE I PROBABLY, AT THAT POINT, KNEW SHE WAS IN SOME

4    TYPE OF BUSINESS BUT I DIDN'T KNOW THE NATURE OF THE BUSINESS

5    OF HER ANALYZERS IF THAT'S WHAT IT WAS.

6         AS I SAY, COUNSEL, YOU KNOW, YOU ARE STANDING UP THERE,

7    YOU ARE ASKING ME QUESTIONS FROM MANY, MANY YEARS AGO.  THESE

8    ARE PEOPLE WHO WERE OUR NEIGHBORS, THEY WERE CLOSE FRIENDS.

9    ELIZABETH GREW UP NEXT DOOR.  WE HAD FREQUENT DINNERS WITH

10   THEM.  MY WIFE AND NOEL WERE ALL OVER THE COUNTRY TOGETHER.

11   AND I KNEW GENERALLY AND I WAS HAPPY ABOUT IT THAT THEY WERE

12   ALL EXCITED THAT SHE WAS IN BUSINESS AND HE RAISED MONEY, AND I

13   WELL COULD HAVE KNOWN IT WAS ANALYZER.

14        I DO RECALL TRYING TO FIND OUT JUST FROM THE STANDPOINT

15   OF WHAT BUSINESS SHE'D WOULD BE IN, BECAUSE I DON'T LOOK

16   UPON -- THAT STATEMENT IS UP THERE ON THE BOARD, HAD NOTHING TO

17   DO WITH THERANOS.

18        WE WERE A FRONT END OF SOMETHING.  I NEVER WANTED TO GO

19   ON THE ANALYZER BUSINESS, PER SE, THAT'S A DIFFERENT BUSINESS

20   THAN WE WERE IN.

21   Q.   SIR, DO YOU REMEMBER THE QUESTION?

22   A.   YEAH, YOU --

23   Q.   WHAT'S THE QUESTION?

24   A.   THE QUESTION WAS YOU TOLD ME I DIDN'T KNOW WHAT THE

25   QUESTION WAS.

DIRECT EXAM BY MR. BOIES

1    Q.  NO, MY QUESTION WAS WHY WERE YOU GOOGLING ELIZABETH HOLMES

2    BACK IN APRIL OF 2006 IF YOU DIDN'T KNOW THEN THAT SHE WAS

3    INVOLVED IN ANALYZERS?

4    A.  I DON'T KNOW WHY OTHER THAN THAT THE NAME, PERHAPS I KNEW

5    THE COMPANY WAS THERANOS, AND IF I WERE FILING A PATENT IN THAT

6    AREA THEN I -- MY NORMAL PRACTICE, WE TRY AND LOOK AT MANY,

7    MANY DIFFERENT COMPANIES.

8        AND AS I EXPLAINED AT MY DEPOSITION, ONE OF THE THINGS

9    LATER ON FASCINATED ME ABOUT THERANOS WAS, THEY WERE THE ONLY

10   COMPANY THAT WAS VERY BROADLY MAKING SPEECHES AND TALKING ABOUT

11   THE CONCEPT THAT THEY WERE GOING TO PUT ANALYZERS IN EVERY HOME

12   IN THE UNITED STATES.

13   Q.  WHEN WERE THEY TELLING PEOPLE THEY WERE GOING TO PUT

14   ANALYZERS IN THE UNITED STATES?

15   A.  YOUR HONOR, I'M 74 YEARS OLD AND LOOK AT THE DATE ON THAT.

16   I DO NOT RECALL EXACTLY WHEN.  IT WAS PUBLIC, OBVIOUSLY I WOULD

17   ONLY KNOW THAT IF IT WAS PUBLIC.  SO EITHER ON THEIR WEBSITE OR

18   IT WAS ON ONE OF HER 35 YOU TUBES.

19   Q.  35 YOU TUBES?

20   A.  WELL I'M BEING FIGURATIVE I'M EXAGGERATING BUT SHE WAS OWL

21   ALL OVER YOU TUBE.

22   Q.  SHE WAS?

23   A.  TOGETHER WITH LIPSKI.

24   Q.  SHE WAS.  HOW MANY TIMES WAS SHE ON YOU TUBE?

25   A.  I'M NOT GOING TO COUNT THEM.

DIRECT EXAM BY MR. BOIES

1    Q.  APPROXIMATELY?

2    A.  MANY, MANY TIMES.

3    Q.  MANY, MANY TIMES?

4    A.  YES.

5    Q.  AND YOU SAW IT?

6    A.  OF COURSE, WHO WOULDN'T SEE IT.

7    Q.  WHEN WAS THE FIRST TIME THAT --

8    A.  OH, I DON'T RECALL.

9    Q.  APPROXIMATELY?

10   A.  I WON'T EVEN GUESS.

11   Q.  APPROXIMATELY, SIR?

12   A.  I'M NOT GOING TO SPECULATE BECAUSE I WOULDN'T EVEN KNOW.

13   Q.  WAS IT BEFORE OR AFTER YOU STARTED THE PATENT ON APRIL 24,

14   2006?

15   A.  WHAT DATE -- REFRESH MY MIND ON WHAT DATE WE APPLIED FOR

16   THE PATENT?  WE ACTUALLY FILED IT.

17   Q.  APRIL 24, 2006?

18   A.  IF WE FILED IT --

19   Q.  THAT'S THE PROVISIONAL.  LET ME BE CLEAR?

20   A.  OKAY.  FILED THE PROVISIONAL ON THAT DAY.

21   Q.  JUST TO BE CLEAR, OKAY.  APRIL 24TH, 2006?

22   A.  RIGHT.

23   Q.  YOU FILED YOUR PROVISIONAL, YOUR 117 PROVISIONAL?

24   A.  RIGHT.

25   Q.  ONE YEAR LATER, APRIL 24TH, 2007?

DIRECT EXAM BY MR. BOIES

1    A.   RIGHT.

2    Q.   YOU FILED YOUR ACTUAL PATENT APPLICATION?

3    A.   OKAY, OKAY.

4    Q.   DOES THAT SOUND RIGHT?

5    A.   YEAH, THAT SOUNDS -- THAT MAKES SENSE.

6    Q.   OKAY.  NOW I WANT TO FOCUS, THOUGH, ON THE TIME WHEN YOU

7    ACTUALLY STARTED WITH THE FILING OF THE PROVISIONAL?

8    A.   RIGHT.

9    Q.   NOW, AT THE TIME THAT YOU STARTED THE PATENT WITH YOUR

10   PROVISIONAL APPLICATION?

11   A.   RIGHT.

12   Q.   THAT WAS A TIME WHEN IT WAS YOUR TESTIMONY YOU WERE NOT

13   AWARE OF THE THERANOS PROVISIONALS, CORRECT?

14   A.   I DON'T BELIEVE I WAS BECAUSE AS I SAY, I COULD NOT FIND

15   ANY THERANOS IN OUR ROUTINE CHECKS.  I COULD FIND EVERY OTHER

16   COMPANY BUT I COULDN'T FIND ANYTHING UNDER THERANOS.  AT SOME

17   POINT THEY HAD A WEBSITE, AT SOME POINT.

18   Q.   DR. FUISZ, WERE YOU SEARCHING PRIOR TO APRIL 24TH, 2006,

19   WHEN YOU STARTED THIS PATENT, WERE YOU SEARCHING FOR THERANOS

20   AS WELL AS ELIZABETH HOLMES?

21   A.   NO -- LOOK, YOU KNOW, I'M NOT GOING TO BE CONTORTED INTO AN

22   ANSWER.

23        WHAT I TOLD YOU OUR POLICY, WHENEVER WE DO A PATENT, WHAT

24   WE NORMALLY DO IS LOOK WHAT THE TREND IS IN THE INDUSTRY,

25   BECAUSE WHEN YOU PATENT, YOU PATENT FOR THE FUTURE.  YOU DON'T

DIRECT EXAM BY MR. BOIES

1    PATENT FOR THE PRESENT.

2         AND SINCE I KNEW GENERALLY THAT SHE WAS IN SOME TYPE OF

3    FIELD THAT HAD TO DO WITH SOME TYPE OF ANALYSIS, AT SOME POINT

4    IN TIME, OBVIOUSLY, I LOOKED AS I LOOKED AT EVERY OTHER

5    COMPANY.

6         AND ALL I KNOW IS EVENTUALLY WHAT I LEARNED, PUBLICLY

7    FROM SOMEWHERE, IS THAT -- AND MY RECOLLECTION IS --

8              MR. BOIES:  YOUR HONOR, COULD I HAVE THE QUESTION

9    REREAD BECAUSE NONE OF THIS IS RESPONSIVE TO THE QUESTION I

10   ASKED.

11              THE COURT:  YOU MAY.

12              (RECORD READ.)

13              THE WITNESS:  AND I THOUGHT I'M BEING RESPONSIVE TO

14   IT.

15              MR. BOIES:  YOUR HONOR, COULD YOU -- COULD WE

16   APPROACH?

17   (SIDE-BAR DISCUSSION OFF THE RECORD.)

18              MR. BOIES:  THAT IS A SIMPLE YES, NO, I DON'T KNOW

19   QUESTION.  AND HE CAN ANSWER IT YES, NO OR I DON'T KNOW.

20              MR. J. FUISZ:  HE'S PROVIDING, FRANKLY, A TRICKY

21   TIMELINE IN TERMS OF THIS FILING OF THE PATENT RELATIVE TO WHEN

22   WE STARTED.  THERE WERE PUBLIC ANNOUNCEMENTS, I COULD FIND THEM

23   ON GOOGLE NOW FOR THERANOS 2005.

24              THE COURT:  ALL RIGHT.  THAT'S ENOUGH.  THAT'S

25   ENOUGH.

DIRECT EXAM BY MR. BOIES

1        I DON'T WANT TO HAVE EVERY EXAMINATION IN HERE WITH

2    CONSTANT SIDE BARS.  YES-OR-NO QUESTIONS REQUIRE YES, NO OR I

3    DON'T KNOW ANSWERS.

4        YOU WILL HAVE AN OPPORTUNITY TO ASK WHATEVER QUESTIONS

5    YOU WANT WHEN IT'S YOUR TURN, IN THE MEANTIME THIS WITNESS IS

6    GOING TO ANSWER THE QUESTIONS POSED JUST AS HE WILL WHEN YOU

7    POSE THE QUESTIONS.  THAT'S THE WAY WE ARE GOING TO PROCEED.

8        THE COURT:  MR. BOIES, YOU MAY PUT YOUR QUESTION TO

9    THE WITNESS.

10        DR. FUISZ, I WANT TO INSTRUCT YOU TO ANSWER THE QUESTION

11    THAT'S POSED.

12        YOU WILL HAVE AN OPPORTUNITY TO ANSWER QUESTIONS PUT TO

13    YOU BY YOUR SIDE DURING THE APPROPRIATE TIME.

14        MR. BOIES, YOU MAY PROCEED.

15    BY MR. BOIES:

16    Q.  PRIOR TO APRIL 24TH, 2006, DID YOU OR ANYONE AFTER YOU AT

17    YOUR DIRECTION, DO ANY SEARCHS ON THERANOS?

18    A.  NO SPECIFIC RECOLLECTION, BUT I WELL MAY HAVE, YES.

19    Q.  AT ANY TIME PRIOR TO APRIL 24, 2006, DID YOU OR ANYONE

20    WORKING AT YOUR DIRECTION DO SEARCHES ON ELIZABETH HOLMES?

21    A.  AS A PERSON OR.

22    Q.  AS A PERSON?

23    A.  NO, BECAUSE WHY WOULD I SEARCH AS A PERSON OTHER THAN TO

24    SEE IF -- WHAT PATENT MIGHT HAVE BEEN FILED IN TERMS OF WHAT

25    THEY WERE DOING.

DIRECT EXAM BY MR. BOIES

1   Q.   NOW, DID YOU SEARCH PRIOR TO APRIL 24TH, 2006 ON ELIZABETH

2   HOLMES TO FIND OUT WHAT YOU COULD FIND OUT ABOUT HER PATENT?

3   A.   I MAY HAVE AND I MAY NOT HAVE.

4   Q.   NOW WHEN YOU TOLD THE JURY THAT YOU WEREN'T EVEN AWARE OF

5   THERANOS AT THE TIME YOU STARTED THE PATENT, YOU WERE TRYING TO

6   BE ACCURATE, CORRECT?

7   A.   YES.

8   Q.   AND YOU WOULD AGREE WITH ME, WOULD YOU NOT, THAT YOU

9   COULDN'T DO A SEARCH ON A COMPANY THAT YOU WEREN'T AWARE OF?

10  A.   I'M NOT AWARE OF A CORPORATE THERANOS.  THE CORPORATION,

11  THERANOS.  WE WERE MIXING A STRANGE NAME WITH A CORPORATION.  I

12  SAID TO THIS JURY, AND IT'S TRUE IT'S INTERESTING TO ME HOW

13  THIS STARTED.

14       YOU KNOW, YOU TOOK THAT OUT OF CONTEXT, WHY DON'T YOU ADD

15  MORE, A FEW MORE SENTENCES.  IT HAD NOTHING TO DO WITH

16  THERANOS, I WASN'T EVEN AWARE OF THERANOS AT THE TIME.  AND I

17  DIDN'T KNOW THEY HAD A PATENT.

18       ADD MORE TO IT.

19  Q.   WHEN YOU SAY YOU WEREN'T EVEN AWARE OF THERANOS AT THE

20  TIME, YOU ARE TALKING ABOUT THE TIME THAT THE '612 PATENT

21  STARTED, CORRECT?

22  A.   I WAS TALKING OF THE '612 PATENT BECAUSE IT HAS NOTHING TO

23  DO WITH THERANOS, THAT'S CORRECT.

24  Q.   I WANT TO BE SURE THAT I GOT AN ANSWER TO MY QUESTION.

25       WHEN YOU SAID YOU WEREN'T EVEN AWARE OF THERANOS AT THE

DIRECT EXAM BY MR. BOIES

1    TIME, THE TIME THAT YOU ARE REFERRING TO IS THE TIME THAT THE

2    '612 PATENT STARTED, CORRECT.

3    A.   I WOULD SAY THE CONCEPTION OF THE '612 PATENT WHICH WAS WAY

4    EARLIER THAN SOME OF THOSE DATES MAY INDICATE, I DON'T RECALL

5    KNOWING SPECIFICALLY ABOUT THERANOS AT THE TIME, NO, BECAUSE WE

6    WERE NOT AIMING TO BE IN A COMPANY THAT WAS IN THE ANALYZER

7    BUSINESS, PER SE, WHEN THIS FIRST STARTED.

8         I'VE ALREADY GONE THROUGH THIS, IT'S IN MY DEPOSITION

9    WITH MR. UNDERHILL WHO WENT ON FOR A LONG TIME

10        MR. BOIES:  YOUR HONOR, COULD I ASK THE WITNESS BE

11   RESPONSIVE TO THE QUESTION THAT I ASK.

12        THE COURT:  DR. FUISZ, I REALLY WANT YOU TO FOCUS ON

13   THE QUESTION PUT TO YOU.  IF IT'S A YES, NO, QUESTION YOU HAVE

14   TO ANSWER EITHER YES, NO OR I DON'T KNOW.

15        AGAIN YOU WILL HAVE YOUR OPPORTUNITY WHEN YOUR SIDE ASKS

16   QUESTIONS BUT YOU REALLY NEED TO FOCUS ON THE QUESTION AT HAND.

17        YOU CAN PUT YOUR QUESTION AGAIN TO THE WITNESS MR. BOIES

18        THE WITNESS:  I COULD ANSWER IT AGAIN --

19        MR. BOIES:  LET ME PUT THE QUESTION UP AGAIN.

20   BY MR. BOIES:

21   Q.   WHEN YOU TOLD THE JURY AT THE BEGINNING OF THIS TRIAL THAT

22   YOU WEREN'T EVEN AWARE OF THERANOS AT THE TIME, WAS THE TIME

23   THAT YOU WERE REFERRING TO THE TIME THAT THE '612 PATENT

24   STARTED?

25   A.   I THINK THAT PROBABLY WAS MY INTENTION, YES.

DIRECT EXAM BY MR. BOIES

1    Q.   OKAY.  AND WOULD YOU AGREE WITH ME THAT YOU COULD NOT RUN A

2    SEARCH ON A COMPANY THAT YOU WERE NOT AWARE OF?

3    A.   IT MAKES EMINENT SENSE.

4    Q.   OKAY.  NOW, LET ME GO TO THE NEXT PART HERE WHERE YOU SAY

5    DIDN'T KNOW THEY HAD A PATENT.  DO YOU SEE THAT?

6    A.   YES.

7    Q.   AND THE THEY THERE IS THERANOS, CORRECT?

8    A.   YES.

9    Q.   AND WHEN YOU SAY IT HAD NOTHING TO DO WITH THERANOS, YOU

10   ARE TALKING ABOUT YOUR '612 PATENT, CORRECT?

11   A.   YES.

12   Q.   ALL RIGHT.  NOW LET ME ASK YOU TO LOOK AT -- EXCUSE ME ONE

13   MOMENT.  LET ME ASK YOU TO LOOK AT TRIAL EXHIBIT 98.  IS THAT

14   AN EXCHANGE OF E-MAILS BETWEEN YOU AND YOUR PATENT ATTORNEY?

15   A.   COULD I JUST READ IT FOR ONE SECOND?

16   Q.   CERTAINLY, YES.

17   A.   YES, I RECOGNIZE THIS, ABSOLUTELY.  I'M GLAD YOU SHOWED

18   THIS TO ME, ACTUALLY.

19           MR. BOIES:  YOUR HONOR, I OFFER THERANOS EXHIBIT 98.

20           THE COURT:  ANY OBJECTION TO 98?

21           MS. ANDERSON:  NO OBJECTION.

22           THE COURT:  TRIAL EXHIBIT 98 IS ADMITTED.

23     (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER 98 HAVING BEEN

24   PREVIOUSLY MARKED FOR IDENTIFICATION, WAS ADMITTED INTO

25   EVIDENCE.)

DIRECT EXAM BY MR. BOIES

1    BY MR. BOIES:

2    Q.   NOW LET ME DIRECT YOUR ATTENTION TO YOUR E-MAIL WHICH IS

3    DATED APRIL 17, 2006, AND THIS GOES TO YOU TO ALAN SCHIAVELLI

4    WHO IS YOUR PATENT ATTORNEY, CORRECT?

5    A.   CORRECT.

6    Q.   COPIED TO YOUR SON, JOE FUISZ, CORRECT?

7    A.   CORRECT.

8    Q.   AND THIS IS APRIL 17, 2006?

9    A.   CORRECT.

10   Q.   ONE WEEK BEFORE YOU FILED YOUR PROVISIONAL PATENT

11   APPLICATION FOR THE '612 PATENT, CORRECT?

12   A.   CORRECT.

13   Q.   AND YOU SAY HERE, A COMPANY CALLED THERANOS, INVENTOR IS

14   ELIZABETH HOLMES, CLAIMS TO HAVE A PATENT ON A DEVICE THAT HAS

15   MODULES FOR EACH DRUG.  IT IS PRECISELY THIS TYPE OF MODULE

16   THAT OUR CLAIMS ARE AIMED AT.

17       DO YOU SEE THAT, SIR?

18   A.   YES, I SURE DO.

19   Q.   AND WHEN YOU TALKED ABOUT YOUR CLAIMS BEING AIMED AT

20   SOMETHING, THOSE WERE YOUR CLAIMS IN THE '612 PATENT, CORRECT,

21   SIR?

22   A.   CORRECT.  THAT'S CORRECT.  BUT IF YOU WOULD HAVE SHOWN ME

23   THIS FIRST AS A 74-YEAR-OLD, I COULD HAVE ANSWERED THAT BETTER.

24   IF YOU LOOK AT THESE DATES THIS IS APRIL 17TH, THAT'S

25   APRIL 24TH.  THAT'S ABOUT A WEEK AHEAD.  AND OBVIOUSLY I HAVE

DIRECT EXAM BY MR. BOIES

1    NOT FOUND THE COMPANY OR I WOULDN'T WRITE HIM A COMPANY CALLED

2    THERANOS AND THEN HE WRITE ME BACK, RICHARD I CAN'T FIND ANY

3    ISSUED U.S. PATENT, I FOUND THE FOLLOWING TWO PUBLISHED.

4         I NEVER KNEW HOW YOU LOOKED UP PUBLISHED AT THE TIME.  I

5    FOUND THE FOLLOWING TWO PUBLISHED APPLICATIONS AND THE NUMBERS

6    ARE THERE.  I WILL REVIEW THEM AND GET BACK TO YOU, AL.

7         I THINK, COUNSELOR, THAT THE RESPONSE, THAT THIS E-MAIL

8    MAKES CLEAR THAT OBVIOUSLY, IF YOU KNOW ENOUGH TO HUNT TO FIND

9    ANYTHING, CURIOUS IN THE FIELD AS I WAS WITH EVERY OTHER PARTY

10   THAT WAS IN THIS FIELD.

11   Q.  MY QUESTION, SIR, IS NOT WHETHER OR NOT YOU WERE INTERESTED

12   IN EVERYBODY IN THE FIELD.

13        MY QUESTION HAS BEEN, HOW YOU KNEW THAT THERANOS WAS IN

14   THIS FIELD.  AND IT'S CLEAR THAT AS OF APRIL 17TH, 2006, BEFORE

15   YOU FILED YOUR PROVISIONAL APPLICATION FOR THE '612 PATENT, YOU

16   KNEW THAT THERANOS WAS IN THE FIELD, CORRECT?

17   A.  OBVIOUSLY FROM THIS I DID, AND IT WOULD HAVE BEEN FROM HER

18   PARENTS.

19   Q.  DO YOU REMEMBER HER PARENTS -- I THOUGHT YOU SAID HER

20   PARENTS DIDN'T TELL YOU ANYTHING ABOUT ANALYZERS?

21   A.  NO, THAT'S NOT WHAT I TOLD YOU.  WHAT I TOLD YOU WAS HER

22   PARENTS WERE NOT TECHNICALLY ORIENTED.  HER PARENTS WERE NOT

23   THE TYPE THAT WOULD BE ABLE TO DISCUSS FOR EXAMPLE A TECHNICAL

24   TOPIC WITH ANY TYPE OF DETAIL.

25        ON THE OTHER HAND, THEY SPOKE AN AWFUL LOT ABOUT THEIR

DIRECT EXAM BY MR. BOIES

1    DAUGHTER, THEIR BUSINESS, LIPSKI, WALL STREET, AND I'M TRYING

2    TO THINK OF THE OTHER FELLOW BECAUSE HE APPEARED ON A FILM WITH

3    HER.  DRAPER -- PITCH.

4    Q.  PITCH?

5    A.  THE FIRST GUY NAMED WAS PITCH.

6    Q.  SIR, HOW MANY YEARS AFTER 2006 WAS THE INTERVIEW OF

7    MR. PITCH, APPROXIMATELY?

8    A.  I HAVE NO IDEA.

9    Q.  APPROXIMATELY?

10   A.  I DON'T KNOW.  IT WOULD BE SO SPECULATIVE I WOULDN'T KNOW.

11   Q.  WELL YOU DO PERFECTLY WELL KNOW THAT IT WAS YEARS AFTER

12   2006, DON'T YOU, SIR?

13   A.  NO, I DON'T.

14   Q.  YOU ARE NOT SUGGESTING THAT YOU LEARNED ABOUT ELIZABETH

15   HOLMES AND THERANOS PRIOR TO APRIL 24TH, 2006, FROM MR. PITCH,

16   ARE YOU?

17   A.  I NEVER DID SAY THAT.

18   Q.  THAT'S MY QUESTION.

19   A.  NO --

20   Q.  MY QUESTION IS HOW DID YOU FIND OUT PRIOR TO -- IT'S NOW

21   CLEAR --

22   A.  RIGHT.

23   Q.  THAT YOU KNEW ABOUT THERANOS PRIOR TO THE TIME THAT YOU

24   FILED YOUR PROVISIONAL PATENT APPLICATION, CORRECT?

25   A.  THAT'S CORRECT.  BECAUSE I OBVIOUSLY KNEW ABOUT IT MONDAY

DIRECT EXAM BY MR. BOIES

1    APRIL 17TH.

2    Q.   NOW --

3    A.   WHAT TO ME IS MORE INTERESTING --

4    Q.   SIR, UNTIL THERE'S A QUESTION.

5        IS IT YOUR TESTIMONY THAT YOU FOUND OUT THAT ELIZABETH

6    HOLMES AND THERANOS WERE WORKING IN THIS ANALYZER AREA PRIOR TO

7    APRIL 24TH, 2006, FROM ELIZABETH HOLMES'S PARENTS?

8    A.   YES.

9    Q.   OKAY.   THAT'S WHAT YOU ARE TELLING US NOW?

10   A.   YES, ABSOLUTELY.

11   Q.   DIDN'T YOU TELL THE JURY ABOUT HOW SECRETIVE ELIZABETH

12   HOLMES'S PARENTS WERE AND THAT'S WHY YOU DIDN'T EVEN KNOW THERE

13   WAS A PATENT.  DIDN'T YOU TELL THE JURY THAT AT THE BEGINNING

14   OF THE TRIAL?

15   A.   NO, I THINK WHAT I TOLD THEM IS WHAT I JUST TOLD YOU, THEY

16   WERE NOT TALKATIVE IN TERMS OF WHAT THE PATENT ENTAILED.   IN

17   FACT I'M NOT SURE THEY KNEW.   ESPECIALLY CHRIS, THE FATHER, THE

18   MOTHER WAS EXTREMELY TALKATIVE.   BUT TO MY WIFE.   AND IT DIDN'T

19   MATTER TO ME, BECAUSE AS I SAY, I HAVE NO INTEREST IN, AND I

20   EXPLAINED THAT TO THE JURY.   I MADE AN LINE THERE, I AM NO

21   INTERESTED IN THAT PART WHICH IS HOW YOU ANALYZE.

22   Q.   DID YOU SAY HER PARENTS REALLY LIKE TO TALK.  YOU JUST SAID

23   THAT?

24   A.   YEAH, WELL THEY ARE TALKATIVE PEOPLE.

25   Q.   LET'S PUT UP PAGE 54.

DIRECT EXAM BY MR. BOIES

1        NOW THIS IS THE PAGE WE'VE BEEN LOOKING AT WHERE YOU SAY

2   THAT WHEN YOUR '612 PATENT STARTED IT HAD NOTHING TO DO WITH

3   THERANOS, YOU WEREN'T EVEN AWARE OF THERANOS AT THE TIME,

4   DIDN'T KNOW THEY HAD A PATENT.

5        LOOK AT WHAT THE VERY NEXT WORDS ARE, HER PARENTS ARE

6   SECRETIVE, THEY DON'T LIKE TO TALK.

7   A.   THAT'S TRUE.

8   Q.   OKAY.

9   A.   THAT IS VERY TRUE.  HER PARENTS ARE VERY SECRETIVE --

10  Q.   AND THEY DON'T LIKE TO TALK?

11  A.   THEY LOVE TO TALK BUT THEY DON'T LIKE TO TALK ABOUT THE

12  COMPANY OTHER THAN TELLING ME THAT THEY PUT $30,000 IN AND IN

13  RESPONSE TO, AFTER HAVING A DRINK OR TWO, CHRIS SAYING TO ME

14  THAT HE RAISED THE MONEY.  BECAUSE I WAS CURIOUS HOW THEY

15  RAISED THE MONEY.  HE SAID HE RAISED IT THROUGH LIPSKI A FRIEND

16  AT AID THAT NOTHING THERE IS INCONSISTENT.  THEY ARE SECRETIVE

17  PEOPLE.

18       I'VE KNOWN THEM A VERY LONG TIME.  THEY ARE SECRETIVE

19  PEOPLE.  THEY DO NOT LIKE TO TALK A LOT AND THEY DON'T LIKE TO

20  GIVE MUCH IN THE WAY OF DETAIL.  AND I COULD ELABORATE ON THAT

21  BUT I'M NOT GOING TO RUN ON.

22  Q.   LET ME GO BACK TO THIS KEY DATE OF APRIL 24TH, 2006, WHEN

23  YOU FILED YOUR PROVISIONAL PATENT APPLICATION --

24  A.   RIGHT.

25  Q.   FOR THE '612 PATENT.

DIRECT EXAM BY MR. BOIES

1      NOW, YOU WILL AGREE WITH ME THAT YOU KNEW ABOUT THERANOS

2  AT THAT TIME AND YOU KNEW THAT AT LEAST SOMEBODY WAS SAYING

3  THEY HAD PATENTS, CORRECT?

4  A.   CORRECT.  FROM THAT E-MAIL, DOCUMENTS IT FOR ME, THAT'S

5  CORRECT.

6  Q.   OKAY.  NOW, HOW DID YOU KNOW THAT?  IF YOU DIDN'T SEE THE

7  THERANOS PROVISIONALS, HOW DID YOU KNOW BEFORE APRIL 24TH,

8  2006, THAT THERANOS AND MS. HOLMES WERE INVOLVED?

9  A.   I WOULD HAVE KNOWN FROM HER PARENTS.

10  Q.   IT'S YOUR TESTIMONY NOW?

11  A.   IT'S IT IS ONLY WAY I COULD HAVE KNOWN PRIOR TO --

12  Q.   NO, NO, I'M NOT ASKING WHETHER YOU COULD HAVE.  WHAT I AM

13  ASKING YOU NOW UNDER OATH IS YOU ARE PREPARED TO TESTIFY THAT

14  HER PARENTS TOLD YOU PRIOR TO APRIL 24TH, 2006, THAT SHE WAS

15  INVOLVED IN A COMPANY NAMED THERANOS AND THERANOS WAS INVOLVED

16  IN ANALYZERS?

17  A.   BASED ON THE E-MAIL YOU SHOWED ME WHICH ESTABLISHES THE

18  DATE ONE WEEK BEFORE, THE ONLY WAY I COULD HAVE KNOWN THAT

19  WOULD BE FROM HER PARENTS, THAT'S CORRECT.

20  Q.   NOW THE ONLY WAY YOU COULD HAVE KNOWN IT IS FROM HER

21  PARENTS.

22      DO YOU HAVE ANY RECOLLECTION, AND I TELL YOU, SIR,

23  ELIZABETH HOLMES'S MOTHER IS GOING TO COME HERE TO TESTIFY --

24  A.   GOOD.

25  Q.   AND I'M NOW ASKING YOU, DID SHE OR HER HUSBAND EVER TELL

DIRECT EXAM BY MR. BOIES

1   YOU PRIOR TO THAT DATE, THAT HER DAUGHTER HAD A COMPANY NAMED

2   THERANOS THAT WAS WORKING IN THE ANALYZER AREA?  THAT'S YES,

3   NO, OR I DON'T KNOW?

4   A.   YES.

5   Q.   DO YOU REMEMBER WHERE YOU WERE WHEN THAT HAPPENED?

6   A.   NO, BECAUSE WE WERE IN SO MANY PLACES TOGETHER, I'M NOT

7   GOING TO SPECULATE BECAUSE THEY LIKE TO GO TO THE SUSHI CO

8   BECAUSE THEY LIVE UP THE STREET FROM IT ON WISCONSIN AVENUE IN

9   WASHINGTON.  THEY LIKE TO GO TO THE MANDARIN HOTEL.  THEY FLEW

10  IN FROM HOUSTON.

11       CHRIS WAS A FEW TIMES AT OUR OFFICE IN GREAT FALLS.  SO I

12  DON'T KNOW SPECIFICALLY WHERE.

13  Q.   LET ME ASK YOU THIS, HOW MANY TIMES -- YOU MENTION ALL

14  THESE DINNER PLACES.  HOW MANY TIMES DID YOU HAVE DINNER WITH

15  ELIZABETH HOLMES'S MOTHER IN 2005 AND 2006 AND 2007 COMBINED,

16  ALL THREE YEARS, HOW MANY YEARS?

17  A.   I THINK WITH THE MOTHER ALONE, JUST THE MOTHER, MY GUESS

18  WOULD BE NOT MORE THAN TWICE, JUST THE MOTHER, BECAUSE THE

19  MOTHER, ONE WAS AT OUR HOME IN VIRGINIA.  SHE CAME OVER FOR

20  LUNCH AND I HAPPENED TO BE THERE.

21       MANY, MANY TIMES WITH THE TWO OF THEM AS A COUPLE,

22  THOUGH.

23  Q.   OKAY.  HOW MANY TIMES IN THOSE THREE YEARS, 2005, 2006 AND

24  2,007, DID YOU HAVE DINNER WITH ELIZABETH HOLMES'S MOTHER,

25  WHETHER OR NOT OTHER PEOPLE WERE ALONG.  THAT IS ALONE, AS A

DIRECT EXAM BY MR. BOIES

1    COUPLE, EITHER WAY?

2    A.   NOT VERY OFTEN.  BUT I RECALL BEING THERE JUST WITH HER,

3    EVEN IF SOMEBODY ELSE WAS THERE, IT WAS USUALLY WITH THE TWO OF

4    THEM.  CHRIS --

5    Q.   YOU USUALLY HAD DINNER WITH --

6    A.   THE HUSBAND AND THE WIFE.

7    Q.   OKAY.  HOW MANY TIMES DID YOU HAVE DINNER WITH THE HUSBAND

8    AND WIFE, IN THESE THREE YEARS?

9    A.   OH, I CAN'T RECALL EXACTLY IN THOSE THREE YEARS.

10   Q.   APPROXIMATELY?

11   A.   IT WOULD REALLY BE, CAN I SPECULATE?

12        THE COURT:  YOU HAVE TO ANSWER THE QUESTION AS PUT TO

13   YOU, DR. FUISZ.

14        THE WITNESS:  I DON'T KNOW EXACTLY THE NUMBER.

15   BY MR. BOIES:

16   Q.   DID YOU GIVE ME AN APPROXIMATION?

17   A.   2 TO 10.

18   Q.   2 TO 10.  THAT'S OVER THREE YEARS?

19   A.   OH, OVER THREE YEARS, 2 TO 20 TIMES.

20   Q.   2 TO 20 TIMES OVER THREE YEARS WHEN YOU HAD DINNER WITH --

21   A.   UNLESS THEY WERE -- IF THEY WERE IN HOUSTON DURING THOSE

22   DATES THEN IT WOULD BE 2 TO 10.  IF THEY WERE IN THE D.C. AREA

23   IT WOULD BE 2 TO 20, 2 TO 30.

24   Q.   AND YOU DON'T REMEMBER, RIGHT.  I DON'T RECALL THE DETAIL,

25   ALL I REMEMBER IS I THINK IT WAS ABOUT 2006 BECAUSE I KNOW MY

DIRECT EXAM BY MR. BOIES

1    WIFE WAS HELPING NOEL PICK OUT THE HOUSE ON WISCONSIN AVENUE,

2    AND I KNOW THAT JOE AND I WERE IN A MEETING WITH CHRIS WHEN HE

3    LEFT RICE AND HAD MOVED TO GREAT FALLS AND WAS LIVING AT THEIR

4    PARENT'S HOUSE AND WANTED A PLACE TO LIVE, AND THAT'S WHEN I

5    OFFERED HIM OUR HOUSE FREE OF CHARGE UNTIL HE GOT ON HIS FEET,

6    BECAUSE I CONSIDERED HIM A FRIEND.

7         AND JOE WAS PRESENT AT THAT MEETING AT OUR OFFICE IN

8    GREAT FALLS.  THE HOUSE WAS ON --

9    Q.  MY QUESTION WAS, OVER THE THREE YEARS, 2005, 2006 AND 2007,

10   HOW MANY TIMES, APPROXIMATELY, WHAT'S YOUR BEST APPROXIMATION,

11   DID YOU HAVE DINNER WITH MR. AND MRS. HOLMES TOGETHER?

12   A.  I COULD GIVE YOU A MUCH BETTER FIGURE IF YOU COULD TELL ME

13   WHEN THEY MOVED BACK TO WASHINGTON FROM TEXAS.  OBVIOUSLY, WHEN

14   THEY WERE IN TEXAS, I WAS NOT PRESENT AS OFTEN, THEY WOULD HAVE

15   TO COME HERE.  USUALLY IF IT WAS THE MANDARIN HOTEL, THEY WERE

16   COMING FROM TEXAS.

17        AFTER THEY WERE HERE, WHICH I THINK WAS AROUND 2006, THEN

18   IT WOULD BE MORE FREQUENT.  BEFORE THEY WENT TO TEXAS, IT WAS

19   VERY FREQUENT.  ONCE A WEEK WOULDN'T BE -- WOULD BE ABOUT

20   RIGHT.

21   Q.  EXCUSE ME, IS IT YOUR TESTIMONY THAT PRIOR TO THE TIME THAT

22   THEY MOVED TO TEXAS, YOU HAD DINNER AVERAGE ONCE A WEEK WITH

23   MR. AND MRS. HOLMES, IS THAT YOUR TESTIMONY?

24   A.  YES, ABSOLUTELY.  A CHINESE RESTAURANT ON M STREET.

25   CHRIS'S FAVORITE RESTAURANT.

DIRECT EXAM BY MR. BOIES

1    MR. BOIES:  THEY I HAVE JUST ONE MOMENT, YOUR HONOR.

2    THE COURT:  YOU MAY.

3    (OFF-THE-RECORD DISCUSSION.)

4    Q.  IF I WERE TO TELL YOU THAT THE HOLMES MOVED BACK TO THE

5    DISTRICT OF COLUMBIA IN 2006, WOULD IT BE YOUR TESTIMONY THAT

6    STARTING THEN YOU HAD DINNER WITH THEM ON AVERAGE ONCE A WEEK?

7    A.  NO, BECAUSE WHEN THEY HAD COME BACK IN 2006 I HAD 1 OR 2

8    DINNERS WITH THEM EARLY IN 2006, IF I RECALL, IT WAS COLD

9    WEATHER, AND I DON'T THINK IT'S PROPER TO GO INTO IT HERE BUT

10   CHRIS WAS QUITE ILL AT THE TIME.

11   Q.  MY QUESTION DIDN'T HAVE ANYTHING TO DO WITH THAT?

12   A.  WELL IT HAS TO DO WITH ALL OF THIS BECAUSE HE COULDN'T GO

13   OUT AS FREQUENTLY.

14   Q.  ALL I'M ASKING YOU IS HOW MANY, SIR?

15   A.  AND I STARTED BY SAYING I THINK ABOUT TWO.

16   Q.  ABOUT TWO.

17   A.  YEAH.

18   Q.  SO FROM, ASSUMING THEY CAME BACK IN 2006, YOU HAVE HAD

19   DINNER WITH MR. AND MRS. HOLMES, ELIZABETH'S PARENTS, TWICE

20   OVER THE NEXT YEAR AND A HALF?  IS THAT YOUR TESTIMONY?

21   A.  MY TESTIMONY IS ONCE THEY ARRIVED BACK IN WASHINGTON, D.C.

22   AND WERE LIVING THERE, I THINK ABOUT TWICE BECAUSE HE BECAME

23   QUITE ILL.

24   Q.  DID YOU --

25   A.  PRIOR TO THAT WE WOULD MEET -- YOU WOULD HAVE TO ADD THAT,

DIRECT EXAM BY MR. BOIES

1    AT THE MANDARIN HOTEL WHICH IS USUALLY WHERE THEY WERE STAYING

2    WHEN THEY WOULD FLY IN FROM HOUSTON LOOKING FOR A HOME.

3    Q.   NOW IN ADDITION TO WHAT YOU SAY ARE THESE TWO DINNERS WITH

4    MR. AND MRS. HOLMES TOGETHER, DID YOU HAVE ANY DINNERS OR

5    MEETINGS WITH ELIZABETH'S MOTHER WHEN HER FATHER WAS NOT

6    PRESENT?

7    A.   AS I SAY, THAT WAS RELATIVELY UNCOMMON.  THE ONE I THINK I

8    RECALL WAS ON OUR LUNCH IN GREAT FALLS VIRGINIA.  AND I THINK

9    IT WAS, LORRAINE HAD BROUGHT HER BY FOR LUNCH AND I JOINED THEM

10   FOR A BIT.

11   Q.   THIS WAS WHEN, SIR?

12   A.   I DON'T KNOW THE DATE.

13   Q.   APPROXIMATELY?

14   A.   I DON'T KNOW THAT, COUNSELOR, TO GO BACK THAT FAR, I MEAN,

15   I HAVE A GREAT MEMORY BUT IT'S NOT THAT GREAT AT 74.

16   Q.   WAS IT BEFORE OR AFTER APRIL 24TH, 2006?

17   A.   I CAN'T HONESTLY ANSWER THAT QUESTION.  I REALLY CAN'T.

18   Q.   NOW YOU SAY THAT THE ONLY WAY YOU LEARNED ABOUT ELIZABETH

19   HOLMES AND THERANOS'S WORK WITH ANALYZERS PRIOR TO APRIL 24,

20   2006, WAS FROM ELIZABETH HOLMES'S PARENTS; IS THAT CORRECT?

21   A.   CORRECT, YES.

22   Q.   NOW WHEN YOU LEARNED OF THIS OR SAY YOU LEARNED OF THIS

23   FROM HER PARENTS, WERE BOTH HER PARENTS PRESENT?

24   A.   TO MY RECOLLECTION THEY BOTH WERE PRESENT.  THERE WERE 2 OR

25   3 MEETINGS AT THE MANDARIN HOTEL.  I BELIEVE THEY WERE BOTH

DIRECT EXAM BY MR. BOIES

1    PRESENT.  IT'S CONCEIVABLE ON ONE OF THOSE ONLY HE WAS PRESENT.

2    BUT WE ARE GOING BACK QUITE A WHILE.

3          AND THE ONLY REASON I RECALL IS, BECAUSE IF YOU KNOW THE

4    WASHINGTON, D.C., YOU KNOW THE MANDARIN IS KIND OF WAY OFF IN

5    SOUTHEAST.  AND IT'S NOT AN AREA I WAS PARTICULARLY FAMILIAR

6    WITH, AND THAT'S WHY I REMEMBERED BECAUSE I GOT LOST TRYING TO

7    FIND IT TO MEET THEM THERE.

8    Q.   WHICH ONE OF HER PARENTS TOLD YOU ABOUT WHAT ELIZABETH AND

9    THERANOS WERE DOING?

10   A.   WELL, I THINK THEY BOTH DID.  I THINK CHRIS WAS MORE VERBAL

11   WITH ME, AND I THINK NOEL WAS MORE VERBAL WITH LORRAINE.

12   Q.   DID, ACCORDING TO YOUR TESTIMONY, YOU EVER ASK EITHER OF

13   HER PARENTS ANY QUESTIONS ABOUT WHAT WORK ELIZABETH WAS DOING?

14   A.   NO, BECAUSE IT'S JUST NOT MY NATURE.  I DON'T PRY INTO, YOU

15   KNOW, PEOPLE DON'T -- LOOK, MOST PEOPLE KNOW I'M VERY ACTIVE IN

16   THE MEDICAL COMMUNITY AND IN BUSINESS AND INVENTION, AND I

17   DON'T PRY.  IT'S NOT MY NATURE TO PRY.

18          WHATEVER IS VOLUNTEERED, I LISTENED AND I WOULD HELP.

19   AND OF COURSE WERE I ASKED TO HELP WITH ELIZABETH, I WOULD HAVE

20   GRADUALLY.  BUT NOT FOR MONEY, BECAUSE IT WAS FRIEND SHIP,

21   THERE USED TO BE.

22   Q.   LET ME SEE IF I UNDERSTAND WHAT YOU ARE SAYING.  YOU DIDN'T

23   ASK ANY QUESTIONS OF MR. AND MRS. HOLMES THEY SIMPLY

24   VOLUNTEERED THIS INFORMATION FOR YOU; IS THAT CORRECT?

25   A.   MY TESTIMONY IS I'M NOT THE TYPE OF PERSON WHO SITS AT A

DIRECT EXAM BY MR. BOIES

1    DINNER AND QUESTIONS PEOPLE.  TOPICS COME UP AND THEY OFTEN

2    COME UP SPONTANEOUSLY AND THEY USUALLY COME UP IN THE CONTEXT

3    OF HOW ARE THE KIDS DOING.  HOW ARE THE CHILDREN DOING.  AND

4    THAT'S USUALLY BILATERAL, BOTH WAYS.

5    Q.   MY QUESTION SIR, IS, IS IT YOUR TESTIMONY THAT YOU DID NOT

6    ASK MR. AND MRS. FUISZ ANY QUESTIONS ABOUT THERANOS --

7    A.   WELL, I'M MR. FUISZ, YOU DON'T MEAN THAT.

8    Q.   YOU ARE RIGHT.  DID YOU ASK MR. AND MRS. HOLMES, ELIZABETH

9    HOLMES'S PARENTS, ANY QUESTIONS ABOUT WHAT ELIZABETH WAS DOING

10   AT THERANOS?

11   A.   I DON'T THINK WHAT SHE WAS DOING AT THERANOS -- HOW WAS SHE

12   DOING, HOW WAS CHRISTIAN DOING, AND THE RECIPROCAL IS HOW IS

13   JOHN DOING, HOW IS JOE DOING, HOW IS JUSTIN DOING.  HOW IS

14   JESSICA DOING, HOW ARE MY CHILDREN DOING.

15   Q.   OTHER THAN SIMPLY INQUIRING AS TO HOW THE CHILDREN WERE

16   DOING, DID YOU ASK ANY QUESTIONS ABOUT WHAT ELIZABETH WAS DOING

17   IN HER BUSINESS?

18   A.   NO, I DIDN'T ASK DETAILED QUESTIONS BECAUSE I DON'T THINK

19   THEY WOULD HAVE KNOWN ANY SPECIFIC ANSWERS AND DIDN'T -- LOOK,

20   IF THEY VOLUNTEERED WHAT SHE WAS DOING, IT WAS GREAT.  I WAS

21   HAVE LISTENED.  THEY WEREN'T THE TYPE OF PEOPLE WHO VOLUNTEERED

22   THAT KIND OF INFORMATION.

23       MY FEELING WAS THAT THEY WERE VERY PROUD OF WHAT SHE WAS

24   DOING, BUT WERE FAIRLY SECRETIVE ABOUT IT AND I RESPECTED THAT.

25   AND I DIDN'T GO BEYOND IT.

DIRECT EXAM BY MR. BOIES

1          I WAS A BIT -- I WAS A BIT RETICENT IN MY MIND BECAUSE I

2    WOULD HAVE BEEN GLAD TO HELP HER IN ANY WAY I COULD, BUT THEY

3    NEVER TOOK THE CONVERSATION THAT FAR, AND I DON'T, AS I SAY,

4    PUSH MYSELF ON SOMEONE.

5    Q.   I'M NOT ASKING ABOUT WHAT YOU GENERALLY DO, I'M ASKING YOU

6    ABOUT WHAT YOU DID IN DEALING WITH MR. AND MRS. HOLMES.  AND

7    I'M NOT ASKING YOU ABOUT WHETHER YOU CONSIDER THE QUESTIONS

8    THAT YOU ASKED DETAILED OR NOT --

9    A.   UH-HUH.

10   Q.   I'M ASKING YOU WHETHER YOU ASKED, ACCORDING TO YOUR

11   TESTIMONY, EITHER MR. AND MRS. HOLMES OR BOTH OF THEM, ANY

12   QUESTIONS ABOUT WHAT ELIZABETH HOLMES WAS DOING AT THERANOS OR

13   IN HER BUSINESS?

14   A.   COUNSELOR, GOD BLESS YOU.  IF YOU GO BACK NINE YEARS OR

15   10 YEARS, LET'S SEE, 2000 -- IT'S ALMOST TEN YEARS, YOU ARE NOT

16   GOING TO PIN ME DOWN TO EXACTLY WHAT WAS SAID AT DINNER.

17          I AM TELLING YOU HONESTLY THAT I HAVE NO RECOLLECTION OF

18   EVER PRYING INTO WHAT ELIZABETH HOLMES DID WITH HER COMPANY.

19   AND ANYTHING THAT I DO KNOW WOULD HAVE BEEN VOLUNTEERED.  I

20   DON'T TREAT THE HOLMES'S ANY DIFFERENT THAN OTHER PEOPLE I

21   KNOW.  I'M NOT A PRYER I'M A LONER.

22   Q.   NOW IN ANY OF THESE CONVERSATIONS THAT YOU HAD WITH THE

23   HOLMES'S DID YOU TELL THEM THAT YOU WERE PREPARING A PATENT

24   APPLICATION FOR A PATENT THAT WAS AIMED AT MODULES THAT

25   THERANOS WAS DOING?

DIRECT EXAM BY MR. BOIES

1    A.  NO BECAUSE I NEVER SPEAK ABOUT PATENTS EVER.  IT'S A POLICY

2    THAT WE HAVE.  WE NEVER SPEAK ABOUT THEM BECAUSE PROPERLY TO

3    SPEAK ABOUT THEM YOU SHOULD HAVE A NONDISCLOSURE IN PLACE, AND

4    I'M NOT GOING HAVE A PATENT ELIMINATED BECAUSE I DISCUSSED IT

5    WITH SOMEONE, SO NORMALLY I DO NOT.

6    Q.  AGAIN I'M NOT ASKING ABOUT NORMALLY, I'M JUST ASKING

7    WHETHER YOU, AND I WANT TO GO BACK TO PAGE 54 WAS TRANSCRIPT OF

8    WHAT YOU TOLD THE JURY AT THE BEGINNING OF TRIAL.

9        DID YOU, WHEN YOU WERE TALKING TO THE HOLMES'S IN 2005,

10   2006, 2007, TELL THEM JUST GENERALLY THAT YOU WERE CONSIDERING

11   GOING AFTER THE ANALYZER SPACE IN SOME WAY

12   A.  NO BECAUSE I WASN'T GOING AFTER THE ANALYZER SPACE.

13   Q.  ALL RIGHT.  LET'S PUT EXHIBIT 98 BACK UP.  IS THIS WHAT YOU

14   WROTE ON APRIL 17TH, 2006?

15   A.  CORRECT.

16   Q.  A COMPANY CALLED THERANOS, THE INVENTOR SAYS ELIZABETH

17   HOLMES, CLAIMS TO HAVE A PATENT ON A DEVICE, OKAY.

18       NOW IT'S YOUR TESTIMONY THAT THAT CAME FROM ELIZABETH

19   HOLMES'S PARENTS, CORRECT

20   A.  IT'S FROM ALAN SCHIAVELLI -- OH, YOU MEAN MY E-MAIL TO HIM.

21   Q.  YES.

22   A.  YES IT'S FROM HER PARENTS, DEFINITELY.

23   Q.  YOU WRITE AN E-MAIL TO MR. SCHIAVELLI, AND IN THAT E-MAIL

24   YOU SAY A COMPANY CALLED THERANOS CLAIMS TO HAVE A PATENT.  AND

25   YOUR INFORMATION THAT YOU ARE PASSING ON TO MR. SCHIAVELLI,

DIRECT EXAM BY MR. BOIES

1    ACCORDING TO YOU, CAME FROM ELIZABETH HOLMES'S PARENTS,

2    CORRECT?

3    A.   IT MUST HAVE.  I DON'T KNOW ANY OTHER SOURCE IT COULD HAVE

4    COME FROM.

5    Q.   AND YOU GO ON TO SAY THAT THIS PATENT THAT THERANOS HAS

6    CLAIMED TO HAVE AS MODULES FOR EACH DRUG, DO YOU SEE THAT?

7    A.   I DO.

8    Q.   AND IS IT YOUR TESTIMONY THAT PLAINTIFF'S PARENTS ALSO TOLD

9    YOU THAT THE PATENT THAT THEIR DAUGHTER AND THERANOS HAD, HAD

10   MODULES FOR EACH DRUG?

11   A.   YOU ARE MISINTERPRETING THE WORD MODULES.  MODULES THERE I

12   THINK YOU ARE INTERPRETING AS CARTRIDGES.  I DIDN'T HAVE THAT

13   KIND OF DETAIL.  I DIDN'T KNOW ANYTHING LIKE THAT.  I MEANT

14   THAT THEY DO -- THAT SHE HAS SOME TYPE OF DEVICE THAT MEASURES

15   ALL KINDS OF ANALYTES NOT JUST GLUCOSE.  THE MODULES DIDN'T

16   MEAN THE CARTRIDGES, THAT WOULD BE A DIFFERENT LEVEL OF

17   KNOWLEDGE; THAT NOW I HAVE BUT I DIDN'T HAVE THEN.

18   Q.   SO IT'S YOUR TESTIMONY WHEN YOU SAID THERANOS HAS A PATENT

19   ON A DEVICE THAT HAS MODULES FOR EACH DRUG, YOU WEREN'T TALKING

20   ABOUT THE CARTRIDGES YOU WERE SIMPLY TALKING ABOUT A DEVICE

21   THAT COULD MEASURE A LOT OF DIFFERENT ANALYTES?

22   A.   CORRECT.

23   Q.   OKAY.  NOW, DID THAT INFORMATION THAT THERANOS HAD A PATENT

24   ON A DEVICE THAT COULD MEASURE ANALYTES IN A LOT OF DIFFERENT

25   DRUGS OR FOR A LOT OF DIFFERENT DRUGS, COME FROM ELIZABETH

DIRECT EXAM BY MR. BOIES

1    HOLMES'S PARENTS?

2    A.   YES, IT WOULD HAVE COME FROM, AND I THINK SPECIFICALLY IT

3    PROBABLY CAME FROM NOEL BECAUSE -- BUT AGAIN, I DIDN'T -- SHE

4    DIDN'T CONVEY THAT TO ME, THAT WAS JUST HUSBAND AND WIFE TALK

5    BEFORE SHE, AFTER MY WIFE WOULD COME BACK FROM A TRIP WITH

6    GNOME, BECAUSE THERE WAS A TIME PERIOD WHICH I THINK WOULD FIT

7    THAT PERIOD WHEN NOEL WAS TALKING ABOUT SOME TYPE OF BRACELET

8    THAT THE DEFENSE DEPARTMENT IS BUYING THAT EVERY SOLDIER IS

9    GOING TO WEAR ON THEIR WRIST THAT IS GOING TO CONSTANTLY

10   EXAMINE THEIR BODY FOR ALL KINDS OF THINGS.  THAT'S PROBABLY

11   WHERE THE ORIGINAL THING CAME WHICH I THEN MENTIONED TO MY

12   ATTORNEY AND HE OF COURSE, LOW AND BEHOLD, FINDS THE

13   PROVISIONAL.

14   Q.   DR. FUISZ, DID I UNDERSTAND YOU TO SAY THIS INFORMATION

15   CAME FROM ELIZABETH'S MOTHER TO YOUR WIFE THEN FROM YOUR WIFE

16   TO YOU, IS THAT WHAT YOU SAID?

17   A.   YES -- NO, NO.  I POSTULATED THAT IT MIGHT HAVE.  THAT'S

18   WHERE I THINK IT DID.  COUNSELOR, I DON'T KNOW IN 2006,

19   PRECISELY THE CHAIN OF CUSTODY, BUT IT WOULD HAVE COME THROUGH

20   HER PARENTS.

21   Q.   MY QUESTION, SIR, AND THE ANSWER MAY BE THAT YOU SIMPLY

22   DON'T REMEMBER AND IF THAT'S THE CASE, TELL ME.

23        BUT ME QUESTION IS WHETHER YOU CAN TELL US WHETHER THIS

24   INFORMATION THAT YOU SAY YOU GOT FROM ELIZABETH HOLMES'S

25   PARENTS CAME DIRECTLY FROM THEM TO YOU OR WHETHER THEY TOLD

DIRECT EXAM BY MR. BOIES

1    YOUR WIFE AND YOUR WIFE TOLD YOU?

2    A.   I COULDN'T ANSWER WHETHER IT CAME DIRECTLY FROM THEM OR IT

3    CAME THROUGH MY WIFE.  I THINK IT CAME THROUGH MY WIFE.

4         THE COURT:  MR. BOIES, I NEED TO STOP YOU THERE, IT'S

5    TIME FOR OUR AFTERNOON BREAK.

6         LADIES AND GENTLEMEN, THE JURY WILL TAKE OUR AFTERNOON

7    BREAK AT THIS TIME.  DON'T DISCUSS THE CASE WHILE YOU ARE OUT

8    ON BREAK AND WE WILL SEE YOU BACK IN TEN MINUTES.

9         THE COURT:  DR. FUISZ YOU MAY STEP DOWN DURING THE

10   BREAK, BUT I DO WANT TO REMIND YOU THAT YOU ARE UNDER OATH AND

11   DO NOT DISCUSS YOUR TESTIMONY WHILE YOU ARE OUT ON BREAK.

12        WE WILL SEE YOU HERE IN TEN MINUTES

13        (WHEREUPON A RECESS WAS TAKEN.)

14        (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN THE

15   PRESENCE OF THE JURY:)

16        THE COURT:  LADIES AND GENTLEMEN, WE ARE IN THE HOME

17   STRETCH FOR THE DAY.

18        MR. BOIES, YOU MAY CONTINUE

19        MR. BOIES:  THANK YOU, YOUR HONOR.

20   Q.   DR. FUISZ, LET ME ASK YOU TO LOOK AT PLAINTIFF'S

21   EXHIBIT 29 -- I MEAN 59, PLAINTIFF'S TRIAL EXHIBIT 59.

22        AND WITH THE COURT'S PERMISSION, MAY I APPROACH?

23        THE COURT:  YOU MAY.

24   Q.   IS THIS AN E-MAIL THAT YOU WROTE ON JANUARY 11TH, 2006?

25   A.   COUNSELOR, COULD I JUST TAKE A MINUTE TO READ IT, PLEASE.

DIRECT EXAM BY MR. BOIES

1    Q.   ABSOLUTELY.

2    A.   THE PRINT IS VERY FINE.

3    Q.   TAKE AS MUCH TIME AS YOU WANT.  AND WHEN YOU FINISH, PLEASE

4    LET ME KNOW.

5    A.   YES, I'VE READ IT.

6    Q.   IS THIS AN E-MAIL THAT YOU WROTE ON JANUARY 11, 2006?

7    A.   YES, I WOULD SAY THAT IT APPEARS GENUINE.

8              MR. BOIES:  I WOULD OFFER THIS EXHIBIT, YOUR HONOR.

9              THE COURT:  ANY OBJECTION?

10             MR. J. FUISZ:  NO.

11             MS. ANDERSON:  NO.

12             THE COURT:  TRIAL EXHIBIT 59 IS ADMITTED.

13     (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER 59 HAVING BEEN

14   PREVIOUSLY MARKED FOR IDENTIFICATION, WAS ADMITTED INTO

15   EVIDENCE.)

16        YOU MAY PROCEED, MR. BOIES.

17   BY MR. BOIES:

18   Q.   NOW THIS IS AN E-MAIL THAT YOU WROTE TO YOUR PATENT

19   ATTORNEY, ALAN SCHIAVELLI, RIGHT?

20   A.   SCHIAVELLI.

21   Q.   SCHIAVELLI.  AND YOU COPIED YOUR SON JOE FUISZ, CORRECT?

22   A.   CORRECT.

23   Q.   AND YOU SAY THAT YOU WANT TO MODIFY THE ANALYZER

24   APPLICATION SOMEWHAT.  DO YOU SEE THAT?

25   A.   RIGHT.

DIRECT EXAM BY MR. BOIES

1    Q.   NOW WHAT YOU ARE REFERRING TO THERE IS THE PROVISIONAL

2    PATENT APPLICATION THAT YOU WERE PLANNING TO FILE FOR WHAT

3    ULTIMATELY BECAME THE '612 PATENT, CORRECT?

4    A.   IT WOULD APPEAR, YES.

5    Q.   NOW, YOU CAN READ WHATEVER PORTION YOU THINK IS RELEVANT,

6    BUT THE PORTION THAT I'M PARTICULARLY INTERESTED IN IS IN THE

7    LAST SENTENCE IN WHICH YOU SAY LASTLY, THE LEVELS ITSELF SET BY

8    AN ANALYZER CHIP SUCH AS THAT MADE BY A COMPANY THERANOS, WOULD

9    ALERT THE CHIP TO TURN ON AND SET THE ALARM PARAMETER.

10        DO YOU SEE THAT?

11   A.   YEAH.  UH-HUH.

12   Q.   HOW DID YOU BECOME AWARE IN JANUARY OF 2006 THAT THERANOS

13   HAD AN ANALYZER CHIP?

14   A.   FIRST OF ALL, I DON'T KNOW THAT THEY HAVE AN ANALYZER CHIP,

15   I DON'T THINK THEY DO HAVE AN ANALYZER CHIP, BUT THAT WOULD BE

16   ERRONEOUS ON MY PART.

17   Q.   WELL, ON JANUARY --

18   A.   I DON'T HONESTLY KNOW WHERE.  IT SOUNDS TO ME AS IF IT'S --

19   IT'S -- I'M NOT DOUBTING YOU AT ALL, IT SAYS BY A COMPANY,

20   THERANOS.  THE SOURCE OF IT.  I'M NOT SURE WHERE IT CAME FROM,

21   SITTING HERE.

22   Q.   ARE YOU FINISHED?

23   A.   YES, GO AHEAD.

24   Q.   THERE'S NO DOUBT THAT ON JANUARY 11, 2006, YOU BELIEVED

25   THAT THERANOS MADE AN ANALYZER CHIP, CORRECT?

DIRECT EXAM BY MR. BOIES

1    A.  RIGHT.  WHATEVER I COMPREHENDED THAT TO BE, RIGHT, THAT

2    ANALYZER CHIP.

3    Q.  AND WHAT YOU WERE TELLING YOUR PATENT ATTORNEY WERE THAT

4    THE LEVELS IN WHAT YOU WERE TRYING TO PATENT WERE GOING TO BE

5    SET BY ANALYZER CHIP SUCH AS THAT MADE BY THERANOS, CORRECT?

6    A.  YEAH, NO, THAT'S WHAT IT SAYS.

7    Q.  AND MY QUESTION IS AS OF JANUARY 2006, WHY DID YOU BELIEVE

8    THAT THERANOS HAD AN ANALYZER CHIP?

9    A.  WELL FIRST OF ALL, I WOULD SAY I WAS WRONG, THEY DON'T HAVE

10   AN ANALYZER CHIP AS FAR AS I KNOW.  I THINK BY CHIP I MEANT

11   MODULE THAT THEY CAN DO DIFFERENT TYPES OF DRUGS.

12       WHERE I LEARNED THAT FROM, WHAT IT COMES DOWN TO IN MY

13   MIND GOING BACK TO IT, I COULD HAVE EITHER LEARNED THAT FROM

14   PARENTS, INTERNET, I DON'T KNOW WHERE ELSE I COULD HAVE LEARNED

15   IT.

16   Q.  YOU DON'T REMEMBER LEARNING THAT FROM THE INTERNET, DO YOU,

17   SIR?

18   A.  NO, I'M SAYING, I CAN'T TELL YOU OFF HAND WHERE I LEARNED

19   THAT.

20   Q.  BUT IT IS YOUR TESTIMONY THAT YOU DID NOT LEARN IT FROM THE

21   THERANOS PROVISIONALS BECAUSE IT IS YOUR TESTIMONY THAT YOU

22   DIDN'T LOOK AT THE THERANOS PROVISIONALS OR ANY SUMMARY OF

23   THEM, CORRECT?  THAT'S YOUR TESTIMONY.

24   A.  WELL I DON'T THINK I COULD V. THEY WEREN'T PUBLIC.

25   Q.  THEY WERE NOT PUBLIC?

DIRECT EXAM BY MR. BOIES

1    A.   RIGHT.

2    Q.   AND IT IS YOUR TESTIMONY TO THIS JURY THAT UNTIL THEY

3    BECAME PUBLIC, YOU DIDN'T HAVE ANY ACCESS TO WHAT WAS IN THOSE

4    THERANOS PROVISIONALS, THAT'S YOUR POSITION, CORRECT?

5    A.   MY POSITION IS ABSOLUTELY, ROCK SOLID, I HAVE NO KNOWLEDGE

6    OF ANY THERANOS PROVISIONALS UNTIL THEY BECAME PUBLIC, THAT'S

7    CORRECT.

8    Q.   BUT YOU CAN'T POINT ME TO ANY SOURCE THAT YOU REMEMBER

9    ABOUT THERANOS'S ANALYZER CHIP OR ANALYZER MODULE AS OF

10   JANUARY 11, 2006, CORRECT?

11   A.   NO, I CAN'T.  SITTING HERE I CANNOT.

12   Q.   OKAY.

13   A.   CORRECT.

14   Q.   LET ME GO TO THERANOS EXHIBIT 120.

15        MAY I APPROACH, YOUR HONOR?

16             MS. ANDERSON:  CAN WE HAVE A COPY?

17             THE COURT:  THANK YOU.

18             MS. ANDERSON:  WRONG DIRECTION.  I APPRECIATE IT.

19             (OFF-THE-RECORD DISCUSSION.)

20   BY MR. BOIES:

21   Q.   IS THIS AN E-MAIL THAT YOU SENT ON OR ABOUT THE DATE WHICH

22   IS --

23   A.   YES, I THINK THAT'S CORRECT.

24             MR. BOIES:  I WOULD OFFER THIS EXHIBIT, YOUR HONOR.

25             THE COURT:  ANY OBJECTION?

DIRECT EXAM BY MR. BOIES

1              MS. ANDERSON:  NO.

2              MR. J. FUISZ:  NO.

3              THE COURT:  TRIAL EXHIBIT 120 IS ADMITTED.

4        (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER 120 HAVING BEEN

5     PREVIOUSLY MARKED FOR IDENTIFICATION, WAS ADMITTED INTO

6     EVIDENCE.)

7     BY MR. BOIES:

8     Q.   NOW I WANT TO BEGIN BY FOCUSSING AT THE VERY TOP.  THIS IS

9     AN E-MAIL FROM YOU TO YOUR SON JOE FUISZ ON APRIL 24TH, 2006,

10    CORRECT?

11    A.   CORRECT.

12    Q.   AND THAT WAS THE VERY DAY THAT YOUR PROVISIONAL PATENT

13    APPLICATION FOR WHAT BECAME THE '612 PATENT, WAS FILED,

14    CORRECT?

15    A.   I DON'T KNOW THAT OFF HAND.  IF THAT CHART IS RIGHT, THEN

16    YES.

17    Q.   AND THIS SAYS IT HAS 13 ATTACHMENTS, DO YOU SEE THAT?

18    A.   YES, I DO.

19    Q.   AND DO YOU RECALL THAT WE ASKED YOU AND YOUR COUNSEL AT THE

20    TIME TO PRODUCE THOSE ATTACHMENTS, CORRECT?

21    A.   I DON'T RECALL THAT, NO.

22    Q.   DO YOU KNOW WHAT HAPPENED TO THOSE ATTACHMENTS?

23    A.   NO.

24    Q.   DID YOU SEARCH FOR THOSE ATTACHMENTS?

25    A.   YES.  AS MUCH AS I COULD.

DIRECT EXAM BY MR. BOIES

1    Q.  DID YOU FIND THEM?

2    A.  NO.

3    Q.  SO ALL WE ARE LEFT WITH ARE THESE TWO PAGES?

4    A.  AND I CAN EXPLAIN TO YOU WHY.

5    Q.  WHY WHAT?

6    A.  WHY THEY ARE DIFFICULT TO SEARCH.

7    Q.  WHY WHAT ARE DIFFICULT TO SEARCH?

8    A.  BECAUSE --

9    Q.  WHAT?  I'M TRYING -- WHAT'S DIFFICULT TO SEARCH?

10   A.  THE ATTACHMENTS.

11   Q.  THESE ATTACHMENTS WERE ATTACHED TO AN E-MAIL YOU SENT,

12   CORRECT?

13   A.  IT WOULD APPEAR THAT WAY, YES.

14   Q.  SO YOU HAD THE ATTACHMENTS AT THE TIME THAT YOU SENT IT,

15   CORRECT?

16   A.  IT WOULD APPEAR I DID, YEAH.

17   Q.  BUT IT'S YOUR TESTIMONY THAT YOU CAN'T FIND THOSE

18   ATTACHMENTS NOW?

19   A.  NO, I CAN EXPLAIN IT TO YOU WHY.

20   Q.  OKAY.

21   A.  BECAUSE AT THE TIME I HAD A BLACK BERRY AND I WAS USING A

22   SERVICE OUT OF FLORIDA CALLED MAILSTREET.COM.  AND THERE CAME A

23   TIME ABOUT 2 OR 3 YEARS AGO THAT THEY -- I TEND TO USE BLACK

24   BARYES AND THEY STOPPED SERVING BLACK BERRIES IN WHICH POINT I

25   HAD TO SEVER MAIL STREET.  THEY WERE A PC FACTORY AND THEY WERE

DIRECT EXAM BY MR. BOIES

1    PRETTY EXPENSIVE.  AND I DIDN'T USE BLACK BERRIES ANYMORE.

2         AND UNFORTUNATELY WHAT I DIDN'T REALIZE IS THAT ERASE

3    YOUR OLD E-MAILS.  THEY ARE AN IMAP SYSTEM AND THEY DON'T KEEP

4    THEM.  AND I, FOR OTHER REASONS I WOULD HAVE LIKED TO HAVE HAD

5    SOME, I CAN'T GAIN ACCESS TO THOSE.

6    Q.  WHEN --

7    A.  NOT THESE, OTHER E-MAILS.

8    Q.  WHEN IS IT YOUR TESTIMONY THAT YOU SWITCHED E-MAIL SERVICES

9    AND LOST SOME OF YOUR E-MAILS?

10   A.  OH, I DON'T RECALL THE EXACT DATE.  BUT IT WAS, I THINK

11   BEYOND THIS DATE.

12   Q.  IT WOULD HAVE HAD TO HAVE BEEN BEYOND THIS DATE FOR YOUR

13   EXPLANATION TO MAKE ANY SENSE, RIGHT?

14   A.  THREE YEARS AGO, FOUR YEARS AGO.

15   Q.  AND WAS IT BEFORE OR AFTER THIS LAWSUIT STARTED?

16   A.  WELL, NO, I THINK IT WAS BEFORE THIS LAWSUIT STARTED.

17   Q.  NOW DID ALL OF THESE ATTACHMENTS TO THIS E-MAIL RELATE TO

18   THERANOS?

19   A.  I HAVE NO RECOLLECTION WHAT THEY RELATED TO.

20   Q.  THIS WAS SOMETHING THAT CAME FROM THE THERANOS WEBSITE,

21   CORRECT?

22   A.  YES.  WHAT'S INTERESTING TO ME IS WHEN DID THIS WEBSITE

23   START.

24   Q.  THAT MAY BE WHAT'S INTERESTING TO YOU BUT MY QUESTION IS

25   THIS CAME FROM THE THERANOS WEBSITE, CORRECT?

DIRECT EXAM BY MR. BOIES

1    A.   YES, BUT I THOUGHT I ASKED YOU EARLIER AND YOU SAID THEY

2    DIDN'T HAVE A WEBSITE.

3    Q.   WHAT?

4    A.   I THOUGHT EARLIER YOU MENTIONED THEY DIDN'T HAVE A WEBSITE.

5    THEY OBVIOUSLY HAVE A WEBSITE.

6    Q.   SIR, FIRST OF ALL, I'M NOT ANSWERING YOUR QUESTIONS, AND

7    SECOND, EVEN IF I HAD, I WOULDN'T HAVE ANSWERED IT THAT WAY.  I

8    DID NOT TELL YOU THEY DIDN'T HAVE A WEBSITE?

9    A.   OH, SORRY, COUNSELOR.

10   Q.   THE -- BUT THIS CAME FROM THE THERANOS WEBSITE WHICH YOU

11   ACCESSED ON APRIL 24TH, 2006, CORRECT?

12   A.   YES.

13   Q.   NOW THIS DOESN'T HAVE ANYTHING TO DO WITH ANY ANALYZER CHIP

14   OR ANY DESCRIPTION OF THEIR PRODUCTS, CORRECT?

15   A.   WELL, THAT'S WHY I ASKED YOU WHEN THIS WEBSITE STARTED.

16   MAYBE IT DID.  I DON'T KNOW THAT.

17        THAT WAS ONE OF MY REASONS FOR ASKING, I WASN'T TRYING TO

18   BE A WISE GUY.

19   Q.   DURING ONE WAY OR ANOTHER WHAT WAS ON THE WEBSITE?

20   A.   I THINK JUST BEFORE WE TOOK THE BREAK I SAID TO YOU IT

21   POSSIBLY CAME FROM THE PARENTS OR THE INTERNET.

22   Q.   NOW THIS WAS THE DAY YOU FILED YOUR PROVISIONAL PATENT

23   APPLICATION, RIGHT?

24   A.   RIGHT.

25   Q.   NOW LET'S GO BACK TO PAGE 54 OF THE TRANSCRIPT.  NOW THIS

DIRECT EXAM BY MR. BOIES

1   IS THE PORTION THAT WE'VE TALKED ABOUT WHERE YOU TOLD THE JURY

2   AT THE BEGINNING OF THE TRIAL THAT WHEN THE '612 PATENT

3   STARTED, YOU HAD NOTHING TO DO WITH THERANOS, YOU WEREN'T EVEN

4   AWARE OF THERANOS AT THE TIME, DIDN'T KNOW THEY HAD A PATENT.

5        IF IT HAD NOTHING TO DO WITH THERANOS, WHY WERE YOU

6   DOWNLOADING 13 ATTACHMENTS FROM THEIR WEBSITE AND SENDING IT

7   AROUND THE DAY THAT YOU FILE YOUR PATENT APPLICATION?

8   A.   THERE WAS NOTHING UNUSUAL ABOUT THAT.  I PROBABLY HAD

9   SIMILAR ATTACHMENTS FROM MEDTRONIC OR BAYER OR ROCHE OR ANYBODY

10  WHO WAS IN THIS BUSINESS.

11  Q.   YOU HAVEN'T SEEN ANY OF THOSE, HAVE YOU SIR?

12  A.   YOU HAVEN'T PRODUCED ANY, NO.

13  Q.   I HAVEN'T PRODUCED THEM?

14  A.   NO.

15  Q.   WELL YOU WERE THE ONE THAT SENT THEM ACCORDING TO YOU,

16  RIGHT?

17  A.   YOU JUST SAID I DON'T HAVE MY E-MAIL FROM BACK THEN.

18  Q.   WELL HAVE YOU THIS E-MAIL FROM BACK THEN I DON'T HAVE THE

19  ATTACHMENTS BUT YOU HAVE THIS E-MAIL?

20  A.   I DON'T KNOW WHERE IT CAME FROM --

21  Q.   YOU HAVE THIS E-MAIL, RIGHT?

22  A.   THIS E-MAIL HONESTLY I DON'T KNOW WHERE THIS CAME FROM, BUT

23  IT LOOKS -- IT'S MY END OF IT, IT APPEARS.

24  Q.   YES, IT DOES APPEAR TO BE YOURS, SIR.

25  A.   YES, I'M NOT DOUBTING THAT.

DIRECT EXAM BY MR. BOIES

1    Q.   AND YOU DON'T HAVE ANY E-MAILS THAT YOU SENT ON APRIL 24TH

2    OR AROUND THEN, 2006 ABOUT ANY OTHER COMPANY OTHER THAN

3    THERANOS, RIGHT?

4    A.   I KNOW I DID.  I DON'T HAVE THE E-MAILS BUT I KNOW I DID.

5    I ALWAYS LOOK AT ALL THE COMPANIES THAT I E-MAIL.

6    Q.   WHAT HAPPENED TO THOSE E-MAILS?

7    A.   I HAVE NO IDEA.

8    Q.   IS THERE SOME REASON, ACCORDING TO YOU, WHY ONLY THE

9    THERANOS E-MAIL SURVIVED AND E-MAILS THAT YOU SAY YOU SENT

10   ABOUT ROCHE AND OTHER COMPANIES DIDN'T?

11   A.   NO, BECAUSE I DON'T EVEN KNOW THE ORIGIN OF THIS, OTHER

12   THAN I OBVIOUSLY SENT IT, BUT I DON'T THINK I PRODUCED IT.

13   Q.   YOU DON'T THINK YOU PRODUCED IT?

14   A.   I DON'T THINK THIS CAME FROM MY COMPUTER BECAUSE I DON'T

15   THINK I HAVE ANY E-MAILS THAT GO BACK THAT FAR.

16   Q.   YOU SEE THE DOCUMENT PRODUCTION NUMBER DOWN THERE?

17   A.   YES.

18   Q.   BEFORE I ASK THE QUESTION, LET ME BE SURE I'M RIGHT,

19   YOUR HONOR.

20          (OFF-THE-RECORD DISCUSSION.)

21   Q.   DO YOU SEE THAT PRODUCTION NUMBER DOWN THERE?

22   A.   RIGHT.

23   Q.   THAT INDICATES THIS WAS PRODUCED BY YOU AND YOUR BROTHER?

24   A.   I DON'T KNOW WHY --

25   Q.   WHERE IT SAYS FUISZ, 000654, DO YOU SEE THAT?

DIRECT EXAM BY MR. BOIES

1    A.   YES.

2    Q.   THAT'S THE WAY DOCUMENTS THAT CAME FROM YOU WERE NUMBERED,

3    RIGHT?

4    A.   THEY COULDN'T HAVE COME FROM JOE OR --

5    Q.   YEAH.  I DON'T MEAN JUST YOU PERSONALLY, I MEAN YOU AND JOE

6    AND FUISZ PHARMA.  THAT THIS IS THE WAY THAT THE DEFENDANT'S

7    DOCUMENTS WERE PRODUCED?

8    A.   THAT'S WHAT I MEANT.  I DON'T THINK THIS CAME FROM ME

9    PERSONALLY.

10   Q.   WHEN YOU SENT OUT E-MAILS THAT YOU SAY YOU SENT OUT TO

11   COMPANIES OTHER THAN THERANOS, DID YOU SEND COPIES OF THOSE TO

12   YOUR SON JOE?

13   A.   I MAY HAVE.  IN FACT I NORMALLY PROBABLY WOULD.

14   Q.   SO IF THIS HAD COME FROM JOE, PRESUMABLY THOSE OTHER -- HE

15   WOULD HAVE HAD THOSE OTHER E-MAILS TOO, RIGHT?

16   A.   PERHAPS.

17   Q.   AND YOU HAVE NO EXPLANATION WHY THIS IS THE ONLY ONE THAT

18   EITHER OF YOU OR YOUR COMPANY PRODUCED?

19   A.   COUNSELOR YOU HAVE TO ASK THE OTHERS.  I CAN ONLY SPEAK FOR

20   MYSELF.

21   Q.   AND YOU HAVE NO EXPLANATION, CORRECT?

22   A.   I JUST GAVE YOU ONE.  I DON'T THINK I, AT THIS POINT, WITH

23   MAIL STREET, MY MAILINGS WERE INCOMPLETE.

24        I THINK YOU COULD FIGURE THIS OUT IF THEY WERE AWARE

25   THERANOS ADDITION BY WHAT WERE THE ATTACHMENTS WERE ON

DIRECT EXAM BY MR. BOIES

1    THERANOS'S SITE AT THE TIME.  IT SAYS THEY HAVE HOME, CONTACT,

2    THEIR PRODUCTS, THEIR LOG IN, THEIR SOLUTIONS, THEIR NEWS,

3    THEIR CAREERS, MAYBE THAT'S WHAT THESE ARE ASKING FOR.

4    Q.   LET ME TRY TO DISTINGUISH BETWEEN TWO DIFFERENT THINGS,

5    OKAY.

6         I ASKED YOU ABOUT WHERE THE ATTACHMENTS WERE AND YOU GAVE

7    ME THE EXPLANATION, CORRECT

8    A.   CORRECT.

9    Q.   I'M NOW ASKING A DIFFERENT QUESTION.

10   A.   OKAY.

11   Q.   THE QUESTION I'M NOW ASKING IS YOU SAID THAT THIS WASN'T

12   DIRECTED AT THERANOS, YOU DIDN'T KNOW ABOUT THERANOS, THERANOS

13   DIDN'T HAVE ANYTHING TO DO WHEN YOU STARTED THE PATENT

14   APPLICATION, AND YET WHAT WE FIND THE DAY OF THE PATENT

15   APPLICATION --

16   A.   SIR, I DON'T MEAN TO DISAGREE WITH YOU.  YOU JUST SAID I

17   KNEW NOTHING ABOUT THERANOS AND I THOUGHT I TOLD YOU THE

18   PARENTS MAY HAVE MENTIONED THERANOS.

19   Q.   WHAT I SAID --

20   A.   OH, YOU ARE GOING BACK TO THAT.  I SEE WHAT YOU ARE DOING.

21   OKAY.

22   Q.   YEAH.  AND --

23   A.   I SAID IT HAD NOTHING TO DO WITH THERANOS.  AND I STILL

24   WILL SAY THE SAME THING TO THE JURY.

25   Q.   AND YOU SAY YOU WEREN'T EVEN AWARE OF THERANOS, DIDN'T KNOW

DIRECT EXAM BY MR. BOIES

1    THEY HAD A PATENT?

2    A.   CORRECT.

3    Q.   AND YET THE DAY YOU FILED THE PATENT APPLICATION YOU ARE

4    SENDING AROUND TO YOUR BROTHER 13 ATTACHMENTS ABOUT THERANOS?

5    A.   I DIDN'T SAY I SENT IT -- YOU SAID FUISZ, COULD BE MY

6    BROTHER, COULD BE FUISZ PHARMA.

7    Q.   NOW WAIT A MINUTE --

8    A.   BUT I --

9    Q.   YOU SENT THIS E-MAIL, REGARDLESS OF WHO PRODUCED A COPY OF

10   IT.  YOU SENT THIS E-MAIL?

11   A.   YEAH.

12   Q.   AND YOU SENT IT TO --

13   A.   TO JOE FUISZ.

14   Q.   TO JOE.

15       AND YOU SENT IT THE DAY THE PATENT APPLICATION WAS GOING

16   IN?

17   A.   CORRECT.

18   Q.   AND WHEN I SAID WHY WERE YOU DOING THIS ABOUT SOME COMPANY

19   THAT DIDN'T HAVE ANYTHING TO DO WITH YOUR PATENT, YOU SAID WELL

20   I DO THIS FOR LOTS OF COMPANIES, ROCHE AND LOTS OF COMPANIES;

21   DO YOU RECALL THAT?

22   A.   COUNSELOR YOU ARE EITHER GOING TO GIVE ME TIME TO EXPLAIN

23   WHY OR WE ARE GOING TO KEEP GOING IN CIRCLES ON THIS ISSUE

24   ABOUT THERANOS, THE PATENT AND WHAT I TOLD THIS JURY.

25   Q.   COULD I JUST ASK TOW ANSWER MY QUESTION, SIR?

DIRECT EXAM BY MR. BOIES

1    A.    YES.

2    Q.    OKAY.  NOW, IT IS YOUR CLAIM THAT YOU SENT E-MAILS LIKE

3    THIS ABOUT COMPANIES OTHER THAN THERANOS, CORRECT?

4    A.    OF COURSE.

5    Q.    EXCEPT NOBODY HAS ANY COPIES OF THOSE E-MAILS, CORRECT?

6    A.    I'M NOT SURE THEY WERE ASKED TO PRODUCE THEM.  MAYBE PEOPLE

7    DO HAVE COPIES.  I DON'T KNOW WHAT THE PRODUCTION WAS.  YOU

8    KNOW WHAT WAS IN THE PRODUCTION, DID THEY ASK FOR BAXTER,

9    ROCHE, MIRC.

10   Q.    ANYTHING TO DO WITH YOUR '612 PATENT APPLICATION?

11   A.    I DON'T CONNECT THIS NECESSARILY WITH -- IN OTHER WORDS,

12   I'M NOT SURE WHOEVER PRODUCED IT, WHEREVER IT CAME FROM, WOULD

13   NOT HAVE PRODUCED E-MAILS TO YOU ABOUT BAYER.  YOU ARE A

14   SMALLTIME PLAYER IN THIS MARKET.  THEY ARE A BIGGER PLAYER THAN

15   THERANOS.

16   Q.    YES.  THERE ARE MUCH BIGGER PLAYERS THAN THERANOS?

17   A.    CORRECT.

18   Q.    AND YET IT'S THERANOS THAT YOU MENTION WHAT YOU ARE TALKING

19   ABOUT THE ANALYZER?

20   A.    THAT'S CORRECT BECAUSE IT WAS ONLY THERANOS THAT WERE

21   SAYING THEY WERE GOING TO PUT A PATENT IN EVERYBODY'S HOME.

22   Q.    LET'S GO BACK TO THAT JANUARY 11TH E-MAIL.

23         NOW YOU JUST TOLD ME, SIR, THAT THE REASONS YOU WERE JUST

24   TALKING ABOUT THERANOS ANALYZER CHIP WAS BECAUSE THERANOS WAS

25   THE ONLY ONE TALKING ABOUT PUTTING AN ANALYZER IN EVERYBODY'S

DIRECT EXAM BY MR. BOIES

1   HOME.

2   A.   YES.

3   Q.   DO YOU RECALL SAYING THAT?

4   A.   I SURE DO.

5   Q.   OKAY.  NOW, HAD ANYBODY FROM THERANOS TALKED ABOUT PUTTING

6   AN ANALYZER IN EVERYBODY'S HOME PRIOR TO JANUARY OF 2006?

7   A.   SOMEONE MUST HAVE OR I WOULD NOT HAVE WRITTEN THAT E-MAIL.

8   OBVIOUSLY IF I KNEW THAT THEY WERE DOING AN ANALYZER CHIP,

9   WHICH THE CHIP IS INAPPROPRIATE, SURE, I DIDN'T HAVE FULL

10  KNOWLEDGE OF IT.

11        SEE, YOU WON'T ANSWER ME WHEN THE WEBSITE STARTED, SO I

12  DON'T KNOW, I ELIMINATE THAT AS THE SOURCE.

13  Q.   WHAT, SIR?

14  A.   NO, I'M SAYING, I DON'T KNOW WHEN THIS WEBSITE STARTED.  SO

15  THAT WAS ONE POTENTIAL SOURCE.  I DO KNOW THAT THERANOS WAS THE

16  ONLY COMPANY I KNOW OF THAT WAS PROCLAIMING THAT IN THE FUTURE

17  THERE WOULD BE AN ANALYZER IN EVERYONE'S HOME.

18  Q.   NOW MY QUESTION, SIR, IS, AND I UNDERSTAND THAT NOBODY'S

19  MEMORY IS PERFECT, OKAY, BUT YOU UNDERSTAND WHY THE DATE OF

20  APRIL 24TH, 2006, IS IMPORTANT, DON'T YOU, IN THIS CASE?

21  A.   I DON'T THINK IT'S AS IMPORTANT TO ME AS IT IS TO YOU.

22  BECAUSE WHEN YOU HAVE 115 PATENTS, WE'VE HAD 14 PATENTS ISSUED

23  SINCE THIS LAWSUIT STARTED.  WE HAD ONE ISSUE TWO DAYS AGO WHEN

24  I SAT AT THAT TABLE.  SETTING OUT DATES WITH PATENTS WHEN YOU

25  HAVE AS MANY AS WE HAVE IS NOT NECESSARILY AS SIGNIFICANT AS IT

DIRECT EXAM BY MR. BOIES

1    IS FOR SOMEBODY WHO HAS FOUR PATENTS.

2    Q.  YOU UNDERSTAND THE SIGNIFICANCE IN THIS LITIGATION TO THAT

3    DATE, DON'T YOU, SIR?

4    A.  PERSONALLY, NO, BECAUSE I KNOW THIS INFORMATION DID NOT

5    COME FROM ANY ILLEGITIMATE SOURCE.

6    Q.  BUT YOU KNOW THAT ONE OF THE IMPORTANT ISSUES IN THIS

7    LITIGATION IS WHERE DID YOU GET THE INFORMATION TO FILE THIS

8    PROVISIONAL APPLICATION.  YOU KNOW THAT, RIGHT?  YOU KNOW

9    THAT'S AN ISSUE?

10   A.  IT'S NOT AN ISSUE TO ME BECAUSE I KNOW WHERE IT DIDN'T COME

11   FROM.  IT'S AN ISSUE TO YOU.

12   Q.  YES.  AND YOU UNDERSTAND THAT THAT'S ONE OF THE ISSUES THIS

13   JURY IS GOING TO HAVE TO DECIDE?

14   A.  I UNDERSTAND.

15   Q.  OKAY.  AND SO YOU UNDERSTAND WHY IT'S IMPORTANT TO KNOW

16   WHEN YOU KNEW CERTAIN THINGS BECAUSE THAT HELPS US FIND OUT

17   WHETHER IT CAME FROM A LEGITIMATE SOURCE OR AN ILL LEGITIMATE

18   SOURCE.  YOU UNDERSTAND THE RELEVANCE OF THAT, DON'T YOU SIR?

19   A.  I DON'T TOTALLY BASED ON THESE DATES, NO, BECAUSE I THOUGHT

20   YOU DID EXHAUST DISCOVERY ON ANY THEORIES THAT IT WAS ILLICITLY

21   TAKEN AND IT TURNED OUT THERE WAS NOTHING TAKEN.

22        MR. BOIES:  MOVE TO STRIKE THE ANSWER AS

23   NONRESPONSIVE YOUR HONOR.

24        THE COURT:  I WILL GRANTS THAT MOTION, ASK THAT THE

25   LAST ANSWER BE STRUCK.

DIRECT EXAM BY MR. BOIES

1    BY MR. BOIES:

2    Q.   PRIOR TO APRIL 24TH, 2006, WHEN YOU AND YOUR SON FILED THE

3    117 PROVISIONAL APPLICATION, HAD ANYBODY FROM THERANOS SAID

4    THERE'S GOING TO BE AN ANALYZER IN EVERY HOME, YES, NO, OR I

5    DON'T KNOW?

6    A.   I'M JUST TRYING TO RESIDE THE --

7         IF YOU ARE ASKING ON THAT PARTICULAR DATE IF I KNEW THAT

8    THERE WOULD BE IN EVERY HOME, I WOULD SAY I DON'T KNOW, ONLY

9    BECAUSE THIS THERANOS WEBSITE DATE IS APRIL 24TH.

10        SO I'M NOT SURE THEY HAD A WEBSITE OR NOT ON

11   JANUARY 11TH.  SO BECAUSE OF THAT I DON'T KNOW.  AND MAYBE AT

12   THAT TIME IN TIME I DID NOT KNOW THAT THEY WERE PROMOTING

13   WEBSITES IN EVERY HOME, PERSONALIZED HEALTH CARE.

14   Q.   NOW, LET ME GO BACK TO THE APRIL 17TH, 2006, E-MAIL, THE

15   ONE WHERE YOU WERE TALKING ABOUT -- EXCUSE ME, YOUR HONOR, IT'S

16   GOING TO TAKE ME A MINUTE TO FIND IT?

17        THE COURT:  YOU ARE REFERRING TO TRIAL EXHIBIT 98,

18   MR. BOIES.

19        MR. BOIES:  I AM, YOUR HONOR.  98.

20   Q.   THIS IS THE ONE WHERE YOU TALKED ABOUT THIS IS A WEEK

21   BEFORE YOU FILED YOUR PATENT APPLICATION, THIS IS AN E-MAIL TO

22   YOUR PATENT LAWYER SAYING THAT A COMPANY CALLED THERANOS CLAIM

23   S TO HAVE A PATENT ON A DEVICE THAT HAS MODULES FOR EACH DRUG.

24   DO YOU SEE THAT?

25   A.   I DO.  I SEE THE POSSIBLE FIT BETWEEN THE TWO OF THEM,

DIRECT EXAM BY MR. BOIES

1    ACTUALLY, ONE MAY HAVE CAUSED THE OTHER.  IN FACT ALAN

2    SCHIAVELLI MAY HAVE CAUSED THIS E-MAIL BECAUSE HE SAYS RICHARD,

3    I CAN'T FIND ANY ISSUED U.S. PATENTS.  I FOUND THE FOLLOWING

4    TWO PUBLISHED APPLICATIONS.  THEN HE GIVES THE NUMBER.  I WILL

5    REVIEW THEM AND GET BACK TO YOU.

6         OKAY.  NOW I KNOW THEY HAVE THE PUBLISHED APPLICATION.

7    THAT IS APRIL 17TH.  SO PERHAPS THAT IS WHAT ENGENDERED THIS

8    E-MAIL OF THERANOS'S WEBSITE ON APRIL 24TH.  I DON'T KNOW THAT

9    FOR A FACT, BUT THAT MAKES SENSE TO ME DATE WISE.  ONE

10   ENGENDERED THE OTHER

11   Q.   THAT'S JUST YOUR INFERENCE.  YOU DON'T KNOW THAT, RIGHT?

12   YOU DON'T HAVE ANY MEMORY OF THAT, DO YOU?

13   A.   COUNSELOR, I PREFACE IT BY SAYING, IT JUST MAY -- SOME

14   LOGIC.

15        MR. BOIES:  IN THAT CASE I MOVE TO STRIKE,

16   YOUR HONOR.

17        THE COURT:  I WILL LET THAT ANSWER STAND.

18        YOU CAN GO ON TO YOUR NEXT QUESTION, MR. BOIES

19   BY MR. BOIES:

20   Q.   WHEN WE TALKED ABOUT THIS BEFORE, NOW, FIRST OF ALL, THE

21   E-MAIL THAT YOU JUST MENTIONED THAT YOUR PATENT ATTORNEY SENT

22   WAS SOMETHING THAT WAS SENT AFTER YOUR APRIL 17TH E-MAIL,

23   CORRECT?

24   A.   I SENT HIM AN E-MAIL ON APRIL 17TH.

25   Q.   AT 4:43 P.M.?

DIRECT EXAM BY MR. BOIES

1    A.   AT 4:00 P.M. HE WAS IN THE SAME TIME ZONE, AND HE RESPONDS

2    APRIL 17TH AT 4:47 P.M.

3    Q.   SO THE INFORMATION IN YOUR E-MAIL AT 4:43 P.M. DIDN'T COME

4    FROM HIM, CORRECT?

5    A.   NO, BUT THE -- I'M TALKING ABOUT THE OTHER PATENT COULD

6    HAVE COME FROM HIM -- I MEAN THE OTHER E-MAIL WHICH IS DATED

7    APRIL 24TH.

8    Q.   LET ME STICK WITH THIS E-MAIL FOR A MINUTE.  IN THIS E-MAIL

9    THE APRIL 17TH, 2006, E-MAIL YOU MENTIONED MODULES AND YOU SAID

10   WHEN WE TALKED ABOUT IT BEFORE, THAT WAS NOT CARTRIDGES?

11   A.   I DON'T THINK IT WAS CARTRIDGES.  I DON'T THINK I KNEW

12   ENOUGH AT THAT TIME.

13       MODULES, UP UNTIL THAT TIME, MOST OF YOUR ANALYZERS WERE

14   UNI ANALYZERS.  THEY WERE MEASURING YOUR BLOOD LIPIDS OR

15   GLUCOSE.

16       AND BY MODULES WHAT I MEANT IS MORE CAPABILITY TO MEASURE

17   MORE DIFFERENT THINGS WHICH IS WHAT WOULD ENGENDER THE PATENT I

18   APPLIED FOR.  BECAUSE NOW THERE WAS MORE VERSATILITY IN TERMS

19   OF WHAT COULD BE MEASURED BY A PATIENT.

20   Q.   YOU NOW KNOW THAT THE THERANOS PROVISIONALS TALKED ABOUT

21   CARTRIDGE CONCEPTS IN CONNECTION WITH THEIR ANALYZER, CORRECT?

22   A.   NOW I KNOW.

23   Q.   THE BUT IT'S YOUR TESTIMONY YOU DID NOT KNOW THAT ON

24   APRIL 17TH?

25   A.   I DON'T BELIEVE I DID, NO.

DIRECT EXAM BY MR. BOIES

1    Q.   CAN YOU THINK OF ANY WAY YOU COULD HAVE KNOWN THAT ON

2    APRIL 17TH OTHER THAN BY LOOKING AT THE THERANOS PROVISIONALS?

3    A.   I ALREADY SAID I DON'T KNOW.  YOU ALL TELL ME WHEN THE

4    WEBSITE WENT UP SO IF IT'S NOT THE WEBSITE, IT WOULD HAVE TO BE

5    HER PARENTS.

6    Q.   WELL, YOU DON'T REMEMBER HER PARENTS TALKING ABOUT DETAILS

7    LIKE CARTRIDGES?

8    A.   NO, I AGREE WITH YOU.  I SAID THAT ALREADY.  THAT SOUNDS TO

9    ME A LITTLE TOO DETAILED TO COME FROM HER PARENTS.  I CONCUR

10   WITH YOU.

11   Q.   SO DO YOU HAVE ANY WAY OF TELLING US HOW YOU COULD KNOW

12   ABOUT CARTRIDGES BACK IN APRIL 2006 IF YOU HAD NOT SEEN THE

13   PROVISIONALS?

14   A.   I COULD NOT HAVE SEEN THE PROVISIONALS IF THEY WEREN'T

15   PUBLIC.  THAT'S IMPOSSIBLE.  MY LIFE I WILL STATE ON THAT.

16   Q.   CAN YOU GIVE ME ANY EXPLANATION HOW YOU CAN KNOW ABOUT

17   CARTRIDGES?

18   A.   WELL, THAT LONG AGO, THERE ARE MANY, MAYBE IT WAS

19   INDUSTRIAL, MAYBE SOMEONE CALLING FROM ANOTHER COMPANY AND

20   SAID, DO YOU KNOW --

21   Q.   BUT YOU DON'T REMEMBER THAT HAPPENING, DO YOU?

22   A.   NO, I ALREADY SAID THAT TO YOU.

23   Q.   LET ME ASK YOU TO LOOK AT THERANOS TRIAL EXHIBIT 106.

24        MR. BOIES:  CAN I HAND THE WITNESS A COPY SO ME MAY

25   START TO READ IT WHILE WE ARE LOOKING FOR THE OTHER COPIES?

DIRECT EXAM BY MR. BOIES

1          THE COURT:  YOU MAY.

2     Q.   JUST TO REMIND EVERYBODY WHERE WE ARE, ON MONDAY,

3     APRIL 17TH WE HAD THERANOS TRIAL EXHIBIT 98.  AND THIS IS THE

4     ONE WHERE IT SAID THAT THERANOS CLAIMED TO HAVE A PATENT ON A

5     DEVICE THAT HAS MODULES FOR EACH DRUG.  AND YOU SAID MODULES

6     DOESN'T REALLY MEAN CARTRIDGES BECAUSE YOU DIDN'T HAVE THAT

7     LEVEL OF DETAIL?

8     A.   BUT YOU CUT OFF THE TOP OF THAT.

9     Q.   WHAT?

10    A.   YOU CUT OFF THE TOP OF THAT E-MAIL.

11    Q.   THE TOP OF WHAT E-MAIL?

12    A.   OF THAT E-MAIL, THERE'S A TOP TO THAT.

13    Q.   DR. FUISZ, --

14    A.   I'M SAYING IT FOR A REASON.  YOU PRODUCED AN EXHIBIT HERE

15    THAT LOOKS LIKE IT'S IN RESPONSE TO THAT E-MAIL BECAUSE IT

16    GAVE -- WHAT WOULD REALLY HELP WITH THIS IS IF WE HAD U.S.

17    2006/2852 HERE RIGHT NOW AND U.S. 2005,100,937 HERE RIGHT NOW.

18    Q.   WHAT YOU ARE REFERRING TO, JUST SO THE RECORD IS CLEAR,

19    DR. FUISZ, AND -- IS THE RESPONSE FROM MR. SCHIAVELLI TO YOU?

20    A.   CORRECT.

21    Q.   AT 4:57 THAT WE JUST READ IN FIVE MINUTES AGO.

22    A.   LOOK AT THE DATES OF WHAT YOU JUST GAVE ME.

23    Q.   I UNDERSTAND THAT.  DR. FUISZ, TRY -- MAY I ASK THE COURT

24    TO INSTRUCT THE WITNESS TO LISTEN TO MY QUESTIONS AND NOT TRY

25    TO DEBATE THIS ISSUE?

DIRECT EXAM BY MR. BOIES

1    THE COURT:  ALL RIGHT.  IF EACH OF YOU COULD GIVE THE

2   OTHER THE OPPORTUNITY TO ASK QUESTIONS AND POSE ANSWERS, I

3   THINK IT WOULD GO MUCH MORE SMOOTHLY.

4        DR. FUISZ, YOU REALLY NEED TO FOCUS ON THE QUESTIONS

5   MR. BOIES IS PUTTING TO YOU.

6        AND MR. BOIES, IN TURN, FOCUS ON YOUR ANSWER.

7        LET'S KEEP IT LIMITED IN THAT FASHION.

8   BY MR. BOIES:

9   Q.  AND LET'S TRY TO --

10  A.  I WAS JUST TRYING TO BE HELPFUL.

11  Q.  LET'S TRY TO GO THROUGH THE CHRONOLOGY.  APRIL 17TH, 2006,

12  AT 4:43 P.M. YOU WRITE AN E-MAIL THAT WE HAVE READ SEVERAL

13  TIMES.  AND IT REFERS TO THERANOS HAVING A PATENT ON A DEVICE

14  THAT HAS MODULES FOR EACH DRUG.

15       AND WHAT YOU SAY IS THAT THAT IS SOMETHING THAT'S NOT

16  REFERRING TO CARTRIDGES.  THEN HE RESPONDS.  I CAN'T FIND AN

17  ISSUED PATENT, ANY ISSUED U.S. PATENT, I FOUND THE FOLLOWING

18  TWO PUBLISHED APPLICATIONS.  AND 2006/62852, AND 2005/100937.

19  HE SAYS I WILL REVIEW THEM AND GET BACK TO YOU

20  A.  YES.

21  Q.  NOW DID HE EVER REVIEW THEM AND GET BACK TO YOU?

22  A.  I DON'T KNOW BECAUSE I'M LOOKING AT WHAT YOU JUST GAVE ME

23  WHICH IS TUESDAY APRIL 18TH, IT HAS A LOT OF DETAIL ON THERANOS

24  A LOT OF DETAIL ON THE BOTTOM THAT'S WHY I ASKED WHAT THOSE

25  APPLICATIONS COULD BE.

DIRECT EXAM BY MR. BOIES

1      Q.   NOW LET ME OFFER SINCE YOU KEEP REFERRING TO IT.

2           LET ME OFFER THERANOS TRIAL EXHIBIT 106.

3                THE COURT:  I TAKE IT MR. BOIES YOU ARE ASKING IF

4      DR. FUISZ RECOGNIZES 106.

5                MR. BOIES:  YES.

6                THE COURT:  DR. FUISZ, DO YOU RECOGNIZE 106?

7                THE WITNESS:  I HAVE NO REASON TO DOUBT IT.  IT'S

8      FROM ME TO ALAN COPYING JOE, THE SUBJECT IS THERANOS.

9                THE COURT:  ANY OBJECTION TO ADMITTING 106?

10               MS. ANDERSON:  NO, YOUR HONOR.

11               THE COURT:  106 IS ADMITTED.  YOU MAY PROCEED,

12     MR. BOIES.

13     BY MR. BOIES:

14     Q.   NOW THERE'S AN E-MAIL ON APRIL 18TH, TWO E-MAILS, BOTH AS I

15     READ THEM ARE FROM BOTH OF THE SUBSTANTIVE ONES ARE FROM YOU.

16     ONE THAT YOU SENT TO MR. SCHIAVELLI AT 10:52 P.M. ON APRIL 17TH

17     AND THEN HE SAYS, THANKS RICHARD I WILL REVISE TO INCLUDE ALL

18     OF THIS.

19          THEN YOU SEND HIM ANOTHER E-MAIL ON APRIL 18TH AT

20     4:53 A.M., CORRECT?

21     A.   NO I SENT HIM ANOTHER E-MAIL AT 10:52 P.M. ON THE 17TH.

22     Q.   APRIL 17TH IS BEFORE APRIL 18TH, CORRECT?

23     A.   THE TOP IS THE RESPONSE TO THE BOTTOM WHICH IS A FEW HOURS

24     AFTER HE IDENTIFIES THESE APPLICATIONS.

25     Q.   DR. FUISZ, THE FIRST E-MAIL ON TRIAL EXHIBIT 106 --

DIRECT EXAM BY MR. BOIES

1    A.   RIGHT.

2    Q.   IS FROM YOU TO MR. SCHIAVELLI, DATED APRIL 17, 2006, AT

3    10:52 P.M., CORRECT?

4    A.   THAT'S THE FIRST ONE SENT.

5    Q.   THAT'S THE EARLIEST E-MAIL ON THIS EXHIBIT?

6    A.   OH, OKAY.  ALL RIGHT.  ON THIS EXHIBIT.

7    Q.   WE HAVE THREE E-MAILS ON THIS EXHIBIT AND THIS IS THE

8    EARLIEST ONE, RIGHT?

9    A.   THERE ARE TWO E-MAILS ON THIS EXHIBIT.  NO, NO, YOU ARE

10   RIGHT.  THREE.  THE THANKS RICHARD.

11   Q.   SO THE EARLIEST IS THE ONE WE JUST LOOKED AT, THEN THERE

12   WAS A RESPONSE FROM MR. SCHIAVELLI, THANKS RICHARD, I WILL

13   REVISE TO INCLUDE ALL OF THIS.

14   A.   RIGHT.

15   Q.   AND THEN YOU RESPOND, THE NEXT DAY APRIL 17TH AT 4:53 A.M.,

16   AGAIN, IN RE THERANOS?

17   A.   I'M SORRY YOU SAID APRIL 17TH, DO YOU MEAN APRIL 18TH.

18   Q.   APRIL 18TH AT 4:53 A.M.

19   A.   AM I CORRECT, THAT'S HIS RESPONSE -- FROM ME TO HIM AT 4:53

20   IN THE MORNING -- THAT WOULD BE RIGHT.

21   Q.   OKAY.  NOW, LET ME LOOK AT THE SUBSTANCE OF THIS

22   INFORMATION, OKAY.  BY THE TIME YOU WRITE THESE E-MAILS, YOU

23   CLEARLY KNOW A LOT OF DETAIL ABOUT THERANOS, CORRECT?

24   A.   ABSOLUTELY.

25   Q.   OKAY.  AND DO I TAKE IT FROM SOMETHING YOU SAID BEFORE,

DIRECT EXAM BY MR. BOIES

1    THAT YOU BELIEVE THAT THAT EXTRA DETAIL MAY HAVE COME FROM THE

2    PUBLISHED APPLICATIONS?

3    A.   THAT'S WHAT I'M WONDERING, YES.

4    Q.   BUT YOU DON'T KNOW THAT, AND WE COULD FIND THAT OUT BY

5    GETTING THE APPLICATIONS, RIGHT?

6    A.   YES, PRECISELY, THAT'S WHY I ASKED.

7    Q.   OKAY.  AND LET ME SET THIS ASIDE UNTIL I FIND THOSE

8    APPLICATIONS, BECAUSE I TAKE IT WHAT YOU ARE SAYING IS YOU ARE

9    SAYING THIS DETAIL MAY HAVE COME FROM THOSE APPLICATIONS?

10   A.   YEAH, I'M GOING BY THE TIME STAMPS BECAUSE I USUALLY WORK

11   THROUGH THE NIGHT.  AND ONE IS AT 4:53 A.M. WHICH WOULD FIT.

12   ONE IS AT 10:52 P.M.

13   Q.   NOW, THE E-MAIL THOUGH THAT IS 98, IF WE COULD PUT THAT

14   BACK UP.  THIS E-MAIL WHERE YOU TALK ABOUT THERANOS CLAIMS TO

15   HAVE A PATENT ON A DEVICE THAT HAS MODULES FOR EACH DRUG.

16        THAT COULD NOT COME AT THE TIME OF THOSE APPLICATIONS

17   BECAUSE AT THE TIME YOU WROTE THIS YOU DID NOT KNOW THAT

18   A.   I WOULD AGREE WITH YOU THE TIME STAMP DOESN'T FIT THERE.

19   BUT IT ALSO IS NOT THE DETAIL THAT'S ON THIS ONE.  THIS IS

20   RICHLY DETAILED THIS 18.  THE ONE SENT AT 10:52 P.M. ON THE

21   17TH IS VERY RICHLY DETAILED AND THAT'S APPROXIMATELY SIX HOURS

22   AFTER MY RECEIPT OF THESE ONES YOU ARE GOING TO FIND.

23   Q.   WELL, SIR?

24   A.   OR SOMEBODY IS GOING TO FIND.

25   Q.   YOU DIDN'T RECEIVE THOSE PATENT APPLICATIONS.  YOU DON'T

DIRECT EXAM BY MR. BOIES

1    KNOW THAT YOU RECEIVED THOSE.  YOU HAVE NO RECORD OF RECEIVING

2    THEM, DO YOU?

3    A.   NO.  JOE KNOWS HOW TO LOOK THOSE UP.

4    Q.   JOE MAY KNOW HOW TO LOOK THOSE UP, BUT WHAT MR. SCHIAVELLI,

5    YOUR PATENT ATTY. TOLD YOU IS THAT HE WAS GOING TO REVIEW THEM

6    AND GET BACK TO YOU?

7    A.   WELL, I DON'T WAIT FOR HIM.  WELL, HE PROBABLY DID, BUT I

8    DON'T WAIT FOR A PATENT ATTORNEY.

9    Q.   YOU DON'T REMEMBER LOOKING THOSE UP, DO YOU SIR?

10   A.   NORMALLY I WOULD.

11   Q.   DO YOU REMEMBER DOING IT?

12   A.   I DON'T SPECIFICALLY REMEMBER THOSE TWO, NOTICE MY NORMAL

13   PRACTICE IS WHEN I GET AN, MAIL LIKE THIS I DON'T LOOK THEM UP.

14   Q.   YOU DON'T HAVE ANY RECORD OF LOOKING THEM UP?

15   A.   OF COURSE NOT.  I'M NOT TRYING TO BE IMPOLITE BUT OF COURSE

16   I DON'T HAVE A RECORD OF IT, OTHER THAN THESE.  TO ME THESE ARE

17   VERY TELLING THESE DATES AND THE TIME STAMPS.

18   Q.   DID YOU IN YOUR PREPARATION FOR YOUR TESTIMONY, YOU

19   REVIEWED THE RECORDS THAT YOU HAVE, CORRECT?

20   A.   NOT REALLY.

21   Q.   NOT REALLY?

22   A.   NO.

23   Q.   HOW ABOUT FOR YOUR DEPOSITION, DID YOU REVIEW THE RECORDS

24   THAT YOU HAD THERE?

25   A.   I THINK I DID.  I DIDN'T HAVE THAT MANY RECORDS.  BUT YES,

363

DIRECT EXAM BY MR. BOIES

1    I THINK I DID.

2    Q.   AND WHEN YOU WERE PRODUCING DOCUMENTS TO US, YOU REVIEWED

3    YOUR DOCUMENTS TO BE SURE THAT YOU WERE PRODUCING EVERYTHING,

4    RIGHT?

5    A.   OH, SURE, ABSOLUTELY.

6    Q.   AND WHEN YOU DID THAT YOU DIDN'T FIND ANY EVIDENCE THAT YOU

7    HAD THESE TWO PATENT APPLICATIONS, CORRECT, YOU DIDN'T HAVE

8    COPIES OF THEM, CORRECT?

9    A.   NO.  I DIDN'T.  BUT YOU ARE BOXING ME IN, BUT WE WENT

10   THROUGH A LOT FROM THAT DATE UNTIL WE WERE SUED.  WE WENT

11   THROUGH A FLOOD.  WE WENT THROUGH AN OFFICE CHANGE.  WE THROUGH

12   A LOT.  WHEN YOU SAY COULDN'T FIND, THAT SOUNDS AS IF I'M

13   CARELESS.

14   Q.   WHEN YOU SAY YOU WENT FLEW A FLOOD, WHICH WAS THAT FLOOD?

15   A.   I THINK THAT FLOOD WAS IN ABOUT 2009 OR 2010 OR 11, IN THAT

16   RANGE.

17   Q.   DID YOU HAVE A FLOOD IN 2005?

18   A.   NO, THE RECORDS WERE ALL THERE IN OUR OFFICE.

19   Q.   DID YOU HAVE A FLOOD OR ANY FLOODING IN 2005?

20   A.   NO, I'M SAYING THE RECORDS FROM 2005 WOULD HAVE BEEN IN THE

21   FLOOD OF 2010.

22   Q.   OKAY.  I WILL NOW ASK A DIFFERENT QUESTION.  I UNDERSTAND

23   YOU SAY YOU HAD A FLOOD IN 2010 THAT WASHED AWAY A LOT OF YOUR

24   RECORDS.

25        WHAT I'M ASKING IS DID YOU HAVE A FLOOD IN 2005 THAT

DIRECT EXAM BY MR. BOIES

1    INTERFERED WITH YOU?

2    A.   NO, NO FLOOD IN 2005.

3    Q.   HOW ABOUT A FLOOD IN 2006?

4    A.   NO.

5    Q.   IN TERMS OF THE DOCUMENT PRODUCTION THAT YOU SAY YOU MADE,

6    YOU DIDN'T PRODUCE ANY LAB BOOKS OR NOTES OR ANY DOCUMENTATION

7    AT ALL ABOUT THE INVENTIVE ACTIVITY THAT WENT INTO THE '612,

8    CORRECT?

9    A.   CAN I JUST CORRECT SOMETHING FOR THE RECORD.

10   Q.   SURE.

11   A.   I LEFT VIRGINIA IN 2010.  WHEN I LEFT VIRGINIA OUR OFFICE

12   WAS ON CONNECTICUT AVENUE IN WASHINGTON, D.C.  SO THE FLOOD IS

13   SOONER RATHER THAN LATER, BECAUSE JOE KNOWS THESE DATES BETTER

14   BUT I THINK WE WERE IN THE CONNECTICUT AVENUE OFFICE FOR A FEW

15   YEARS.  SO THAT WOULD HAVE PUT THE -- I JUST DON'T WANT

16   SOMEBODY LATER ON SAYING YOU LIED ABOUT THE FLOOD.  THE FLOOD

17   MIGHT HAVE OCCURRED AROUND 2005, 2006.  I DON'T RECALL THE

18   EXACT DATE BUT I'M THINKING BACKWARDS WHEN I MOVED TO

19   CALIFORNIA.

20   Q.   THIS FLOOD --

21   A.   IT'S NOT A BIG THING, THE FLOOD.  IT WASN'T A FLOOD THAT

22   THE WHOLE TOWN FLOODED.  THE PIPES BROKE AND ALL -- THE

23   CONTRACTOR'S ABOVE TOILET STUCK.  AND IT RAN FOR A WHOLE

24   WEEKEND.  EVERYTHING WAS SOAKED AND ALL THE RECORDS GOT SOAKED

25   AND IT WAS A DISASTER.

DIRECT EXAM BY MR. BOIES

1    Q.   WHAT I'M TRYING TO FIND OUT AS BEST YOU CAN TELL US IS WHEN

2    DID THIS FLOODING OCCUR THAT WIPED OUT ALL THESE DOCUMENTS?

3    A.   YOU LET ME ASK JOE I WILL TELL YOU BECAUSE I'M SURE HE

4    KNOWS.  HE'S SITTING RIGHT OVER THERE.

5    Q.   OKAY.  WELL, WE WILL HAVE A CHANCE TO ASK HIM ONE WAY OR

6    THE OTHER.  BUT I TAKE IT IT'S FAIR TO SAY THAT YOU JUST DON'T

7    RECALL AS YOU SIT HERE NOW.  COULD HAVE BEEN 2005, COULD HAVE

8    BEEN 2010?

9    A.   NO, NO, COULDN'T BE 2010 I DON'T THINK BECAUSE THAT'S WHEN

10   I MOVED TO CALIFORNIA.  WE HAD ALREADY BEEN ON CONNECTICUT

11   AVENUE IN WASHINGTON, D.C. WHERE OUR OFFICE IS IN A SMALL LAB

12   SPACE.  SO WE WERE ALREADY ON CONNECTICUT AVENUE THERE FOR 3 OR

13   4 YEARS SO IF I MOVED IN 2010 THAT PUSHED IT BACK TO 2007.

14   SOME TIME BEFORE THAT OUR OFFICE IT IS WERE IN GREAT FALLS

15   VIRGINIA.  AND THERE WE HAD A MUCH MORE SUBSTANTIAL OFFICE AND

16   THAT'S WHERE WE HAD THIS FLOOD WITH THE CONTRACTOR WHO WAS

17   ABOVE US THAT HIS TOILET BROKE AND HIS PIPES BROKE AND IT, ALL

18   WEEKEND, AND WE CAME INTO THIS MUCH WATER OVER EVERYTHING.

19        AND THANK GOD FOR SERVICE PRO.

20   Q.   ARE YOU FINISHED?

21   A.   YES.

22   Q.   YOU WOULD AGREE WITH ME THAT IF THE FLOOD HAD OCCURRED IN

23   2005, IT COULDN'T BE RESPONSIBLE FOR DOCUMENTS THAT ARE MISSING

24   FROM 2006, CORRECT?

25   A.   I DIDN'T NEED A FLOOD TO HAVE DOCUMENTS MISSING.  WE ARE

366

DIRECT EXAM BY MR. BOIES

1    SLOPPY PEOPLE, WE DON'T KEEP THE BEST RECORDS IN THE WORLD.

2    Q.   LET ME GO BACK TO THE QUESTION --

3    A.   I DON'T EVEN KNOW IF THESE WERE COPIED.  FOR ALL I KNOW, IF

4    I RECOLLECT, YOU CAN GET THESE ONLINE AND LOOK AT THEM RIGHT ON

5    YOUR COMPUTER, YOU DON'T HAVE TO PRINT THEM TO SEE THEM.  I

6    THINK THE USPTO HAS APPLICATIONS THAT YOU LOOK AT THAT YOU

7    DON'T PRINT.

8    Q.   IS IT YOUR TESTIMONY THAT THE DETAILED E-MAILS YOU WROTE

9    WERE BASED ON YOUR REVIEWING THESE APPLICATIONS ONLINE ON A

10   SCREEN.  IS THAT YOUR TESTIMONY?

11   A.   NO, MY TESTIMONY IS NEITHER OF THOSE, MY TESTIMONY WAS IF I

12   GO BY TIME STAMPS ON THESE, IT WOULD APPEAR THAT IT'S VERY,

13   VERY POSSIBLE THAT ON APRIL 17TH AT 4:00 HE IDENTIFIES A NUMBER

14   OF APPLICATIONS.  AND THEN IT'S JUST INTERESTING TO ME THAT ON

15   THE 17TH AT 10:52 P.M. IT APPEARS LIKE NOW I KNOW AN AWFUL LOT

16   MORE ABOUT THIS COMPANY.  THAT'S WHAT'S INTERESTING TO ME.

17        AND THEN I SEND HIM ANOTHER E-MAIL AT 4:53 A.M. ON THE

18   18TH WHICH WOULD BE MY WORK POLICY, I WORKED THOSE KIND OF

19   HOURS.

20        THEN HE SAYS THANKS RICHARD, I WILL REVISE TO INCLUDE ALL

21   OF THIS.  THAT'S ALL I'M TRYING TO SAY.

22   Q.   MY QUESTION WAS WHETHER IT IS YOUR TESTIMONY THAT YOU MIGHT

23   HAVE PREPARED THOSE DETAILED E-MAILS BASED ON YOUR REVIEWING

24   THOSE APPLICATIONS SIMPLY ON A SCREEN?

25   A.   VERY POSSIBLE, YES.

DIRECT EXAM BY MR. BOIES

1    Q.   WHEN YOU DO THAT, WHEN YOU ARE REVIEWING SOMETHING ON A

2    SCREEN, DO YOU TAKE NOTES OR DO YOU JUST MEMORIZE IT?

3    A.   I JUST TRY TO KEEP IT --

4    Q.   YOU JUST TRY TO MEMORIZE IT?

5    A.   SOMETIMES I TAKE NOTES, SOMETIMES I DO.  BUT OFTEN I TRY TO

6    DO IT HERE.  AS I GET OLDER NOW, IT'S HARDER, BUT I WAS YOUNG

7    THEN.  I WAS WHAT, 64 THEN, 65.

8    Q.   AND YOUR TESTIMONY THEN IS THAT YOU WOULD JUST READ THESE

9    THINGS ON THIS PATENT APPLICATIONS ON THE SCREEN AND JUST SORT

10   OF MEMORIZE ALL THOSE DETAILS?

11   A.   NO, NO, NO, I SAID TO YOU SOMETIMES I WOULD READ THEM ON

12   THE SCREEN, SOMETIMES I WOULD PRINT THEM.  NOT ALL THE TIME BUT

13   IT'S VERY POSSIBLE TO READ THESE ON THE SCREEN AND I DO.

14   NOWADAYS, I STILL SOMETIMES WILL READ A PATENT ON A SCREEN.

15   Q.   BUT YOU DON'T HAVE ANY NOTES OR RECORDS OF EITHER OF THOSE

16   PATENTS OR ANYTHING THAT YOU GLEAN FROM THEM EITHER ON THE

17   SCREEN OR IN ANY OTHER FORM?

18   A.   I DON'T KEEP NOTES AND I DON'T KEEP A DIARY.  SO I DON'T

19   KEEP THOSE, NO.

20   Q.   NOW WHEN WE ASKED YOU TO PRODUCE ANY DOCUMENTATION YOU HAD

21   ABOUT THE PATENT, ANY LAB BOOKS OR NOTES OR SUMMARIES, WE WERE

22   TOLD THAT YOU DIDN'T HAVE ANY, CORRECT?

23   A.   WE DON'T HAVE ANY BECAUSE PATENT COUNSEL HAS LONG SINCE

24   INFORMED ME THAT LAB BOOKS HAVE BEEN OUTDATED BY E-MAILS.  AND

25   WE DON'T KEEP E-MAILS -- WE DON'T KEEP LAB BOOKS FOR 20 YEARS,

DIRECT EXAM BY MR. BOIES

1    SINCE COMPUTERS HAVE SUPPLANTED LAB BOOKS.

2         THE LAST COMPANY I KNEW WE HAD LAB BOOKS, FRANKLY WAS I

3    THINK AT FUISZ TECHNOLOGIES.  AND THERE WE PRINCIPALLY KEPT

4    THEM TO KEEP EMPLOYEES FROM STEALING IDEAS.

5    Q.   LEAVING ASIDE WHETHER LAB BOOKS ARE OR ARE NOT TOTALLY

6    DISPLACED, YOU DON'T HAVE ANY DOCUMENTS OF ANY KIND, ANY NOTES

7    ANY SUMMARIES, IN FACT THE FIRST E-MAIL YOU HAVE IS

8    SEPTEMBER 23, 2005, CORRECT?

9    A.   THAT'S THE FIRST E-MAIL THAT I FOUND IN THIS, THAT DOESN'T

10   MEAN OTHER E-MAILS DIDN'T OCCUR.

11   Q.   THAT'S THE ONLY E-MAIL THAT YOU HAVE ANY REASON TO BELIEVE

12   EXISTS, CORRECT?

13   A.   THAT E-MAIL WAS PRODUCED I THINK BY ALAN, AM I CORRECT,

14   THAT FIRST E-MAIL YOU ARE REFERRING TO.  WASN'T THAT PRODUCED

15   BY SCHIAVELLI?  WAS IT?

16   Q.   I THINK IT WAS PRODUCED BY YOU, BUT IT COULD HAVE COME FROM

17   MR. SCHIAVELLI TO YOU.  OKAY, OKAY.  THIS IS TRIAL EXHIBIT 7.

18        MAY I APPROACH, YOUR HONOR?

19           THE COURT:  YOU MAY.

20   Q.   IS THIS AN E-MAIL THAT YOU WROTE ON SEPTEMBER 23, 2005?

21   A.   COULD I JUST READ IT FOR A SECOND.

22   Q.   CERTAINLY.

23   A.   THIS DOCUMENT APPEARS THAT ALAN PRODUCED THIS ON MAY 30,

24   2012, OF AN E-MAIL I SENT HIM ON SEPTEMBER 23RD, 2005, --

25   SEPTEMBER 23RD, 2005, AT 7:30 P.M.  BUT THERE'S ONE FROM ME TO

DIRECT EXAM BY MR. BOIES

1    HIM ALSO AT 4:51 P.M. ON SEPTEMBER 29TH, ABBREVIATION -- I

2    DON'T KNOW WHAT THAT MEANS BUT IT LOOKS LIKE IT CAME FROM ALAN.

3    IT CAME FROM ME THEN ANOTHER ONE CAME FROM ME THEN ALAN

4    PRODUCED THEM IS HOW IT LOOKS TO ME.

5            MR. BOIES:  I WOULD OFFER THE EXHIBIT, YOUR HONOR.

6            THE COURT:  ANY OBJECTION TO TRIAL EXHIBIT 7?

7            MS. ANDERSON:  NO.

8            THE COURT:  TRIAL EXHIBIT 7 IS ADMITTED.

9        (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER 7 HAVING BEEN

10   PREVIOUSLY MARKED FOR IDENTIFICATION, WAS ADMITTED INTO

11   EVIDENCE.)

12           MR. BOIES:  OKAY FIRST.  THE BOTTOM OF THE PAGE,

13   THERE'S AN E-MAIL FROM YOU TO YOUR PATENT ATTORNEY DATED

14   SEPTEMBER 23, 2005, CORRECT.

15           THE WITNESS:  CORRECT.

16   Q.  AT 7:30:50 SECONDS P.M. EASTERN DAYLIGHT TIME, CORRECT?

17   A.  CORRECT.

18   Q.  AND IT SAYS THAT YOU WOULD LIKE TO FILE A PATENT

19   APPLICATION, CORRECT?

20   A.  CORRECT.

21   Q.  AND IT TALKS ABOUT HAVING A MEMORY CHIP OR OTHER STORAGE

22   DEVICE WHICH COULD BE PROGRAMMED BY A COMPUTER OR SIMILAR

23   DEVICE AND CONTAINED THE NORMAL PARAMETERS FOR THE INDIVIDUAL

24   PLAINTIFF?

25   A.  CORRECT.

DIRECT EXAM BY MR. BOIES

1   Q.  PATIENT, NOT PLAINTIFF.  PATIENT.  THAT'S A PROBLEM WITH

2   BEING A LAWYER.

3         AND YOU GO ON TO SAY, THUS, IF RESULTS WOULD DIFFER

4   SIGNIFICANTLY FROM THESE NORMS AND NOTICE WOULD BE GIVEN TO THE

5   USER OR HEALTH PROFESSIONAL TO REPEAT THE SAMPLING.  IF THE

6   SIGNIFICANT DIFFERENCE PERSISTS ON THE RETEST THE TWICE USING

7   THE EXISTING TECHNOLOGY WELL KNOWN IN THE ART TO CONTACT THE

8   PHYSICIAN, CARE CENTER PHARMA COMPANY OR OTHER OR ALL.

9         PLEASE LET ME KNOW NEXT WEEK IF YOU THINK WE COULD COVER

10  THIS.

11        DO YOU SEE THAT?

12  A.  YES.

13  Q.  NOW FIRST, PRIOR TO THIS, PRIOR TO SAYING YOU WANT TO FILE

14  THIS PATENT APPLICATION, NOT ONLY ARE THERE NO LAB BOOKS BUT

15  THERE ARE NO NOTES, THERE ARE NO RECORDS, THERE ARE NO

16  INDICATIONS OF ANALYSIS, THERE ARE NO SEARCHES.  THERE ARE NO

17  DOCUMENTS OF ANY KIND WHATSOEVER THAT RELATE TO WHAT BECAME THE

18  '612 PATENT, CORRECT?

19  A.  YOU HAVE DOCUMENTS IN YOUR DEPOSITION ON THIS.  WHAT

20  HAPPENED PRIOR TO THIS.  I WAS DEPOSED ON THIS I TOLD YOU I

21  EXPLAINED TO MICHAEL UNDERHILL.

22  Q.  LET ME TRY TO ASK A QUESTION, OKAY?

23  A.  YES.

24  Q.  PRIOR TO SEPTEMBER 23, 2005, AT 7:30 P.M., THERE WERE NO

25  DOCUMENTS OF ANY KIND WHATSOEVER, NO E-MAILS NO LAB BOOKS NO

DIRECT EXAM BY MR. BOIES

```
 1    NOTES, NO RECORDS OF EVENT OF ACTIVITY, NOTHING RELATED TO THE

 2    '612 PATENT OR ITS INVENTION, YES, NO OR I DON'T KNOW?

 3    A.   YOU SAID RECORDS.  IN THE RECORDS OF MINE.

 4    Q.   RECORDS OF --

 5    A.   TELEPHONIC --

 6    Q.   RECORDS, WHEN YOU HIT YOUR HEAD YOU MEAN YOU'VE GOT RECORDS

 7    IN YOUR MIND?

 8    A.   NO, NO, CUSTOMARILY JOE AND I PROBABLY TALK ABOUT 20 TIMES

 9    A DAY, AS WITH ALAN.  YOU ARE JUST LOOKING AT, MAILS.

10    Q.   LET ME TRY TO BE REALLY CLEAR, OKAY?

11    A.   GO AHEAD.

12    Q.   I'M NOT TALKING ABOUT WHAT MAY OR MAY NOT BE IN YOUR MIND,

13    I'M TALKING ABOUT PHYSICAL RECORDS, E-MAILS, NOTES, LAB BOOKS,

14    OTHER KIND OF WRITTEN RECORDS, ANY KIND OF DOCUMENTATION

15    WHATSOEVER, DOES ANY OF THAT EXIST PRIOR TO SEPTEMBER 23, 2005,

16    AT 7:30 P.M. WITH RESPECT TO WHAT YOU HAVE REFERRED TO AS YOUR

17    '612 PATENT INVENTION?

18    A.   I THINK IT DOES INVOLVE THE PHONE CALL FROM PALO ALTO,

19    CALIFORNIA.

20    Q.   IS THERE A RECORD OF THAT PHONE CALL?

21    A.   IT'S IN YOUR DEPOSITIONS.

22         NO, NO, I UNDERSTAND.

23            MR. BOIES:  YOUR HONOR, I ASK TO APPROACH.

24            THE COURT:  LET'S APPROACH.

25    (SIDE-BAR DISCUSSION OFF THE RECORD.)
```

DIRECT EXAM BY MR. BOIES

1          THE COURT:  GO AHEAD.

2          MR. BOIES:  FIRST, I THINK I'M ENTITLED TO A DIRECT

3   ANSWER.  I THINK WHAT HE'S REFERRING TO IS A DEPOSITION AS A

4   RECORD AND I THINK I HAVE BEEN ABSOLUTELY CLEAR THAT I'M

5   TALKING ABOUT RECORDS THAT EXISTED AS OF SEPTEMBER 23RD.

6          SECOND, UNLESS I'M VERY BADLY MISTAKEN I THINK WHAT HE IS

7   DOING RIGHT NOW IS ATTEMPTING TO DIRECTLY VIOLATE YOUR MOTION

8   IN LIMINE RULING THAT THERE WAS TO BE NO SUGGESTION OR

9   TESTIMONY OF CONCEPTION PRIOR TO SEPTEMBER 23RD, I THINK THAT'S

10  EXACTLY WHERE HE'S GOING.

11          MS. ANDERSON:  I SAID IN THIS CASE WE ALSO HAVE

12  ALLEGATIONS OF THEFT.  SO WE MAY HAVE TO REVISIT SOME OF THESE

13  ISSUES.  HE'S BEEN ASKED A QUESTION ON THE WITNESS STAND.  IT'S

14  LATE IN THE DAY.  AND HE'S WHAT, 74, 75 YEARS OLD.  TO BE

15  ACCUSED OF VIOLATING A COURT ORDER TRYING TO RECALL WHAT

16  HAPPENED --

17          THE COURT:  ALL RIGHT.

18          MS. ANDERSON:  THAT LONG AGO IS A HIGH ORDER OR

19  ALLEGATION.

20          THE COURT:  ALL RIGHT.  IT IS LATE IN THE DAY.  IF

21  THERE HAS BEEN A VIOLATION OF MY ORDER I WILL DEAL WITH IT.

22          RIGHT NOW I WOULD LIKE TO HAVE THIS WITNESS ANSWER THE

23  QUESTION PUT TO HIM ABOUT ANY RECORDS.  WE ALL KNOW WHAT

24  RECORDS ARE.  IF THERE ARE RECORDS BEFORE SEPTEMBER OR THERE

25  ARE WEREN'T.

DIRECT EXAM BY MR. BOIES

1      SEPARATELY AFTER WE DISMISSED THE JURY FOR THE DAY WE

2    WILL ADDRESS WHETHER MY ORDER WAS VIOLATED.  IF IT HAS BEEN.

3    WE WILL TAKE IT UP.  LET'S PROCEED.

4         THE COURT:  MR. BOIES YOU MAY PUT YOUR QUESTION TO

5    THE WITNESS.

6         MR. BOIES:  THANK YOU.

7    Q.  AS OF SEPTEMBER 23, 2005, AT 7:30 P.M., WERE THERE ANY

8    RECORDS THAT EXISTED OF ANY KIND WHATSOEVER, ANY DOCUMENTS, ANY

9    NOTES, ANY LAB RECORDS, ANY KIND OF WRITTEN OR PHYSICAL RECORD

10   OF ANY KIND THAT SUPPORTS THE FACT THAT YOU HAD MADE THE

11   INVENTION THAT IS REFLECTED IN THE '612 PATENT OR ALLEGEDLY

12   REFLECTED IN THE '612 PATENT; YES, NO, I DON'T KNOW?

13   A.  I DON'T KNOW.

14   Q.  ARE THERE ANY, I TAKE IT THAT MEANS YOU DON'T KNOW OF ANY

15   SUCH, IS THAT FAIR?

16   A.  NO, IT MEANS I DON'T KNOW BECAUSE SEVERAL BAR CODES OR RFV

17   TAGS THAT ISSUES WERE CHECKED ET CETERA.  I DON'T KNOW THE

18   DATES RELATIVE TO THIS DATE.  SO THAT'S WHERE I'M SAYING I

19   DON'T KNOW.

20   Q.  YOU DO KNOW THAT NONE OF THOSE THAT HAPPENED BEFORE

21   SEPTEMBER 23RD IN 2005 WERE EVER PRODUCED TO US IN THIS

22   LITIGATION, CORRECT?

23   A.  CORRECT.  IF YOU DON'T HAVE THEM, YOU DON'T HAVE THEM.

24   Q.  AND I TAKE IT IF YOU HAD THEM YOU WOULD HAVE PRODUCED THEM,

25   CORRECT?  YES, NO?

DIRECT EXAM BY MR. BOIES

1    A.   I FEEL LIKE I CAN'T ANSWER AT THIS POINT.

2    Q.   ALL I'M ASKING, THIS IS REALLY SIMPLE.  YOU DIDN'T PRODUCE

3    ANY KIND OF WRITTEN OR PHYSICAL EVIDENCE OF AT ALL THAT

4    PRECEDED SEPTEMBER 23, 2005, OF ANY INVENTIVE ACTIVITY RELATING

5    TO THE '612 PATENT?

6    A.   YES.

7    Q.   THAT'S SEPTEMBER 23, 2005?

8    A.   YES, DID I INVENT AT THAT MOMENT --

9    Q.   SIR, PLEASE LISTEN TO MY QUESTION?

10   A.   I AM, I AM.

11   Q.   THE QUESTION IS PRIOR TO THIS, BEFORE THIS, YOU DON'T HAVE

12   ANY WRITTEN RECORD OR PHYSICAL DOCUMENTATION WHATSOEVER THAT

13   RELATES TO YOUR INVENTIVE ACTIVITY?

14   A.   I DON'T KNOW IF I HAVE ANY.  THAT'S CORRECT.

15            MS. ANDERSON:  ASKED AND ANSWERED, YOUR HONOR, A FEW

16   TIMES ALREADY.

17            THE COURT:  OVERRULED.  THE ANSWER WILL STAND.

18            MR. BOIES:  I THINK WE'VE COMPLETED THAT, YOUR HONOR.

19       IN VIEW OF THE HOUR, DO YOU WANT TO TAKE --

20            THE COURT:  I TAKE IT YOU HAVE FURTHER EXAMINATION.

21            MR. BOIES:  I DO HAVE MORE.

22            THE COURT:  ALL RIGHT.  I THINK IT WOULD BE

23   APPROPRIATE TO CALL IT A DAY AT THIS POINT.

24       LADIES AND GENTLEMEN OF THE JURY, YOU GET SEVEN MINUTES

25   ON THE HOUSE.  IT'S BEEN A LONG WEEK FOR EVERYONE.

```
 1            I APPRECIATE YOUR ATTENTION AND FOCUS ON THIS VERY

 2    IMPORTANT MATTER.  WE ARE GOING TO RECONVENE ON MONDAY MORNING,

 3    AGAIN, READY TO GO AT 9:00.

 4            I WANT TO ONCE AGAIN CAUTION YOU NOT TO DISCUSS THE CASE

 5    WHILE WE ARE OUT ON BREAK.  TREAT THE WEEKEND LIKE ANY OTHER

 6    BREAK WE'VE HAD SO FAR, EXCEPT A LITTLE BIT LONGER.

 7            WE WILL SEE YOU BACK HERE AT 9:00 READY TO GO ON MONDAY

 8    MORNING.

 9            THANK YOU.

10            (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD OUT OF

11    THE PRESENCE OF THE JURY:)

12              THE COURT:  DURING THE SIDEBAR WE ADDRESSED AN ISSUE

13    THAT I WOULD LIKE TO HAVE RESOLVED BY MONDAY MORNING AT 9:00.

14            SO WITHOUT GETTING INTO THE SPECIFICS, I THINK THAT

15    COUNSEL AND THE PARTIES UNDERSTAND WHAT THE ISSUE IS.  I WOULD

16    LIKE ANY BRIEF OR ANYTHING YOU WOULD LIKE TO SUBMIT ON THE

17    SUBJECT AS EARLY AS YOU CAN IN ADVANCE OF 9:00 SO I CAN

18    ACTUALLY CONSUME IT.  BUT I WILL RETAIN A REQUEST IF IN FACT

19    THE ORDER HAS BEEN VIOLATED.

20              MR. BOIES:  THANK YOU, YOUR HONOR.

21            MAY I JUST ASK A COUPLE OF QUESTIONS OF THE WITNESS WHICH

22    I THINK WILL CONFIRM WHAT WAS GOING ON?

23              THE COURT:  I'M NOT SURE THAT'S APPROPRIATE IN THE

24    ABSENCE OF THE JURY.

25              MR. BOIES:  THIS DOESN'T HAVE TO DO WITH -- IT HAS
```

```
 1        ONLY TO DO WITH THE ISSUE THE COURT HAS RAISED.

 2               MR. J. FUISZ:  I OBJECT, YOUR HONOR.

 3               THE COURT:  COUNSEL?

 4               MS. ANDERSON:  I THINK QUITE FRANKLY IF WANTS TO TAKE

 5        UP ARGUMENT NOW AND DEAL WITH THE ISSUE WHETHER OR NOT HE WAS

 6        VIOLATING A COURT ORDER, THE MANNER IN WHICH THE QUESTIONING

 7        WAS DONE, HE WAS INVITING HIM TO GO BACK.

 8               SO IT'S VERY INAPPROPRIATE AT THIS TIME TO CONTINUE ON

 9        BADGERING THE WITNESS OVER AND OVER AGAIN ABOUT THE DATE AND

10        WHETHER HE HAS RECORDS AND WHETHER OR NOT HE PRODUCED ANYTHING.

11               HE'S DIGGING BACK TO A DATE PRIOR TO THIS COURT'S ORDER.

12        AND HE INVITED THE ERROR, IF THERE WAS ANY.

13               THE COURT:  MR. BOIES, WHY DON'T YOU TELL ME WHAT YOU

14        WOULD LIKE TO ASK THE WITNESS BEFORE YOU ELICIT THE

15        INFORMATION.

16               MR. BOIES:  SURE.

17               HE'S TALKING ABOUT THIS PALO ALTO TELEPHONE CALL, OKAY.

18               THAT PALO ALTO TELEPHONE CALL IS SUPPOSEDLY A TELEPHONE

19        CALL WITH A MONEY MANAGER, WHICH IT IS HIS POSITION THAT OUT OF

20        THAT SPRANG THE IDEA FOR THIS PATENT.  AND THAT'S WHAT HE

21        TESTIFIED TO AT HIS DEPOSITION AND THAT'S WHAT HE WAS REFERRING

22        TO WHEN HE KEPT SAYING IT'S IN THE DEPOSITION.

23               AND MY QUESTIONS WERE REALLY VERY CLEAR WHICH WAS THAT

24        PRIOR TO THE SEPTEMBER 23 DATE, THERE IS NO PHYSICAL EVIDENCE,

25        THERE IS NO WRITTEN DOCUMENTATION.
```

```
 1            I WASN'T INVITING HIM TO GO BACK IN TIME, I WAS SAYING AS

 2     OF THAT TIME, BEFORE THAT TIME, THERE IS NOTHING PHYSICAL.  AND

 3     THERE WAS NOTHING PHYSICAL.  EVEN IF THAT TELEPHONE CALL HAD

 4     EXISTED, THERE'S NO PHYSICAL REPRESENTATION OF IT.

 5            SO IT WAS NOT CALLED FOR BY A RESPONSIVE ANSWER TO MY

 6     QUESTION.  AND WHAT IT DID WAS IT SAID TO THE JURY THERE'S

 7     STUFF IN THE DEPOSITION THAT YOU'RE NOT HEARING THAT PROVES

 8     THAT I DID THINK ABOUT THIS AND I DID DO SOMETHING EARLIER.

 9            AND THAT'S THE CRUX OF THE ISSUE.

10            THE COURT:  I UNDERSTAND.

11       GO AHEAD, MS. ANDERSON.

12            MS. ANDERSON:  YOUR HONOR, THE E-MAIL ITSELF CONTAINS

13     LANGUAGE IN IT, CONFERS THAT THERE WERE CONVERSATIONS BETWEEN

14     JOE AND HIM.

15            AND WHETHER OR NOT HE TESTIFIED TO IT ON A DATE PRIOR TO

16     THAT DURING THE DEPOSITION OR NOT AS FAR AS SPECIFICITY OF

17     INFORMATION.

18            THE WITNESS CAN, YOU KNOW, HE'S NOT AN ATTORNEY, HE

19     DOESN'T KNOW THE DISTINCTIONS.  HE MIGHT HAVE BEEN REFERRING TO

20     STATEMENTS HE HAD MADE IN THE DEPOSITION ITSELF, BUT THE E-MAIL

21     ITSELF INFERS THAT CONVERSATIONS OCCURRED BEFORE THAT DATE.

22            SO --

23            THE COURT:  ALL RIGHT.  WELL, HERE'S THE CONCERN I

24     HAVE:

25            I ISSUED A VERY SPECIFIC ORDER THAT THE COURT WOULD NOT
```

1    PERMIT EVIDENCE RELATING TO CONCEPTION THAT PREDATED

2    SEPTEMBER '05.

3         SO IF THERE'S EVIDENCE IN A DEPOSITION OR IN A SHOE BOX

4    OR ANYWHERE ELSE THAT SUGGESTS THERE WAS AN EARLIER CONCEPTION

5    DATE, IT'S A VIOLATION OF MY ORDER.

6         SO WHY SHOULDN'T I HOLD AS SUCH RIGHT HERE AND NOW AND

7    PROVIDE AN INSTRUCTION FIRST THING MONDAY MORNING TO THE JURY

8    ACCORDINGLY?

9         MR. J. FUISZ:  YOUR HONOR, I SUBMIT IT WASN'T ON FOR

10   PURPOSES OF CONCEPTION.

11        THE COURT:  HOW COULD IT NOT RELATE TO CONCEPTION?

12   THAT'S THE WHOLE ISSUE IN THIS CASE, AND THAT'S WHAT THE ORDER

13   WAS ABOUT.

14        MR. J. FUISZ:  THERE'S CONCEPTION AS A MATTER OF

15   PRIORITY, OKAY.  AND MAYBE I MISUNDERSTOOD YOUR HONOR'S ORDER.

16        WHAT I UNDERSTOOD YOU TO BE DOING, AGAIN PERHAPS I

17   MISUNDERSTOOD, OF COURSE IT'S A MATTER OF PRIORITY DATE.  THAT

18   WAS, THAT WE CERTAINLY -- WE WERE CERTAINLY NEVER GOING TO GO

19   BEYOND THAT.

20        BUT IN TERMS OF TELLING THE ACTUAL STORY OF OUR WORK,

21   WALLING US OFF FROM THAT, I DIDN'T UNDERSTAND THAT TO BE

22   YOUR HONOR'S ORDER, MYSELF AT LEAST.

23        AND I THINK IT WAS EVEN STATED IN THERE.  I HAVE TO

24   REVIEW IT, IN FAIRNESS.

25        MS. ANDERSON:  AND IT'S THE PLAINTIFFS THAT HAVE

1      CALLED THEM.  THEY ARE THE ONES THAT ARE ASKING THE QUESTIONS,

2      THEY ARE THE ONES THAT KEEP DIGGING BEHIND THE DATE.

3            THIS IS NOT THE DEFENSE PUTTING UP THEIR CASE DIGGING

4      BEHIND THE DATE.  THERE'S TWO DIFFERENT THINGS GOING ON.

5                  THE WITNESS:  AM I ALLOWED TO SAY ANYTHING?

6                  MR. J. FUISZ:  YOU PROBABLY SHOULDN'T.

7                  THE COURT:  YOU PROBABLY SHOULDN'T SINCE YOU ARE ON

8      THE WITNESS STAND, DR. FUISZ.

9        I THINK YOUR COLLEAGUES ARE ADEQUATELY REPRESENTING YOUR

10     INTEREST IN THIS, SO LET ME HEAR FROM MR. BOIES.  I WOULD LIKE

11     TO GET THIS RESOLVED.

12                 MR. BOIES:  YOUR HONOR, I DID NOT ASK ANY QUESTIONS

13     THAT CALLED FOR A RESPONSE ABOUT WHAT HE DID OR WHAT HIS MENTAL

14     IMPRESSIONS WERE OR WHAT HE THOUGHT OR WHO HE TALKED ABOUT

15     PRIOR TO SEPTEMBER 23RD.

16          MY QUESTIONS WERE SIMPLY TO IDENTIFY VERY CLEARLY THAT

17     THE FIRST DOCUMENTATION, THE FIRST PHYSICAL EVIDENCE OF ANY

18     CONCEPTION ACTIVITY WITH RESPECT TO THE '612 PATENT, TOOK PLACE

19     ON SEPTEMBER 23, 2005.

20          AND THAT IS AN ANSWER THAT I SHOULD HAVE JUST GOTTEN A

21     SIMPLE ANSWER WITHOUT AN EXPLANATION AT ALL.

22          BUT THE EXPLANATION THAT HE GAVE WENT DIRECTLY CONTRARY

23     AND IT WAS INTENDED TO GO DIRECTLY CONTRARY BECAUSE WHAT IT WAS

24     INTENDED TO DO WAS TO SAY NO, I DIDN'T CONCEIVE IT ON

25     SEPTEMBER 23RD, I CONCEIVED IT EARLIER, AND I SAID IT IN THE

1    DEPOSITION.

2            THE COURT:  GO AHEAD.

3            MS. ANDERSON:  I DISAGREE WITH THAT INTERPRETATION.

4        AND I WILL SAY THIS, LET'S PRODUCE THE TRANSCRIPT.  WE

5    WILL GO THROUGH THE QUESTIONS AND ANSWERS AND THE SERIES OF

6    THEM THAT WERE POSED TO HIM OVER AND OVER AND OVER AGAIN.

7        AND IF YOU LOOK AT THE HISTORY OF THIS TRANSCRIPTION, HE

8    CLEARLY IS HAVING TROUBLE WITH MEMORY.  OKAY.

9        AND TO SAY THAT BECAUSE HE'S TRYING TO GIVE INFORMATION

10   TO HIM BECAUSE HE'S WANTING TO SATISFY THE QUESTIONER AND USING

11   IT IN VIOLATION OF A COURT ORDER IS A FAR STRETCH.

12           THE COURT:  ALL RIGHT.

13           MS. ANDERSON:  I THINK HE CAN BE INSTRUCTED

14   ACCORDINGLY TO BE CAUTIOUS ABOUT THAT IN THE FUTURE AND WE

15   WON'T HAVE ANYMORE PROBLEM.

16           THE COURT:  HERE'S WHAT WE WILL DO.

17       BEFORE 9:00 ON MONDAY IF YOU WISH TO SUBMIT TO ME A LETTER

18   OF FIVE PAGES OR LESS ON THIS SUBJECT, IN LIGHT OF THIS

19   TRANSCRIPT AND IN LIGHT OF THE DEPOSITION TRANSCRIPT, I WILL

20   TAKE WHATEVER YOU HAVE.

21       AT 9:00 I WILL MAKE A DECISION AND WE WILL PROCEED.  I WILL

22   ENTERTAIN BOTH A REQUEST FOR ANY CURATIVE INSTRUCTION OR ANY

23   OTHER REMEDY AS WELL AS RESPONSES TO WHY ANY SUCH REMEDY IS NOT

24   APPROPRIATE.

25           WITH THAT, ARE THERE ANY OTHER ISSUES?

1          MR. J. FUISZ:  NO, YOUR HONOR.

2          MR. BOIES:  THERE'S ONE MORE ISSUE, YOUR HONOR.

3       I WOULD ASK THE COURT TO INSTRUCT THE DEFENDANTS THAT

4    THEY SHOULD NOT COMMUNICATE WITH ELIZABETH HOLMES, THAT THEY

5    SHOULD NOT MOUTH WORDS TO HER, THEY SHOULD NOT MAKE FACES AT

6    HER, THEY SHOULD NOT DO ANYTHING THAT IS DESIGNED TO

7    COMMUNICATE WITH HER.

8       IT IS TRUE THEY ARE NOT LAWYERS, BUT THEY ARE ACTING PRO

9    SE IN THAT CAPACITY.  AND I THINK IT'S INAPPROPRIATE FOR THEM

10   TO DO THAT, JUST AS IT WOULD BE INAPPROPRIATE FOR A LAWYER TO

11   DO THAT.

12          THE COURT:  ALL RIGHT.  I WILL -- HOW ABOUT IF WE

13   SOLVE THAT PROBLEM THIS WAY:

14       IT STARTS TO FEEL LIKE KINDERGARTEN.  NOBODY LOOK AT EACH

15   OTHER WITH AN INAPPROPRIATE FACE, NOBODY POINT ANY FINGERS, NO

16   MOUTHING OF WORDS -- KEEP TO YOURSELVES.  KEEP YOUR HANDS TO

17   YOURSELVES, BEHAVE, AND WE WILL GET THROUGH THIS TRIAL

18   ACCORDINGLY.

19       ALL RIGHT.

20          MR. J. FUISZ:  THANK YOU, YOUR HONOR.

21          MR. BOIES:  THANK YOU, YOUR HONOR.

22          THE COURT:  HAVE A GOOD WEEKEND.

23       (WHEREUPON, THE PROCEEDINGS IN THIS MATTER WERE CONCLUDED.)

24

25

1

2

3

4        **<u>CERTIFICATE OF REPORTER</u>**

5

6

7

8            I, THE UNDERSIGNED OFFICIAL COURT

9    REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10   THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11   FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12   CERTIFY:

13            THAT THE FOREGOING TRANSCRIPT,

14   CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16   SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17   HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18   TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21

22

23

24   _____

25   SUMMER A. FISHER, CSR, CRR
     CERTIFICATE NUMBER 13185          DATED: 3/14/14